**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

| | | |
|---|---|---|
| SHUNDA WILKINS and DAVID WATSON on behalf of themselves and all others similarly situated, | ) ) ) | Case No. 3:20-cv-00116-DPM |
| | ) | Hon. D.P. Marshall Jr. |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SIMMONS BANK, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

E. B. Chiles IV (96179)
R. Ryan Younger (2008209)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700 Telephone
(501) 379-1701 Facsimile
ryounger@qgtlaw.com

Debra Bogo-Ernst (IL No. 6271962) (*pro hac vice*)
Joshua Yount (IL No. 6256900) (*pro hac vice*)
Lucy Holifield (AR No. 2016165; IL No. 6329822)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600 Telephone
(312) 701-7711 Facsimile
dernst@mayerbrown.com
jyount@mayerbrown.com
lholifield@mayerbrown.com

*Attorneys for Simmons Bank*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    Simmons Has A Contractual Right To Charge Per "Item" Paid And Return Item Fees ............................................................................................ 4

    B.    Nacha Rules And Industry Custom Treat Every ACH Payment Request As A Separate "Item" ........................................................................ 5

    C.    Simmons Customers Must Repay Negative Balances Within 30 Days .................. 8

    D.    Plaintiffs Are Chronic Overdrafters Who Owe Simmons Hundreds Of Dollars ............................................................................................................ 8

        1.    Plaintiff Wilkins never paid the sole fee she challenges, owes Simmons hundreds of dollars, and materially breached the very agreement she attempts to enforce before any alleged breach by Simmons ................................................................................. 8

        2.    Plaintiff Watson never paid most of the fees he challenges and owes Simmons hundreds of dollars ......................................... 10

    E.    Despite Their Debts To Simmons, Plaintiffs Have Brought This Lawsuit ..................................................................................................... 14

ARGUMENT .................................................................................................................... 15

I.    Simmons Is Entitled To Judgment On Plaintiffs' Breach-Of-Contract Claim. ................ 16

    A.    The Customer Agreement Authorized Simmons To Charge A Fee Each Time A Merchant Requested Payment Against Insufficient Funds. ................................................................................................... 16

        1.    In light of the Nacha Rules, the Customer Agreement is reasonably susceptible to only Simmons's interpretation. ....................... 17

        2.    Plaintiffs' contrary arguments miss the mark. ......................................... 20

        3.    Other courts have concluded that each ACH payment request sent to a bank is a separate item subject to fees. ..................................... 23

    B.    Plaintiffs' Theory That Simmons Violated The Implied Covenant Of Good Faith And Fair Dealing Fails With Plaintiffs' Breach-of-Contract Claims. ................................................................................................. 25

## TABLE OF CONTENTS
### (continued)

Page

C.  Simmons Also Is Entitled To Summary Judgment Against Wilkins For The Independently Dispositive Reason That Wilkins Breached Her Contract Before Any Alleged Breach by Simmons. ............................................... 26

II.   Simmons Is Entitled To Judgment On Plaintiffs' Unjust-Enrichment Claims. ............... 28

A.  The Customer Agreement Bars Plaintiffs' Unjust-Enrichment Claims. ............... 28

B.  Plaintiffs Also Cannot Establish Basic Elements Of Their Unjust-Enrichment Claims. ............................................................. 29

C.  As A Matter Of Law, The Clean-Hands Doctrine Bars Plaintiffs' Unjust-Enrichment Claims. ....................................................... 31

D.  The Statute Of Limitations Bars Watson's Unjust-Enrichment Claim. ................ 32

III.   Plaintiffs Lack Standing To Pursue Any Of The Relief They Seek. ................................ 33

A.  Plaintiffs Were Not Injured By Fees They Never Paid. ....................................... 33

B.  Neither Plaintiff Can Establish Redressability. ................................................... 35

1.  Plaintiffs are not entitled to actual or compensatory damages. ............... 35

2.  Plaintiffs cannot prove entitlement to restitution or disgorgement. ................................................................................ 37

3.  Plaintiffs cannot prove entitlement to pre-judgment interest. ................... 38

4.  Plaintiffs cannot prove entitlement to declaratory or injunctive relief. .......................................................................................... 38

5.  Plaintiffs are not entitled to attorneys' fees. ............................................. 40

CONCLUSION ........................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Com Corp. v. Banco do Brasil, S.A.*,
171 F.3d 739 (2d Cir. 1999)...................................................................................19

*Ark. Rsch. Med. Testing, LLC v. Osborne*,
2011 Ark. 158 (2011)............................................................................................25

*Ark. Valley Elec. Coop. Corp. v. Sw. Bell Tel. Co.*,
2017 WL 3314008 (W.D. Ark. Apr. 17, 2017)....................................................32

*Bedford v. Doe*,
880 F.3d 993 (8th Cir. 2018) ...............................................................................16

*Brookewood, Ltd. P'ship v. DeQueen Physical Therapy &*
*Occupational Therapy, Inc.*,
547 S.W.3d 461 (Ark. App. 2018).......................................................................35

*C.B. Ensign & Co. v. Coffelt*,
177 S.W. 735 (Ark. 1915).....................................................................................27

*Campbell v. Asbury Auto., Inc.*,
381 S.W.3d 21 (Ark. 2011)...................................................................................29

*Carson v. Pierce*,
719 F.2d 931 (8th Cir. 1983) ...............................................................................39

*Cherne Cont. Corp. v. Marathon Petroleum Co., LLC*,
578 F.3d 735 (8th Cir. 2009) ...............................................................................16

*Choy v. Space Coast Credit Union*,
2020 WL 3039243 (Fla. Cir. Ct. May 11, 2020) .................................................24

*Com. Credit Grp. Inc. v. Allianz Glob. Corp. & Specialty N. Am.*,
2018 WL 1575823 (E.D. Ark. Mar. 30, 2018) ....................................................26

*Crisler v. Unum Ins. Co. of Am.*,
233 S.W.3d 658 (Ark. 2006).................................................................................28

*Crowell v. Campbell Soup Co.*,
264 F.3d 756 (8th Cir. 2001) ...............................................................................25

*Day v. Case Credit Corp.*,
2007 WL 604636 (E.D. Ark. Feb. 22, 2007) .......................................................31

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Dog Walkin Divas LLC v. Wash. Fed., Inc.*,
   2021 WL 2309675 (W.D. Wash. May 28, 2021) .......................................................34, 39, 40

*Fairpark, LLC v. Healthcare Essentials*,
   381 S.W.3d 852 (Ark. Ct. App. 2011) ..................................................................................27

*Fenton v. Tri-County Bank & Trust Co.*,
   2020 WL 8673276 (Ind. Cir. Ct. Dec. 29, 2020) ..................................................................24

*Foltz v. Matanuska Valley Fed. Credit Union*,
   2021 WL 865542 (Alaska Super. Ct. Jan. 12, 2021) .......................................................23, 24

*Frost v. Sioux City*,
   920 F.3d 1158 (8th Cir. 2019) ...........................................................................33, 38, 39, 40

*Fuller v. Cmty. Nat'l Bank*,
   --- S.W.3d. ---, 2020 WL 1485696 (Tenn. Ct. App. Mar. 27, 2020) ....................................31

*Garner v. XTO Energy, Inc.*,
   2011 Ark. App. 606 (2011) ..................................................................................................19

*Generation 4 Recycling Grp., LLC v. Triumph Aerostructures,*
   *LLC - Vought Aircraft Div.*,
   2020 WL 5498038 (Tenn. Ct. App. Sept. 11, 2020) .............................................................28

*George's Inc. v. Lloyd's of London Syndicate 4000 Issuing Certificate*
   *No. CPP1877167*,
   2020 WL 6829959 (W.D. Ark. Nov. 20, 2020) .....................................................................25

*Gonzales v. Comcast Corp.*,
   2012 WL 10621 (E.D. Cal. Jan. 3, 2012) .............................................................................34

*Graham v. Catamaran Health Sols. LLC*,
   940 F.3d 401 (8th Cir. 2017) ...............................................................................................32

*Green v. Skyline Highland Holdings LLC*,
   2018 WL 3800240 (E.D. Ark. June 12, 2018) ......................................................................29

*Haines v. Wash. Trust Bank*,
   2020 WL 6861458 (Wash. Super. Ct. Nov. 17, 2020) ..........................................................24

*Harbin v. Emergency Coverage Corp.*,
   2017 WL 11606942 (E.D. Tenn. June 20, 2017) ..................................................................30

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hobson v. Entergy Ark., Inc.,*
   432 S.W.3d 117 (Ark. App. 2014).................................................................35, 37

*Hocker v. N.H. Ins. Co.,*
   922 F.2d 1476 (10th Cir. 1991) ..............................................................................31

*Hogue v. Kroger Co.,*
   373 S.W.2d 714 (Tenn. 1963)................................................................................31

*Indigo LR LLC v. Advanced Ins. Brokerage of Am. Inc.,*
   717 F.3d 630 (8th Cir. 2013) .................................................................................34

*Jerome Hardwood Lumber Co. v. Beaumont Lumber Co.,*
   247 S.W. 1059 (Ark. 1923)....................................................................................27

*Kilgore Lumber Co. v. Thomas & Hammonds,*
   128 S.W. 62 (Ark. 1910)........................................................................................37

*Lambert v. Navy Fed. Credit Union,*
   2019 WL 3843064 (E.D. Va. Aug. 14, 2019).................................................23, 25

*Lawyers Title Ins. Corp. v. United Am. Bank of Memphis,*
   21 F. Supp. 2d 785 (W.D. Tenn. 1998)..................................................................30

*Litchfield v. Bank of New York,*
   2000 WL 1449848 (D. Me. Sept. 21, 2000) ..........................................................29

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)................................................................................................33

*McNair v. Synapse Grp. Inc.,*
   672 F.3d 213 (3d Cir. 2012)..............................................................................38, 39

*Merchs. & Planters Bank & Tr. Co. of Arkadelphia v. Massey,*
   790 S.W.2d 889 (Ark. 1990).........................................................................31, 32, 37

*In re Milk Prod. Antitrust Litig.,*
   195 F.3d 430 (8th Cir. 1999) .................................................................................39

*Mobil Expl. & Producing N. Am., Inc. v. Graham Royalty Ltd.,*
   910 F.2d 504 (8th Cir. 1990) .................................................................................26

*Moore v. Mack's Sport Shop, LLLP,*
   2017 WL 4350980 (E.D. Ark. Sept. 29, 2017) ......................................................26

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Olivares v. Brentwood Indus.*,
  2015 WL 13658070 (W.D. Ark. Apr. 13, 2015)....................................................38

*Page v. Alliant Credit Union*,
  2020 WL 5076690 (N.D. Ill. Aug. 26, 2020) ........................................................24

*Park v. Forest Serv. of U.S.*,
  205 F.3d 1034 (8th Cir. 2000) ..............................................................................38

*Poff v. Brown*,
  288 S.W.3d 620 (Ark. 2008)............................................................................31, 37

*In re Pruett*,
  220 B.R. 625 (Bankr. E.D. Ark. 1997) ............................................................35, 37

*Ramthun v. Bryan Career College-Inc.*,
  93 F. Supp. 3d 1011 (W.D. Ark. 2015)..................................................................26

*Randall Ford, Inc. v. Randall*,
  2021 Ark. App. 360 (2021) ....................................................................................19

*Reynolds Health Care Servs., Inc. v. HMNH, Inc.*,
  217 S.W.3d 797 (Ark. 2005)..................................................................................38

*Robins v. Glob. Fitness Holdings, LLC*,
  838 F. Supp. 2d 631 (N.D. Ohio 2012)............................................................29, 34

*Sanders v. Bradley Cty. Hum. Servs. Pub. Facilities Bd.*,
  956 S.W.2d 187, 191 (Ark. 1997)..........................................................................29

*Saunders v. Y-12 Fed. Credit Union*,
  2020 WL 6499558 (Tenn. Ct. App. Nov. 5, 2020)................................................24

*Seaboard Coast Line R.R. Co. v. Long Island R.R. Co.*,
  447 F. Supp. 108 (E.D.N.Y. 1978), *aff'd*, 595 F.2d 96 (2d Cir. 1979)....................37

*Servewell Plumbing, LLC v. Summit Contractors, Inc.*,
  210 S.W.3d 101 (Ark. 2005)..................................................................................28

*Shipwash v. United Airlines, Inc.*,
  28 F. Supp. 3d 740 (E.D. Tenn. 2014)...................................................................28

*Singletary v. Singletary*,
  431 S.W.3d 234 (Ark. 2013)..................................................................................19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sparks Reg'l Med. Ctr. v. Blatt,*
    935 S.W.2d 304 (Ark. Ct. App. 1996) ....................................................................30

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) .................................................................................................33, 40

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ..............................................................................................33

*Whitley v. Irwin,*
    465 S.W.2d 906 (Ark. 1971) .....................................................................................30

*Winamaki v. Umpqua Bank,*
    2020 WL 6861466 (Or. Cir. Ct. Oct. 30, 2020) .......................................................24

*Withco, LLC v. Republic Servs. of Tenn., LLC,*
    818 F. Supp. 2d 1040 (M.D. Tenn. 2011) ................................................................30

*Wuliger v. Mfrs. Life Ins. Co.,*
    567 F.3d 787 (6th Cir. 2009) ....................................................................................32

*In re Wyo. Tight Sands Antitrust Cases,*
    1990 WL 155542 (D. Kan. Sept. 6, 1990) ................................................................35

*Zayed v. Associated Bank, N.A.,*
    913 F.3d 709 (8th Cir. 2019) ....................................................................................16

**Statutes**

Ark. Code § 4-4-104(9).................................................................................................18

Ark. Code § 16-56-105 .................................................................................................32

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................................15

Nacha Rules § 2.12.4 .....................................................................................................7

Nacha Rules § 3.1.1 ..................................................................................................7, 18

Nacha Rules § 8.36 ...................................................................................................5, 18

Restatement (Second) of Conflict of Laws § 221 (Am Law Inst. 1971) ......................28

Uniform Commercial Code § 4-104(9)......................................................................5, 18

## INTRODUCTION

Plaintiffs Shunda Wilkins and David Watson used Simmons's overdraft protection services on their checking accounts to run up hundreds of dollars in negative account balances that they still owe—in violation of the very contracts they now seek to enforce.  Nonetheless, Plaintiffs claim that they are entitled to compensatory, equitable, and injunctive relief because Simmons purportedly violated customer agreements by assessing overdraft or insufficient-funds fees when a merchant made a second attempt to collect payment for previously returned transactions and Plaintiffs still lacked sufficient funds to cover those transactions.

Plaintiffs fundamentally misconceive the way overdraft and insufficient-funds transactions work.  Plaintiffs base their claims on Simmons's fee schedule, which states that Simmons will charge (i) an "Overdraft"/"Paid Item Fee" ("per item") if it pays an item that overdraws a customer's account, or (ii) an "Insufficient Funds"/"Return Item Fee" ("per item") if it returns an item due to insufficient funds. Plaintiffs argue that the "per item" language reflects a promise by Simmons to charge only a single paid or return item fee for each customer transaction with a merchant—regardless of how many payment requests a merchant sends to Simmons for that transaction.  Plaintiffs theorize that all merchant collection attempts on any particular good or service (including alleged resubmissions) collectively constitute a single "item" that Simmons simply "reprocesses" multiple times.

But the undisputed facts, including testimony from Simmons's unrebutted industry expert, show that Plaintiffs' theory defies reality.  Under the industry-standard, National Automated Clearing House Association Operating Rules and Guidelines ("Nacha Rules") that the Simmons customer agreement expressly incorporates, *every* attempt by a merchant to collect payment from Simmons is a *new and unique* Automated Clearing House ("ACH") payment request "Entry," which the Rules specifically equate to an "item."  Indeed, every ACH Entry (including those that

1

Plaintiffs claim are "the same") is assigned a *unique* Trace Number.[1] And there is no feasible, automated way for Simmons to accurately identify all of the "retry" attempts to collect payment on previously returned transactions out of the millions of ACH payment Entries it receives daily, especially when merchants only rarely provide any indication that they are submitting a "retry." As a result, Simmons must (and did) process every ACH payment Entry as a separate "item" on which Simmons is entitled to charge a fee when it pays or returns the ACH Entry on an insufficient account balance. Because Plaintiffs' reading of the contract is untenable, Simmons is entitled to judgment on Plaintiffs' breach-of-contract claims, including Plaintiffs' duplicative good-faith-and-fair-dealing theory, as a matter of law.

Wilkins also cannot maintain a breach-of-contract claim against Simmons for the independently dispositive reason that her months-long failure to bring her account balance into positive territory put her in material breach of her customer agreement long before Simmons assessed the *only* fee she challenges. In other words, Wilkins breached first. As a matter of law, a party who is already in breach cannot bring a breach-of-contract claim.

Plaintiffs' unjust-enrichment claims are similarly riddled with fatal defects. To start, neither Plaintiff has offered any evidence disputing that a valid contract governs the assessment of the challenged fees; to the contrary, they maintain that their customer agreements control the parties' dispute. That alone precludes any unjust-enrichment claim. So, too, does the fact that Plaintiffs did not confer any benefit on Simmons but instead owe Simmons hundreds of dollars

---

[1]    "Trace numbers are 15-digit strings in which the first eight digits represent the routing number of the ODFI [*i.e.*, the merchant's bank] and the remaining seven digits are a sequential number assigned by the ODFI to help it identify the transaction within its system by assigning a unique identification to the transaction." Bogo Ex. 1 at 13 n.13 (Nesbitt Rep.). Citations to "Bogo Ex. __" refer to the Exhibits to the Declaration of Debra Bogo-Ernst filed herewith, and citations to "Hunter Decl." refer to the Declaration of Lisa Hunter also filed herewith.

each.  In addition, Arkansas's three-year statute of limitations bars Plaintiff Watson's unjust-enrichment claim.  Watson incurred the last of the fees he challenges on February 9, 2016—more than four years before the filing of the original complaint in this suit (on April 14, 2020).

Finally, the undisputed evidence shows that Plaintiffs lack Article III standing to pursue their claims.  With respect to fees they never *paid*, neither Plaintiff suffered a cognizable injury-in-fact.  That entirely disposes of Wilkins's claims, because she never paid the single fee she challenges in this case.  As for Watson, he did not pay at least three of the five fees he challenges and, therefore, cannot maintain claims based on those fees.

Plaintiffs also cannot satisfy Article III's redressability requirement, because the Court cannot award any of the relief sought in this litigation.  Plaintiffs are not entitled to compensatory damages because they each owe Simmons more than ten times the amount of fees they could conceivably recover, which allows Simmons to set off, or recoup, the entire amount of claimed damages.  For similar reasons, the "clean-hands" doctrine bars Plaintiffs' unjust-enrichment claims, and, in any event, the Court could not award restitution or disgorgement of fees that Plaintiffs never paid.  Plaintiffs likewise cannot obtain injunctive or declaratory relief, because they ceased being Simmons customers well before this litigation commenced, and they can show no "immediate" risk that they will be subject to Simmons's fees in the future.

In sum, this case should come to an end for numerous, independent reasons.  Simmons is entitled to judgment as a matter of law on all of Plaintiffs' claims, or, alternatively, those claims should be dismissed for lack of standing.

## BACKGROUND

As the Court has previously ruled, "several documents comprise the contract" between Simmons and Plaintiffs, including: (a) "the deposit agreement," also known as Simmons's Terms and Conditions ("Terms") (Bogo Ex. 5 at 39; *id.* Ex. 6 at 24); (b) "the overdraft privilege account

disclosure" ("ODP Disclosure") (*id.* Ex. 5 at 60; *id.* Ex. 6 at 46); (c) "the schedule of fees and charges" ("Fee Schedule") (*id.* Ex. 5 at 48; *id.* Ex. 6 at 43); and (d) "the incorporated ACH rules" (referring to the Nacha Rules).   Doc. 41 at 3 (MTD Order).[2]   Read together, those contract documents—the "Customer Agreement"—indisputably authorize the fees challenged by Plaintiffs.

### A.   Simmons Has A Contractual Right To Charge Per "Item" Paid And Return Item Fees.

Like many other financial institutions, Simmons offers its customers overdraft protection services ("Overdraft Privilege").   The Fee Schedule explains that a customer "overdraw[s] [their] account" "[w]hen [they] write a check, withdraw money in person or from an ATM, use [their] debit card to make a purchase, or make an automatic bill payment or other electronic payment for more than the amount in [their] account."   Bogo Ex. 5 at 49; *id.* Ex. 6 at 44.   For transactions subject to the Overdraft Privilege, Simmons can pay the overdraft, "up to a pre-approved $500 negative funds balance"—thus saving the customer "time, embarrassment, and the additional fees charged by many other companies."   *Id.* Ex. 5 at 60; *id.* Ex. 6 at 46.   Moreover, Simmons can charge a fee for every received payment "item" that overdraws the customer's account. Specifically, Simmons's Fee Schedule provides:

> Simmons Bank has the choice to either pay the item or not.  If we pay even though you do not have the money in your account; you may be charged a Paid Item Fee (Overdraft Fee).  If we return your item without paying it, you may be charged a Return Item/Insufficient Funds (NSF) Fee.

*Id.* Ex. 5 at 49; *id.* Ex. 6 at 44.   Under Simmons's Fee Schedule, both the Paid Item/Overdraft Fee "(per item)" and the Return Item/Insufficient Funds Fee "(per item)" were $30 from 2014 through July 2016, at which time they increased to $35.   *Id.* Ex. 5 at 49; *id.* Ex. 6 at 44.

---

[2]   Simmons's Terms provide: "This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us."   Bogo Ex. 5 at 39.

**B.      Nacha Rules And Industry Custom Treat Every ACH Payment Request As A Separate "Item."**

As this Court has held, Wilkins and Watson "agreed 'to be bound by automated clearing house association rules.'"  Doc. 41 at 1 (MTD Order) (quoting Doc. 22-2 at 4); Bogo Ex. 5 at WILKINS-0000553; *id.* Ex. 6 at WILKINS-0001099.  Those Nacha Rules establish the context for understanding what constitutes an "item" under the Simmons Customer Agreement, and specifically state that "each debit Entry shall be deemed an 'item' within the meaning of the … Uniform Commercial Code," which in turn defines an "item" as an "order to pay money handled by a bank for collection or payment."  Bogo Ex. 29 at OR63 (Nacha Rules § 8.36); UCC 4-104(9); *see also* Bogo Ex. 1 ¶ 17 n.3 (Nesbitt Rep.); Doc. 28 at 15 (MTD Resp) (admitting that "Plaintiffs' ACH payment took place over Automated Clearing House (ACH) system which, as Simmons correctly points out, is governed by the Nacha Rules").[3]  And Simmons's industry expert, Gary Nesbitt, has explained in an uncontroverted report ("Nesbitt Rep.") that the Nacha Rules and corresponding industry practices view "each individual ACH transaction" as "a unique item, including resubmissions."  Bogo Ex. 1 ¶ 12 (Nesbitt Rep.).[4]

The Nacha Rules contemplate the following distinct steps in any ACH transaction:

- The ACH process starts when a "**Receiver**" (here, each of the Plaintiffs) authorizes an "**Originator**" (here, a merchant) to charge their bank account for goods or services the merchant provided;

---

[3]   Bogo Ex. 29 provides excerpts from the 2015 Nacha Rules, where the relevant provision is found at § 8.36, while Nesbitt's expert report (Bogo Ex. 1) references the 2019 Nacha Rules, where the relevant (and materially identical) provision is found at § 8.37.

[4]   Gary Nesbitt has worked in the electronic payments industry for more than 30 years.  Bogo Ex. 1 ¶¶ 1–2 (Nesbitt Rep.).  He has worked for banks, with responsibility for their ACH operations, and for regional ACH associations.  *Id.* ¶ 3.  He also has served on Nacha committees, boards, and task forces.  *Id.* ¶ 4.  Plaintiffs did not submit any expert report to rebut Mr. Nesbitt's testimony.

- the Originator (*i.e.*, the merchant) then submits a payment request—termed an "Entry" under the Nacha Rules—to an "**Originating Depository Financial Institution**" ("ODFI") (*i.e.*, the merchant's bank);

- The merchant's bank, in turn, submits the payment Entry to an "**ACH Operator**" (*i.e.*, a central clearing house operated here by the Federal Reserve System);

- The ACH Operator sorts all ACH entries and delivers them to the appropriate "**Receiving Depository Financial Institution**" ("RDFI") (here, Simmons), which is obligated under the Nacha Rules to process the ACH Entry by either paying it or "returning" it unpaid to the Originator (the merchant) if the Receiver (the Plaintiff) lacks sufficient funds in their account, and the RDFI (Simmons) chooses not to advance those funds on the Receiver's behalf.



*Id.* Ex. 1 ¶¶ 20–22 (Nesbitt Rep.).

Simmons, as an RDFI, might "return [an ACH] item without paying it" when the requested payment would cause the customer's account balance to exceed the $500 Overdraft Privilege or if the customer's Overdraft Privilege has been suspended.  *Id.* Ex. 5 at 61; *id.* Ex. 6 at 46 (ODP Disclosure); Hunter Decl. ¶¶ 8, 14, 20.  When Simmons does return an item, *the merchant* can— at its sole discretion—try up to two additional times within a 180-day period to collect payment

for the underlying transaction by "resubmitting" it to Simmons (in hopes that the customer has made a deposit in the interim that will cover the charge).  Bogo Ex. 1 ¶¶ 9, 40 & n.22 (Nesbitt Rep.); Ex. 29 at OR30 (Nacha Rules § 2.12.4).  Every time the merchant submits a customer-authorized transaction to Simmons for payment, the ACH system assigns it a new, unique Trace Number, and Simmons is required to "accept" and process the new ACH item in the same manner as when the merchant first attempted to collect payment.  Bogo Ex. 1 ¶¶ 30–31, 33–35, 37 & n.21 (Nesbitt Rep.); *id.* Ex. 2 ¶ 8 (Kwon Rep.) ("In general, no two transactions are ever given a discrete code or identification showing they are the 'same'"); *id.* Ex. 29 at OR39 (Nacha Rules § 3.1.1); *see, e.g.*, Hunter Decl. ¶¶ 8, 14, 16, 20, 24, 27, Exs. A–B (column 8) (Trace Numbers).

In most cases, there is no indication from Simmons's perspective that the new ACH Entry relates to a prior item that Simmons processed and returned, and no law obligates Simmons to attempt to identify potentially related items.  Bogo Ex. 1 ¶ 52 (Nesbitt Rep.).  Indeed, with millions of transactions occurring on an annual basis, trying to do so would not be possible.  *Id.* Ex. 1 ¶ 14.  Moreover, such an exercise would be inconsistent with the "automated" nature of the *Automated* Clearing House system.  *Id.* Ex. 1 ¶ 38.  And while a Nacha Rule introduced in September 2015 requires the originator (the merchant) to include a "RETRY PYMT" note in a free-form Company Entry Description field when the merchant resubmits certain kinds of transactions for payment, that rule was designed to provide information from merchants to customers (not to the receiving banks), is often disregarded by merchants, and does not apply to recurring charges (a major source of resubmitted transactions, *e.g.*, mortgage, car, and insurance payments).  *Id.* Ex. 1 ¶¶ 48–50.  To illustrate how unreliable a "RETRY PYMT" notation is, only *one* of the six fees challenged in this case (Watson's February 1, 2016 fee) arose from an ACH Entry with a "RETRY PYMT" notation.  *Id.* Ex. 1 ¶ 51; *id.* Ex. 2 ¶¶ 23, 50 (Kwon Rep.); Hunter Decl. ¶¶ 8, 14, 16, 20, 24, 27, Exs. A–B.

7

### C.      Simmons Customers Must Repay Negative Balances Within 30 Days.

Like all financial institutions, Simmons requires customers to periodically repay the overdraft amounts it covers on their behalves (together with associated fees).  In particular, each accountholder agrees to be "jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts" and agrees that such "liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available."  Bogo Ex. 5 at 39; *id.* Ex. 6 at 24 (Terms).  While the Overdraft Privilege allows customers to take on a negative account balance temporarily, customers must "bring [their] account to a positive balance at least once every thirty (30) days" to maintain their Overdraft Privilege.  *Id.* Ex. 5 at 60; *id.* Ex. 6 at 46  (ODP Disclosure).  A customer's failure to do so thus violates the Customer Agreement.

### D.      Plaintiffs Are Chronic Overdrafters Who Owe Simmons Hundreds Of Dollars.

Plaintiffs contend that Simmons should not have assessed them a fee when a merchant resubmitted a transaction that Simmons had previously returned for insufficient funds and the Plaintiffs still lacked the funds to pay the transaction.  In total, Plaintiffs challenge six fees (one for Wilkins and five for Watson) that we describe below and summarize in a one-page table in Appendix A.  The undisputed evidence shows that Plaintiffs never paid at least four of the fees they challenge and ran up large negative account balances that they have likewise never repaid.

#### 1.      Plaintiff Wilkins never paid the sole fee she challenges, owes Simmons hundreds of dollars, and materially breached the very agreement she attempts to enforce before any alleged breach by Simmons.

Plaintiff Wilkins challenges only one fee—a $35 return item fee that Simmons assessed on December 19, 2017 on a $72.93 ACH Entry submitted by Liberty National.  Bogo Ex. 20 (Wilkins 2d Supp. Rog Response).  At the time, Wilkins was in breach of the Customer Agreement, her Overdraft Privilege had been suspended, and Simmons was preparing to end its relationship with her.  Hunter Decl. ¶¶ 6, 8; Bogo Ex. 9 at WILKINS-0001245–1248.  Simmons accordingly

returned the December 19 item unpaid and assessed a return item fee.  Hunter ¶ 8, Ex. A; Bogo Ex. 9 at WILKINS-0001245–1248; *id.* Ex. 10 at WILKINS-0001306–1310; *id.* Ex. 11 at WILKINS-0001302–1305.  Wilkins argues that the December 19 fee violated the Customer Agreement because Simmons previously assessed a return item fee when it returned a prior Liberty National ACH Entry for $72.93 on December 7, 2017.  Bogo Ex. 20; Hunter ¶ 8, Ex. A.  The ACH Entry associated with the December 19 fee did not contain a "RETRY PYMT" notation.  Bogo Ex. 1 ¶ 66 (Nesbitt Rep.); Hunter Decl. ¶ 8 & Ex. A.

For most of the approximately one year in which Wilkins had a checking account with Simmons (from December 2, 2016 to December 22, 2017), her account was chronically overdrawn.  Bogo Ex. 7 (Wilkins Sig. Card); Hunter Decl. ¶ 4.  Between June 6 and October 10, 2017, Simmons sent at least five letters to Wilkins regarding her negative account balances, in which Simmons warned that, if she failed "to bring [her] checking account to a positive balance at least once every thirty days," her "Overdraft Privilege [would] be suspended."  Bogo Ex. 11 at WILKINS-0001297–1302.

After intermittently bringing her account to a positive balance for short periods of time, Wilkins overdrew her account yet again on October 23, 2017 and never had a positive balance thereafter.  *Id.* Ex. 9 at WILKINS-0001245–1250; Hunter Decl. ¶ 5.  Wilkins's last deposit occurred on October 13, 2017.  Hunter Decl. ¶ 10; Bogo Ex. 9 at WILKINS-0001251.

By November 22, 2017, Wilkins's account had been overdrawn for 30 days.  *Id.* Ex. 9 at WILKINS-0001245–1248; *id.* Ex. 11 at WILKINS-0001303.  Based on Wilkins's violation of the Customer Agreement, Simmons suspended Wilkins's Overdraft Privilege and advised Wilkins that, "[a]s long as your account remains overdrawn, we will return, unpaid, any checks or other items presented to us for payment."  *Id.* Ex. 11 at WILKINS-0001303.  Yet Wilkins never made

9

any deposits and continued to attempt payments from her account, which Simmons returned unpaid, charging return item fees each time, including the challenged December 19 fee. *Id.* Ex. 9 at WILKINS-0001245; *id.* Ex. 10 at WILKINS-0001306–1308.  On December 22, 2017, Simmons notified Wilkins that it would be closing her account as a result of her ongoing failure to bring her account balance positive.  *Id.* Ex. 11 at WILKINS-0001305.

As Wilkins herself admits, she never paid the challenged December 19 fee (which occurred almost a month after her Overdraft Privilege had been suspended) or any other part of her negative balance.  Hunter Decl. ¶¶ 6–10; Bogo Ex. 3 at 61:15-20 (S. Wilkins Dep.) ("Q: Have you ever repaid Simmons the amount that you owe it as a result . . . of your checking account being closed with a negative balance?  A: No."); *id.* Ex. 9 at WILKINS-0001245.  Ultimately, Simmons charged off Wilkins's negative $545.21 account balance.  Hunter Decl. ¶ 9; Bogo Ex. 8 (Deposit Inquiry).

>        **2.      Plaintiff Watson never paid most of the fees he challenges and owes
>                  Simmons hundreds of dollars.**

Plaintiff Watson's account history tells a similar yet entirely unique story.  Watson opened a joint Simmons checking account with his wife, Marilyn Watson, on April 21, 2015.  Bogo Ex. 12 (Watson Sig. Card).  The Watsons' account was chronically overdrawn, which ultimately led Simmons to close their account for failure to repay their long-standing negative balance.  *Id.* Ex. 15 at WILKINS-0003810; Hunter Decl. ¶¶ 12, 29.  Watson challenges five $30 fees charged on allegedly resubmitted transactions on June 11, 2015; August 17, 2015; January 11, 2016; February 1, 2016; and February 9, 2016.  Bogo Ex. 21 (Watson 2d Supp. Rog Response).

**June 11, 2015 PayPal Fee.**  The Watsons incurred the first challenged fee on June 11, 2015 on a PayPal ACH Entry that Simmons paid into overdraft.  *Id.* Ex. 13 at WILKINS-0001797, Ex. 14 at WILKINS-0003833; Hunter Decl. ¶ 14, Ex. B.  A week earlier, on June 4, 2015, Simmons had returned a prior PayPal ACH Entry (with a different date and Trace Number) seeking the same

dollar amount and assessed a return item fee, because the Watsons' account had a negative balance of more than $500.  Bogo Ex. 14 at WILKINS-0003834; Hunter Decl. ¶ 14, Ex. B.

**First Overdraft Repayment Plan.**  On June 22, 2015, Simmons offered the Watsons an opportunity to bring their account back into good standing by executing an "Overdraft Repayment Plan"—essentially an interest-free loan from Simmons.  Bogo Ex. 16.  Pursuant to the repayment plan, Simmons deposited $625.65 into the Watsons' account (bringing their balance to zero) and gave the Watsons nearly one year to repay that loan, *interest-free*, in monthly installments.  *Id.*; *id.* Ex. 13 at WILKINS-0001789; *id.* Ex. 28 at DWatson_0014, 0045; Hunter Decl. ¶ 15.

But that loan did not stop the Watsons from continuing to overdraw their account.

**August 17, 2015 PayPal Fee.**  Indeed, the Watsons incurred the second challenged fee, which arose from another PayPal ACH Entry, less than two months later.  Bogo Ex. 21 (Watson 2d Supp. Rog Response).  Simmons paid the Entry on August 17, 2015 and assessed a $30 paid item fee, because the Watsons had a negative account balance.  *Id.* Ex. 13 at WILKINS-0001788; *id.* Ex. 14 at WILKINS-0003830; Hunter Decl. ¶ 16, Ex. B.  Simmons had previously returned a prior PayPal ACH Entry (with a different date and Trace Number) for the same amount and assessed a return item fee on August 10, 2015.  Bogo Ex. 14 at WILKINS-0003831; Hunter Decl. ¶ 16, Ex. B.  Significantly, on August 20, 2015, Simmons reversed the challenged August 17 fee in connection with crediting the Watsons' account for a purportedly unauthorized PayPal charge. *See* Hunter Decl. ¶ 17; Bogo Ex. 13 at WILKINS-001782; *id.* Ex. 28 at DWatson_0054; *id.* Ex. 4 at 172:1-4 (D. Watson Dep.).  Thus, Watson never paid this fee.

**January 11, 2016 Verizon Fee.**  Throughout the remainder of 2015, the Watsons continued to overdraw their account.  Bogo Ex. 13 at WILKINS-001763–1781.  Indeed, they defaulted on their Overdraft Repayment Plan in November 2015 and had to repay the loan balance

in full to maintain their account.  *Id.* Ex. 13 at WILKINS-0001773–1778.  Less than a month later, however, Marilyn Watson withdrew $500 at an ATM—causing the Watsons' account balance to go negative yet again (*id.* Ex. 13 at WILKINS-0001770–1772)—and then sent Simmons an email stating that she wanted another overdraft repayment plan loan.  *Id.* Ex. 19 at WILKINS-0002401; Hunter Decl. ¶¶ 18–19.

Meanwhile, on January 11, 2016, Simmons assessed the third challenged fee on a Verizon ACH Entry (*see* Hunter Decl. ¶ 20), which Simmons returned unpaid because the Watsons by that time had a more-than-$500 negative account balance.  Bogo Ex. 14 at WILKINS-0003819, *id.* Ex. 23 at WILKINS-VERIZON-0000028.  Simmons had previously returned another Verizon ACH Entry (with a different date and Trace Number) for the same amount and assessed a return item fee on January 5, 2016.  Hunter Decl. ¶ 20, Ex. B; Bogo Ex. 14 at WILKINS-0003821.  The Watsons never paid the challenged January 11 fee.  *See* Hunter Decl. ¶ 22.

**Second Overdraft Repayment Plan.**  On January 14, 2016, the Watsons entered into a second Overdraft Repayment Plan, under which Simmons loaned the Watsons the $675.59 they needed to bring their account balance back to zero; again, this loan was interest-free, to be repaid in eleven monthly installments.  Bogo Ex. 17 at WILKINS-0001761; *id.* Ex. 13 at WILKINS-0001770; *id.* Ex. 28 at DWatson_0007, 0059; Hunter Decl. ¶ 21.  *The Watsons never made any payments on the second Overdraft Repayment Plan* (which included the third challenged fee).  Hunter Decl. ¶¶ 22; Bogo Ex. 13 at WILKINS-0001763–70.

**February 1, 2016 Progressive Fee.**  Instead, the Watsons almost immediately overdrew their account.  Hunter Decl. ¶ 23.  The Watsons' fourth challenged fee followed on February 1, 2016, when Simmons received a $108.10 ACH Entry from Progressive Insurance while the Watsons had a negative account balance (on top of the $675.59 they owed Simmons on the

repayment plan).  Hunter Decl. ¶ 24, Ex. B; Bogo Ex. 13 at WILKINS-0001767.  Simmons returned the item unpaid and assessed a $30 return item fee.  Hunter Decl. ¶ 24, Ex. B; Bogo Ex. 14 at WILKINS-0003815.  Simmons had previously returned a Progressive ACH Entry (with a different date and Trace Number) for the same amount and assessed a return item fee on January 26, 2016.  Hunter Decl. ¶ 24, Ex. B; Bogo Ex. 14 at WILKINS-0003817.

On February 5, 2016, the Watsons made a $60 deposit to bring their account to negative $30.  Hunter Decl. ¶ 26; Bogo Ex. 13 at WILKINS-0001767.  This was the last deposit ever made to the Watsons' account.  Hunter Decl. ¶ 26; Bogo Ex. 13 at WILKINS-0001763–1767.

**The February 9, 2016 Verizon Fee.**  Simmons assessed the fifth and final challenged fee on February 9, 2016, when it returned an ACH Entry for a $1,371.44 purchase from Verizon, because the Watsons still had a negative balance.  Bogo Ex. 13 at WILKINS-0001767; *id.* Ex. 14 at WILKINS-0003811; Hunter Decl. ¶ 27, Ex. B.  Simmons had previously returned a Verizon ACH Entry (with a different date and Trace Number) for the same amount and assessed a return item fee on February 2, 2016.  Hunter Decl. ¶ 27, Ex. B; Bogo Ex. 13 at WILKINS-0001767; *id.* Ex. 14 at WILKINS-0003813.  Because the Watsons never made any deposits after February 5, they never paid the challenged February 9 fee.  Hunter Decl. ¶¶ 26, 28.

The *only* ACH Entry in this entire list that bore the "RETRY PYMT" notation in the Company Entry Description Field was the Progressive ACH Entry associated with the challenged February 1 fee.  Hunter Decl. ¶ 24, Ex. B; Bogo Ex. 1 ¶ 83 (Nesbitt Rep.); *id.* Ex. 2 ¶¶ 23, 50 (Kwon Rep.).  Even though all of the remaining Entries at issue allegedly involved a merchant's second attempt to obtain payment on a transaction, none of those included the "RETRY PYMT" notation.  Hunter Decl. ¶¶ 8, 14, 16, 20, 27, Exs. A-B; Bogo Ex. 1 ¶ 51(Nesbitt Rep.); *id.* Ex. 2 ¶¶ 23, 50 (Kwon Rep.).

The Watsons ceased using their account in February 2016, and Simmons charged off the Watsons' then-negative balance of $735.59 (which included the unpaid loan for the second Overdraft Repayment Plan) on February 24, 2016.   Hunter Decl. ¶ 29; Bogo Ex. 28 at DWatson_0001.  Simmons formally closed the account in January 2020.  Hunter Decl. ¶ 29; Bogo Ex. 13 at WILKINS-0001763; *id.* Ex. 15 at WILKINS-0003810; *id.* Ex. 28 at DWatson_0001. The negative $735.59 balance that Simmons charged off is more than 10 times the two $30 fees the Watsons arguably paid and encompasses at least the third and fifth challenged fees.  Hunter Decl. ¶ 28; Bogo Ex. 13 at WILKINS-0001763–1770.  The Watsons never paid those fees or any other portion of their negative closing balance.   Hunter Decl. ¶¶ 28–29; Bogo Ex. 28 at DWatson_0001.

### E.    Despite Their Debts To Simmons, Plaintiffs Have Brought This Lawsuit.

Plaintiff Wilkins, represented by a half-dozen class-action lawyers in the business of bringing bank-fee litigation, filed a class action complaint against Simmons on April 14, 2020. Doc. 1 (Compl.).  After learning of some of the defects plaguing Wilkins's claims, her counsel filed an Amended Class Action Complaint on June 29, 2020 on behalf of three Plaintiffs—Wilkins, Watson, and Diann Graham.  Doc. 15.  The Amended Complaint asserts claims for breach of contract and unjust enrichment based on Simmons's alleged assessment of paid or return item fees on more than one ACH Entry supposedly related to a single underlying transaction.

In moving to dismiss the Amended Complaint, Simmons argued that Plaintiffs had not stated viable claims because (1) the theory behind their claims is contrary to "clear ACH Network rules," (2) Plaintiffs could not allege compliance with the terms of the contracts they want to enforce, and (3) Plaintiffs owe Simmons far more than the fees Plaintiffs challenge.  Doc. 23 at 2 (MTD Br.).

In its order on Simmons's motion to dismiss ("MTD Order"), the Court declined to dismiss Plaintiffs' breach-of-contract claims because it saw contractual ambiguity that could not be resolved at the motion-to-dismiss stage, without the record development that has now occurred. Doc. 41 at 3.  The Court also could not determine "who committed the first material breach."  *Id.* at 4.  Finally, the Court decided it was "too early to tell whether the contract addresses every issue in this case," preventing dismissal of Plaintiffs' unjust-enrichment claims.  *Id.* at 5.

Simmons answered the Amended Complaint and filed a counterclaim against Wilkins for the $545.21 negative balance due on her account, plus interest, attorneys' fees, and costs.  Doc. 42 (Def.'s Ans.).  Despite repeated notice from Simmons regarding Wilkins's obligation to respond to the counterclaims, Wilkins failed to answer the counterclaims for more than six months.  Doc. 46 at 2 (Mot. for Default).  Ultimately, Simmons moved for default judgment, which the Court granted with respect to the $510.21 "uncontested balance due" on Wilkins's account.  Doc. 62 at 2 (Default Order).  The Court reasoned that "Wilkins has always disputed one $35 fee" charged on December 19, 2017, so it reserved judgment as to that fee.  *Id.*  The Court also awarded Simmons $3,000 in attorneys' fees and $117.88 in (still accruing) prejudgment interest related to the counterclaim damages.  Doc. 73 (Fee Order).  Meanwhile, Plaintiff Graham voluntarily dismissed her claims against Simmons, after abruptly leaving her deposition after only two-and-a-half hours and refusing to return.  Doc. 71 (Dismissal Stip.).

Now that discovery has concluded, there is no dispute that Plaintiffs' claims fail for numerous reasons.

## ARGUMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). And there is only a genuine dispute of material fact on an issue if "a factfinder could reasonably

determine the issue in the non-moving party's favor . . . based on 'sufficient probative evidence' and not on 'mere speculation, conjecture, or fantasy.'" *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019) (citations omitted).  Accordingly, despite the existence of "disputed terms in oral or implied contracts, or ambiguities in written contracts . . . summary judgment remains appropriate" when "no reasonable jury could find the facts necessary to entitle a plaintiff to relief." *Cherne Cont. Corp. v. Marathon Petroleum Co., LLC*, 578 F.3d 735, 740 (8th Cir. 2009) (citation omitted).

As the party moving for summary judgment, Simmons bears the "far from stringent" burden of  (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Bedford v. Doe*, 880 F.3d 993, 996–97 (8th Cir. 2018) (citations omitted).  Then the burden shifts to Plaintiffs to submit "'evidentiary materials' of specific facts showing the presence of a genuine issue for trial," which "do more than raise some metaphysical doubt about the material facts" and constitute "enough evidence that a jury could reasonably find in his favor." *Id*.

Under these standards, summary judgment for Simmons on all of Plaintiffs' claims is thoroughly warranted.

## I.    Simmons Is Entitled To Judgment On Plaintiffs' Breach-Of-Contract Claim.

### A.    The Customer Agreement Authorized Simmons To Charge A Fee Each Time A Merchant Requested Payment Against Insufficient Funds.

Plaintiffs' breach-of-contract claim fails as a matter of law because the Customer Agreement permitted Simmons to assess a paid or return item fee each time Simmons received and processed an ACH Entry against insufficient funds.  At the dismissal stage, the Court found that the "contract is susceptible at the case's threshold to the equally reasonable interpretations

urged."  Doc. 41 at 4 (MTD Order).  Discovery is now closed, however, and the undisputed evidence shows that each ACH Entry submitted to Simmons was a separate "item" and, hence, subject to a fee if the customer's account balance was insufficient.

      **1.**      **In light of the Nacha Rules, the Customer Agreement is reasonably susceptible to only Simmons's interpretation.**

The operative contract language allows Simmons to charge paid or return item fees on a "per item" basis when a payment or withdrawal "item" exceeds the amount of money in a customer's account.  Bogo Ex. 5 at 49; *id.* Ex. 6 at 44.  The question raised by this lawsuit is whether, as Plaintiffs contend, all attempts by a merchant to collect payment on an underlying customer-merchant transaction—including a second (or third) ACH Entry received by Simmons— collectively comprise a single "item."  The Nacha Rules incorporated into the Customer Agreement, together with broader industry usages and understandings, answer that question with a resounding "no."  That context makes clear that references to "item" in the Simmons Customer Agreement instead refer to *each* separate ACH Entry that Simmons receives, even when the Entry is an alleged "resubmission."

In the ACH framework established and maintained under the Nacha Rules, every time a merchant submits a transaction with a Simmons customer to the ACH system for payment, Simmons receives a new, and unique, ACH Entry, which it must independently process.  When Simmons returns an ACH Entry for insufficient funds, the Entry is not held over by Simmons for further instructions (like "try again").  Bogo Ex. 1 ¶ 30 (Nesbitt Rep.).  Rather, it is returned by Simmons, and its processing is at an end.  If the merchant (or the merchant's bank) decides to resubmit the transaction, it does so by creating a new ACH item—*with a new date and a new, unique Trace Number*—that is sent to Simmons to process anew, just like any other ACH Entry. *Id.*

The Nacha Rules provide that each ACH Entry "is deemed to be received by an RFDI [here, Simmons] on the Banking Day on which the Entry is made available by the Receiving ACH Operator to the RDFI [Simmons] or to the RDFI's Receiving Point."  Bogo Ex. 1 ¶ 33 (Nesbitt Rep.) (quoting Nacha Rules § 3.1.1, *see* Bogo Ex. 29 at OR39).  Thus, for example, when Liberty National sent Simmons an ACH Entry on December 18, 2017 for $72.93 on Ms. Wilkins's account, that Entry was deemed received that day—not on December 6, when Liberty National sent an item with a different Trace Number for the same amount.  *See id.* Ex. 1 ¶ 65; *cf.* Hunter Decl. ¶ 8, Ex. A.  The second Liberty National Entry did not relate back to the Entry submitted weeks earlier. Bogo Ex. 1 ¶ 65 (Nesbitt Rep.); Hunter Decl. ¶ 8.  Furthermore, the Nacha Rules *required* Simmons to accept and process the new ACH Entry.  Bogo Ex. 29 at OR39 (Nacha Rules § 3.1.1); *id.* Ex. 1 ¶ 33 (Nesbitt Rep.) (quoting Nacha Rule § 3.1.1).  Simmons has no discretion to reject an ACH Entry because it derives from the same underlying customer transaction as a previously submitted ACH Entry (if Simmons could make that determination at all, which is not possible). *See id.* Ex. 1 ¶ 34.

Crucially, moreover, the Nacha Rules expressly provide that "each debit Entry shall be deemed an 'item' within the meaning of Revised Article 4 of the Uniform Commercial Code"; and Article 4 in turn defines "item" to include an "order to pay money handled by a bank for collection or payment."  Bogo Ex. 29 at OR63 (Nacha Rules § 8.36); UCC § 4-104(9); *see also* Bogo Ex. 1 ¶ 17 n.3 (Nesbitt Rep.); Ark. Code § 4-4-104(9) (adopting same definition of "item").  In other words, an "Entry" is an "item," and both terms refer to the "order to pay money" that the bank receives and "handle[s]"—*not* to the underlying transaction between a customer and a merchant. Thus, when a single customer-merchant transaction generates two (or three) "orders to pay money

handled by a bank" because the merchant submits a "retry" ACH Entry following the bank's return of a prior Entry, the Nacha Rules dictate that there are two (or three) "items," not one.

Gary Nesbitt's uncontested expert industry opinions confirm the correctness of this understanding of the term "item." He attests that, in his extensive "experience with the Nacha Rules, … [a] resubmitted ACH transaction is a new item." Bogo Ex. 1 ¶ 30 (Nesbitt Rep.). He also reports from his "experience in the industry" that "third-party merchants or service providers likewise treat a resubmission of an ACH transaction as a unique item." *Id.* Ex. 1 ¶ 32. And he concludes that "Simmons's handling of the named Plaintiffs' transactions … was consistent with the Nacha Rules, industry practice, and the way in which electronic payment systems operate." *Id.* Ex. 1 ¶ 16. Plaintiffs have no contrary expert or other evidence.

Where the "evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary," the meaning of a disputed contract is properly resolved at summary judgment. *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746 (2d Cir. 1999). That is the case here. The Nacha Rules incorporated into the Customer Agreement, along with the undisputed evidence of industry customs from Gary Nesbit, conclusively and unambiguously require that the term "item," as used in the Customer Agreement, be read as a reference to "each" unique ACH "Entry" submitted by a merchant seeking payment. *See Singletary v. Singletary*, 431 S.W.3d 234, 238, 241 (Ark. 2013) (resolving ambiguity based on incorporated document and course of dealing); *Randall Ford, Inc. v. Randall*, 2021 Ark. App. 360, at *12, *16 (2021) (reading option agreement "together" with lease agreement incorporated by reference left no ambiguity regarding the contract's meaning); *Garner v. XTO Energy, Inc.*, 2011 Ark. App. 606, at *2 (2011) (affirming summary judgment in contract dispute where only one party's interpretation comported with the parties' course of performance and "standard industry

practice").   As a result, assessing a paid or return item fee for each ACH Entry exceeding the Plaintiffs' available funds did not violate the Customer Agreement, even when multiple Entries arose from the same underlying transaction.   Plaintiffs' breach-of-contract claims therefore fail.

### 2.       Plaintiffs' contrary arguments miss the mark.

Plaintiffs allege that "Simmons's Deposit Agreement and Fee Schedule state that a singular fee can be assessed on checks, ACH debits, and electronic payments."  Doc. 15 ¶ 59 (Am. Compl.). Tellingly, Plaintiffs identify no language in the Customer Agreement promising to charge only a "single" fee regardless of how many ACH payment requests Simmons processes for one underlying transaction.  That is not surprising, for there is no such language in the contract.

Instead, Plaintiffs suggest that, when they initiated transactions with their merchants, they subjectively "understood the payment to be a single item pursuant to the terms of Simmons's contract, capable at most of receiving a single Return Item Fee (if Simmons returned it) or a single Overdraft Fee (if Simmons paid it)."  Id. ¶ 26.  They allege that "[t]he same 'check … automatic bill payment or other electronic payment' on an account cannot conceivably become a new item each time it is rejected for payment then reprocessed, especially when—as here—Plaintiffs took no action to resubmit the item."  Id. ¶ 62.

Plaintiffs' position is belied by the record evidence.   Perhaps most importantly, the undisputed facts show that an item rejected for payment was not "then reprocessed" by Simmons. Id. ¶ 62.  Rather, if Simmons returned an item for insufficient funds, its processing of that item was complete.  Further, while the merchant could decide to resubmit a transaction, the merchant would not request that Simmons reprocess the item previously submitted.  Instead, the merchant would submit a new item to Simmons, with a new date and a new Trace Number.  Bogo Ex. 1 ¶ 30 (Nesbitt Rep.).

Plaintiffs' assertion that *they* did not resubmit the transactions at issue is irrelevant because they authorized the *merchants* with whom they contracted to submit second or third requests for payment.  There is no dispute that, as the Court noted previously, Wilkins and Watson "agreed 'to be bound by automated clearing house association rules.'"  Doc. 41 at 1 (MTD Order) (quoting Doc. 22-2 at 4); Bogo Ex. 5 at WILKINS-0000553; *id.* Ex. 6  at WILKINS-0001099.   And "[t]hose ACH rules, in turn, allow an item to be resubmitted twice after it has been returned for insufficient funds."  Doc. 41 at 1 (MTD Order).  Additionally, Plaintiffs generally entered into agreements with their merchants that expressly authorized the merchants to resubmit a transaction when a payment request was returned.  *See, e.g.*, Bogo Ex. 23 at WILKINS-VERIZON-0000025, 0054; *id.* Ex. 24 at WILKINS-PROGRESSIVE-0000040–42.   Indeed, Wilkins specifically conceded that she authorized the Liberty National transaction underlying the sole December 19 fee she challenges.  Bogo Ex. 3 at 133:18–21 ("Q: did you authorize Liberty National to debit the Simmons Bank account for your sister's life insurance policy?  A: Yes.").  If Plaintiffs did not want a second or third payment request submitted to Simmons, they either should have made other payment arrangements with their merchants, or they should have made a stop payment request to Simmons (which Simmons would have had to honor under Nacha Rules).  Bogo Ex. 1 ¶ 35 (Nesbitt Rep.).  Plaintiffs did neither of those things and cannot now blame Simmons for processing activity they authorized.

Plaintiffs have also previously argued that "resubmissions" should not be deemed new "items" because the Nacha Rules now instruct merchants to include the language "RETRY PYMT" in the Company Entry Description field when reinitiating certain returned Entries.  Doc. 28 at 16 (MTD Resp.).  This is incorrect.

First, merchants often do not use this language.  Bogo Ex. 1 ¶ 50 (Nesbitt Rep.); *see also* Hunter Decl. ¶¶ 14, 16, 20, 24, 27, Exs. A–B.  Indeed, of the six fees challenged by Plaintiffs, just one arose from an ACH Entry including a "RETRY PYMT" notation.  Bogo Ex. 1 ¶¶ 51, 83; Hunter Decl. ¶ 24, Ex. B.  The other five arose from Entries with no notation that the item related to a previously returned item.  *See supra* pp. 13–14.  As this evidence confirms, there is no data field that reliably tells Simmons whether the new Entry relates to a transaction that generated a previously returned Entry.  Bogo Ex. 1 ¶ 30 (Nesbitt Rep.); Hunter Decl. ¶ 30.  And, as Mr. Nesbitt explains, a receiving bank cannot and should not individually evaluate every Entry it receives to try to guess whether it relates to a prior Entry from a different day with a different Trace Number.  Bogo Ex. 1 ¶¶ 36–47 (Nesbitt Rep.).  There is no reliable way for a receiving bank to differentiate between a resubmission and a separate recurring or additional payment request in the same amount.  *Id.* Ex. 1 ¶¶ 37, 41–42, 45–47; *id.* Ex. 2 ¶ 8 (Kwon Rep.); Hunter Decl. ¶ 30.  Nor is it practical to do so, given that the ACH system is automated, with batches of hundreds or thousands of Entries being processed simultaneously and automatically.  Bogo Ex. 1 ¶¶ 14, 38 (Nesbitt Rep.).

Second, Plaintiffs have submitted no evidence to support their claim that the purpose of the "RETRY PYMT" notation is "to ensure that the receiving financial institution recognizes the merchant's payment request is a 're-presented' entry rather than a new one."  Doc. 28 at 16 (MTD Resp.).  On the contrary, "[t]he stated purpose of the [Nacha rule] change [to require the "RETRY PYMT" notation] was to provide notice to *the Receiver*, here *each Plaintiff*, that the item is related to a previously returned item and *to facilitate dispute resolution with Receivers*."  Bogo Ex. 1 ¶ 49 (Nesbitt Rep.) (emphases added).  In other words, the rule change had nothing to do with RDFIs, like Simmons, which have no obligation to review the contents of the Company Entry Description field—much less to engage in some kind of futile matching exercise to relate a new Entry to a

22

previously returned one.  *Id.* Ex. 1 ¶ 50.  In sum, even the single ACH Entry in this case that included the "RETRY PYMT" notation was still a new request for payment—presented on a different day with a different Trace Number than the previously returned ACH Entry—and Simmons was obligated under the Nacha Rules to process it anew like any other ACH Entry.

> **3.    Other courts have concluded that each ACH payment request sent to a bank is a separate item subject to fees.**

Other courts have acknowledged that when a merchant decides to submit multiple ACH payment requests on a transaction for goods or services the customer has authorized, each request is a separate "item" on which the bank could assess fees.

For example, in *Lambert v. Navy Federal Credit Union*, the court held that contract language authorizing the bank to assess "[a] fee" "for each returned *debit item*" permitted a fee every time a merchant attempted to collect payment on insufficient funds.  2019 WL 3843064, at *1 (E.D. Va. Aug. 14, 2019) (emphasis added).  The court reasoned that each of two "ACH debit requests ... submitted by Plaintiff's insurer [on a transaction alleged to be the same] qualif[ied] as [separate] 'debit items'" under the contract, because, after the "insurer's first ACH debit request" was rejected, the bank "did not keep Plaintiff's insurer's unsuccessful first ACH request and attempt to reprocess the request on its own." *Id.* at *3.  Rather, "[i]t returned the request and waited for Plaintiff's insurer to submit another request for payment, which [the bank] was then obligated to process." *Id.*  Thus, "[w]hen Plaintiff's insurer 're-presented' the request for payment, it was a new ACH debit item . . . and was therefore eligible for a fee when it was returned for nonsufficient funds." *Id.*

Another court reached the same conclusion in *Foltz v. Matanuska Valley Federal Credit Union*, 2021 WL 865542 (Alaska Super. Ct. Jan. 12, 2021), in addressing a contract authorizing a fee "for each overdraft check or item we pay" and a "Returned Item fee … for each check or item

we return." *Id.* at *2.  The court held that, "[w]hen Foltz's merchant 're-presented' the request for payment, it was a new ACH item and was eligible for a fee when it was returned for insufficient funds." *Id.* at *8.  Likewise, in *Saunders v. Y-12 Federal Credit Union*, the court held that contract language authorizing a fee per overdraft "check, draft, transaction, *or other item*" permitted a fee "each time [a] … transaction is submitted by the merchant for payment and there are insufficient funds in the account, thus constituting an overdraft."  2020 WL 6499558, at *5 (Tenn. Ct. App. Nov. 5, 2020) (emphasis added).  The court specifically rejected the contract interpretation advanced by Plaintiffs here (and the plaintiff in *Saunders*) as "not reasonable." *Id.*  Numerous other courts have agreed.[5]

Just like the contracts in *Lambert*, *Foltz*, and *Saunders*, Simmons's Customer Agreement authorizes a fee "per item" received.  Here, no less than in those cases, that terminology "clearly refers to a transaction that attempts to withdraw money from the account, such as an ACH debit request," and thus the bank "did not breach the contract when it assessed the second nonsufficient

---

[5]  *See, e.g.*, *Haines v. Wash. Trust Bank*, 2020 WL 6861458, at *3 (Wash. Super. Ct. Nov. 17, 2020) ("Each ACH attempt is an item"); *Page v. Alliant Credit Union*, 2020 WL 5076690, at *4 (N.D. Ill. Aug. 26, 2020) ("in the context of the entire Membership Agreement, Alliant charges its members an overdraft fee every time a third-party payee presents an item for payment against insufficient available funds," and the contract "does not promise members that Alliant will charge just one overdraft fee"); *Fenton v. Tri-County Bank & Trust Co.*, 2020 WL 8673276, at *1 (Ind. Cir. Ct. Dec. 29, 2020) ("the Plaintiffs claim that the word 'single' (fee) appears in the documents – which the Defendant points out it does not.  The adjective used is 'an'.  Clearly, the bank can charge 'an' NSF for each time the claim is submitted, pursuant to the plain reading of the terms."); *Choy v. Space Coast Credit Union*, 2020 WL 3039243, at *3 (Fla. Cir. Ct. May 11, 2020) ("This provision states that the NSF fees may be charged each time a pre-authorized transfer is presented for payment.  Reading this provision in the context of the whole agreement leads to the inescapable conclusion that Defendant is clearly empowered to charge more than one NSF fee if a transaction is resubmitted."); *Winamaki v. Umpqua Bank*, 2020 WL 6861466, at *2 (Or. Cir. Ct. Oct. 30, 2020) (dismissing contract claim because each ACH request is an "item" subject to overdraft fee).  As the Court is aware from the prior motion-to-dismiss briefing, there are some other cases permitting a claim like Plaintiffs' to survive early dismissal.  But here, on summary judgment, the evidence conclusively refutes Plaintiffs' assertion that Simmons was re-processing the same item, as that is not how the ACH payments system works.

fund fee for Plaintiff's insurer's second ACH debit request." *Lambert*, 2019 WL 3843064 at *4–5. Indeed, the undisputed evidence before the Court at the summary-judgment stage allows no other conclusion. The Court should therefore grant summary judgment to Simmons.

**B.     Plaintiffs' Theory That Simmons Violated The Implied Covenant Of Good Faith And Fair Dealing Fails With Plaintiffs' Breach-of-Contract Claims.**

When a plaintiff's breach-of-contract theory is "plainly contradicted by the written terms of the contracts" and "unreasonable as a matter of law," any allegation that the defendant violated the duty of good faith and fair dealing also fails. *Crowell v. Campbell Soup Co.*, 264 F.3d 756, 765 (8th Cir. 2001) (affirming dismissal of both). The Supreme Court of Arkansas has "decline[d] to recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing." *Ark. Rsch. Med. Testing, LLC v. Osborne*, 2011 Ark. 158, at *5-6 (2011). Instead, "a breach of the implied covenant of good faith and fair dealing remains nothing more than evidence of a possible breach of a contract between parties." *Id.*

Plaintiffs' theory that Simmons violated that covenant is subsumed in Plaintiffs' breach-of-contract claim and predicated on the same allegations as its breach-of-contract theory. *Compare* Doc. 15 ¶ 101 (Am. Compl.), *with id.* ¶ 108. For the reasons already described, Plaintiffs' proffered interpretation of the Customer Agreement is "unreasonable" and fails as a matter of law. Plaintiffs' "duplicative" good-faith-and-fair-dealing theory therefore cannot save their breach-of-contract claim from summary judgment. *See, e.g.*, *George's Inc. v. Lloyd's of London Syndicate 4000 Issuing Certificate No. CPP1877167*, 2020 WL 6829959, at *8 (W.D. Ark. Nov. 20, 2020) ("the claim for breach of duty of good faith and fair dealing is identical to the breach of contract claim and should be dismissed as duplicative" "as a matter of law").

**C.** **Simmons Also Is Entitled To Summary Judgment Against Wilkins For The Independently Dispositive Reason That Wilkins Breached Her Contract Before Any Alleged Breach by Simmons.**

To prevail on a breach-of-contract claim under Arkansas law, Plaintiffs must show that they "did what the contract required." *Ramthun v. Bryan Career College-Inc.*, 93 F. Supp. 3d 1011, 1023 (W.D. Ark. 2015) (citing Ark. Model Jury Instr.—Civil 2401); *accord Mobil Expl. & Producing N. Am., Inc. v. Graham Royalty Ltd.*, 910 F.2d 504, 507 (8th Cir. 1990) ("Where one party breaches a contract and defends that the other party did so first, defendant's obligation to perform may be discharged if plaintiff's breach is material and sufficiently serious."); *Com. Credit Grp. Inc. v. Allianz Glob. Corp. & Specialty N. Am.*, 2018 WL 1575823, at *5 (E.D. Ark. Mar. 30, 2018); *Moore v. Mack's Sport Shop, LLLP*, 2017 WL 4350980, at *11 (E.D. Ark. Sept. 29, 2017).[6] The Court concluded at the dismissal stage that "more facts" were required to resolve the "deep issue [of] who committed the first material breach." Doc. 41 at 4, 5 (MTD Order). The undisputed facts now show that Wilkins materially breached the Customer Agreement before Simmons's alleged breach.

Under Simmons's customer Terms, Wilkins "agree[d] to be . . . liable for any account shortage resulting from charges or overdrafts." Bogo Ex. 6 at 24 (Terms). "This liability [was] due *immediately*," and Wilkins had "no right to defer payment of this liability." *Id.* (emphasis added). The ODP Disclosure further provided that Wilkins could overdraw her account up to $500 but must "bring [her] account to a positive balance at least once every thirty (30) days to maintain [her] Overdraft Privilege in good standing." *Id.* Ex. 6 at 46.

---

6   Arkansas law governs Plaintiffs' breach-of-contract claims because the Customer Agreement contains a choice-of-law provision specifying Arkansas law for contractual disputes. Bogo Ex. 6 at 24 (Terms).

Wilkins indisputably breached those contractual obligations no later than November 22, 2017—nearly a full *month* before Simmons assessed the one fee she challenges on December 19, 2017.  Doc. 15 ¶ 28 (Am. Compl.).  On November 22, 2017, Simmons notified Wilkins by letter that her account had been overdrawn for 30 days, and it was therefore suspending her Overdraft Privilege.  Bogo Ex. 11 at WILKINS-0001303.  The letter also notified Wilkins that unless a deposit or payment plan was received within ten days, her account would be turned over to a collection agency.  *Id.*  Wilkins never brought her account back into positive territory, and Simmons sent her another letter on December 4, 2017, notifying her that it had engaged a collection agency to recover her negative balance.  *Id.* Ex. 11 at WILKINS-0001304–1305.  And these letters came on the heels of a half-dozen notices regarding Simmons's overdraft policy.  *See supra* pp. 9–10.

In short, the undisputed facts show that Wilkins was in material breach of the Customer Agreement no later than November 22, 2017 and remained in breach as of December 19, 2017, when the sole fee she challenges was assessed.  Having failed to perform her end of the bargain before any purported breach by Simmons, Wilkins cannot maintain a breach-of-contract claim against Simmons.  *See, e.g.*, *Jerome Hardwood Lumber Co. v. Beaumont Lumber Co.*, 247 S.W. 1059, 1060 (Ark. 1923) ("We recognize the well-established rule that one who first breaks a contract cannot maintain suit to recover upon it, and that the failure of one party to comply with a contract releases the other party from performance."); *C.B. Ensign & Co. v. Coffelt*, 177 S.W. 735, 736 (Ark. 1915) ("Appellant was not entitled to recover the price at all" because "the rule is elemental that one who is the first to break a contract cannot maintain an action to recover upon it."); *Fairpark, LLC v. Healthcare Essentials*, 381 S.W.3d 852, 857 (Ark. Ct. App. 2011) (applying "concept of first breach" to hold that the "breach of a lease by one contracting party … release[d]

27

the other party from its contractual duties" because the "first breach [was] material and sufficiently serious").

## II. Simmons Is Entitled To Judgment On Plaintiffs' Unjust-Enrichment Claims.

The undisputed facts also call for summary judgment for Simmons on Plaintiffs' unjust-enrichment claims for multiple, independent reasons.

### A. The Customer Agreement Bars Plaintiffs' Unjust-Enrichment Claims.

As a threshold matter, Plaintiffs' unjust-enrichment claims fail because "it is a settled principle"—under both Arkansas and Tennessee law—"that 'the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter.'" *Servewell Plumbing, LLC v. Summit Contractors, Inc.*, 210 S.W.3d 101, 112 (Ark. 2005); *Shipwash v. United Airlines, Inc.*, 28 F. Supp. 3d 740, 757 (E.D. Tenn. 2014) (dismissing unjust enrichment claim challenging airline fee because "a valid and enforceable contract governs the parties"); *Generation 4 Recycling Grp., LLC v. Triumph Aerostructures, LLC - Vought Aircraft Div.*, 2020 WL 5498038, at *1 (Tenn. Ct. App. Sept. 11, 2020) ("We affirm the trial court's dismissal of the unjust enrichment claim on the ground that there was a valid contract.").[7]

Here, neither Plaintiff has provided any evidence disputing that the Simmons Customer Agreement governs the subject matter of this suit.  On the contrary, both Plaintiffs have consistently contended that Simmons breached that Agreement by charging paid or return item fees each time a transaction was allegedly "resubmitted" to Simmons for payment when their

---

[7]    Under Arkansas choice-of-law rules, Arkansas law governs Watson's unjust-enrichment claims because he is a citizen and resident of Arkansas (Doc. 15 ¶ 7 (Am. Compl.)), and Tennessee law governs Wilkins's unjust enrichment claim because she is a citizen and resident of Tennessee (*id.* ¶ 5). *Crisler v. Unum Ins. Co. of Am.*, 233 S.W.3d 658, 660 (Ark. 2006); *see also* Restatement (Second) of Conflict of Laws § 221 (Am Law Inst. 1971).

accounts lacked sufficient funds to cover the transaction. Because the "terms and conditions" of the parties' "written contracts" indisputably govern the present dispute, Plaintiffs' unjust-enrichment claims must be "dismissed with prejudice." *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 646 (N.D. Ohio 2012) (holding that the plaintiff "cannot bring an unjust enrichment claim against [defendant], however, because there is a valid contract that covers [the challenged conduct]").

**B.    Plaintiffs Also Cannot Establish Basic Elements Of Their Unjust-Enrichment Claims.**

"To find unjust enrichment, a party must have received something of value, to which [it] is not entitled and which [it] must restore." *Campbell v. Asbury Auto., Inc.*, 381 S.W.3d 21, 36 (Ark. 2011). "One who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right." *Id.*

As a matter of law, Plaintiffs cannot show that Simmons "received something of value" to which it was "not entitled." First, to the extent Plaintiffs challenge fees they never paid—or that Simmons immediately reversed—Simmons received no benefit at all. That is fatal to Plaintiffs' unjust enrichment claims. In *Litchfield v. Bank of New York*, for example, the court held that a bank cannot be "enriched at the expense of Plaintiffs" if it "returned all of the money in question." 2000 WL 1449848, at *3 (D. Me. Sept. 21, 2000) (granting judgment to defendant on unjust-enrichment claim). Arkansas and Tennessee courts have consistently granted judgment to defendants on unjust-enrichment claims when, as here, the plaintiff has offered "no proof whatsoever" that the defendant *actually* "received" the claimed benefit. *Sanders v. Bradley Cty. Hum. Servs. Pub. Facilities Bd.*, 956 S.W.2d 187, 191 (Ark. 1997) (affirming grant of summary judgment to the defendant); *Green v. Skyline Highland Holdings LLC*, 2018 WL 3800240, at *6 (E.D. Ark. June 12, 2018) (dismissing unjust-enrichment claim when defendant did not "receive[]

any financial benefit or thing of value directly from the plaintiffs"); *Withco, LLC v. Republic Servs. of Tenn., LLC*, 818 F. Supp. 2d 1040, 1054 (M.D. Tenn. 2011) (holding that an "unjust enrichment claim fails" at the summary judgment stage when the plaintiff "ha[s] not produced evidence that they actually provided valuable goods or services to [defendant]"); *Harbin v. Emergency Coverage Corp.*, 2017 WL 11606942, at *3 (E.D. Tenn. June 20, 2017) (granting summary judgment on unjust-enrichment claim because "there is no evidence in the record suggesting that [defendant] received a benefit from Plaintiffs" and therefore an essential element of the claim was lacking).

Simmons is entitled to judgment here for the same reasons.  The undisputed evidence shows that Simmons did not receive at least $125 of the $185 in challenged fees.  *See supra* pp. 8–14.  Wilkins never paid the sole December 19, 2017 fee she challenges.  Watson never paid at least three of the five fees he challenges—the August 17, 2015 fee (which was reversed), the January 11, 2016 fee, and the February 9, 2016 fee.

Relatedly, Simmons is entitled to judgment because Plaintiffs cannot show that Simmons "received something of value *to which [it] was not entitled* and which [it] should restore." *Sparks Reg'l Med. Ctr. v. Blatt*, 935 S.W.2d 304, 307 (Ark. Ct. App. 1996) (emphasis added); *see also Lawyers Title Ins. Corp. v. United Am. Bank of Memphis*, 21 F. Supp. 2d 785, 805–06 (W.D. Tenn. 1998) (Under Tennessee law, "[t]he most significant requirement for a recovery [of restitution] is that the enrichment to the defendant be unjust.").  Even as to the two $30 fees (June 11, 2015 and February 1, 2016) that the Watsons may have paid, Simmons indisputably *was* "entitled" to those sums—and hundreds of dollars more for the amounts that the Watsons incurred on their checking account and never repaid before their negative balance was charged off.  As the Arkansas Supreme Court has repeatedly emphasized, "[n]o recovery of money received can be based upon unjust enrichment when the recipient can show a legal or equitable ground for keeping it." *Whitley v.*

*Irwin*, 465 S.W.2d 906, 911 (Ark. 1971); *accord Merchs. & Planters Bank & Tr. Co. of Arkadelphia v. Massey*, 790 S.W.2d 889, 891 (Ark. 1990) ("One is not unjustly enriched by receipt of that to which he is legally entitled.").

### C.   As A Matter Of Law, The Clean-Hands Doctrine Bars Plaintiffs' Unjust-Enrichment Claims.

The undisputed evidence also shows that the "clean-hands" doctrine bars each Plaintiff from invoking the Court's equitable powers.  Under both Arkansas and Tennessee law, "[e]quity will not intervene on behalf of a plaintiff whose conduct in connection with the same matter has been unconscientious or unjust."  *Poff v. Brown*, 288 S.W.3d 620, 622 (Ark. 2008); *Day v. Case Credit Corp.*, 2007 WL 604636, at *3 (E.D. Ark. Feb. 22, 2007); *accord Hogue v. Kroger Co.*, 373 S.W.2d 714, 716 (Tenn. 1963) (similar).  "[A]ny willful act regarding a litigated matter which would be condemned and pronounced as wrongful by fairminded persons is sufficient to trigger the doctrine of unclean hands."  *Fuller v. Cmty. Nat'l Bank*, --- S.W.3d ---, 2020 WL 1485696, at *5 (Tenn. Ct. App. Mar. 27, 2020).  For example, a plaintiff that commits a "contractual breach" in connection with the matter on which it seeks restitution "does not have clean hands" and therefore cannot maintain a claim for restitution or other equitable relief.  *Hocker v. N.H. Ins. Co.*, 922 F.2d 1476, 1486 (10th Cir. 1991).  Similarly, a plaintiff who "seeks to take advantage of its own wrongful conduct" cannot maintain a claim for unjust enrichment.  *Merchants*, 790 S.W.2d at 891.

That is precisely what Plaintiffs attempt here.  Both Plaintiffs abused Simmons's Overdraft Privilege by spending hundreds of dollars they did not have and then failing to repay the sums Simmons advanced on their behalves.  *See supra* pp. 10, 14.  In so doing, Plaintiffs breached the very Customer Agreements they attempt to enforce.  *See supra* pp. 8, 26–28.  Indeed, less than a month after repaying the first Overdraft Repayment Plan loan from Simmons, the Watsons maxed

out their overdraft protection by withdrawing $500 from an ATM and then immediately asked for a second Overdraft Repayment Plan.  Hunter Decl. ¶¶ 18–19; Bogo Ex. 13 at WILKINS-0001770; *id.* Ex. 19 at WILKINS-0002401.  After Simmons accommodated that request (depositing $675.59 into the Watsons' account, interest free), the Watsons immediately overdrafted their account, never made a single payment on the second Overdraft Repayment Plan, and ultimately left their account with a negative $735.59 balance.  Hunter Decl. ¶¶ 21–29; Bogo Ex 13 at WILKINS-0001763– 1770; *id.* Ex. 17 at WILKINS-0001761; *id.* Ex. 28 at DWatson_0001.  Wilkins similarly left her Simmons account with a negative $545.21 balance.  *See supra* p. 10.

Plaintiffs now "seek[] to take advantage of [their] own wrongful conduct" by challenging the fees Simmons charged as Plaintiffs ran up large negative balances that they have now failed to repay for years.  *Merchants*, 790 S.W.2d at 891.  As a matter of law, "equity will not intervene" in these circumstances.  *Id.* (affirming dismissal of unjust enrichment claims because "defense of unclean hands barred recovery" when the plaintiff sought to enforce a promissory note bearing her "forged signature"); *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 797 (6th Cir. 2009) (unclean hands doctrine precluded claim for refund of insurance premiums when plaintiff committed fraud in procuring the policies).

### D.    The Statute Of Limitations Bars Watson's Unjust-Enrichment Claim.

Watson's unjust enrichment claim fails for yet another reason:  It is barred by Arkansas's statute of limitations.[8]  "Claims for unjust enrichment in Arkansas are subject to a three-year statute of limitations."  *Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401, 408 (8th Cir. 2017)  (citing Ark. Code § 16-56-105).  Here, the *latest* fee Watson challenges was levied on February 9, 2016

---

[8]   Arkansas's statute of limitations governs common-law claims when an Arkansas district court is sitting in diversity jurisdiction, because statutes of limitations are "procedural" rules for purposes of Arkansas's choice-of-law analysis.  *See Ark. Valley Elec. Coop. Corp. v. Sw. Bell Tel. Co.*, 2017 WL 3314008, at *4 (W.D. Ark. Apr. 17, 2017).

(Bogo Ex. 21)—more than four years before the original complaint in this case was filed (on April 14, 2020).  *See* Doc. 1 (Compl.).  Watson's unjust-enrichment claim is therefore untimely.

### III.    Plaintiffs Lack Standing To Pursue Any Of The Relief They Seek.

Independent of the other grounds for dismissal set forth herein, all of Plaintiffs' claims fail for the additional reason that Plaintiffs lack Article III standing.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  The "'irreducible constitutional minimum of standing' contains three requirements": (1) "an 'injury in fact'—meaning a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not conjectural or hypothetical'"; (2) "causation"; and (3) "redressability"—meaning "a likelihood that the requested relief will redress the [plaintiff's *own*] alleged injury." *Id.*  "Standing must persist throughout all stages of litigation." *Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019).  At the summary-judgment stage, the plaintiff must offer "evidence" of "specific facts," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), that demonstrate standing "for each form of relief sought," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021).  Plaintiffs cannot shoulder their burden for at least two reasons.

#### A.    Plaintiffs Were Not Injured By Fees They Never Paid.

Plaintiffs lack the required injury-in-fact with respect to the four challenged fees that they did not pay.  Wilkins did not pay the *only* fee she is challenging, as she has admitted.  Hunter Decl. ¶ 10; Bogo Ex. 3 at 61:15–17 (S. Wilkins Dep.); *id.* Ex. 9 at WILKINS-0001245.  And Watson did not pay at least three out of five fees he challenges (those incurred on August 17, 2015, January 11, 2016, and February 9, 2016).  *See supra* pp. 11–14; Hunter Decl. ¶¶ 17, 22, 28.  As Watson concedes, the August 17, 2015 fee was reversed only days after it was incurred.  Bogo Ex. 13 at WILKINS-001782; *id.* Ex. 28 at DWatson_0054; *id.* Ex. 4 at 172:1-4 (D. Watson Dep.) (Q: "Does that confirm that the $30 NSF charge that you're challenging from August of 2015 was credited back to your account?"  A: "Yes, ma'am."); Hunter Decl. ¶ 17.  And the remaining unpaid fees are

part of the never-paid negative account balance that Simmons charged off before closing the Watsons' account.  Hunter Decl. ¶¶ 22, 28; *see also supra* p. 14.

In materially identical circumstances, the court in *Dog Walkin Divas LLC v. Washington Federal, Inc.* recognized that a plaintiff suffers no "injury in fact" for purposes of Article III when it "never paid" the challenged fees.  2021 WL 2309675, at *2 (W.D. Wash. May 28, 2021) (dismissing claims for lack of standing).  And this analysis accords with the rulings of other courts in similar circumstances.  *See, e.g.*, *Indigo LR LLC v. Advanced Ins. Brokerage of Am. Inc.*, 717 F.3d 630, 633 (8th Cir. 2013) (affirming dismissal of claims for lack of standing when plaintiff "presented no evidence to show that it was out-of-pocket for any … amount"); *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 644 (N.D. Ohio 2012) (dismissing breach-of-contract claims with prejudice when plaintiffs could "show no injury because [challenged] charges were reversed by their banks"); *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *7 (E.D. Cal. Jan. 3, 2012) (plaintiffs lacked standing to challenge refunded fees because their assertions that defendant's refunds were inadequate lacked any "reasonable basis"), *R&R adopted*, 2012 WL 217708 (E.D. Cal. Jan. 23, 2012).  Indeed, Watson conceded that Simmons customers cannot maintain claims based on fees they never paid.  Bogo Ex. 4 at 112:10–11 ("If they didn't pay the fee, they wouldn't have a claim to challenge.") (D. Watson Dep).

Because the four challenged fees that Plaintiffs never paid did not injure them, they lack standing to pursue any claims with respect to those fees.[9]

---

[9]   To the extent that the Court is inclined to grant summary judgment on these grounds, Simmons has already agreed to forgo any future efforts to collect any of the unpaid fees challenged by Watson, and Simmons agrees to forgo any future efforts to collect the one fee challenged by Wilkins.  Hunter Decl. ¶ 31.

**B.      Neither Plaintiff Can Establish Redressability.**

Plaintiffs also cannot prove that the relief they request would redress their purported injuries.  Even if they had viable claims (and they do not), the Court could not award any of the relief they seek: "actual and/or compensatory damages," (Doc. 15, Prayer for Relief ¶¶ 4–6 (Am. Compl.)), restitution (*id.* ¶ 4), disgorgement (*id.* ¶ 5), pre-judgment interest (*id.* ¶ 7), injunctive relief (*id.* ¶ 3), declaratory relief (*id.* ¶ 2), and attorneys' fees and costs (*id.* ¶ 8).  None of these remedies are available here.

**1.      Plaintiffs are not entitled to actual or compensatory damages.**

To start, neither Plaintiff could recover the actual or compensatory damages they seek on their breach-of-contract claims.  Under Arkansas law, breach-of-contract damages are limited to those necessary "to place the injured party in the same position he would have been in had the contract been performed."  *Hobson v. Entergy Ark., Inc.*, 432 S.W.3d 117, 125 (Ark. App. 2014). Compensatory damages are not available for Plaintiffs' unpaid fees, because that "would place [them] in a better position than that which [they] would have occupied but for the [alleged] breach." *In re Wyo. Tight Sands Antitrust Cases*, 1990 WL 155542, at *12 (D. Kan. Sept. 6, 1990); *Brookewood, Ltd. P'ship v. DeQueen Physical Therapy & Occupational Therapy, Inc.*, 547 S.W.3d 461, 467 (Ark. App. 2018) (reversing judgment on breach-of-contract claim where plaintiff never proved "actual damages"—"an essential element of a breach-of-contract claim").

Even as to any fees Watson paid—and even if Plaintiffs could press challenges to their unpaid fees—any compensatory-damage recovery would be entirely offset by Plaintiffs' negative account balances, for which Simmons is entitled to recoupment under Arkansas law.  *See In re*

*Pruett*, 220 B.R. 625, 628 (Bankr. E.D. Ark. 1997) ("Recoupment … reduce[s] the plaintiff[']s claim by the amount … due from the plaintiff to the defendant").[10]

The undisputed evidence confirms that each Plaintiff owes Simmons *hundreds* of dollars for transactions that Simmons covered while Plaintiffs' account balances were negative, for which Plaintiffs have never repaid Simmons.  Hunter Decl. ¶¶ 10, 28–29; Bogo Ex. 8 (Dep. Inq.); *id.* Ex. 9 at WILKINS-0001245; *id.* Ex. 28 at DWatson_0001.  To start, both Wilkins and Watson have testified that they owe Simmons money.  Bogo Ex. 3 at 110:18 (S. Wilkins Dep.); *id.* Ex. 4 at 38:18–19, 42:12–22 (S. Wilkins Dep.).  Indeed, at the time Simmons charged off the Watsons' account for nonpayment and violation of the Customer Agreement, Watson had a negative balance of $735.59—more than ten times the two $30 fees he arguably paid and almost five times the entire $150 in fees that he claims Simmons wrongfully charged (at least $90 of which he never paid).  Bogo Ex. 15 at WILKINS-0003810; *id.* Ex. 28 at DWatson_0001; Hunter Decl. ¶¶ 17, 22, 28–29.  Similarly, Wilkins has "conceded" that she owes Simmons at least $510.21 of the negative account balance due at the time Simmons charged off her account—again, many orders of magnitude more than the sole $35 fee she challenges (and never paid in any event).  Doc. 64 ¶¶ 8, 11, 20 (Wilkins Am. Ans.); Bogo Ex. 4 at 61:11–20 (D. Watson Dep.); Hunter Decl. ¶ 10.  Indeed, this Court has found Wilkins liable to Simmons for not just that $510.21, but also $3,000 in attorneys' fees and over $100 in prejudgment interest.  Doc. 62 at 2 (Default Order) (entering judgment in Simmons's favor for the "uncontested [$510.21] balance due"); Doc. 73 (Fee Order) (awarding fees and interest).

---

[10]   In addition, the Watsons' second Overdraft Repayment Plan (on which the Watsons indisputably defaulted) specifically authorized Simmons "to set-off Borrower's obligations against any amounts due to Borrower" in the "event of default."  Bogo Ex. 17 at WILKINS-0001761.

Though Plaintiffs may dispute Simmons's liability for the $185 in challenged fees, neither has offered any evidence disputing their liability for the hundreds more dollars *in underlying transactions* that Simmons paid without recompense.  Because Simmons paid these transactions pursuant to the same Customer Agreements that form the basis for Plaintiffs' breach-of-contract claims, recoupment (or set off) applies.  *In re Pruett*, 220 B.R. at 628 (recoupment available when the debts "arise[s] out of the same contract or occurrence that gives rise to the liability sought to be reduced").

When, as here, the defendant is entitled to recoup more than the actual damages either Plaintiff could conceivably prove, recoupment serves to "extinguish the demand of the plaintiff[s]." *Kilgore Lumber Co. v. Thomas & Hammonds*, 128 S.W. 62, 63 (Ark. 1910); *Hobson*, 432 S.W.3d at 125.  And the Court may make this determination as a matter of law.  *Seaboard Coast Line R.R. Co. v. Long Island R.R. Co.*, 447 F. Supp. 108, 116 (E.D.N.Y. 1978) (applying recoupment at the summary judgment stage and reducing plaintiff's damages accordingly), *aff'd,* 595 F.2d 96 (2d Cir. 1979).

### 2.    Plaintiffs cannot prove entitlement to restitution or disgorgement.

Restitution and disgorgement are also unavailable for many of the same reasons that Simmons is entitled to judgment on Plaintiffs' unjust enrichment claim. *See supra* pp. 28–32.  With respect to the fees that Plaintiffs *never paid*, there is simply nothing to disgorge, and therefore no remedy the Court could award.  Specifically, Wilkins did not pay the one fee that she challenges.  And, even as to the fees Watson may have paid, the Court could not award restitution because (i) Simmons was indisputably "entitled" to those fees—and hundreds of dollars more, *e.g.*, *Merchants*, 790 S.W.2d at 891; and (ii) Watson's unclean hands preclude him from pursuing such relief, *e.g.*, *Poff*, 288 S.W.3d at 622.

### 3. Plaintiffs cannot prove entitlement to pre-judgment interest.

Because Plaintiffs are not entitled to any damages award, there is no basis upon which the Court could award prejudgment interest. *See, e.g.*, *Olivares v. Brentwood Indus.*, 2015 WL 13658070, at *2 (W.D. Ark. Apr. 13, 2015) (plaintiff was "not entitled" to receive "compensatory damages, so there is no damages award upon which to base an award of prejudgment interest."); *cf. Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 217 S.W.3d 797, 807 (Ark. 2005) ("Prejudgment interest is compensation for *recoverable* damages wrongfully withheld from the time of the loss until judgment." (emphasis added)).   Furthermore, any interest that could conceivably accrue on the challenged bank fees would be far exceeded by the interest to which Simmons would be entitled on Plaintiffs' negative account balances.

### 4. Plaintiffs cannot prove entitlement to declaratory or injunctive relief.

Plaintiffs also lack standing to pursue injunctive or declaratory relief.   "[W]here the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing," because those remedies are "inherently prospective and cannot redress past injuries." *Frost*, 920 F.3d at 1161–62.   Instead, Plaintiffs must "show that [they] face[] 'a real and immediate threat that [they] would again suffer similar injury in the future.'" *Id.* at 1162.   "It is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue and that the threatened injury is certainly impending." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000).

As courts have consistently recognized, plaintiffs that "are no longer customers" of the defendant cannot make that showing, because "there is no reasonable likelihood that they will be injured by [the defendant's challenged practices] in the future." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 224 (3d Cir. 2012).   In *McNair*, the court held that former magazine subscribers lacked standing to enjoin the defendant's automatic renewal billing practices, because the plaintiffs were

at no risk of incurring future renewal fees and therefore "ha[d] no cognizable interest in the prospective relief sought in the Complaint." *Id.* Similarly, the *Dog Walkin Divas* court held that a former bank customer lacked standing to enjoin challenged overdraft fee practices when the customer "no longer ha[d] an account with Defendant and w[ould] therefore not be subject to future fees." 2021 WL 2309675, at *3.

This case calls for the same result: As former customers, neither Wilkins nor Watson faces an immediate or ongoing threat of being charged fees by Simmons on allegedly resubmitted transactions in the future. Wilkins attempted her last transaction in December 2017, and Simmons charged off her negative $545.21 account balance later that month. Hunter Decl. ¶¶ 9–11; Bogo Ex. 3 at 42:16–23 (S. Wilkins Dep.); *id.* Ex. 8 (Dep. Inq.); *id.* Ex. 11 at WILKINS-0001305. Likewise, the Watsons attempted their last transaction in February 2016, and Simmons charged off their negative $735.59 balance later that month. Hunter Decl. ¶¶ 28–29; Bogo Ex. 4 at 38:1–5 (D. Watson Dep.); *id.* Ex. 28 at DWatson_0001. Indeed, both Wilkins and Watson have admitted that they have no interest in Simmons's current or future fee practices. Bogo Ex. 3 at 98:3–8 (S. Wilkins Dep.) (agreeing that she does "not have any interest in what Simmons' current or future policies are about charging overdraft of NSF fees when a merchant resubmits a previously declined transaction"); *id.* Ex. 4 at 117:11–19 (D. Watson Dep.) ("I don't know why I would want to know what Simmons is doing at this point."). Any award of declaratory or injunctive relief "would have no effect on the individual plaintiffs," *Carson v. Pierce*, 719 F.2d 931, 933 (8th Cir. 1983), and Plaintiffs therefore lack standing to seek declaratory or injunctive relief. *Frost*, 920 F.3d at 1162; *accord In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) (plaintiff that had sold its business "lack[ed] standing to seek injunctive relief").

### 5. Plaintiffs are not entitled to attorneys' fees.

For the reasons discussed above, Plaintiffs cannot conceivably recover any of the relief they seek in this litigation. Thus, their remaining request for attorneys' fees cannot provide the basis for standing. *Steel Co.*, 523 U.S. at 107 (A claimed "interest in attorney's fees is ... insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim."). To have standing, "[t]he litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself," *id.*; "[o]therwise the limitation of federal jurisdiction to cases and controversies would be empty." *Frost*, 920 F.3d at 1162 n.1.

*       *       *

Plaintiffs' inability to obtain any of the requested relief precludes them from satisfying the redressability element of Article III standing. In *Dog Walkin Divas*, the court held that a customer lacked standing to maintain claims that a bank unlawfully charged overdraft fees when, as here, the plaintiff had not paid the fee it challenged and, in any event, had a "negative balance of $461.92" at the time the bank finally closed its account for failure to pay its debt. 2021 WL 2309675, at *3. The court reasoned that there was no relief it could award because the challenged fees "would not offset the negative balance" that the plaintiff owed the bank. *Id.* Moreover, as a former customer, the plaintiff could not seek injunctive relief. *Id.*

For the same reason, Plaintiffs' claims must be dismissed, in their entirety, for lack of standing. *See Steel Co.*, 523 U.S. at 110 (plaintiffs' claims must be dismissed for lack of redressability when they identify no relief that could redress their claimed injuries).

## CONCLUSION

For the reasons set forth above, Simmons respectfully requests that the Court either (1) grant judgment in Simmons favor on all claims, as a matter of law; or (2) dismiss Plaintiffs' claims in their entirety for lack of standing.

DATED:  December 13, 2021

Respectfully submitted,

/s/ *Debra Bogo-Ernst*

E. B. Chiles IV (96179)
R. Ryan Younger (2008209)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
(501) 379-1700 Telephone
(501) 379-1701 Facsimile
ryounger@qgtlaw.com

Debra Bogo-Ernst (IL No. 6271962) (*pro hac vice*)
Joshua Yount (IL No. 6256900) (*pro hac vice*)
Lucy Holifield (AR No. 2016165; IL No. 6329822)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600 Telephone
(312) 701-7711 Facsimile
dernst@mayerbrown.com
jyount@mayerbrown.com
lholifield@mayerbrown.com

*Attorneys for Simmons Bank*

APPENDIX A

**CHALLENGED FEES AND ACH ENTRIES**

| | Wilkins's Only Challenged Fee | Watson's First Challenged Fee | Watson's Second Challenged Fee | Watson's Third Challenged Fee | Watson's Fourth Challenged Fee | Watson's Fifth Challenged Fee |
|---|---|---|---|---|---|---|
| Merchant | Liberty Nat'l | PayPal | PayPal | Verizon | Progressive | Verizon |
| Transaction Amount | $72.93 | $3.25 | $6.17 | $367.05 | $108.10 | $1,371.44 |
| Date of Fee | 12/19/17 | 6/11/15 | 8/17/15 | 1/11/16 | 2/01/16 | 2/09/16 |
| Type of Fee | Return Item | Paid Item | Paid Item | Return Item | Return Item | Return Item |
| Fee Amount | $35 | $30 | $30 | $30 | $30 | $30 |
| Fee Paid? | No | Yes | No | No | Yes | No |
| RETRY PYMT note? | No | No | No | No | Yes | No |
| **Associated ACH Entries** | | | | | | |
| Trace No. | 62001180094271 | 91000010113963 | 91000010790949 | 21000029262404 | 21000022394246 | 21000020370421 |
| Date of Receipt | 12/18/17 | 6/9/15 | 8/13/15 | 1/8/16 | 1/28/16 | 2/8/16 |
| Action Taken | Returned unpaid and assessed return item fee | Paid into overdraft and assessed paid item fee | Paid into overdraft and assessed paid item fee | Returned unpaid and assessed return item fee | Returned unpaid and assessed return item fee | Returned unpaid and assessed return item fee |
| **Prior ACH Entries** | | | | | | |
| Trace No. | 62001183607168 | 91000016299032 | 91000018849623 | 21000027472366 | 21000025765108 | 21000026450119 |
| Date of Receipt | 12/6/17 | 6/3/15 | 8/6/15 | 1/4/16 | 1/25/16 | 1/29/16 |
| Action Taken | Returned unpaid and assessed return item fee | Returned unpaid and assessed return item fee | Returned unpaid and assessed return item fee | Returned unpaid and assessed return item fee | Returned unpaid and assessed return item fee | Returned unpaid and assessed return item fee |