# GZJ KDKV'4"



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

NORTHERN DIVISION


Shunda Wilkins, et al., Plaintiffs,

v.

Simmons Bank, Defendant


Case No. 3:20-cv-00116-DPM


PRELIMINARY EXPERT REPORT AND DISCLOSURE OF

SONYA KWON

ANKURA CONSULTING


OCTOBER 4, 2021


CONFIDENTIAL



**Table of Contents**

I.   PROFESSIONAL BACKGROUND AND EXPERIENCE ............................................................ 3

II.   CASE BACKGROUND .......................................................................................................... 4

III.  DATA AND MATERIALS CONSIDERED .................................................................................. 5

IV.  SUMMARY OF EXPERT OPINIONS ...................................................................................... 6

V.   MR. OLSEN DID NOT DEMONSTRATE HIS ABILITY TO PERFORM HIS HYPOTHETICAL ANALYSIS USING THE DATA PRODUCED IN THIS MATTER. ....................... 9

VI.  DESPITE HIS ASSERTIONS, MR. OLSEN CANNOT PROGRAMMATICALLY IDENTIFY THE CLASS. ....................................................................................................................... 11

    *A.   Mr. Olsen does not describe how he will determine whether an underlying transaction was a resubmitted transaction* .......................................................................................... 11

    *B.   Fees cannot always be programmatically matched to triggering transactions, which means that any allegedly injured accountholders can be identified only through individual analysis.* .............................................................................................................................. 12

    *C.   Refunds cannot always be matched to overdraft or return item fees, which can cause the improper inclusion of customers who were not harmed under Plaintiffs' theory.* ...................... 14

    *D.   Proper analysis of chargeoffs may require information from a variety of sources, without which may result in the improper inclusion of customers who were not harmed under Plaintiffs' theory.* ............................................................................................................... 16

    *E.   It is necessary to piece together data and information from different sources to identify allegedly injured accountholders, which requires individualized manual review.* ...................... 17

VII.  INDIVIDUALIZED REVIEW OF THE TRANSACTIONS DISPUTED BY NAMED PLAINTIFFS DOES NOT REFLECT INDICATIONS OF "RETRY PYMT" IN THE ACH DATA. .. 18

VIII. CONCLUSION .................................................................................................................... 25



## I.    PROFESSIONAL BACKGROUND AND EXPERIENCE

1.  I am a Senior Managing Director at Ankura Consulting Group ("Ankura"), a provider of litigation and disputes consulting services with over 1,400 professionals worldwide. I lead the Complex Data and Statistical Analysis practice and specialize in the application of financial, statistical, and complex data-intensive analyses to legal and regulatory issues. My education includes a B.A. in Economics from the University of California, Berkeley and an M.B.A. from the University of California, Los Angeles. In addition to Ankura, I have worked at Navigant Consulting, Inc., Deloitte & Touche LLP, PricewaterhouseCoopers LLP, and Arthur Andersen LLP. At all of these firms, I developed and implemented national complex data analysis programs and courses.

2.  My qualifications are summarized in greater detail in my curriculum vitae, attached as Appendix A. Over the past twenty-two years, I have been involved in a number of complex litigation matters involving a range of issues, including data collection, conversion, management and statistical, economic or data-intensive analysis. I have worked on numerous financial services related litigation matters, including several overdraft fee-related matters, and am experienced in the collection and analysis of large volumes of banking data (including transaction, account balance, holds, authorizations, and exception processing types of data). I also have experience in preparing or providing expert testimony for financial, economic, statistical, and data-intensive related analyses.

3.  Ankura was retained by Mayer Brown LLP ("Mayer Brown") on behalf of Simmons Bank ("Simmons") to provide data analysis services and to review and comment on Plaintiffs' Expert Report of Arthur Olsen.[1] Specifically, I was asked to comment on Mr. Olsen's conclusion that he "will be able to ascertain class members and calculate the total amount of NSF fees for each customer" assessed multiple fees on what Plaintiffs allege to be the same item presented for payment in the customer's checking account and that he can do this without individual analysis.[2]  I am not opining on Nacha rules or the ACH network.

4.  The hourly bill rate currently charged by Ankura for my services in connection with this matter is $700 and the hourly bill rates for other Ankura professionals assisting me range from

---

[1] Plaintiffs' Expert Report of Arthur Olsen, July 12, 2021 ("Olsen Report").
[2] Olsen Report, ¶24.



$315/hour to $600/hour. Ankura's compensation does not depend on either the findings of my review or the outcome of this case. I have prepared this report based on the work my team and I have performed to date and the information available to me as of the date of this report. Due to the ongoing nature of this litigation, I reserve the right to supplement my opinions based on any additional information that I may be asked to consider or any additional analyses that I may be asked to perform.

## II.     CASE BACKGROUND

5.   Like many other financial institutions, Simmons Bank ("Simmons") assesses overdraft and return item fees on transactions when a customer's account is overdrawn or there are insufficient funds in the customer account, as outlined in its checking account terms and conditions and in conjunction with the applicable fee schedule.[3]

6.   Plaintiffs Shunda Wilkins and David Watson ("Plaintiffs")[4] allege that Simmons improperly assessed and collected multiple overdraft and/or return item fees relating to the alleged "same" transaction or item presented for payment in the customer's checking account.[5] Further, Plaintiffs' proposed class is defined as "[a]ll persons who, within the applicable statute of limitations period, were charged multiple fees for the same debit item in a Simmons checking account."[6]

7.   The issues in this matter center on the resubmission of Automated Clearing House ("ACH") payment instructions. The ACH network is an electronic network for financial transactions that processes large volumes of credit and debit transactions in batches.

8.   As a preliminary and foundational point, and as indicated by the ACH data, each and every transaction is considered a new and distinct transaction, regardless of whether a merchant considers it a "retry" for the payment of goods or services that remain unpaid. This is indicated, in part, by the fact that each and every ACH transaction, including a resubmitted transaction, is assigned a unique trace number. In general, no two transactions are ever given a discrete

---

[3] Amended Class Action Complaint, Case No. 3:20-cv-0016-DPM ("Complaint"), ¶17.
[4] I understand Plaintiff Graham's claims have been dismissed with prejudice. Order, Stipulation of Dismissal, Dkt 72, 10/4/20201.
[5] Complaint, ¶17-18.
[6] *Id*, ¶88.



code or identification showing they are the "same." As for hardcopy checks, even using check serial numbers to identify resubmissions presents challenges and can be inaccurate.

9.  Plaintiffs' allegations center on whether Simmons assesses multiple overdraft and/or return item fees for transactions Plaintiffs inappropriately characterize as the "same." Mr. Olsen's assignment was to determine whether he could "ascertain class members and calculate individual damages" if the case is ultimately certified.[7]

## III.   DATA AND MATERIALS CONSIDERED

10.  In preparing this report, I reviewed legal pleadings and discovery requests and responses, electronic data,[8] and other documents, including but not limited to:

A.  Amended Class Action Complaint;[9]

B.  Data for named Plaintiffs Shunda Wilkins, Diann Graham, and David Watson: Transaction journal detail (2,875 records),[10] Return Items (9 records),[11] Transactions Supplement (162 records),[12] and ACH data (1,315 records);[13]

C.  Data for sample months June 1, 2014 – August 31, 2014:[14] Transaction journal detail (3,567,941 records), Return Items (7,390 records), Transactions Supplement (257,088 records), and ACH data (452,889 records);

---

[7] Olsen Report ¶1.
[8] Electronic data includes transaction journal detail (daily posted transactions with transaction amount and transaction code), trial balance data (daily ending balances), and Automated Clearing House ("ACH") data (date, time, and descriptions of ACH transactions presented by merchants for payment).
[9] *See supra,* Footnote 3.
[10] WILKINS-0002647 (5/1/2014-8/16/2016); WILKINS-0002650 (8/17/2016–10/31/2018); WILKINS-0002653 (11/1/2018–6/30/2021. With the exception of items captured in the Return Items or Transactions Supplement reports, the transaction journal detail includes all transactions posting to a checking account.
[11] WILKINS-0002646 (5/1/2014–8/16/2016). The return items report shows all items returned by Simmons prior to August 16, 2016. Beginning August 17, 2016, returned items are included in the transaction journal detail.
[12] WILKINS-0002648 (8/17/2016–10/31/2018); WILKINS-0002651 (5/1/2014–8/16/2016). The transactions supplement shows overdraft fees assessed prior to November 1, 2018. Beginning November 1, 2018, these fees are included in the transaction journal detail.
[13] WILKINS-0002645 (5/1/2014–8/16/2016); WILKINS-0002649 (8/17/2016–10/31/2018); WILKINS-0002652 (11/1/2018–6/30/2021)
[14] On and before August 16, 2016, returned items, overdraft fees, and certain other transactions are not included in the transaction data extracted from the DD3700 report. Information about returned items has been extracted from a separate report ("EP6230P") and information about overdraft fees and round up credit and debit transactions has been extracted from the Enhanced Statement (DD7600AP). WILKINS-0001812; WILKINS-0001810; WILKINS-0001811; WILKINS-0001817



D.  Data for sample months June 1, 2017 – August 31, 2017:[15]  Transaction journal detail (4,938,408 records), Transactions Supplement (334,814 records), and ACH data (725,964 records);

E.  Data for sample months February 1, 2019 – April 30, 2019:[16]  Transaction journal detail (6,740,747 records) and ACH data (768,879 records);

F.  Plaintiffs' Expert Report of Arthur Olsen ("Olsen Report"), July 12, 2021;[17]

G.  Deposition of Lisa Hunter, Simmons Corporate Representative,[18] August 18, 2021;

H.  Deposition of Shunda Wilkins, named plaintiff, September 14, 2021;

I.  Deposition of David Watson, named plaintiff, September 15, 2021; and

J.  Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, and Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021 (collectively "Supplemental Interrogatory Responses").

11. The complete list of data and documents I considered is included as Appendix B.

## IV.    SUMMARY OF EXPERT OPINIONS

12. Based on my review of the information provided to me in this matter, as well as my experience in overdraft fee litigation matters, it is my opinion that Mr. Olsen has not undertaken the proper steps to evaluate the data or confirm the viability of his proposed process. Mr. Olsen has not described how he would handle the complexities, gaps, and limitations in the data or how he would analyze the multiple individualized issues present. His unsupported statements show that his opinions and proposed methodology regarding class identification and potential damages – including his opinion that damages can reliably be calculated on a proposed classwide basis using readily available information[19] are speculative, unreliable, and inaccurate. Specifically, my opinions are as follows:

---

[15] Between August 17, 2016 and October 31, 2018, returned items are included in the transaction data extracted from the DD3700 report, but the information about overdraft fees and round up credit and debit transactions has been extracted from the Enhanced Statement (DD7600AP).  WILKINS-0001815; WILKINS-0001814; WILKINS-0001813

[16] WILKINS-0001816; WILKINS-0001818

[17] *See supra*, Footnote 1.

[18] Simmons Chief Data Officer and Executive Vice President (8:25–9:1).

[19] Olsen Report, ¶¶24-26.



**Mr. Olsen does not demonstrate his ability to perform his hypothetical analysis using the data produced in this matter.**

13. Mr. Olsen tries to rely on high-level, non-specific descriptions of his experience serving as the basis of his opinion, much of which involve unrelated issues based on completely different theories of overdraft fee liability, such as resequencing.[20] Furthermore, Mr. Olsen preemptively issued his report describing a hypothetical process that he never attempted to test using any of the actual data produced in this litigation, not even for the named Plaintiffs. I understand that Mr. Olsen subsequently identified the fees referenced in Plaintiffs' Supplemental Interrogatory Responses,[21] but even there, he provided no detail about how he identified those fees, including whether he performed an individualized review of each named plaintiff's electronic ACH and other data, account statements, and/or internal communications with customers or whether he employed the programmatic process to which he vaguely alludes in his report.

**Based on my understanding of the data, and despite his assertions, Mr. Olsen cannot programmatically identify the class.**

14. Plaintiffs claim that Simmons assessed multiple overdraft and return item fees on the alleged "same" items, causing purported harm to Simmons customers.[22] It is my understanding the Plaintiffs have vaguely asserted three methods to identify their alleged damages:

  A. *The inclusion of "RETRY PYMT" in the ACH transmission from merchants*:[23] This is problematic because it relies on the merchant to include the precise term "RETRY PYMT." Indeed, in the data produced in this matter there are no records with this description prior to September 18, 2015,[24] and less than 2% of the ACH records on or after September 18, 2015 have the description "RETRY PYMT."

---

[20] Resequencing cases involve financial institutions modifying the posting order of transactions, *e.g.*, re-ordering debit card and ATM transactions from highest dollar amount to lowest dollar amount in a posting category. *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010); *In re checking Account Overdraft Litigation*, MDL No. 2036 (S.D. Florida, 2012); *Shane Swift v. BancorpSouth*, Case No. 1:09-MD-02036 (S.D. Florida, 2013).

[21] Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021; Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021.

[22] Complaint, ¶¶17–18.

[23] Olsen Report ¶25; Plaintiffs' First Set of Interrogatories, Nos. 2 & 8; Plaintiffs' Requests For Production of Documents Nos. 7 & 13.

[24] The Nacha requirement to include RETRY PYMT in the Company Entry Description field was effective September 18, 2015.



B. *Some payment pattern of transactions in the same amount from the same merchant within an undisclosed period of time:*[25] This is problematic because a customer can have multiple transactions within a given period of time from the same merchant and in the same dollar amount that are not resubmissions, but rather represent a new good or service provided. This method of trying to find patterns is also problematic because no reliable patterns are apparent. Indeed, Mr. Olsen has not addressed how he will account for this, and he has not explained any pattern that could be used.

C. *The presence of duplicate check serial numbers in the electronic data:*[26] While Plaintiffs raised this methodology as a possibility to identify purported damages, neither Ms. Wilkins nor Mr. Watson allege damages based on this methodology. As a result, this now appears moot. Nevertheless, even if any plaintiff attempted to claim damages based on this theory, the check serial number is not included in the transaction journal data produced for May 2014 through October 2018, complicating the ability to know whether a check is being resubmitted or another check in the same amount is being presented for payment.[27]

15. As I explain below, data limitations make it impossible to reliably identify programmatically whether a transaction is a submission of a previously returned transaction (hereafter "retry" or "retries"). To start, it is not possible from the electronic data alone to identify whether a transaction is a retry. Additionally, overdraft and return item fees cannot always be matched to their triggering transactions, which causes issues identifying proposed class members. Similarly, refunds cannot be matched to fees, and Mr. Olsen's proposed methodology would likely include non-harmed accountholders in the putative class. As a result of these limitations, determining whether accountholders actually were assessed and paid allegedly improper and unrefunded fees will require manual and individualized review of electronic data, documents,

---

[25] Olsen Report ¶ 25; Plaintiffs' First Set of Interrogatories: Interrogatory Nos. 2 & 8; Plaintiffs' Requests For Production of Documents: Request Nos. 7 & 13.

[26] Complaint, ¶71; Olsen Report ¶¶ 17, 25; Plaintiffs' Requests For Production of Documents: Request No. 7.

[27] The Return Items data, extracted from the EP6230P report, includes the check serial number for returned checks. Not all returned checks may be assessed a fee, however, so it is necessary to compare i) this information to ii) the Transaction Journal data which includes return item fees and reversed (or refunded) fees, extracted from the DD3700 report, and iii) to the Transactions Supplement, extracted from the DD7600AP report, which includes overdraft fees to identify whether multiple unrefunded fees were assessed on a check that was presented multiple times for payment.



and testimony to piece together accountholder-specific data, account documentation, and other information from bank and non-bank sources.

## V.   MR. OLSEN DID NOT DEMONSTRATE HIS ABILITY TO PERFORM HIS HYPOTHETICAL ANALYSIS USING THE DATA PRODUCED IN THIS MATTER.

16.  Although the same data I received was produced to Plaintiffs' counsel, Mr. Olsen did not use this data, in its entirety or on a sample basis, to identify accountholders charged "multiple NSF fees on the same item."[28] Instead, he relies on his experience with other unrelated matters involving different facts and allegations, and involving other financial institutions with different processes and data to make his assertions.

17. Mr. Olsen fails to describe how he will use the data available in *this* matter to match each fee to the transaction that triggered the fee; nor does he describe how he will identify whether the allegedly "same" item had previously triggered another fee:

> I can identify each transaction that was the subject of an NSF fee. I can then determine if the same item had previously resulted in and *(sic)* NSF fee. If it had, then the fee would be identified as harm. After performing this calculation for all NSF transactions for all customers during the time frame I am provided, I can calculate the total amount of harm for each customer under the Plaintiffs' theory.[29]

As discussed in more detail below, data obstacles preclude Mr. Olsen from identifying retries and then matching transactions with the related fee.

18. Mr. Olsen also does not describe with any specificity how he intends to identify and apply *refunds* in this matter. Rather, he broadly summarizes two potential options he previously used in other matters (the 30-day method and the last-in-first-out method), without demonstrating how he would account for the data gaps in this matter while using either of these approaches.[30] Further, Mr. Olsen does not acknowledge the limitations of either refund-calculation method or how he would accurately identify allegedly injured accountholders when

---

[28] Olsen Report, ¶18.
[29] Olsen Report, ¶26.
[30] Olsen Report, ¶28.



he cannot programmatically match refunds to the fees being refunded using the data produced in this matter.

19. Similarly, Mr. Olsen does not explain how he would include or exclude accounts that were assessed fees but charged off with negative account balances (and therefore unpaid by the accountholder). For example, as described in more detail below, Ms. Wilkins did not pay the single fee she is challenging because her balance was already negative at the time it was assessed,[31] and she has not repaid the negative balance owed to Simmons.[32]  Mr. Olsen states he "can easily include"[33] uncollectibles in his analysis, but provides no detail regarding how he would do so *at all*—much less with how he could do so without the need for individualized review. Mr. Olsen's assertion lacks any basis: He has not identified the electronic data he would use to identify and calculate uncollectibles, or confirmed that the data exists and is sufficiently complete over the course of the class period.

20. Mr. Olsen does not describe the processes undertaken to arrive at his opinions. In fact, Mr. Olsen has not described any general data processing steps (e.g., data cleansing, data conversion, etc.) or data validation techniques he would apply to the Simmons electronic data. It is standard practice for an expert to describe such processes, including (i) the steps involved to prepare the data for analysis, (ii) any assumptions made, and (iii) an approach for handling data anomalies and exceptions, so that the processes may be replicated and validated.[34] Also, without actually creating programs for the methodologies described in his report or digging into the electronic data enough to understand its gaps and complexities, Mr. Olsen's opinion[35] that he can reliably apply his methods to the entire proposed class using data produced in this matter is conjectural and unable to be tested. Without testing his proposed methodology on any of the actual data, Mr. Olsen cannot know the data challenges that may present themselves. In fact, he assumes that the data contains certain elements, such as posting sequence order, when in fact the data is incomplete (as explained further below). As a result, his opinion that his approach can be reliably applied to the entire proposed class to determine alleged damages is completely unreliable and speculative. Additionally, his hypothetical

---

[31] WILKINS-0002363–WILKINS-0002365
[32] Order, Dkt. 62, Filed 8/25/2021.
[33] Olsen Report, ¶29.
[34] *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).
[35] Olsen Report, ¶28.



analysis, as vaguely described, risks improperly identifying numerous accountholders as allegedly injured when they did not actually pay supposedly improper unrefunded fees.

## VI. DESPITE HIS ASSERTIONS, MR. OLSEN CANNOT PROGRAMMATICALLY IDENTIFY THE CLASS.

### A. *Mr. Olsen does not describe how he will determine whether an underlying transaction was a resubmitted transaction*

21. At the core of Plaintiffs' claims is the assertion that fees were assessed multiple times for the alleged "same" items.[36]   Evaluating whether multiple fees were assessed on the same goods/services provided by merchants or service providers requires the determination of whether a payment instruction for the same goods/services was submitted multiple times.

22. However, identifying resubmission of ACH transactions is substantially more difficult than Mr. Olsen's report assumes. It is common for customers and merchants to have an ongoing relationship in which the customer is regularly charged the same amount for goods/services provided (*e.g.*, recurring charges). In these circumstances, multiple transactions for the same account, merchant, and dollar amount in the same period of time (e.g., weekly, semi-weekly, bi-weekly, or other) is often *not* an indicator of a charge being resubmitted, but simply reflects a series of unrelated transactions being processed.

23. Perhaps sensing this difficulty, I understand that Plaintiffs' counsel has claimed that the inclusion of the term "RETRY PYMT" in certain electronic data submitted through the ACH network should alert receiving financial institutions about the resubmission of checking account transactions by merchants or service providers. While I understand that Simmons disagrees with this interpretation, even if Plaintiffs were correct, the merchant-provided descriptions must be searched days, months, and years after the transactions to even attempt to identify these merchant-identified retries. I searched all description and notes fields from merchants' ACH transmissions in the sample ACH data produced in this matter for the period prior to September 2015 (which I understand was the date on which the Nacha Rules began to require merchants to include "RETRY PYMT" in certain circumstances) for values containing "retry" or "resub"[37] and found only three transactions with a description referencing a resubmission and none that referenced "RETRY PYMT" that was required after the

---

[36] Complaint, ¶¶17–18.
[37] Searching the data for "resub" would also capture derivations including values with "resubmit," "resubmitted," "resubmitting," and "resubmission."



September 2015 Nacha rule change, or even some other permutation of "retry." Furthermore, it is not possible to confirm from the data that these are, in fact, resubmitted transactions.[38] For the period after September 2015, while "RETRY PYMT" is used more often than it was prior to the rule change, less than 2% of the ACH records have the description "RETRY PYMT," many merchants may not have labeled retries with this description, and Plaintiffs themselves do not even argue that the "RETRY PYMT" description will identify the universe of relevant transactions (*e.g.*, only 1 of 6 challenged transactions have this description related to the transaction). Moreover, I have not seen, nor am I aware of, any separate indicator or code in the transactional data which would identify transactions resubmitted by merchants or service providers.

24. Turning to checks, it is my understanding that there is not a named plaintiff representative in this matter who is alleging any damages relating to alleged check resubmissions. Specifically, Plaintiffs have not alleged multiple fees on checks for Ms. Wilkins or Mr. Watson.[39] Nevertheless, the check number is not included in certain data for May 2014 through October 2018, which means Mr. Olsen will not be able to identify purportedly resubmitted checks for this time period. Mr. Olsen has not addressed how he would account for this limitation. Moreover, Mr. Olsen has not indicated how he will determine which checks were purportedly resubmitted for the full putative class period.

B. *Fees cannot always be programmatically matched to triggering transactions, which means that any allegedly injured accountholders can be identified only through individual analysis.*

25. The data produced is further limited in that it is not possible to reliably identify each transaction that was subject to an overdraft or return item fee. To properly identify the proposed class members, each fee must be matched to the transaction that triggered it. Failing to accurately match the triggering transactions to the correct fees could misidentify accountholders who were allegedly harmed under the theories asserted by Plaintiffs in this matter.

26. There are exceptional challenges with attempting to match fees to triggering transactions in the pre-November 2018 data. For a complete analysis of fees assessed prior to November 1,

---

[38] In the sample ACH data produced in this matter, less than 2% of the records on or after the effective date of the Nacha requirement in September 2015 include a reference to "RETRY PYMT."
[39] Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021; Plaintiff David Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021.



2018, one would have to consult the Transactions Supplement data,[40] which contains assessed overdraft fees. However, this data is extracted from archived reports[41] and does not include the sequence number present in the transaction journal detail ("SEQ") which facilitates matching of fees to triggering transactions.

27.  As such, identifying with certainty which transactions were assessed fees from the electronic data alone is not possible in the pre-November 2018 data. Simmons's corporate representative noted this lack of direct connection between the fee and the transaction that triggered the fee at deposition.[42]   A manual, individualized review of the Notices of Non-Sufficient Funds mailed to individual accountholders would be necessary to attempt to identify the transactions assessed fees. As shown in **Table 1**, the Transactions Supplement includes only the account number, the date of the fee, the transaction code,[43] and the amount of the fee. As a result, it is not possible to match the fee with the triggering transaction in the example below.

**Table 1**

**Exemplar Transactions Supplement Data**

| AnonAccountId | Report Date | TC | Amount |
|---|---|---|---|
| 15656 | 7/28/2014 | 178 | ($60.00) |
| 15656 | 8/15/2014 | 178 | ($30.00) |
| 15656 | 8/25/2014 | 178 | ($60.00) |
| 15656 | 9/23/2014 | 178 | ($30.00) |
| 15656 | 9/29/2014 | 178 | ($30.00) |

28. Without being able to match fees to the correct triggering transactions, certain assumptions would need to be made about which transactions caused the overdraft or return item and were assessed fees. For example, one approach would be to assume that the last transaction(s) that posted each day incurred the fee(s). For this approach to even work, the posting sequence for transactions would be required, and this data is not available pre-November 2018. The posting order would, therefore, need to be recreated to simulate reality as closely as possible based on Simmons's actual posting order methodology. Errors in the process to

---

[40] WILKINS-0002651 (5/1/2014-8/16/2016), WILKINS-0002648 (8/17/2016-10/31/2018); WILKINS-0001811
[41] DD7600AP
[42]  Deposition of Lisa Hunter, August 18, 2021 ("Hunter Deposition"), (41:14–42:10).
[43] Transaction Code 178 indicates Overdraft Fees (Wilkins-0002411).



recreate the posting order are likely.

29. Furthermore, the more complete post-November 2018 data, which includes the posting sequence for transactions, shows this "last transaction" type approach is not reliable. As shown in **Table 2,** transactions earlier in the posting order were assessed fees; the last two transactions posting on March 11, 2019 were not, in fact, assessed fees.

**Table 2**

**Later Transactions Posting Without Fees After Fees On Earlier Transactions**

| Anon Account ID | Transaction Date | Transaction Code | Description | Debit Credit Code | Transaction Amount | Posted Sequence | Batch | Sequence Number |
|---|---|---|---|---|---|---|---|---|
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (3.14) | 1 | 1624 | 3480795275 |
| 23963 | 3/11/2019 | 178 | Overdraft Fee | D | (35.00) | 2 | 1624 | 3480795275 |
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (35.19) | 3 | 5170 | 11762511 |
| 23963 | 3/11/2019 | 178 | Overdraft Fee | D | (35.00) | 4 | 5170 | 11762511 |
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (40.00) | 5 | 6768 | 9686768776 |
| 23963 | 3/11/2019 | 178 | Overdraft Fee | D | (35.00) | 6 | 6768 | 9686768776 |
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (40.00) | 7 | 5606 | 1759183107 |
| 23963 | 3/11/2019 | 178 | Overdraft Fee | D | (35.00) | 8 | 5606 | 1759183107 |
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (50.00) | 9 | 7996 | 26270859 |
| 23963 | 3/11/2019 | 178 | Overdraft Fee | D | (35.00) | 10 | 7996 | 26270859 |
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (100.00) | 11 | 2945 | 17358766 |
| 23963 | 3/11/2019 | 178 | Overdraft Fee | D | (35.00) | 12 | 2945 | 17358766 |
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (143.50) | 13 | 9051 | 12731835 |
| 23963 | 3/11/2019 | 183 | ACH Debit | D | (41.59) | 14 | 6354 | 5133678122 |

30. As a result, making the assumption that the last transactions posting each day were the transactions with fees can be inaccurate.

31. These data complications are important because incorrectly matching fees to the triggering transactions could incorrectly link certain resubmitted transactions to fees when those transactions actually did not cause Simmons to assess a fee. As a result, the existence or amount of any alleged injury for certain accountholders could be misstated.

   C.  *Refunds cannot always be matched to overdraft or return item fees, which can cause the improper inclusion of customers who were not harmed under Plaintiffs' theory.*

32. Any fees refunded cannot be characterized as harm. Thus, to determine the existence or amount of injury for any accountholder as a result of the Simmons fee practices challenged by Plaintiffs, refunds must be factored into the analysis. This includes identifying all refund transactions and matching the refunds to the corresponding fees. In his report, Mr. Olsen



agrees that refunds must be accounted for but also admits that "in the Simmons data there is not a way to conclusively relate a reversal to a specific NSF fee for purposes of reducing the damages."[44]  For example, there is no consistent code or indicator that identifies which fee is being refunded.

33. Mr. Olsen describes two methodologies he has used in the past to programmatically match refunds to fees: the 30-day method and the last-in-first-out method. However, these algorithms rely on assumptions, and, in practice, the incorrect transactions may be chosen by Mr. Olsen's methodologies because he is not able to match refunds to fees.

34. Mr. Olsen's first proposed methodology for addressing refunds is to use a 30-day refund method to assign fees to refunds.[45] To assign refunds to the fees being refunded, each refund found in the data would be used to offset any improper overdraft and/or return item fee(s) that occurred in the preceding 30-day period.[46]  Under this methodology, if a customer incurred only one fee in the putative class period on January 1, 2019, and it was refunded more than 30 days later, that person would be in the putative class under Mr. Olsen's 30-day refund methodology despite the fact that that person would not have suffered any harm at all, since the fee was later refunded.

35. Mr. Olsen's second proposed methodology for addressing refunds is a last-in-first-out method under which each refund is applied to the last fee assessed.[47]  However, there is no reason to assume that a refund necessarily relates to the last fee assessed. In my experience, refunds may be made days, weeks, or even months after a fee was assessed. Without a way to link refunds to fees, which Mr. Olsen acknowledges does not exist in the Simmons data,[48] it is not possible to determine whether a refund relates to the last fee assessed. Again, this lack of certainty could result in refunds being assumed to apply to fees that weren't actually refunded, while fees that were refunded might be assumed to have not been refunded. As such, Mr. Olsen's damages calculation will likely overstate or understate injury for different individual accountholders due to the misapplication of refunds. For example, if a customer was assessed a fee on a "retry" transaction *and* later on a "new" transaction, and only one fee (the retry fee) was refunded, Mr. Olsen's methodology would erroneously apply the refund to the later-in-

---

[44] Olsen Report, ¶28.
[45] *Ibid*.
[46] *Ibid*.
[47] *Ibid*.
[48] *Ibid*.



time transaction (the "new" transaction), resulting in an erroneous assumption that the customer experienced an alleged injury under Plaintiffs' theory of the case.

36. Correctly linking refunds to transactions becomes even more difficult when multiple refunds are posted to an account in one transaction, or when only partial refunds are made (which also occurs in the Simmons data). In these circumstances, too, it is not possible to determine on a programmatic basis whether a particular refund is related to a fee assessed on a resubmitted transaction or another fee that is not a purported injurious fee.

37. Additionally, in my experience with these types of cases and similar data, identifying reversed transactions or refunds through refund-related transaction codes used by a bank is not reliable. Banks often use many different transaction codes for refunds and are sometimes inconsistent, making it impossible to confirm which fees are refunded from the electronic data alone. Analysis of additional documentation and/or interviews of the accountholder and/or Simmons personnel would be necessary to reliably understand the transactions. This level of individualized inquiry is not practical on a classwide basis.

38. Without the ability to match specific refunds to fees, it is not possible to determine accurately whether a potential class member was ultimately assessed and paid any fees on a resubmitted transaction without extensive manual review of account statements and without possibly needing to interview potential class members or Simmons personnel responsible for authorizing the refunds. It is not possible to tie a refund to the proper fee without first looking at statements, written notices to customers, and online account activity to see when the customer was notified of the fee and then reviewing records of internal communications with customers to try to determine the reason for the refund and which fee was the subject of the refund.

D. *Proper analysis of chargeoffs may require information from a variety of sources, without which may result in the improper inclusion of customers who were not harmed under Plaintiffs' theory.*

39. Mr. Olsen has not identified the electronic data he would use to identify and calculate uncollectibles, nor how he would analyze this data across accountholders and over the entire class period. Moreover, it is often necessary to consider information other than electronic data to accurately evaluate whether uncollectibles that Simmons charged off included purportedly wrongful fees—such as account statements and correspondence. Additionally, if concessions or a settlement were agreed upon between Simmons and the customer, additional



correspondence would require review to understand whether any at-issue fees were waived as part of the settlement. Similarly, if a partial recovery was made, additional documentation or interviews with bank personnel would be necessary to understand to which fees and/or substantive transactions the recoveries were applied and whether any alleged injurious fees remained unpaid as part of the charged off balance. Mr. Olsen has not addressed how he will account for that information or documentation in his analysis.[49]

E.   *It is necessary to piece together data and information from different sources to identify allegedly injured accountholders, which requires individualized manual review.*

40. To gain a complete view of fees assessed and the underlying transactions to which they relate, an individualized review of electronic data, account statements, NSF/overdraft notices and customer or internal correspondence is necessary to identify which transactions triggered each fee. It is not possible to determine from the electronic data or account statements alone which transactions caused the fee. As noted above, it is not possible to match all fees to the triggering transactions in the electronic data. Additionally, even referencing the account statements will not provide the needed information to make this match because fees do not always follow the transactions to which they relate. More specifically, while fees post in the "Withdrawals" section of the account statements, checks post in a separate section.[50] As such, it is not possible to reliably determine from the statement alone whether a fee relates to the debit card transaction immediately above it on the statement or to a check shown in another section of the statement. A manual review of the Notices of Non-Sufficient Funds sent to the customer identifying the triggering transaction in conjunction with the monthly account statement is necessary to reliably identify which transactions on the account statement triggered each fee.

41. In my opinion, considering all of these factors, identification of the proposed class is not possible without individualized, manual review of documents and data from a number of sources.

---

[49] Olsen Report, ¶25.
[50] WILKINS-0001287-WILKINS-0001292

*Confidential*                                                                                          17



## VII.  INDIVIDUALIZED REVIEW OF THE TRANSACTIONS DISPUTED BY NAMED PLAINTIFFS DOES NOT REFLECT INDICATIONS OF "RETRY PYMT" IN THE ACH DATA.

### A.  *Shunda Wilkins*

42.  Ms. Wilkins challenges one fee assessed on December 19, 2017.[51]   The ACH record related to the challenged fee does not include "RETRY PYMT." Furthermore, Ms. Wilkins never paid the single fee she challenges because her account was already negative at the time that fee was assessed and was not subsequently brought positive.[52] Indeed, Ms. Wilkins admitted she never paid the single fee she now seeks as alleged damages.[53] There are no fees challenged by Ms. Wilkins that are related to checks.

43.  More specifically, Plaintiffs allege that the December 18, 2017 ACH payment instruction by Liberty National on Ms. Wilkins's account in the amount of $72.93, which was assessed a return item fee on December 19, 2017, was a resubmission of a transaction previously assessed a fee on December 7, 2017.[54]   As shown in **Table 3** below, however, there is no information included in the ACH payment instruction from Liberty National identifying the payment as a "retry" transaction. Neither the *Description* nor the *Note1* or *Note2* fields include "RETRY PYMT" (or any reasonable derivation thereof) and, in fact, the Note1 descriptions are different across the payment instructions on December 7 and December 18. It is not possible from the ACH data alone to determine whether Liberty National was attempting to obtain payment again. Therefore, to evaluate whether the fee on this transaction would count as an alleged injury under Plaintiffs' theory of the case requires additional analysis of other data

---

[51] Ms. Wilkins checking account statement for November 20, 2017 through December 19, 2017 indicates that her account was overdrawn throughout this period (WILKINS-0002363–WILKINS-0002365). Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, Interrogatory No. 6. Ms. Wilkins was notified of this return item fee on December 19, 2017 (WILKINS-0001306).

[52] Ms. Wilkins was notified that her account balance was overdrawn by $437.99 and that her account had been overdrawn for 30 days or more on November 22, 2017 (WILKINS-0001303). Ms. Wilkins was notified that her account balance was overdrawn by $472.21 and that her Overdraft Privilege had been suspended on December 4, 2017 (WILKINS-1304). Account Statement, WILKINS-0002363-WILKINS-0002365; Order, Dkt 62, Filed 08/25/2021.

[53] Deposition of Shunda Wilkins, September 14, 2021 ("Wilkins Deposition") (61:11-17) ("Did you ever repay Simmons any of the money that you owed to Simmons at the time that your checking account was closed? . . . A: No.").

[54] Complaint, ¶¶22–24, Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, Interrogatory No. 6. Ms. Wilkins was notified of this return item fee on December 7, 2017 (WILKINS-0001307).



sources including the Simmons electronic data and correspondence, Liberty National documentation and correspondence, and potentially interviews with the accountholder, Simmons personnel, and/or former Liberty National personnel to determine whether the December 19, 2017 payment instruction was a resubmission of the December 7, 2017 payment instruction. The Trace Number cannot help associate the transactions because the Trace Number is different for each transaction.[55]

**Table 3**

**Transactions Related to 12/19/2017 Fee Challenged by Plaintiff Wilkins**

| Report Date | Anon Account ID | Amount | TC | Type 1 | Type 2 | Description | Company | Trace Number | Note1 | Note2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/6/2017 | 621396 | $72.93 | 27 | | PPD | INS. PREM | LIBERTY NATIONAL | 62001183607168 | CO. DISCRETIONARY DATA- LNL BANK DRAFT CO. ID- 9630124600 DESCRIPTION DATE- 171204 | INDIVIDUAL ID- 00010A007942787 ADDENDA INFO- |
| 12/18/2017 | 621396 | $72.93 | 27 | | PPD | INS. PREM | LIBERTY NATIONAL | 62001180094271 | CO. DISCRETIONARY DATA- LNL BANK DRAFT CO. ID- 9630124600 DESCRIPTION DATE- 171214 | INDIVIDUAL ID- 00010A007942787 ADDENDA INFO- |

  *B. David Watson*

44. Mr. Watson, who held a Simmons checking account with his wife, challenges five fees.[56]  Only one is associated with any sort of "RETRY PYMT" language in the ACH data, and none of the fees challenged by Plaintiffs for Mr. Watson are related to checks. The last activity on the Watsons's checking account was on February 23, 2016,[57] and Simmons charged off the account with a negative balance of $735.59 thereafter.[58]

  *i. Paid Item Fee Challenged by Plaintiff Watson (June 11, 2015)*

45. First, Plaintiffs allege that the June 10, 2015 payment instruction by PayPal on Mr. Watson's account in the amount of $3.25, which was assessed an overdraft fee on June 11, 2015,[59] was a resubmission of a transaction previously processed on June 3, 2015 and assessed a

---

[55] The Trace Number is "the 17-digit number assigned by the ODFI that uniquely identifies each entry. The first eight digits of the trace number are the Routing/Transit number of the ODFI."  Revised Healthcare Primer final 3.30.16.pdf (nacha.org).
[56] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, Interrogatory No. 6.
[57] WILKINS-0001765
[58] Deposit Inquiry dated February 27, 2018 (DWatson_0001). WILKINS-0001763; WILKINS-0003810.
[59] Mr. & Ms. Watson were notified of this paid item fee on June 11, 2015 (WILKINS-0003833).



fee on June 4, 2015.[60]  As shown in **Table 4** below, however, there is no information included in the ACH payment instruction from PayPal allegedly identifying the payment as a retry transaction. Neither the *Description* nor the *Note1* or *Note2* fields include "RETRY PYMT" (or any reasonable derivation thereof). Furthermore, the Note1 descriptions for these transactions are different. It is not possible from the ACH data alone to determine whether PayPal was attempting to obtain payment again. Therefore, to evaluate whether the fee on this transaction would count as an alleged injury under Plaintiffs' theory of the case requires additional analysis of other data sources including the Simmons electronic data and correspondence, and interviews with the accountholder, Simmons personnel, and/or PayPal personnel to determine whether the June 10, 2015 payment instruction was a resubmission of the June 4, 2015 payment instruction. The Trace Number cannot help associate the transactions because the Trace Number is different for each transaction.

**Table 4**

**Transactions Related to 6/11/2015 Fee Challenged by Plaintiff Watson**

| Report Date | Anon Account ID | Amount | TC | Type 1 | Type 2 | Description | Company | Trace Number | Note1 | Note2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/3/2015 | 203693 | $3.25 | 27 | NULL | WEB | INST XFER | PAYPAL | 91000016299032 | CO. DISCRETIONARY DATA- INSTANT TRANSFER        CO. ID- PAYPALSI77 DESCRIPTION DATE- 150602   WEB-S | INDIVIDUAL ID- EBAYINCSHIP ADDENDA INFO- |
| 6/10/2015 | 203693 | $3.25 | 27 | NULL | WEB | INST XFER | PAYPAL | 91000010113963 | CO. DISCRETIONARY DATA- INSTANT TR(R)   H     CO. ID- PAYPALSI77 DESCRIPTION DATE- 150602   WEB-S | INDIVIDUAL ID- EBAYINCSHIP ADDENDA INFO- |

### ii.   *Paid Item Fee Challenged by Plaintiff Watson (August 17, 2015)*

46. Second, Plaintiffs allege that the August 14, 2015 payment instruction by PayPal on Mr. Watson's account in the amount of $6.17, which was assessed an overdraft fee on August 17, 2015,[61] was a resubmitted transaction previously processed on August 7, 2015 and assessed a fee on August 10, 2015.[62] As shown in **Table 5A** below, however, there is no information included in the ACH payment instruction from PayPal allegedly identifying the payment as a retry transaction. Neither the *Description* nor the *Note1* or *Note2* fields include "RETRY PYMT" (or any reasonable derivation thereof). Furthermore, the Note1 descriptions

---

[60] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, Interrogatory No. 6. Mr. & Ms. Watson were notified of this fee on June 4, 2015 (WILKINS-0003834).
[61] Mr. & Ms. Watson were notified of this paid item fee on August 17, 2015 (WILKINS-0003830).
[62] Mr. & Ms. Watson were notified of this return item fee on August 10, 2015 (WILKINS-0003831).



for these transactions are different. It is not possible from the ACH data alone to determine whether PayPal was attempting to obtain payment again. Again, the Trace Number cannot help associate the transactions because the Trace Number is different for each transaction.

**Table 5A**

**Transactions Related to 8/17/2015 Fee Challenged by Plaintiff Watson**

| Report Date | Anon Account ID | Amount | TC | Type 1 | Type 2 | Description | Company | Trace Number | Note1 | Note2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/7/2015 | 203693 | $6.17 | 27 | | WEB | INST XFER | PAYPAL | 9100001884962 | CO. DISCRETIONARY DATA- INSTANT TRANSFER    CO. ID- PAYPALSI77 DESCRIPTION DATE- 150806   WEB-S | INDIVIDUAL ID- HULU ADDENDA INFO- |
| 8/14/2015 | 203693 | $6.17 | 27 | | WEB | INST XFER | PAYPAL | 9100001079094 | CO. DISCRETIONARY DATA- INSTANT TR(R)       CO. ID- PAYPALSI77 DESCRIPTION DATE- 150806   WEB-S | INDIVIDUAL ID- HULU ADDENDA INFO- |

47. Furthermore, the electronic data alone does not tell a complete story of what occurred on this PayPal transaction because it does not conclusively show whether the related fee was refunded. As shown in **Table 5B**, Simmons credited $30 to the Watsons's account on August 20, 2015 as a "Credit Back Item."  "Credit Back Items" are those items which I understand may, but do not always, signify a refund depending upon the circumstances present at the time a refund was made.[63] There is no indication anywhere in the data as to which transaction the Credit Back Item relates. To attempt to figure this out, I reviewed Notices of Non-Sufficient Funds, the account statements, and the underlying account documentation produced by Simmons.[64]  Upon review of this documentation, it is clear *only* that a $30 fee was refunded. It is unclear whether the bank is refunding $30 because of the $6.17 PayPal transaction or another $84.91 PayPal transaction. For a conclusive determination, I would need to interview both Simmons and Mr. and Ms. Watson.[65] If the $30 credit is a refund of the fee assessed on August 17, 2015, Mr. Watson cannot legitimately claim harm from the fee on the purportedly resubmitted $6.17 PayPal payment instruction as it was ultimately refunded.

---

[63] Hunter Deposition, 40:1–41:3.
[64] WILKINS-0002399-2400; WILKINS-0001805.
[65] Mr. Watson confirmed at deposition that, in fact, he did receive a refund for this return item fee *("Well, I guess I'm trying to get $120 back instead of 150 now.")*; Deposition of David Watson, September 15, 2021 ("Watson Deposition"), 169:5-172:23.



**Table 5B**
**Transaction Journal Activity for Plaintiff Watson August 2015**

| Report Date | Anon Account ID | BCH | SEQ | Tran ID | RT | TC | Amount | Transaction Description |
|---|---|---|---|---|---|---|---|---|
| 8/7/2015 | 203693 | 8607 | 18849623 | | | 183 | ($6.17) | ACH Debit |
| 8/10/2015 | 203693 | 504 | 18849623 | | | 121 | ($30.00) | Return Item Fee |
| 8/11/2015 | 203693 | 358 | 190018746 | | | 20 | $30.00 | Deposit |
| 8/17/2015 | 203693 | 7106 | 17365134 | | | 183 | ($84.91) | ACH Debit |
| 8/17/2015 | 203693 | 504 | 10790949 | | | 183 | ($6.17) | ACH Debit |
| 8/17/2015 | 203693 | 504 | 10790949 | | | 128 | ($30.00) | Paid Item Fee |
| 8/20/2015 | 203693 | 502 | 12 | | | 136 | $30.00 | Credit Back Item |

48. In this instance, it was necessary to review multiple pieces of bank correspondence, in addition to the electronic data, to understand the assessment and subsequent refunding of the paid item (overdraft) fee on August 17, 2015. This course of events is an excellent example of why systematic analysis cannot identify alleged harm to Plaintiffs or any putative class members.

### iii.   *Return Item Fee Challenged by Plaintiff Watson (January 11, 2016)*

49. Third, Plaintiffs allege that the January 8, 2016 payment instruction by Verizon Wireless on Mr. Watson's account in the amount of $367.05, which was assessed a return item fee on January 11, 2016,[66] was a resubmitted transaction previously assessed a fee on January 5, 2016.[67]   As shown in **Table 6** below, however, there is no information included in the ACH payment instruction from Verizon Wireless allegedly identifying the payment as a retry transaction. Neither the *Description* nor the *Note1* or *Note2* fields include "RETRY PYMT" (or any reasonable derivation thereof). It is not possible from the ACH data or any other electronic data alone to determine if Verizon was attempting to obtain payment again. Therefore, to evaluate whether the fee on this transaction would count as an alleged injury under Plaintiffs' theory of the case requires additional analysis of other data sources including the Simmons electronic data and correspondence, and interviews with the accountholder, Simmons personnel, and/or Verizon Wireless personnel to determine whether the January 8, 2016 payment instruction was a resubmission of the January 5, 2016 payment instruction. The

---

[66] Mr. Watson was notified that his account balance was overdrawn by $645.59 and that his account had been overdrawn for 15 days or more on January 6, 2016 (WILKINS-0003809). Mr. & Ms. Watson were notified of this return item fee on January 11, 2016 (WILKINS-0003819).

[67] Complaint, ¶¶47–50. Mr. & Ms. Watson were notified of this return item fee on January 5, 2016 (WILKINS-0003821).



Trace Number cannot help associate the transactions because the Trace Number is different for each transaction.

**Table 6**

**Transactions Related to 1/11/2016 Fee Challenged by Plaintiff Watson**

| Report Date | Anon Account ID | Amount | TC | Type 1 | Type 2 | Description | Company | Trace Number | Note1 | | Note2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/4/2016 | 203693 | $367.05 | 27 | | WEB | VZW WEBPAY | VZ WIRELESS VE | 2100002747236 | CO. DISCRETIONARY DATA- 800-350-2830 CO. ID- 0000751800 DESCRIPTION DATE- 160101 | WEB-S | INDIVIDUAL ID- 9939069 ADDENDA INFO- |
| 1/8/2016 | 203693 | $367.05 | 27 | | WEB | VZW WEBPAY | VZ WIRELESS VE | 2100002926240 | CO. DISCRETIONARY DATA- CO. ID- 0000751800 DESCRIPTION DATE- 160101 | WEB-S | INDIVIDUAL ID- 9939069 ADDENDA INFO- |

#### iv.   Return Item Fee Challenged by Plaintiff Watson (February 1, 2016)

50. Fourth, Plaintiffs allege that the January 28, 2016 payment instruction by Progressive Direct Insurance on Mr. Watson's account in the amount of $108.10, which was assessed a return item fee on February 1, 2016, was a resubmitted transaction previously assessed a fee on January 26, 2016. Of all the challenged fees resulting from transactions referenced in the Complaint and Supplemental Interrogatory Responses, this is the *only* one of six payment instructions (less than 17% of challenged fees) including a description that the merchant is allegedly retrying the transaction for payment. As shown in **Table 7**, the payment instruction in the amount of $108.10, which was assessed a fee on February 1, 2016,[68] states "RETRY PYMT" in the Description field. The Trace Number cannot help associate the transactions because the Trace Number is different for each transaction.

---

[68] Complaint, ¶¶52–55; Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, Interrogatory 6. Mr. & Ms. Watson were notified of this return item fee on February 1, 2016 (WILKINS-0003815).



**Table 7**

**Transactions Related to 2/1/2016 Fee Challenged by Plaintiff Watson**

| Report Date | Anon Account ID | Amount | TC | Type 1 | Type 2 | Description | Company | Trace Number | Note1 | Note2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/25/2016 | 203693 | $108.10 | 27 | | PPD | INS PREM | PROG DIRECT INS | 21000025765108 | CO. DISCRETIONARY DATA-BRANCH03DEBIT ACH CO. ID-9409348047 DESCRIPTION DATE- 160125 | INDIVIDUAL ID-907976763 DAVID ADDENDA INFO- |
| 1/28/2016 | 203693 | $108.10 | 27 | | PPD | RETRY PYMT | PROG DIRECT INS | 21000022394246 | CO. DISCRETIONARY DATA-BRANCH03DEBIT ACH CO. ID-9409348047 DESCRIPTION DATE- 160125 | INDIVIDUAL ID-907976763 DAVID ADDENDA INFO- |

*v.    Return Item Fee Challenged by Plaintiff Watson (February 9, 2016)*

51. Fifth, Plaintiffs allege that the February 8, 2016 payment instruction from Verizon Wireless on Mr. Watson's account in the amount of $1,371.44, which was assessed a fee on February 9, 2016,[69] was a resubmitted transaction previously assessed a fee on February 2, 2016.[70] As shown in **Table 8** below, there is no information included in the ACH payment instruction from Verizon Wireless allegedly identifying the payment as a retry transaction. Neither the *Description* nor the *Note1* or *Note2* fields include "RETRY PYMT" (or any reasonable derivation thereof) and, furthermore, the Note1 descriptions are different between the payment instructions on January 29, 2016 and February 8, 2016. It is not possible from the ACH data alone to determine whether Verizon was attempting to obtain payment again. Therefore, to evaluate whether the fee on this transaction would count as an alleged injury under Plaintiffs' theory of the case requires additional analysis of other data sources including the Simmons electronic data and correspondence, and interviews with the accountholder, Simmons personnel, and/or Verizon Wireless personnel to determine whether the February 8, 2016 payment instruction was a resubmission of the February 2, 2016 payment instruction.

---

[69] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, Interrogatory 6. Mr. & Ms. Watson were notified of this return item fee on February 9, 2016 (Wilkins-0003811).

[70] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021, Interrogatory 6. Mr. & Ms. Watson were notified of this return item fee on February 2, 2016 (Wilkins-003813).



**Table 8**

**Transactions Related to 2/9/2016 Fee Challenged by Plaintiff Watson**

| Report Date | Anon Account ID | Amount | TC | Type 1 | Type 2 | Description | Company | Trace Number | Note1 | Note2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/29/2016 | 203693 | $1,371.44 | 27 | | WEB | VZW WEBPAY | VZ WIRELESS VE | 21000026450119 | CO. DISCRETIONARY DATA- 800-350-2830 CO. ID- 0000751800   DESCRIPTION DATE- 160129   WEB-S | INDIVIDUAL ID- 5564449 ADDENDA INFO- |
| 2/1/2016 | 203693 | $1,371.44 | 27 | | WEB | VZW WEBPAY | VZ WIRELESS VE | 21000026450119 | CO. DISCRETIONARY DATA- 800-350-2830 CO. ID- 0000751800   DESCRIPTION DATE- 160129   WEB-S | INDIVIDUAL ID- 5564449 ADDENDA INFO- |
| 2/8/2016 | 203693 | $1,371.44 | 27 | | WEB | VZW WEBPAY | VZ WIRELESS VE | 21000020370421 | CO. DISCRETIONARY DATA- CO. ID- 0000751800      DESCRIPTION DATE- 160131   WEB-S | INDIVIDUAL ID- 5564449 ADDENDA INFO- |

52. Beyond the transactions specifically referenced in the Complaint and Supplemental Interrogatory Responses, I also evaluated all of the ACH data produced for the named Plaintiffs' accounts to identify any other instances for which the *Description*, *Note1*, or *Note2*[71] fields include "RETRY PYMT" or any reasonable derivation thereof.[72]  For these accounts, I did not identify any ACH transactions including "RETRY PYMT" or any reasonable derivation thereof other than the transaction shown in **Table 7** relating to Mr. and Ms. Watson above.[73]

## VIII.   CONCLUSION

53. In summary, given all the issues with Mr. Olsen's proposed approach described above, there is not a reliable method to identify, on a classwide basis, the customers within Plaintiffs' proposed class. Mr. Olsen did not perform any part of the analysis he broadly and vaguely asserts in his report using any the data produced in this matter (or even a sample of that data) prior to issuing his report. Furthermore, he is unable to accurately perform his hypothetical analysis because of the gaps and limitations in the data elements described in this report. While it is my understanding that Mr. Olsen subsequently identified the named plaintiff-related fees referenced in the Supplemental Interrogatory Responses, there is no detail about how Mr. Olsen identified those fees, including whether he performed an individualized review of each named plaintiff or whether he employed the ambiguous programmatic process described in his report.

---

[71] In the November 1, 2018 – June 30, 2021 ACH data, the corollary fields are the Description1 and Description2 fields.
[72] WILKINS-0002645 (5/1/2014-8/16/2016); WILKINS-0002649 (8/17/2016-10/31/2018); WILKINS-0002652 (11/1/2018-6/30/2021)
[73] This field includes a variety of descriptions including payment references (e.g., "PMT03948"), general descriptions (e.g., "PETINSUR"), and codes that would require additional explanation for full understanding ("REDACTED V062714", where the accountholder's name has been redacted).

*Confidential*



54. The foregoing statements are made under penalty of perjury and are true and correct to the best of my knowledge and belief.


Executed this 4th day of October 2021 at Los Angeles, CA.


_____

Sonya S. Kwon

# APPENDIX A



# Sonya Kwon

### Senior Managing Director

1 Park Plaza, Suite 1050, Irvine, CA 92614

## Contact

Direct    +1.949.409.9626
Mobile   +1.213.949.5649
sonya.kwon@ankura.com

**EDUCATION**
Masters of Business Administration, University of California, Los Angeles

Bachelor of Arts, Economics, University of California, Berkeley

**AFFILIATIONS**
West Coast Chapter of Women's Leadership and Mentoring Alliance (WLMA)

ABA Section of Litigation

Sonya is a Senior Managing Director in Ankura's  Commercial Disputes and Forensics (CDF) practice and leads a national economics team that specializes in the application of statistical, economic, financial and complex data analyses to legal and regulatory issues. She has over twenty years of experience leading data-intensive matters including overdraft fee litigation matters, data and privacy breaches, TCPA matters, labor and employment disputes, consumer class action suits, financial services related matters, regulatory and governmental investigations, healthcare litigation, financial and accounting investigations, theft of trade secret matters, entertainment royalty and FCPA audits, and other cases requiring the analysis of systems, structured data, financial or statistical modeling. Technically, Sonya has extensive experience in the cost-effective and total quality management of large dataset capture and analysis and has worked with Fortune 100 companies to analyze data from the largest warehouses.  She is an expert in data science and has developed numerous relational database design, data quality management, economic modelling and computer programming courses to fellow employees and clients. She has served as a named expert on dozens of matters involving quantification of damages, class certification issues, the collection and analysis of data, statistical analysis, complex data modeling, data integrity, as well as wage and hour and other class action issues.

**Practice Area**

- Consumer Class Action Matters
- Wage and Hour Class Action Matters
- Financial Services Matters
- Complex Data Management Analysis and Data Science
- Statistical Analysis and Economic Analysis
- Regulatory and Governmental Investigations

**Client and Industry Focus**

- Telecommunications
- Insurance
- Banking and Financial Services
- Healthcare
- Media and Entertainment
- Retail



Sonya Kwon

### Representative Financial Services Matters

- **Overdraft Fee Class Action Matters:** Directed numerous teams in dozens of overdraft fee related class action litigation matters for large financial institutions. Reviewed Plaintiff reports and prepared rebuttal analysis and evaluated the reasonableness and accuracy of the methodologies utilized by Plaintiffs' data analysis expert. Served as testifying expert witness.

- **Consumer Class Action (Major National Mortgage Provider):** Retained as the expert on a consumer class action matter involving allegations that borrowers were overcharged on fees related to renewing mortgages rates. Analyzed marketing materials and millions of historical marketing and loan transactional records to assess liability and to estimate potential exposure.

- **Breach of Contract Dispute (Financial Institution):** Retained as the Third-party Neutral Expert in a matter pertaining to allegations of a breach of Insurance Recovery Agreement for REO properties entered into by the parties.  Led a team in analyzing data from disparate sources including bank loan foreclosure and real-estate owned ("REO") property records, asset manager records, hazard insurance recovery provider data and insurance claims records to provide expert opinions regarding: 1) the potentially relevant loan and/or REO population; 2) the potential REO assignment shortfall; 3) the financial payments for recoveries made on this REO population; and 4) the assumptions and characteristics applicable to determining the calculations.  Issued expert report and provided key expert testimony in arbitration.

- **Breach of Contract Dispute (Financial Institution):** Led a team in a class action matter involving allegations of misleading information on loan marketing and disclosures. Led a team in analyzing data from disparate sources including borrower information, loan transactional detail, as well as service information to evaluate class certification issues as well as analyze potential exposure.

- **Corporate Trust Accounting Investigation (Large Commercial Bank):** Provided litigation support services to a large financial institution in a class action lawsuit pertaining to corporate trust accounting practices. Designed and developed a SQL Server data repository containing over 200 million historical client transactions.  Performed bond recalculations from transactional data and developed a reporting system. Created complex financial models to estimate escheat liabilities.

- **Financial investigation (Large Non-Profit Financial Institution): Designed** and developed a database to support defense efforts in a high profile investigation involving over $1 billion in alleged damages against a financial institution.  Studied investment relationships to understand transferring of funds across accounts.  Programmed sophisticated processes of recreating, analyzing and summarizing investment account histories and applied advanced statistical theories to understand patterns and anomalies.

- **Alleged Trust Accounts Mismanagement Investigation (Government):** Developed an analytical data repository of 60 million transactional records for a period of 15 years for a large-scale investigation of individual Native Americans involving the mismanagement of individual trust accounts. Reconciled over 500,000 accounts to determine account status, misclassified accounts, and beginning balances at the time of electronic system inception.



Sonya Kwon

*Representative Consumer Class Action Litigation Matters*

- **Consumer Class Action (National Insurance Provider):** Led a team in providing defense support in a consumer class action matter involving allegations against numerous insurance providers regarding a software program that allegedly underestimated insurance claim amounts. Performed complex data analysis and statistical tests on uninsured and under-insured claims to assess whether the program was systematically awarding amounts in favor of the insurance companies.  Assessed whether the amounts for various bodily injury claims were statistically reasonable and fair over time and across individuals.

- **Consumer Class Action (National Insurance Provider):** Led a team in a consumer class action matter involving allegations that the due dates on insurance renewal bills were misleading and were earlier than the effective dates of automobile insurance policies. Analyzed millions of records to assess statistical trends between types of consumers and payment behavior for any given customer.  Assessed reasonableness of whether consumers were misled into submitting payments early and estimated potential liability and exposure.

- **TCPA Matters (Various):** In numerous TCPA matters, (1) provided privileged consulting and/or submitted expert reports and provided deposition testimony on behalf of the defense; (2) evaluated company data collection/tracking methods and data systems to identify whether potentially relevant data exists; (3) assessed the identification of purported class members, the reliability of selected information on call records, and the completeness of caller identification information on complaint records; (4) evaluated third party sources to assess whether numbers were wireless or wireline numbers at the time of the call and performed extensive research into phone number call histories to assess ownership; and (5) been engaged to ascertain the class and prepare analysis to evaluate whether the data was reliable and could be used to identify putative class members.

- **TCPA Matters (Financial Services):** In a privileged consulting matter, led the design and development of SQL Server databases to house and manage detailed customer calls for call centers and banks in class action matters involving TCPA related allegations. Acquired over 100 million electronic call records from client computer systems and reorganized data into relational tables to facilitate analyses. Performed extensive data quality audits of the data and provided data and document production services. Led statistical and economic analyses related to class certification issues.

- **Consumer Class Action (National Manufacturer):** Retained by a large national manufacturer to analyze warranty claims data, sales data, and customer service notes. Performed complex data and statistical analyses and issued a report on class certification issues.

- **Product Liability Class Action:** In a nationwide class-action products liability matter, Navigant Consulting analyzed statistically valid samples of Medicaid claims data from several states in order to determine the typicality and commonality of demographic and utilization patterns of various sub-populations. These analyses included identifying a correlation between demographic composition and the disease mix or utilization patterns of a population.

- **Class Action (Electric Company):** Navigant Consulting was engaged by a large electric energy company of Puerto Rico. NCI provided an independent investigation and testimony in the class certification phase of a $750 million lawsuit in connection with alleged consumer billing fraud. Led a team of data specialists to successfully acquire and analyze multiple client databases, confirming that pricing calculations were correct, and that actual billing statements conformed to the rate structure as set forth by the government of Puerto Rico. Performed calculations



Sonya Kwon

to determine the degree of homogeneity of the proposed class action and identified serious conflicts of interest and lack of commonality and representativeness.

- **Charge-back Analysis (Telecommunications):** For a major telecommunications company, evaluated reasonableness and accuracy of charge-backs associated with customer service requests related to complaints for '900' number calls.  Reviewed multiple data sources containing information pertaining to the time requests were made and responses were recorded as well as any ultimate actions taken to correct the issues.  Developed a statistical sampling methodology to evaluate the process and created an analytical data repository of multiple data sources containing millions of transactions.

- **Refund Analysis (Major Retailer):** For a major big box retailer, hired on a privileged consulting basis to evaluate whether charge-backs and returns associated with electronic products were reasonable and accurate. Reviewed multiple sources of supporting information including invoices and documentation to determine if charge-backs were appropriately validated.  Estimated the balance on the A/R after adjustments were made.

## *Representative General Matters*

- **Theft of Trade Secrets Matter (Information Provider**): Retained as the expert in a theft of trade secrets matter involving competing subscription providers of online and hard copy information. The scope of our work included reviewing the data that had been exchanged by both parties, converting the data into an analytical repository, standardizing the data to facilitate a comparison of the data contents including metadata for the two competing products, and reviewing the content of the databases to evaluate the likelihood that the defendants used unauthorized access to proprietary information for their benefit and make inaccurate statements to the public about the superiority of their information.  We were also asked to assess and comment on the following the reliability of the data produced by both parties and the reasonableness of making any direct comparisons between the competing products to the marketplace.

- **Theft of Trade Secrets Matter (Information Provider):** Retained as the expert in a theft of trade secrets matter involving competing providers of real estate information. The scope of our work included a forensic review of the information accessed and relied upon. Reviewed the software utilized by both parties and algorithm and process by which information was collected.  Analyzed and compared documentation including bids, process flows and other business logic and rules related to the programs for companies pre-separation and opine on the similarities and differences in the coding, programming, and business logic. Also provided testimony on the potential usefulness of code, business logic, and rules that are transferred to a different programming language.

- **Software Dispute:** Retained by a County in California to review and analyze data and documents related to a software vendor's allegedly failed contract to implement a custom property tax management system.  Reviewed programming, data and documents to assess liability and estimate damages County potentially suffered. The case resulted in the County being awarded a settlement in the amount estimated by Navigant. Reviewed and assess liability and damage issues including code and databases developed to date by vendor, viability and usability of the work completed to date by the vendor, amount paid to the vendor for services, external and incremental costs to finish the project and maintain the system.

- **Accounting Restatement (Global Software Company):** Engaged by management of a software company to assist with a multiyear accounting restatement involving the following issues: 1) recognizing consulting project revenue on a completed performance basis; 2) project completion time and contract related records were not



Sonya Kwon

reliable. Led the team in extracting, processing and analyzing data from SAP, Oracle, ERP systems, and tape archives.  Navigant obtained project completion date evidence through reviews of customer correspondence and software delivery tickets, interviews with project managers, and email reviews. Also led the efforts to build a database to collect evidence and to enable enhanced collaboration with client personnel and automated reporting system to prepare auditor support packages.

- *Review of Accounting Procedures (Entertainment Company):* Led a team in reviewing year-end accounting and quality control procedures.  Reviewed general ledger accounting transactions from sub-business units and reviewed the SAP system and relevant hard copy document support to determine if there was adequate documentation and accurate posting of transactions by the finance department.  Quantified the economic impact of noncompliance with contractual obligations and federal, state and local regulations

- *Royalty Reporting Review (Large Entertainment Company):* Led the data quality assessment and analysis in response to multiple royalty audits of a major entertainment company regarding allocation of distribution costs for cable and pay television, home video, theatrical, and non-theatrical income. Scope of work included: 1) Understanding the procedures used by internal accounting and financial groups to record and report financial information; 2) tracing revenues and expenses through various levels of internal reporting systems to confirm data integrity, accuracy and consistency before data was released to the requesting party; and 3) making recommendations for improved efficiency and accuracy of reporting systems. Applied sophisticated database techniques and statistical theories to develop cutting-edge data analyses/models to perform in-depth review of all underlying mainframe, SAP, JDE, ORACLE, and contract rights systems that feed into participations reporting system.

- *Financial Systems Review (Large Entertainment Company):* Led multi-faceted consulting engagement to assist a major entertainment company with general streamlining, automating, and tightening of internal controls for financial reporting and tracking purposes. Led interviews of numerous business leaders and systems/IT personnel to understand: 1) relevant business processes including manufacturing, warehousing, distribution, and revenue/expense sharing with participants; 2) internal controls; and 3) reporting for all relevant business functions. Led the review of financial reporting accuracy and robustness of the IT systems including a detailed review of historical and current system 'mappings' and 'queries'.  Reviewed financial statements and reports to ensure accuracy in reporting and calculations. Reviewed invoices, adjustments, charge-backs, and set-offs to assess the reasonableness and accuracy of transactions and estimated outstanding A/R and account balances.

- *Systems Review (Satellite Distributor)*: For a major satellite distributor, performed privileged consulting in connection with royalty audit. Performed an in-depth financial review of multiple facets of their business including purchases, revenues, expenses, charge-backs and rebates.  Developed statistical testing modules to identify patterns, hidden relationships, anomalies, outliers and gaps; performed segmentation analyses; and created an analytical data repository to analyze royalty reporting processes.

- *Systems Architecture Review/ Efficiency Assessment (Waste Management Company):* Conducted an in-depth privileged systems review and efficiency assessment of all relevant IT systems for a large waste management company which included SAP, JDE and Oracle systems.  Developed an automated proprietary computerized module for a large waste management company to streamline the financial reporting system.  Programmed the tool to also review the accuracy and validity of the data migration process to and from various databases.



- ***Data Quality Assurance Review (US Governmental Agency):*** In support of the US EPA Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) enforcement efforts, served as a national expert on the application of SAP business management software in the business practices of major U.S. companies.  Performed the following: 1) reviewed a large data dump from an SAP-over-Oracle database for tracking distribution and sales information; and 2) assessed the quality of data that another Contractor reconstructed in spreadsheet format from that data dump. The data dump was submitted by the subject of an enforcement investigation, a Fortune 500 company.

### *Representative Employment Litigation Experience*

- ***Wage and Hour (Improper Termination):*** Calculated damages in an improper termination matter. Reviewed calculation of alleged lost earnings and benefits, emotional distress and medical bills, costs of searching for new work, and punitive damages.

- ***Wage and Hour (Mortgage Broker):*** Led defense analyses involving alleged minimum wage and overtime issues pertaining to training costs.  Analyzed all available timekeeping and system timestamp records and payroll systems to develop a statistical methodology for estimating potential exposure for statute of limitations period.

- ***Wage and Hour (International Company):*** Led team in evaluating all available metadata from IT systems as proxies for potential time worked.  Led discussions with Plaintiff's expert in discovery and meet and confer meetings. Developed economic models to estimate exposure related to potential overtime and minimum wage related allegations.

- ***Employee Wage and Hour (Nurses and Physicians)****:*  Led dozens of class action matters for national hospital networks.  Analyzed payroll, time and attendance, and exception reports, and applied economic and statistical modeling to calculate exposure related to alleged issues with the tracking and calculation of the regular rate of pay. Assessed potential award amounts to the plaintiffs, the time and dollar impact of overtime, the effect of increased payroll expenses on profit-based bonuses, and calculated offsets to potential exposure.

- ***Wage & Hour (Hospital):*** Retained by a hospital group to review and analyze payroll and time punch data for non-exempt hourly personnel, and determine potential damages related to overtime payments, meal and rest break violations, and time system rounding errors, in accordance with California state law.

- ***Employee Misclassification (Electronics National Retailer)****:*  Led seven class action matters for national electronics retailer chain.  Developed an analytical data repository of payroll, time and attendance and hard copy exception data, and applied economic and statistical modeling to calculate exposure related to the alleged misclassification of store managers for a national electronics retailer. Prepared expert economic report that included an opinion on potential award amounts to the plaintiffs, the time and dollar impact of overtime, the effect of increased payroll expenses on profit-based bonuses, and calculated offsets to potential exposure due to decreased profits.

- ***Off-the-Clock and Break Time Violations (Major Big Box Retailer)*:** Developed an analytical data repository of punch clock, hard copy exception, payroll and point-of-sale data to evaluate claims of inappropriate time shaving and break inserts and to detect instances of time deletions and inserted breaks for a national merchandiser. Assisted in the preparation of expert report to respond to allegations of time deletions and inserted breaks.

- ***Meal and Rest Break Violations (National Electronics Retailer)*:** Analyzed over 83 million point-of-sale transactions to develop a proxy for employee behavior in the class certification stage for a national electronics



Sonya Kwon

retailer.  Applied advanced clustering algorithms to identify unique attributes of employees, categorize combinations of employee attributes into distinct cluster groups and to quantify the magnitude of differences in groups.  Developed a sampling methodology to compare hard copy scheduling documents with the point-of-sale data to test accuracy of time card recording.  Prepared expert report to oppose plaintiff's motion for class certification.

- ***Employee Misclassification (National Bank):*** For one of the largest international banks, led a team of privileged consultants to assist in the class certification defense of a wage and hour case involving alleged overtime and missed breaks.  Developed surveys to collect data on the amount of time spent on different tasks. Prepared statistical analyses to assess the heterogeneity and trends across the branches, employees, and locations. Analyzed and evaluated the statistical validity of Plaintiffs' expert's analyses.

- **Misclassification (Global Professional Services Firm):** Led consulting services to a large accounting firm in a matter involving alleged misclassification issues.  Conducted surveys to evaluate the merits of the allegations and prepared statistical analyses to evaluate potential exposure.  We also assisted in the defense against class certification.

- ***Wage and Hour (National Transportation Company):*** Led defense analyses involving potential meal and rest break, daily overtime and regular rate of pay exposure.  Analyzed electronic timekeeping systems and current payroll systems to estimate exposure for statute of limitations period. Reprogrammed calculations to incorporate all components of regular rate of pay (i.e., bonus and incentive pay) in the payroll system.

- ***CA Wage and Hour Issues (Department Store Chain):*** For a large department retail store chain, provided privileged consulting services to assess the potential exposure and merits related to allegations of unpaid overtime and meal break violations.

- ***Off-the-Clock and Break Time Violations (Call Center):*** Developed an analytical data repository of phone timekeeping, badge swipe, computer log in, and productivity information to evaluate claims of off-the-clock work and missed breaks against a national call center.  Prepared expert report in opposition to class certification of over 2,000 employees. Our analyses included qualitative and quantitative studies of patterns and practices, commonality and typicality to defend class certification and rebuttal of Plaintiffs' statistical methodology.

### *Healthcare Litigation Matters*

- ***Data Breach (Large National Hospital Chain):*** Led engagement on a data breach matter involving a large national hospital chain. Reviewed structured data retrieved from computer systems, network servers, and other proprietary systems to understand the potential breach of personal health information and personally identifiable information.

- ***Data Breach (Major Health Plan):*** In a data breach matter involving lost and/or misplaced backup hardware, analyzed structured data from various data systems and scanned documents regarding health plan member data, to assess the type of information that was potentially compromised as well as the identity of the individuals impacted.

- ***Class Action Litigation (Sports League):*** Served as an expert on behalf of a national sports league in a class action concussion lawsuit filed by former players, which alleged that the league did not do enough to protect and inform its players about the dangers of traumatic head injuries. Served as the statistician and complex data expert and reviewed available data regarding game statistics, medical records, player history, etc to review and analyze numerous statistical trends.



Sonya Kwon

- ***Response to DOJ Investigation (Pharmaceutical Company):*** Led a team to help a large pharmaceutical company respond to an investigation regarding allegations of oversized tablets.  Reviewing millions of records related to call records, emails, quality assurance follow up records, adverse events and unusual incident reports for the relevant tablets in question.

- ***Review of Improper Medicare Billing Allegations (Healthcare Provider):*** Led a team to develop a sampling plan in which cost reports from selected hospitals nationwide would be reviewed for improper Medicare billing of non-allowable costs, including use of management companies in cost-based units and treatment of reserves.  Applied complex statistical methods to extrapolated results of 37 facilities to the population of hospitals nationwide.

- ***Review of Medicare Fraud Allegations (Healthcare Provider):*** Led a team to quantify potential Medicare fraud and payback to U.S. government related to cost report cost-shifting issues.  Cost reports from throughout the U.S. were sampled and reviewed for alleged improper Medicare billing, including shifting of costs between cost-based units. Implemented extrapolation strategies and statistical and financial modeling of large data sets to estimate damages for use in settlement negotiations with the U.S. government.  Estimated potential adjustment to Medicare submissions by a third-party reviewer using a statistical cluster model. Developed fraud risk management programs and strategies and performed fraud risk assessments.

- ***Medicare Dispute (Hospital System):*** Developed automated programs using Visual Basic for Applications (VBA) to identify the financial impact of fraudulent cost reports related to a multi-billion dollar Medicare reimbursement dispute for a nationwide hospital system.  Developed automated processes to import provider claim data from text files into organized databases and to test for fraudulent cost reports. Results of tests were relied upon for exposure calculations.

- ***Payer/Provider Reimbursement Dispute (Payer/Provider):*** Led a variety of engagement teams for hospitals or health insurers involved in disputes over reimbursement rates for both contracted and non-contracted services. Reviewed application of contractual clauses for stop-loss claims and high cost items and the appropriateness of the denial of services as non-covered, medically unnecessary or provided without proper pre-authorization or referral. Evaluated whether appropriate reimbursement (usual and customary) rates were applied for non-contracted providers and reviewed claims for commercial, Medicare and Medicaid members.

- ***Securities Investigation (Financial Institution):*** Led a complex data team in the investigation and analysis of a massive real estate based Ponzi scheme for a failed non-profit financial institution.  The work included understanding the relationships between accounts, mapping the flow of funds, asset tracing, and estimating potential recovery amounts.



***Expert Reports and Testimonial Experience***

- ***Susanne Pace, individually and on behalf of all others similarly situated, v. Landmark Bank***
  Circuit Court of Boone county, Missouri (Case No. 20BA-CV00244)
  Declaration of Sonya Kwon, August 13, 2021

- ***Danny L. Walkingstick. et al., v. Simmons Bank, Inc***
  United States District Court Western District of Missouri (Case No. 6:19-cv-03184-RK)
  Expert Report of Sonya Kwon, November 30, 2020
  Deposition of Sonya Kwon, December 8, 2020

- ***Liberty Salad, Inc. et al., v. Groundhog Enterprises, Inc***
  United States District Court Eastern District of Pennsylvania (Case No. 2:17-CV-00226)
  Expert Report of Sonya Kwon, October 30, 2020

- ***Ginger Darty, individually and on behalf of all others similarly situated, v. Scott Credit Union***
  Circuit Court for the Twentieth Judicial Circuit St. Clair County, Illinois (Case No. 19L0793)
  Declaration of Sonya Kwon, September 25, 2020

- ***Frantz Samson, individually and on behalf of all others similarly situated, v. United Healthcare Services Inc.***
  United States District Court for the Western District of Washington (Case No. 2:19-cv-00175-JLR)
  Declaration of Sonya Kwon, June 5, 2020
  Deposition of Sonya Kwon, April 23, 2020
  Supplemental Report of Sonya Kwon, April 13, 2020
  Expert Report of Sonya Kwon, December 11, 2019

- ***Teh Shou Kao and T S Kao, Inc., et al., v. CardConnect Corp.***
  Deposition of Sonya Kwon, March 3, 2020 United States District Court for the Eastern District of Pennsylvania (Case No. 2:16-CV-5707) Expert Report of Sonya Kwon, February 13, 2020

- ***IN RE OPIOID LITIGATION***
  Supreme Court of the State of New York County of Suffolk and County of Nassau (Index No.: 400001/2017 and 400008/2017)

- ***Karmel al Haj, individually and on behalf of all others similarly situated, v. Pfizer Inc.***
  United States District Court for the Northern District of Illinois Eastern Division (Case No. 1-17-cv-06730)
  Expert Report of Sonya Kwon, November 19, 2019

- ***Cynthia D. Larson, et. al., v. Isle of Capri Casinos Inc., et al.***
  United States District Court, Western District of Missouri (Case No. 4:16-CV-00902-ODS)
  Declaration of Sonya Kwon, November 18, 2019

- ***Emma Bradley, et. al., v. The Hertz Corporation***
  United States District Court, Southern District of Illinois (Case No. 3:15-cv-00652-NJR-RJD)
  Deposition of Sonya Kwon, August 22 2019



Sonya Kwon

Expert Report of Sonya Kwon, June 28, 2019
Expert Report of Sonya Kwon, March 30, 2018

- ***Cryesha Macdonald, et. al., v. Trustmark National Bank***
  United States District Court, Southern District of Florida (Case No. 3:18-cv-852-DPJ-FKB)
  Declaration of Sonya Kwon, April 22, 2019

- ***Catherine Papasan, et. al., v. Dometic Corporation***
  United States District Court, Southern District of Florida (Case No. 1:16-cv-22482-RNS)
  Deposition of Sonya Kwon, March 8, 2019
  Expert Report of Sonya Kwon, February 4, 2019

- ***Terriann Walker, et. al., v. People's United Bank***
  United States District Court, District of Connecticut (Case No. 3:17-cv-00304-AVC)
  Declaration of Sonya Kwon, March 4, 2019
  Declaration of Sonya Kwon, January 18, 2019

- ***Rodney Smith, et. al., v. Bank of Hawaii, et al.***
  United States District Court, District of Hawaii (Case No. cv 16-00513 JMS-RLP)
  Declaration of Sonya Kwon, February 12, 2019
  Declaration of Sonya Kwon, December 3, 2018

- ***In & Out Welders, et. al., v. H & E Equipment Services, et al.***
  United States District Court, Northern District of Alabama (Case No. 7:15-cv-01746-TMP)
  Expert Report of Sonya Kwon, July 11, 2018
  Deposition, August 15, 2018.

- ***Paula Blair, et. al., v. Rent A Center, et al.***
  United States District Court, Northern District of California (Case No. 3:17-cv-02335-WHA)
  Deposition, July 9, 2018.
  Expert Report of Sonya Kwon, June 14, 2018

- ***Sandra Bond, et. al., v. Berkshire Bank and Berkshire Hills Bancorp, et al.***
  United States District Court, District of Massachusetts (Case No. 16-30050-MGM)
  Expert Report of Sonya Kwon, February 27, 2018
  Deposition, April 26, 2018.

- ***John C. Etter, et. al., v. Allstate Insurance Company, et al.***
  United States District Court, District of Northern California (Case No. 17cv184-WHA)
  Expert Report of Sonya Kwon, February 28, 2018
  Deposition of Sonya Kwon, November 30, 2017
  Expert Report of Sonya Kwon, November 17, 2017

- ***Gloria Runton, et al., v. Brookdale Senior Living Inc.***
  United States District Court, Southern District of Florida (Case No. 0:17-cv-60664-CMA)
  Declaration of Sonya Kwon, February 8, 2018



Sonya Kwon

- ***Rebecca Rysewick, et. al., v. Sears Holding Corporation, et al.***
  United States District Court, Northern District of Illinois (Case No. 1:15-cv-04519)
  Deposition of Sonya Kwon, August 29, 2017
  Expert Report of Sonya Kwon, June 26, 2017

- ***Monitronics International, Inc., Telephone Consumer Protection Act Litigation***
  United States District Court for the Northern District of West Virginia (MDL No. 1:13-MD-2493)
  Expert Report of Sonya Kwon, May 1, 2017

- ***Brandy Varner, et. al., v. Dometic Corporation***
  United States District Court, Middle District of Florida (Case No. 1:16-cv-22482-RNS)
  Deposition of Sonya Kwon, June 2, 2017
  Expert Report of Sonya Kwon, April 21, 2017

- ***National Hockey League Players' Concussion Injury Litigation***
  United States District Court, District of Minnesota (MDL No. 14-2551 (SRN/JSM))
  Expert Report of Sonya Kwon, April 26, 2017

- ***Nathan Swell et al., v. Wescom Credit Union.***
  Superior Court of the State of California, County of Los Angeles (Case No. BC 586014)
  Declaration of Sonya Kwon, November 23, 2016

- ***Michelle Hummel et al., v. TAMKO Building Products, Inc.***
  United States District Court, Middle District of Florida (Case No. TGW 6:15-cv-910-Orl-40-GJK)
  Deposition of Sonya Kwon, January 12, 2017
  Initial Expert Report of Sonya Kwon, November 2, 2016

- ***Wendy and Nicholas Grasso et al., v. Electrolux Home Products, Inc.***
  United States District Court, Middle District of Florida (Case No. 8:16-cv-00911-CEH-TGW)
  Initial Expert Report of Sonya Kwon, October 3, 2016

- ***TD Bank, N.A. Debit Card Overdraft Fee Litigation MDL No. 2613***
  United States District Court, District of South Carolina (MDL No. 2613) Deposition of Sonya Kwon, September 15, 2016
  Expert Report of Sonya Kwon, August 23, 2016

- ***Patrick Lynch, et al., v. San Diego Credit Union***
  Superior Court of the State of California, County of San Diego (Case No. 37-2015-00008551-CU-BT-CTL)
  Declaration of Sonya Kwon, July 20, 2016

- ***Richard Disher, Eric Kline, John O'Malley and Dimitri Mishurov, et al., v. TAMKO Building Products, Inc. and TAMKO Roofing Products, Inc.***
  United States District Court for the Southern District of Illinois
  Deposition of Sonya Kwon, June 2, 2016
  Expert Report of Sonya Kwon, May 26, 2016



Sonya Kwon

- ***CORELOGIC, INC., vs. First American Financial Corporation***
  Judicate West Arbitration (Reference No. A213700-25)
  Testimony of Sonya Kwon, May 9, 2016
  Declaration of Sonya Kwon February 26, 2016

- ***Hernandez, et al. v. Point Loma Credit Union***
  Superior Court of the State of California, County of San Diego (Case No. 37-2013-00053519-CU-BT-CTL)
  Declaration of Sonya Kwon, April 18, 2016

- ***Hablian, et al. v. Liberty Mutual Insurance Company, et al.***
  Worker's Compensation Appeals Board, State of California (Case No. 1:11-cv-8987)
  Deposition of Sonya Kwon, March 30, 2016
  Declaration of Sonya Kwon, January 7, 2016

- ***Charlene Faris et al., vs. Flagstar Bank, FSB.***
  State of Michigan in the Circuit Court for the County of Oakland (Civil Action No: 15-145287-CZ)
  Deposition of Sonya Kwon, March 10, 2016

- ***Espejo et al., vs. Santander Consumer, et al.***
  United States District Court, Northern District of Illinois (Case No. 1:11-cv-8987)
  Deposition of Sonya Kwon, January 11, 2016
  Expert Report of December 8, 2015

- ***County of Orange vs. Tata Consulting Services LTD, et al.***
  Central District of California, Southern Division (Case No. SACV13-683 JLS(JCx)) Deposition of Sonya Kwon, December 7, 2015
  Expert Report of September 13, 2015

- ***Debra Harris et al. v. Nortek Global HVAC LLC***
  United States District Court, Miami Division (Case No. 1:14-cv-21884-BB)
  Deposition of Sonya Kwon, November 20, 2015
  Expert Report of Sonya Kwon, November 6, 2015

- ***Huerta v. St. Jude Medical***
  Superior Court of the State of California, County of Los Angeles (Case No. BC526645)
  Trial August 14, 2015
  Deposition of Sonya Kwon, March 23, 2015

- ***Morrison et al. v. Knight Transportation, Inc.***
  Superior Court of the State of California, County of Tulare (Case No. 228016)
  Declaration of Sonya Kwon, May 6, 2015

- ***McKinnon et al. v. Dollar Thrifty, Inc.***
  U.S. District Court for the Northern District of California (Case No. 12-cv--04457_SC)
  Deposition of Sonya Kwon, April 3, 2015



Sonya Kwon

- ***Friedman et al. v. Dollar Thrifty, Inc.***
  U.S. District Court for the District of Colorado (Case No. 12-cv--2432-WYD-KMT)
  Deposition of Sonya Kwon, April 27, 2015
  Expert Report of Sonya Kwon, November 17, 2014

- ***Behaein et al. v. Pizza Hut, Inc.***
  Superior Court of the State of California, County of Los Angeles – (Case No. BC384563)
  Expert Report of Sonya Kwon, September 12, 2014

- ***Batarse et al. v. Desert Nephrology Medical Group, LLC***
  Superior Court of the State of California, County of Riverside – (Case No. 1108219) Deposition of Sonya Kwon, June 3, 2014

- ***Kevin Helde et al. v. Knight Transportation, Inc.***
  U.S. District Court for the Western District of Washington (Case No. 2:12-cv-00904 RSL)
  Rebuttal Expert Report of Sonya Kwon in Support of Defendant, May 20, 2014

- ***Howard Entertainment et al. v. Lisa Kudrow/ Big Fouche Entertainment***
  Superior Court of the State of California, County of Los Angeles – West District (Case No. SC099232)
  Deposition of Sonya Kwon, January 28, 2014

- ***Zheng et al. vs. Amgen Inc.***
  Superior Court of the State of California, County of Santa Barbara (Case No. 56-2012-00420-CU-OE VTA)
  Declaration of Sonya Kwon, September 13, 2013

- ***Yarger et al. vs. ING Bank, FSB d/b/a ING Direct***
  U.S. District Court for the District of Delaware (Civil Action No. 11-154-LPS)
  Deposition, October 9, 2013
  Expert Report of Sonya Kwon, August 14, 2013

- ***Cline et al. vs. Kmart Corporation***
  U.S. District Court, Northern District Court of California (Case No. 11-2575 WHA)
  Declaration of Sonya Kwon, June 6, 2013

- ***Ovieda et al v. Sodexo Operations, Inc.***
  U.S. District Court, Central District of California (Case No. CV 12-1750-GHK(SSx)
  Declaration of Sonya Kwon in Support, May 6, 2013

- ***Maria Myrna Dominguez v. Sutter's Place Inc dba Bay 101., et al***
  U.S. District Court for the Northern District of California (Case No. 10-cv-02181)
  Trial, December 20, 2012

- ***Reed Construction Data Inc. v. The McGraw-Hill Companies, Inc., et al***
  U.S. District Court for the Southern District of New York (Case No. 09-cv-8578)
  Expert Report of Sonya Kwon, September 7, 2012

ankura.com

13



Sonya Kwon

- ***Vietnam Veterans of America v. Central Intelligence Agency***
  U.S. District Court, Northern District of California, Oakland Division
  Expert Report of Sonya S. Kwon, August 6, 2012

- ***Toledo v. Little Caesar Enterprises, Inc.***
  Superior Court of the State of California, County of Santa Barbara (Case No. 1265755)
  Expert Report of Sonya S. Kwon, June 22, 2012

- ***Noel Smith, et al. v. MV Transportation***
  Superior Court of the State of California, City and County of Alameda (Case No. RG08389864) Declaration of Sonya
  S. Kwon, November 4, 2010

- ***McSwain, et al. v. Thrifty Payless, Inc. dba Rite Aid***
  Superior Court of the State of California, City and County of Alameda (Case No. BC429793) Declaration of Sonya
  S. Kwon, November 15, 2011

- ***Eder Rojas, et al. v. Gail Stoffer, Gail Stoffer dba Somerset Studios, Marco Antonio Espinoza***
  Superior Court of the State of California, County of Alameda (Case No. CGC-07-470047)
  Expert Report and Deposition of Sonya S. Kwon, August 19, 2009

- ***Worldwide Processors, LLC dba PRP claims v. Washington Mutual Bank, Inc.***
  American Arbitration Association (AAA Case No. 72 148 Y 00779 07 MARS)
  Court Appointed Neutral Expert
  Expert Testimony and Expert Report of James Gordon and Sonya S. Kwon, January 26, 2009

- ***Cindy Fulawka, et al. vs. Bank of Nova Scotia***
  Ontario Superior Court of Justice (Court File No.07-CV-345166CP)
  Expert Report of Sonya S. Kwon, November 4, 2008

- ***Stacey Smith, et al vs. Teletech Holdings, Inc.***
  American Arbitration Association (AAA Case No. 111 600 272 604)
  Expert Report of David A. Gulley and Sonya S. Kwon, November 17, 2005

### *Publications*

- ***From Anecdotes to Facts: Bringing Clarity to Fraud Investigations***
  Article posted on Ankura.com, July 2018
  By Sonya Kwon, Debra Aron

- ***4 Questions to Ask When Facing a Class Action***
  Article posted on Ankura.com, May 2018
  By Sonya Kwon, Mary Beth Edwards

- ***Three Things You Should Know to Effectively Use Financial Forensics: From Books and Records to Bits and Bytes***
  Article posted on Navigant.com, April 2018
  By Sonya Kwon, Mary Beth Edwards, Angela Sabbe, and Rebecca Patterson



Sonya Kwon

- ***Approaches to Measuring Erroneous Payments in the National School Lunch Program and School Breakfast Program at the State-Level***
  U.S. Department of Agriculture Food and Nutrition Service, August 2016
  Contributing Authors with Manhattan Strategy Group (Contract No: AG-3198-C-14-0014)

- ***Department of Labor Proposes Changes to the White Collar Exemption Rule - What It Means for Employers***
  Published by the American Bar Association, Section of Litigation, Labor & Employment, January 2016
  By Sonya Kwon and Jeremy Guinta

- ***Unique Litigation Risks and Challenges Facing the Oil & Gas Industry***
  Published by Corporate Disputes Magazine, October, December 2015
  By Sonya Kwon and Jeremy Guinta

- ***The Impact of Crude Oil and Natural Gas Market Trends on Litigation***
  Published by the American Bar Association, Section of Litigation, Section of Litigation, Energy Litigation, November 2015
  By Sonya Kwon, Bob Broxson, and Julie Carey

- ***Employment Litigation: 2012 Year in Review***
  Navigant Consulting Website
  By Brendan Burke, Sonya Kwon, and Nicholas Schmidt

- ***Medical Loss Ratio in Group Markets: Will Many Plan Participants Receive Rebates?***
  Published by the American Bar Association, Section of Litigation, Employment & Labor Relations, September 2012
  By Sonya Kwon and Melissa Hulke

- ***Medical Loss Ratio Rebates in August 2012: Has the Burden of Distribution Been Shifted to Employers?***
  Published by the American Bar Association, Section of Litigation, Employment & Labor Relations, on August 1, 2012
  By Sonya Kwon, Melissa Hulke, and Wayne Jacobsen from O'Melveny & Myers

### *Presentations and Speaking Engagements*

- **September 12, 2019:** Speaker, American Bar Association Section of Litigation. *Key Considerations for Working with Expert Witnesses in Class Actions.*

- **October 23, 2018:** Bloomberg Law Webinar. *Beyond Litigation: Maximizing the Benefits of Financial Forensics.*

- **May 4, 2018:** Speaker, National Law Firm Conference. *How to Hire a Damages Expert Witness.*

- **September 28, 2017:** Speaker, American Bar Association, Regional CLE Workshop. Commercial and Business Litigation, Pretrial Practice & Discovery, and Intellectual Property Litigation Committees. *Maximizing Expert Witnesses: Best Strategies and Practices for Selecting, Using, Challenging, and Defending Expert Witnesses.*

- **June 6, 2017:** Speaker, American Bar Association, Class Actions and Derivative Suits and Expert Witness Committees Expert Witness Committees. *"Best" Practices for Working With Experts*

- **May 11, 2016:** Speaker, American Bar Association, Expert Witness Committee. *Roundtable on Working Effectively With Experts.*



Sonya Kwon

- **November 9, 2015:**  Speaker, Association of Corporate Counsel; webinar.  *LGBT Legal Issues in the Workplace.*

- **February 10, 2015:**  Speaker, Orange County Bar Association; Newport Beach, CA.  *Structured Data Analysis.*

- **April 16, 2014:**  Panelist, American Bar Association Section of Litigation; Scottsdale, AZ.

  *Selecting the Right Testifying Expert.*

- **Feb 14, 2013:**  Panelist, American Bar Association; Hollywood, FL.  *Sex, Lies, and Backup Tape - Litigating A Spoliation Claim American Idol Style!*

- **Feb 2, 2011:**  Speaker, Discovery Breakfast Seminar; Los Angeles, CA.  *Understanding Structured Data.*

- **June 2, 2009:**  Speaker, Employment Law Update and Current Employer Issues Breakfast  Seminar; Valencia, CA.  *New Alternative Workweek Regulations: Employer Obligations under New  COBRA Rules and Case Law Updates Affecting California Employers of All Sizes.*

- **May 20, 2009:**  Speaker, Employer Breakfast Seminar; Los Angeles, CA. *New Electronic  Discovery Obligations: A Trap for the Unwary Employer - Employer Obligations Regarding the  Safeguarding of Electronic Information.*

- **March 4, 2009:**  Speaker, Hitachi Global Storage Technologies, Inc.; San Jose, CA. *The Use of  Statistical Sampling and Ethical Issues in Electronic Discovery.*

- **May 2, 2008:**  Panelist, Annual ABA Section of Litigation Conference; Chicago, IL. *Reducing the Costs of Reviewing Electronically Stored Information.*

- **Sept 27, 2007:**  Speaker, National Annual Employment Conference for National Law Firm;  Lake Las Vegas, NV. *Fresh Approaches in Employment Class Actions.*

- **April 12, 2007:**  Panelist for National Annual Employment Conference; Phoenix, AZ. *Advanced  Analytical Approaches to Defend Employment Class Actions.*

- **2005 – Current: Numerous CLE Presentations at Various Law Firms/ Clients on Topics  including:** (1) *Ethical Issues in Electronic Discovery and the Attorney-Client Relationship; (2)  Advanced Analytical Concepts in Class Action Litigation; (3) Recent Trends and Hot Topics in  Class Actions; (4) Understanding Structured Data; (5) Statistical Analysis Techniques*

# APPENDIX B

**Shunda Wilkins, et al., v. Simmons Bank**
**Appendix B – Data and Documents Relied Upon**

| Bates Numbers | Description |
| --- | --- |
| ***Legal Filings and Discovery Requests and Responses*** | |
| | Shunda Wilkins, et al., v. Simmons Bank, Amended Class Action Complaint, United States District Court Eastern District of Arkansas Northern Division, Case No. 3:20-cv-0016-DPM, Dkt. 15, June 29, 2020 |
| | Plaintiffs' First Set of Interrogatories, November 23, 2020 |
| | Plaintiffs' Requests For Production of Documents to Defendant Simmons Bank, November 23, 2020 |
| | Defendant Simmons Bank's Objections and Responses to Plaintiffs' First Set of Interrogatories, January 15, 2021 |
| | Defendant Simmons Bank's Objections and Responses to Plaintiffs' Requests for Production of Documents, January 15, 2021 |
| | Plaintiff Shunda Wilkins' Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021 |
| | Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, September 7, 2021 |
| | Order, Dkt. 62, 8/25/2021 |
| | Order, Stipulation of Dismissal, Dkt. 72, 10/4/20201 |
| ***Declarations, Expert Reports, and Deposition Transcripts*** | |
| | Plaintiffs' Expert Report of Arthur Olsen, July 21, 2021 |
| | Deposition of Lisa Hunter, August 18, 2021 |
| | Deposition of Shunda Wilkins, September 14, 2021 |
| | Deposition of David Watson, September 15, 2021 |
| ***Electronic Data*** | |
| WILKINS-0001810 | Return Items: June 1, 2014 – August 31, 2014 |
| WILKINS-0001811 | Transactions Supplement: June 1, 2014 – August 31, 2014 |
| WILKINS-0001812 | Transaction journal detail: June 1, 2014 – August 31, 2014 |
| WILKINS-0001813 | ACH data: June 1, 2017 – August 31, 2017 |
| WILKINS-0001814 | Transactions Supplement: June 1, 2017 – August 31, 2017 |
| WILKINS-0001815 | Transaction journal detail: June 1, 2017 – August 31, 2017 |
| WILKINS-0001816 | ACH data: February 1, 2019 – April 30, 2019 |
| WILKINS-0001817 | ACH data: June 1, 2014 – August 31, 2014 |
| WILKINS-0001818 | Transaction journal detail: February 1, 2019 – April 30, 2019 |
| WILKINS-0002411 | Transaction Code Listing |
| WILKINS-0002645 | ACH data: May 1, 2014 – August 16, 2016, named plaintiff data |

**Shunda Wilkins, et al., v. Simmons Bank**
**Appendix B – Data and Documents Relied Upon**

| Bates Numbers | Description |
|---|---|
| WILKINS-0002646 | Return Items: May 1, 2014 – August 16, 2016, named plaintiff data |
| WILKINS-0002647 | Transaction journal detail: May 1, 2014 - August 16, 2016, named plaintiff data |
| WILKINS-0002648 | Transactions Supplement: May 1, 2014 – August 16, 2016, named plaintiff data |
| WILKINS-0002649 | ACH data: August 17, 2016 – October 31, 2018, named plaintiff data |
| WILKINS-0002650 | Transaction journal detail: August 17, 2016 – October 31, 2018, named plaintiff data |
| WILKINS-0002651 | Transactions Supplement: August 17, 2016 – October 31, 2018, named plaintiff data |
| WILKINS-0002652 | ACH data November 1, 2018 – June 30, 2021, named plaintiff data |
| WILKINS-0002653 | Transaction journal detail: November 1, 2018 – June 30, 2021, named plaintiff data |

**Other Documents**

| Bates Numbers | Description |
|---|---|
| | NACHA ACH Operations Bulletin #3-2013, Reinitiation of Returned Debit Entries, July 15, 2013 |
| | Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993) |
| | Federal Rules of Evidence, Rule 702(b) |
| | DFI Checklists for Implementing Rules related to ACH Risk and Enforcement, and Improving ACH Quality |
| | Nacha.org/content/about-us |
| WILKINS-0001234 – WILKINS-0001296; WILKINS-0002363 - WILKINS-0002380 | Documents related to Shunda Wilkins's account, including monthly account statements |
| WILKINS-0001763 – WILKINS-0001802 | Documents related to David Watson's account, including monthly account statements |
| WILKINS-0002395 | Simmons correspondence regarding refund of Plaintiff Watson's return item fee, August 17, 2015 |
| WILKINS-0001306 - WILKINS-0001322 | Notices of Non-Sufficient Funds: Shunda Wilkins |
| WILKINS-0002332 - WILKINS-0002344 | Notices of Non-Sufficient Funds: David Watson |
| WILKINS-0003808 | Notice of overdrawn account: David Watson, June 11, 2015 |
| WILKINS-0003809 | Notice of overdrawn account: David Watson, January 6, 2016 |
| WILKINS-0003810 | Notice of overdrawn account: David Watson, February 24, 2016 |
| WILKINS-0003811- WILKINS-0003841 | Notices of Non-Sufficient Funds: David Watson |
| WILKINS-0001297- WILKINS-0001305 | Notices of overdrawn account: Shunda Wilkins June 6, 2017 - December 22, 2017 |
| WILKINS-0002399- WILKINS_0002340 | Email correspondence between Marilyn Watson and Simmons Bank regarding NSF fee refund. |

**Shunda Wilkins, et al., v. Simmons Bank**
**Appendix B – Data and Documents Relied Upon**

| Bates Numbers | Description |
| --- | --- |
| DWatson_0001-DWatson_0265 | Documents produced by David Watson |
| SWilkins_0001-SWilkins_0058 | Documents produced by Shunda Wilkins |