UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

| | |
|---|---|
| SHUNDA WILKINS and DAVID WATSON, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br> vs.<br><br>SIMMONS BANK,<br><br>        Defendant. | Case No. 3:20-cv-00116-DPM<br><br><br>JURY TRIAL DEMANDED |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## I.  INTRODUCTION

In this breach of contract class action, Plaintiffs Shunda Wilkins and David Watson, on behalf of themselves and all others similarly situated, seek to certify the following class of Simmons Bank customers:

> All persons who, within the applicable statute of limitations period, were charged Retry Fees – NSF Fees or Overdraft Fees – on an item that had already been subject to an NSF Fee in a Simmons checking account.

Simmons improperly assesses two or more NSF Fees and OD Fees ("Retry Fees") on same item, specifically an Automated Clearing House ("ACH") or a check written on the accountholder's account. It is undisputed that the account documents were form contracts; that the relevant terms were the same across all Class members and throughout the Class Period; and that Simmons systematically assessed Retry Fees on an item that had already been subject to an NSF Fee. As reflected in its unsuccessful motion to dismiss, Simmons does not dispute that it charged Retry Fees on items that the Bank had already been subject to an NSF Fee. Given the uniformity in the account agreements and the uniformity in Simmons's practices, class certification is appropriate here. Cases like this are ideally suited for class certification. *See, e.g., Darty v. Scott Credit Union*, No. 19L0793, at 20 (20th Jud. Cir., St. Clair, Ill., July 19, 2021) (granting class certification in a "retry NSF Fee" case and citing "the reliability of Mr. Olsen's methodology has been tested and refined, so that he is able to perform this analysis under numerous liability theories proffered in bank fee litigation") (Exh. A hereto).

Plaintiffs respectfully request that the Court: (1) certify a Rule 23(b)(3) damages class; (2) certify a Rule 23(b)(2) declaratory and injunctive relief class to declare rights under the contract and restrain Simmons from assessing multiple NSF Fees or multiple NSF and OD Fees on the same transaction; and (3) appoint the undersigned as Class Counsel under Rule 23(g).

## II.    FACTUAL BACKGROUND

Simmons has approximately $21.4 billion in assets and tens of thousands of customers.[1] In 2019, it posted a record net income of $237.8 million.[2] It derived massive income by assessing fees on customers' accounts— including $42.3 million in fees in 2018 alone.[3]

This Court previously determined that certain provisions of Simmons' account contract— especially the Bank's "per item" promise—was ambiguous. *Wilkins v. Simmons Bank*, 2020 WL 7249030, at *1 (E.D. Ark. Dec. 9, 2020) (holding that "the customers allege a plausible breach. . . . The Court concludes that there is ambiguity in all this, and lurking in the Bank's 'per item' fee in particular. Is each try an item? Or is the entire transaction one item even though multiple tries are involved?"). The meaning of Simmons's ambiguous form contract is a question that can and should be answered on a class-wide basis applying Arkansas law. Simmons's adhesion contracts are uniform across all accountholders, as was its practice of assessing Retry Fees on the same item against personal and business accounts. The recitation of evidence below highlights the predominance of common issues, typicality of Plaintiffs' claims, and the superiority of the class action format to resolve these claims. Because the breach of contract claim must be decided on an objective basis, a class should be certified.

### A.    Simmons Unlawfully Collected Multiple NSF or OD Fees from Plaintiffs and the Class in a Uniform Manner.

#### 1.    Simmons Provided Checking Account Services to Individuals and Businesses During the Class Period

Throughout the Class Period, Simmons had a substantial retail banking presence, offering

---

[1] Simmons Bank, https://www.simmonsbank.com/about-us (Exh. B hereto).
[2] *Simmons First posts record income in 2018,* 1/23/30, https://talkbusiness.net/2020/01/simmons-first-posts-record-income-in-2019-announces-retirements/ (Exh. C hereto).
[3] Based on the Federal Financial Institutions Examination Council, *Consolidated Reports of Condition and Income for a Bank With Domestic Offices Only – Simmons Bank,* 2019 (Exh. D hereto).

checking account services to tens of thousands of accountholders through its branch network in

in Arkansas, Missouri, Oklahoma, Tennessee, and Texas. Its headquarters is located in Pine

Bluff, Arkansas. All relevant contracts in effect during the Class Period stated that Arkansas law

applied. *See, e.g.*, May 2013 Terms & Conditions (Exh. E hereto); August 2017 Terms &

Conditions (Exh. F hereto); October 2019 Terms & Conditions (Exh. G hereto).

### 2.   Customers Were Subject to the Same Form Adhesion Contracts.

For the whole Class Period, all Simmons customers were subject to standardized

adhesion contracts drafted by Simmons, which consisted of uniform Terms and Conditions and

Fee Schedules. *Id.*; *also* May 2013 Schedule of Fees (Exh. H hereto); December 2017 Schedule

of Fees (Exh. I hereto); March 2019 Schedule of Fees (Exh. J hereto). The relevant provisions of

these documents have not changed during the Class Period, other than an increase to the amount

of the fees at issue. The Parties have stipulated to the relevant Fee Schedules and Terms and

Conditions documents that applied, uniformly, to all Class members during the period each

document was in effect. *See* Stipulation (ECF No. 78).

Each and every iteration of the Fee Schedule in effect during the Class Period made the

same promise:

> A fee may be imposed if you overdraw your account. When you write a check, withdraw
> money in person or from an ATM, use your debit card to make a purchase, or make an
> automatic bill payment or other electronic payment for more than the amount in your
> account; you overdraw your account. Simmons First has the choice to either pay the item
> or not. If we pay even though you don't have the money in your account, you may be
> charged a Paid Item Fee (Overdraft Fee). If we return your item without paying it, you
> may be charged a Return Item Fee (Insufficient Funds (NSF) Fee).
>
> 14. Paid Item Fee (Overdraft Fee) (per item): $30.00
> 15. Return Item Fee (Insufficient Funds (NSF) Fee) (per item): $30.00

*E.g.,* Dec. 2017 Schedule of Fees. No version of the Fee Schedule ever disclosed that the same

check or ACH could receive more than one OD or NSF Fee—or, in other words, that Simmons

would assess a fee for each time or *occurrence* when a check or ACH was returned or processed, as opposed to a fee for each "item."

The key term in dispute, therefore, is "item." Simmons concedes that despite repeatedly using the term "item" in its account documents, it "*doesn't have 'item' defined in any of our documents* because, again, it is considered kind of an ordinarily generally understood word." *See* November 4, 2021 Deposition of Lisa Hunter ("Hunter II") at 12:18-20 (Exh. K hereto). Simmons believes there is no "special definition for 'item,'" *id*. at 12:23-24, and the term "is defined just in ordinary everyday use, it is something that is distinctive." *Id*. at 12:13-15. Even Simmons' own stated definition of the term "item" supports Plaintiffs' breach of contract claim here: an "item" is something that is ordinarily understood to be "distinct," just as each of Plaintiffs' instructions to make an ACH payment or write a check from their accounts were distinct.

Crucially, Simmons admits that it never once states in its contract documents that the same check or ACH can incur more than one NSF or OD Fee:

> Q. [W]ould you agree that Simmons doesn't expressly describe the circumstance in which a check or an ACH can get more than one fee in its account documents?
> THE WITNESS: Yes, I would agree. There is -- there are not scenarios in our documents.

*Hunter II*, 26:9-18.

While Simmons agrees that the Fee Schedule does not actually say that an item can cause more than one fee, it believes that accountholders should have *inferred* Simmons' preferred meaning, even though it is not stated expressly:

> Q. And do you think the [fee schedule means] that each -- a new fee will be assessed each time each item is presented?
> A. Yes.
> Q. Okay. You agree it does not say that, but you think that's what it means; right?
> […]
> THE WITNESS: Yes.

*Hunter II*, 51:15-22. Crucially, in every Fee Schedule, Simmons <u>did</u> specify that certain <u>other</u> fee types were assessed on a "per occurrence," as opposed to a "per item" basis—the fee being assessed based on the number of times something occurs versus being assessed on the thing itself:

> 12. Miscellaneous Fees:
> Loan Coupon Book Replacement Fee (**per occurrence**) $3.00
> Levies/ Garnishments (**per occurrence**) (Administrative Fees for garnishments are established by state statue, but will not exceed a maximum of $50.00.)

*See* Stipulation (emphasis added). Simmons' corporate representative agrees that "per occurrence"—the term it never used with respect to NSF or OD Fee assessment—means "each time" something happens:

> Q. Well, would you agree "per occurrence" means each time something happens?
> […]
> THE WITNESS: I think -- I think yes, that would be the common understanding of it.

*Hunter II*, 57:2-6.

As made clear during briefing and order on the motion to dismiss, how the trier of fact construes the ambiguous contracts will uniformly determine whether there is a breach of contract for all Class members.

### 3. For the Whole Class Period, Simmons Assessed Multiple NSF or OD Fees on the Same Item

The common evidence described below demonstrates that Simmons systematically and uniformly assessed Retry Fees on the same item, for both personal accounts and business accounts, in violation of its standardized account agreements. The documents material to Plaintiffs' claims are the Terms and Conditions and the Fee Schedule, both of which the Court has already considered in denying the motion to dismiss.

**4. The Named Plaintiffs Were Assessed Multiple NSF or OD Fees on the Same ACH or Check**

Simmons agrees that both Plaintiffs have incurred more than one NSF or OD Fee on the same check or ACH:

> Q. [D]o you know whether either of the Plaintiffs have had this situation we've been discussing, that is where a check or an ACH was presented more than one time and more than one NSF or overdraft fee resulted?
> […]
> THE WITNESS: Well, as I recall, the two remaining Plaintiffs have the circumstance related to ACH, but neither of them have check related circumstances. There is – yeah.

*Hunter II*, 24: 2-11.

**5. Simmons Concedes ACH and Checks May Be Re-Presented, and Do Not Thereby Become New ACH or Checks**

Simmons' corporate representative repeatedly conceded the basic factual premise of Plaintiffs' claims: that a check or ACH can be presented more than one time, without morphing into a *new* check or ACH:

> Q. So let's talk about returned checks. Is it possible for a check to be presented more than one time after it has been returned for insufficient funds?
> A. Yes.

*Hunter II*, 15:8-14.

> Q. Okay. What about ACH payments, can those be presented a second or a third time after being returned for insufficient funds?
> A. Yes.

*Id*. at 18:10-13; 19:24-25 – 20:1-9.

> Q. [I]t is your testimony that they can incur fees specifically on the second or the third time an ACH or a check is presented?
> A. Yes. Yes.

*Id*. at 29:2-5. Throughout the entire Class Period, it was Simmons' policy that the second or third presentment of a check could result in an OD or NSF Fee. *Hunter II* at 17:15-25 – 18:1. This is

true for all personal and business accounts. *Hunter II* at 23:15-20.

This testimony brings with it a logical necessity:  if a check or ACH can be presented more than one time, it is by necessity the <u>same</u> check or ACH—the same item—being presented again. Indeed, the Bank's corporate representative stated this premise—a check does not become a new check merely by dint of being reprocessed—in even more plain terms:

> Q. [I]if someone at Simmons looked at check number 100 and returned it for insufficient funds and then saw check number 100 a few days later come in and returned for insufficient funds, if someone looked, you would be able to determine it was the same check; right?
> […]
> THE WITNESS: I think by visual review of the check you would see that -- you would see that yes, you would see that.

*Hunter II* at 83:12-21.

### 6.  The Class Representatives Are Adequate.

Plaintiffs Shunda Wilkins and David Watson are adequate class representatives. The Bank concedes they both incurred fees on representments of item. Their claims stem from the same practices and same form contracts as the other Class members. Both have actively participated in the case including responding to discovery. *See* Wilkins Discovery Responses (Exh. L hereto); Watson Discovery Responses (Exh. M hereto). Both sat for deposition. *See generally* Wilkins Dep. Transcript (Exh. N hereto); Watson Dep. Transcript (Exh. O hereto). Ms. Wilkins and Mr. Watson understand the general nature of the case (Wilkins Dep. at 63:3-8; 87:7-10; Watson Dep. at 85:18-22; 88:21 – 89:1) and understand their duty to prosecute the case in the best interest of the Class. *See* Wilkins Dep. at 76:21 – 77:7; Watson Dep. at 98:2-22. By any measure, Shunda Wilkins and David Watson are adequate class representatives.

### 7.  Plaintiffs' Expert Can Prove Damages on a Class-Wide Basis

All Class members, including Plaintiffs, were wrongfully charged Retry Fees on the same

item during the Class Period. A highly experienced expert, Arthur Olsen, who has served as an expert in numerous class actions involving overdraft fees, including cases certified for litigation and settlement purposes, was retained in this case. He regularly evaluates transaction data maintained by financial institutions to determine whether the data fits a plaintiff's theory of liability. Using data maintained and supplied by Simmons, Mr. Olsen developed a methodology to identify the improper Retry Fees Simmons charged to Class members, including Plaintiffs, on the same item. *See* Deposition of Arthur Olsen, pp. 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104:4-15 (Exh. P hereto).

For ACH transactions, Mr. Olsen can ascertain Class members through an algorithm that will look at which customers were charged two fees on the same item from ACH reports that listed information about the merchant and the amount of the ACH, and also whether the merchant flagged it as "retry" per NACHA (though he could identify Class members without this "retry flagging") for a sampling period of ten business days. *See* Olsen Depo. at 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104:4-15. The same is true for check transactions. *See* Olsen Depo. at 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104:4-15. To the extent he is given additional information on charge-offs and refunds, he can make further determinations to ascertain Class members and calculate damages. *Id.* at 104:4-15.

## III.   LEGAL STANDARD

Class certification is appropriate if the Court determines that the requirements of Rule 23 have been met. *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 349-50 (2011); *Zehentbauer Family Land, LP v. Chesapeake Exploration, LLC*, 935 F.3d 496 (6th Cir. 2019). Class certification is proper under Rule 23(a) if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or

defenses of the representative parties are typical of the claims or defenses of the class and, (4) the representative parties will fairly and adequately protect the interests of the class. In addition, to certify a class under Rule 23(b)(3), "questions of law or fact common to class members [must] predominate over any questions affecting only individual members" and a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."

## IV.   ARGUMENT

Rule 23 requires that a class satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and that the class fits within "one of the three subsections of Rule 23(b)" – here subsections 23(b)(2) and (b)(3).[4]   A district court has "broad discretion" to certify a class.[5]   Class actions are "peculiarly appropriate" where "issues involved are common to the class as a whole," those issues "turn on questions of law applicable in the same manner to each member of the class," and "each individual claim has little monetary value."[6]

### A.    There Is a Track Record of Courts Certifying Bank Fee Cases Like This.

Financial institutions contesting certification trot out a standard set of meritless objections that courts repeatedly reject. Indeed, Plaintiffs are unaware of a single bank fee case involving standard form adhesion contracts and standard fee assessment practices in which class certification was denied.[7]   In fact, dozens of such cases have been certified, and in factual

---

[4] *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1155 (8th Cir. 2017).

[5] *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375 (8th Cir. 2018).

[6] *Id.*

[7] Class certification was granted in at least the following cases: *Smith v. Bank of Haw.*, No. 16-00513 JAO-RLP, 2019 U.S. Dist. LEXIS 111636, at *23 (D. Haw. Jan. 30, 2019), report and recommendation adopted in part, rejected in part, 2019 U.S. Dist. LEXIS 109110; *Gunter v. United Federal*, 2017 WL 4274196 (D. Nev. Sept. 25, 2017); *Hernandez v. Point Loma Credit Union*, San Diego Super. Ct., Case No. 36-2013-00053519; *Faris v. Flagstar Bank*, No. 15-145287-CZ (Oakland Cnty., Michigan, Cir. Ct. Oct. 9, 2015); Order Granting Class Certification, *Jacobs v. FirstMerit Corp.*, No. 11CV000090 (Ohio Ct. Com. Pl Dec. 26, 2012); Agreed Order

circumstances that are arguably far more complex than those in the instant matter.[8]

By way of example, in *In re TD Bank*, *N.A. Debit Card Overdraft Fee Litigation*, after approximately five years of extensive and substantive litigation, the court granted class certification of a total of two classes and 26 subclasses of consumers who were wrongfully assessed overdraft and insufficient funds fees in violation of the bank's and its predecessors' standardized adhesion contracts. 325 F.R.D. at 173. In certifying the class, the court held that common issues predominated because the same form contracts and the same bank policies applied to all consumers. *Id.* at 172-73. The court explained that to deny certification would require "*an entirely nonsensical interpretation of class actions as a vehicle for the resolution of mass disputes*, particularly disputes where the harm suffered by any one class member may be too small to incentivize a lawsuit for vindication of that class member's rights." *Id.* at 159 (emphasis added).

Like the dozens of courts that have granted class certification in bank fee cases (*see* fns. 7-8), this Court should likewise certify the Class here.

---

Granting Class Certification, *Morton v. Greenbank*, No. 11-135-III (Tenn. Ch. Ct. Aug. 2, 2012); *In re TD Bank*, *N.A. Debit Card Overdraft Fee Litig.,* 325 F.R.D. 136, 157 (D.S.C. 2018).

[8] *See, e.g., In re Checking Account Overdraft Litig.*, 307 F.R.D. 656 (S.D. Fla. 2015) ("Wachovia Bank"), pet. for leave to appeal denied, No. 15-90026 (11th Cir. Dec. 1, 2015); *In re Checking Account Overdraft Litig.*, 307 F.R.D. 630 (S.D. Fla. 2015) ("Wells Fargo"), pet. for leave to appeal denied, No. 15-90024 (11th Cir. Dec. 1, 2015); *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645 (S.D. Fla. 2012) (Comerica), pet. for leave to appeal denied, No. 12-90036 (11th Cir. Dec. 13, 2012); *In re Checking Account Overdraft Litig.*, No. 09-MD-2036, Order Granting Class Certification, DE # 2847 (S.D. Fla. July 19, 2012) (Capital One), pet. for leave to appeal denied, No. 12-90041 (11th Cir. Feb. 13, 2013); *In re Checking Account Overdraft Litig.*, No. 09-MD-2036, Order Granting Class Certification, DE # 2673 (S.D. Fla. May 4, 2012) (BancorpSouth); *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667 (S.D. Fla. 2012) (TD Bank); *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666 (S.D. Fla. 2011) (Union Bank), pet. for leave to appeal denied, No. 11-90012 (11th Cir. Oct. 7, 2011); *In re Checking Account Overdraft Fee Litig.*, 2012 WL 12877718 (S.D. Fla. May 16, 2012) (PNC Bank).

**B.** **The Requirements of Rule 23 Are Satisfied.**

**1.** **The Four (4) Requirements of Rule 23(a) and Any Implied Ascertainability Requirements – Are Satisfied.**

**a.** **Rule 23(a)(1) – Numerosity – is Satisfied, as Joinder of All Members of the Class is Impracticable.**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The 8th Circuit has not established any rigid rules concerning the number of members necessary to constitute a "class" under Rule 23. *Boyd v. Ozark Airlines, Inc*., 568 F.2d 50, 54 (8th Cir. 1977); *Robinson v. Sears, Roebuck & Co*., 111 F. Supp.2d 1101, 1120 (E.D. Ark. 2000)*. See also Ark. Educ. Ass'n v. Bd. of Educ.,* 446 F.2d 763, 765 (8th Cir. 1971) (20 class members sufficient).

While Defendant has not yet produced transactional data sufficient to identify the precise number of Class members, there is no doubt that there are at least thousands of Class members. Simmons is the 3rd largest bank in the state of Arkansas. It is also the 91st largest bank in the nation. Simmons Bank operates 72 branches throughout the state of Arkansas. The Bank also has 152 additional branches across five other states: Missouri, Oklahoma, Tennessee, Texas, and Kansas.

Further, Defendant has received multiple complaints from account holders regarding the practice at issue: **WILKINS-0002412- WILKINS-0002415, at 14** (complaining that "in some cases I was charged a NSF and return fee for the same item making a $5 transaction cost over $65!!") (Exh. Q hereto). **WILKINS-0002557- WILKINS-0002558** (August 8, 2017 letter from Simmons representative Chris W. White responding to accountholder expressing concerns regarding "issues with automatic payments being submitted multiple times and fees being assessed for each submission") (Exh. R hereto); **WILKINS-0002510- WILKINS-0002513** (complaining to CFPB regarding Retry Fees being charged on the same item) (Exh. S hereto)**;**

**WILKINS-0002643** (referencing 12/11/2018 complaint involving Retry Fees on check at line 165; 12/19/2018 complaint involving Retry Fees on check at line 168; 11/9/2018 complaint that "[t]he bank has allowed one payment to process unsuccessfully 4 times, charging me a $35.00 fee each time" at line 144); 12/19/2018 (BBB Complaint from Howard P involving Simmons' "standard policy" regarding charging NSF Fees "multiple times on the same item") (Exh. T hereto). Numerosity cannot be seriously questioned.

> **b.   Rule 23(a)(2) – Commonality – is Satisfied, as Common Questions of Law or Fact Exist.**

Rule 23(a)(2) requires that there be common questions of law or fact among the members of a class. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir. 1982). It is satisfied when a plaintiff's claims "depend upon a common contention" that "is capable of class wide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The commonality requirement does not require that every question of law or fact be common to every class member. *Paxton*, 688 F.2d at 561. It may be satisfied when the legal question uniting the class members is substantially related to the resolution of the case. *DeBoer v. Mellon Mortg. Co*., 64 F.3d 1171, 1174 (8th Cir. 1995). Said differently, when common questions represent a significant aspect of a case and they can be resolved in a single action, the class action device is appropriate. *See* 7A Wright, Miller & Kane, Federal Practice and Procedure, § 1788 at 528. Commonality "is easily met in most cases." *Robinson*, 111 F. Supp. 2d at 1120 (citing 3 Newberg and Conte, *Newberg on Class Actions,* § 3.10).

In *Gunter, TD Bank*, and *Smith*, federal courts considering similar bank fee claims each found commonality satisfied. In *Gunter*, the court found commonality because (a) "class members were subject to the same contractual language regarding overdraft fees", (b) although

customers were subject to different contracts over time, the overdraft language was consistent; and (c) "class members were charged an overdraft fee" based on a standard practice. *Gunter*, 2017 WL 4274196, at *5. In *TD Bank*, the bank's fee policy was "uniform, both in definition and in implementation," meaning that "the *answer* to the overarching question of whether it was permissible, under the contract and/or other legal duties, for the Bank to charge overdraft fees will resolve large swathes of the class members' claims in one fell swoop." *In re TD Bank*, 325 F.R.D. at 152-53. And in *Smith*, the court found commonality where the bank's standard contracts had identical overdraft language and the bank uniformly assessed fees on the available balance. *Smith*, 2019 WL 3297301, at *3.

This case also presents a model case for class certification. Here, Simmons used standardized form adhesion contracts on a take-it-or-leave it basis. Plaintiffs' and the putative Class members' claims each arise from Simmons' standard practice of assessing more than one NSF Fee on the same item or assessing multiple NSF and OD Fees on the same item (*see* **Sections II, A, 3-4, 6** *infra*.) in violation of the standardized adhesions contract. *See* **Section II, A, 2** *infra*.

Construction of the terms of a contract is a pure question of law for the Court and any ambiguities must be construed against Simmons, without resort to extrinsic evidence. *Hurt-Hoover Inv., LLC v. Fulmer*, 448 S.W.3d 696, 704 (Ark. 2014); *Alexander v. McEwen*, 239 S.W.3d 519, 522 (Ark. 2006); *see also* 2 E. Farnsworth, *Contracts*, § 7.9, p. 285 (3d Ed. 2004) ("Interpretation . . . must turn on the meaning that reasonable persons in the positions of the parties would have attached if they had given the matter thought"). Courts uniformly rule this way in overdraft fee litigation. *Smith*, 2019 WL 2712262, at *7 (certifying overdraft fee class over the bank's "mere specter of non-standardization [in bank employee responses to consumer

questions], especially where in all other areas [the bank] appears to standardize its conduct towards customers"); *Gunter*, 2017 WL 4274196, at *7 (certifying class and noting "individual issues such as how frequently clients overdrafted, the amount of their charges, the nature of their transactions, and the source of the holds that reduced their available balance" were "legally irrelevant").

> As succinctly explained by the court in *In re TD Bank*:
>
> If the Court were to find that *this* case could not be certified as a class action based on breach of contract and implied covenant theories due to Defendant's assertions regarding the predominance of individual issues, the logical consequence would be that *no* contract-based claims could be certifiable, because any prospective defendant could defeat certification simply by raising the specter of putative class members' idiosyncratic understanding of the term(s) at issue . . . . Such a result would be an entirely nonsensical interpretation of class actions as a vehicle for the resolution of mass disputes . . . . Given the Bank's repeated affirmation that uniform disclosures were provided to its entire customer base, individualized proof is peripheral, if necessary at all . . .

325 F.R.D. at 159 (emphasis in original).

### c. Rule 23(a)(3) – Typicality – is Satisfied, as Plaintiffs' Claims Are Typical of the Class Members.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality 'is fairly easily met so long as other class members have claims similar to the named plaintiff.'" *Postawko v. Mo. Dept. of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018) (quoting *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)). In assessing typicality, courts consider whether the named plaintiffs' claim "arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp. United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Further, the Eighth Circuit has held that typicality is satisfied as long as "there are other members of the class who have the same or similar grievances as the plaintiff." *Cortez*, 266

F.R.D. at 290. "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Robinson*, 111 F. Supp. 2d at 1123 (citing *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)). *See also* 5 Newberg and Conte, *Newberg on Class Actions*, § 24.29 at 24-119, 24-124. Additionally, "differences in the claimed damages or the availability of certain defenses do not defeat typicality, as long as the class claims are generally based on the same legal or remedial theory." *Lopez v. Tyson Foods*, 2008 WL 3485289, at *17 (E.D.N.C. Nov. 10, 2010) (citation omitted). A class representative who suffered an injury typical to the class can meet this requirement even if the amount of damages differs among class members. *See Mund v. EMCC, Inc.*, 259 F.R.D. 180, 184 (D. Minn. 2009). "Class representatives need not share identical interests with every class member, but only 'common objectives and legal and factual positions.'" *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1064 (8th Cir. 2013) (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999)).

In bank fee cases, courts have found typicality to exist. *See, e.g.*, *Smith*, 2019 WL 2712262, at *2-3; *In re TD Bank*, 325 F.R.D. at 153-54; *Gunter*, 2017 WL 4274196, at *5-6; *Comerica*, 286 F.R.D. at 653-54. In doing so, they have rejected arguments that a plaintiff was not typical because the plaintiff (1) opened several accounts and was a customer for longer than other class members; (2) received information about fees by numerous means; (3) never read the contract; (4) complained about the fees; (5) was subject to only some of the contracts where the contracts did not materially vary; and (6) had more overdrafts than others. *Smith*, 2019 WL 2712262, at *2-3; *Gunter*, 2017 WL 4274196, at *5-6. This is because in bank fee cases, plaintiffs' claim derives from the same contract and same uniform, computerized fee practices

and interactions with the bank and individualized understandings "have nothing to do with" these claims because "whether it was permissible under the Bank's materially uniform contract with its customers, and associated common law and statutory duties, for the Bank to impose overdraft fees" is an "overarching question," "the resolution of [which] . . . will permit resolution of Plaintiffs' and class members' [overdraft fee] claims in the aggregate." *In re TD Bank*, 325 F.R.D. at 155.

Here, typicality is easily satisfied. Plaintiffs' claims are typical of the claims of all Class members because each Plaintiff and Class member, whose accounts were governed by common and materially uniform agreements, were subjected to Simmons' practice of charging more than one fee on the same item, and were assessed improper fees as a result. Typicality is, therefore, satisfied.

### d. Rule 23(a)(4) – Adequacy – Is Satisfied as Plaintiffs Are Adequate Class Representatives and Plaintiffs' Counsel Are Also Adequate.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The adequacy requirement is met where: "(1) the class representatives have common interests with the members of the class, and (2) [] the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562-63. The requirement of adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1142-43 (W.D. Mo. 2020) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

Arkansas district courts have found that adequacy requires that the representative display "some minimal level of interest in the action, familiarity with the practices challenged, and ability to assist in decision making as to the conduct of the litigation." *Gentry v. C & D Oil Co.*, 102 F.R.D. 490, 494–95 (W.D. Ark. 1984). "The representative need not have . . . personal

knowledge of the facts needed to make out a prima facie case." *Id.* As with typicality, courts have held in bank fee class actions that plaintiffs are adequate where their claims stem from the same documents and practices as other class members. *See Gunter*, 2017 WL 4274196, at *6-7 (D. Nev. June 22, 2016); *Union Bank*, 275 F.R.D. at 675; *Comerica*, 286 F.R.D. at 654-55; *Capital One*, 2012 WL 12877717, at *9. Indeed, defendants in bank fee overdraft cases often do not challenge this requirement at all. *See In re TD Bank*, 325 F.R.D. at 151 (adequacy uncontested); *Smith*, 2019 WL 3297301, at *5.

As set forth above, Plaintiffs are adequate class representatives. *See* **Section II, A, 6** *supra*. As to the adequacy of counsel, Plaintiffs are represented by undersigned counsel, firms with extensive experience litigating class action litigation throughout the United States, including extensive experience in bank fee class actions.[9]

### 2. The Class is Ascertainable.

Rule 23 requires any certification order to "define the class." Fed. R. Civ. P. 23(c). In order to do so, the class must be ascertainable. "Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable." *Riedel v. XTO Energy, Inc.*, 257 F.R.D. 494, 506 (E.D. Ark. 2009). "The requirement of ascertainability simply means that the description of a proposed class must be sufficiently definite 'so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Eastwood v. Southern Farm Bureau Cas. Ins. Co.*, 291 F.R.D. 273, 278 (W.D. Ark. 2013) citing, 7A Charles Alan Wright et al., *Federal Practice and*

---

[9] The accompanying Firm Résumés detail the firms' extensive class action experience and adequacy as counsel. *See* Webb, Klase & Lemond, LLC Firm Resume (Exh. U hereto); Kaliel Gold PLLC Firm Resume (Exh. V hereto); Consumer Protection Legal, LLC Firm Resume (Exh. W hereto); Watson Burns PLLC Firm Resume (Exh. X hereto).

*Procedure* § 1760 (3d ed.2005). "The requirement that a class be clearly defined is designed primarily to help the trial court manage the class. **It is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that the general outlines of the membership of the class are determinable at the outset of the litigation.**" *Id.* (citing *Bynum v. District of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003)) (emphasis added).

Here, the record evidence shows that Simmons Bank has the historical data available from which Plaintiffs can ascertain the class. *See* August 18, 2021 Deposition of Lisa Hunter ("Hunter I") at 12:18-20 (Exh. Y hereto). Moreover, as explained herein above, Plaintiffs' expert can ascertain the Class members using the transactional data that Simmons has available or, if need be, its customer account statements. *See* **Section II, A, 7** *supra*. Moreover, even Defendant's own expert, Sonya Kwon, testified that the Bank has the necessary data from which class membership can be ascertained. *See* Deposition of Sonya Kwon, at 104:14-21 (Q: "If the court certifies a class in this case, do you expect to be involved in creating the class list?" A: "I don't know . . . But if I'm asked to assist, I could") (Exh. Z hereto). Clearly Plaintiffs are able to establish "the general outlines of the membership of the class" as was done on the outset of this litigation. Accordingly, Plaintiffs have satisfied the ascertainability requirement.

### 3. The Requirements of Rule 23(b) Are Also Satisfied as Plaintiffs' Claims Meet the Predominance and Superiority Requirements.

Before certifying a Rule 23(b)(3) class, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018) (quoting Rule 23(b)(3)). Here, as in other overdraft fee matters, these requirements are satisfied.

### a. Common Issues Predominate Over Individualized Inquiries

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) (citations and quotation marks omitted).

### i. The Putative Class's Breach of Contract Claim Will Be Decided for the Class in One Fell Swoop.

As one federal district court has explained, the class members' understanding of a term in a standard form agreement generally has no bearing on Rule 23(b)(3)'s predominance requirement:

> The Court begins with the common sense principle, stated in the Restatement (Second) of Contracts, that standardized agreements should be "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." § 211(2). The contracts at issue are contracts of adhesion, involving non-negotiable terms and a vast bargaining/information imbalance between the parties.

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 157 (D.S.C. 2018); *see also In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 677 (S.D. Fla. 2011) (certifying class where "agreements at issue . . . are uniform form contracts offered on a take-it-or-leave it basis and were not the product of individual negotiation" reasoning that in the context of uniform contracts and bank policies, "individual customers' 'intent' and 'course of performance' is largely irrelevant to resolving any ambiguity").

19

Uniform interpretation of standardized contracts of adhesion like the Simmons contract documents at issue here makes sense from both the perspective of the drafter and the signatory. For the drafter, "the principal goal of using boilerplate language in such contracts is that there be uniform construction of those provisions." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 948 (5th Cir. 1981). "Such uniform interpretation of standard contract language ensures effective functioning of our financial markets and begets stability." *Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1298 (11th Cir. 2012) (internal citations and quotations omitted). Likewise, "[i]ndividual signatories to such contracts understand that they have no bargaining power as to specific terms, and they expect to be treated like all other signatories to the form document." *Gillis*, 677 F. App'x at 756.

This approach has been followed by numerous federal courts when presented with class claims based on the breach of a form contract. *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 441 (1st Cir. 2013) (collecting cases) ("Several federal courts have certified classes for contract disputes over form contracts because the form contracts are interpreted uniformly across members of the class, and thus the outcome does not depend on extrinsic evidence that would be different for each putative class member."); *Vedachalam v. Tata Consultancy Servs., Ltd.*, 2012 WL 1110004, at *9 (N.D. Cal. Apr. 2, 2012) ("in construing the form contract between Defendants and class members, the Court need not delve into the actual knowledge of individual class members"); *Ewert v. eBay, Inc.*, 2010 WL 4269259, at *7 (N.D. Cal. Oct. 25, 2010) (same); *Violette v. P.A. Days, Inc.*, 214 F.R.D. 207, 215 (S.D. Ohio 2003) (certifying TILA class and reasoning that Defendants' "liability will be analyzed in terms of its standard policies and procedures, which affected each class member"). *See also Dupler v. Costco Wholesale Corp.*,

249 F.R.D. 29, 37 (E.D.N.Y. 2008) ("An overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment").

In *TD Bank*, *Gunter*, *Smith*, and other cases, each court found predominance satisfied because the central issue was whether, through a standard fee assessment practice, the bank breached its standard form contracts with all customers. *See, e.g.*, *Smith*, 2019 WL 2712262, at *4-7; *In re TD Bank.*, 325 F.R.D. at 154-62; *Gunter*, 2017 WL 4274196, at *7-8; *see also Union Bank*, 275 F.R.D. at 676-77. For example, in *Gunter*, the court found predominance because "class members were subject to the same contractual language regarding overdraft fees in their account agreements . . . ." *Gunter*, 2017 WL 4274196, at *7. Thus, in *Gunter*, as here, "[t]he legal question presented by the proposed Positive Balance Class – whether [defendant] breached its contractual agreements – predominates over any individual characteristics of the proposed class members." *Id.*

Here, common issues predominate for the same reasons as in *In re TD Bank*, *Gunter*, *Smith*, and the *Overdraft MDL* matters. During the Class Period and for all Class members, Simmons (1) used common, standardized form adhesion contracts with identical terms; and (2) had uniform practices in assessing Retry Fees for ACH or checking transactions. Also, per the choice of law provision in Simmons's contracts with each Class Member,[10] Arkansas law applies no matter the citizenship of the customer. *McKeage v. TBMC, LCC*, 847 F.3d 992, 1002 (8th Cir. 2017) ("A valid choice of law provision in a contract binds the parties."); *Stacy v. Williams*, 834 S.W.2d 156, 159 (Ark. Ct. App. 1992); *Jones v. Santander Cons. USA Inc.*, 2020 WL 4113045, at *4 (E.D. Ark. July 20, 2020) (same).

---

[10] *See, e.g.*, May 2013 Terms & Conditions; August 2017 Terms & Conditions; October 2019 Terms & Conditions.

These are common factual and legal issues that predominate over any individualized issues that Simmons may try to gin up here. Predominance is satisfied.

### ii. Plaintiffs' Unjust Enrichment Claim Is Also Suitable for Class Treatment.

Plaintiffs' unjust enrichment claims are also suitable for class treatment. *See, e.g.*, *Comerica*, 286 F.R.D. at 657 ("Unjust enrichment claims can be certified for class treatment where there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not."); *Union Bank*, 275 F.R.D. at 680 (certifying unjust enrichment subclass in overdraft case because of the focus on defendant bank's uniform conduct and disclosures); *In Re: TD Bank*, 325 F.R.D. at 160-64 (certifying unjust enrichment subclass in overdraft case because the questions relevant to resolution of the unjust enrichment claim related to uniform corporate policies and practices).

### iii. Damages

If the Court determines that Plaintiffs need to present a class-wide damages methodology, Mr. Olsen's opinions do just that. Plaintiffs' expert will be able to ascertain Class members and calculate damages – just as he has done in scores of other cases. He has provided a detailed explanation of how he can determine damages and ascertain Class members here, using Simmons' transactional data or, if need be, its customer account statements and Simmons' own posting rules.[11]

In particular, for ACH transactions, Mr. Olsen can ascertain Class members through an algorithm that will look at which customers were charged two fees on the same item from ACH reports that list information about the merchant and the amount of the ACH, and also whether the

---

[11] *See* Olsen Depo. at 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104:4-15.

merchant flagged it as a "retry" per NACHA (though he could identify Class members without this "retry flagging") for a sampling period of ten business days. *See* Olsen Depo. at 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104:4-15. To the extent he is given additional information on charge-offs and refunds, he can make further determinations to ascertain Class members and calculate damages. *Id.* at 104: 4-15.

For check transactions, Mr. Olsen can ascertain Class members through an algorithm that will look at what customers were charged two fees on the same item from transactional data that shows the check number and the amount of the check. *See* Olsen Depo. at 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104: 4-15. Furthermore, he has explained that his methodology will address common issues that financial institutions sometimes raise (including those raised by Simmons' retained expert Sonia Kwon), including crediting the bank fee reversals, and crediting the bank for uncollectables.[12]

State and federal courts, as well as litigants, have relied on Mr. Olsen's expertise in overdraft fee litigation as to class certification, mediation, and the distribution of settlement proceeds on scores of occasions, and Olsen successfully analyzed data of a least 100 financial institutions while serving in this capacity.[13] His opinions have withstood at least seven *Daubert* challenges and, in the *instant* litigation, Simmons' own expert, Sonia Kwon, has conceded that Mr. Olsen is qualified to be an expert in this case. Indeed, at least 14 courts have granted contested class certification motions in partial reliance on Mr. Olsen's expertise. *See, e.g., In re TD Bank*, 325 F.R.D. at 172; *Gunter*, 2017 WL 4274196, at *5-8. This includes at least four overdraft fee cases (*TD Bank*, *Gunter*, *Smith*, and *Hernandez*) in which courts certified a class

---

[12] *See* Olsen Depo. at 104:4-15.
[13] *See* Olsen Report ¶¶ 14-15 (Exh. AA hereto).

where both he and Ms. Kwon – a frequent naysayer in bank fee matters – had filed competing declarations. *In re TD Bank*, 325 F.R.D. at 172-174; *Gunter*, 2017 WL 4274196, at *8-9 (Olsen and Kwon submitted competing declarations at *Gunter* D.E. 64-1, 72, and 84-6); *Smith*, 2019 WL 2712262 (Olsen and Kwon submitted competing declaration at *Smith* D.E. 131-3, 150-8, and 146-30); *Hernandez*, at 3-4 (crediting Olsen's methodology and rejecting Kwon's criticisms). For example, in *TD Bank*, the court endorsed Olsen's methodology to ascertain class members and calculate damages, rejected Kwon's contrary opinions, and granted class certification. *See In re TD Bank*, 325 F.R.D. at 172-73. It explained that "[i]t is enough that, should Plaintiffs prevail on any of their claims, Mr. Olsen has adequately demonstrated he can mine the Bank's customer transaction data, determine the number of fees each customer did incur or would have incurred under [various overdraft fee theories], and adjust these calculations based upon data parameters established by the Court." *Id.* at 173. And in response to Kwon's nit-picking about highly specific scenarios that might come up, the court stated that, "[u]ndoubtedly, Mr. Olsen's precise calculations will need to be refined as these, and likely other, issues are resolved in this case. But it is abundantly clear to the Court that any such individualized issues are vastly outweighed by the common questions predominating in this litigation" because "damages calculations made pursuant to a common methodology 'need not be exact' at the class-certification stage." 325 F.R.D. at 173 (quoting *Comcast Corp. v. Behrend*, 529 U.S. 27, 34 (2013)). The same principles apply here with equal force. Mr. Olsen's methodology is reliable and buttresses why predominance is met here.

For all of these reasons, predominance is satisfied.

**b.   A Class Action is the Superior Method to Resolve this Dispute**

Under Rule 23(b)(3), the Court must also find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The pertinent superiority factors a court should consider are:

- Class members' interests in individually controlling their own litigation;

- the extent and nature of any already-pending litigation concerning the controversy;

- the desirability of concentrating claims in one judicial forum; and

- potential problems that could arise in managing the case as a class suit.

All of these factors favor class treatment here.

As the Supreme Court observed, "the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617. Superiority is supported here because the "maintenance of these claims as a class action [is a] more efficient and superior to other methods of adjudicating the controversy." *Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 244 (W.D. Ark. 2018). Certification of the putative class will serve this policy here, where the Class is composed of consumers who have account balances of less than zero, and such consumers would find it extremely difficult to obtain counsel to take their cases on an individual basis. *See, e.g.*, *Violette*, 214 F.R.D. at 216 (finding a class superior where "[m]any of the plaintiffs are of low income and lack the resources to secure representation and see the litigation through to completion").

Regarding manageability, there are no difficulties unique to this case that would prevent class certification. The factual and legal issues are based on a common nucleus of operative facts and legal theories. As discussed above, resolution of the central issues in dispute as to Plaintiffs

25

will resolve these issues as to all members of the Class. There is no meaningful alternative for prosecution of individual Class members' claims. Rather, litigation of thousands of cases would unnecessarily burden the courts, whereas this action provides an efficient vehicle for resolving this magnitude of claims in a single proceeding. Given the fact that the amount of each class member's damages is small, the likely alternative to this proceeding is not multiple individual actions, but none.

Courts have repeatedly found superiority satisfied in overdraft fee class actions, including in *In re TD Bank*, *Gunter*, and *Smith*, as well as in the *Overdraft MDL* matters. *See, e.g.*, *Smith*, 2019 WL 2712262, at *2-3; *In re TD Bank*, 325 F.R.D. at 162; *Gunter*, 2017 WL 4274196, at *8-9; *Capital One*, 2012 WL 12877717, at *14-15; *Comerica*, 286 F.R.D. at 659. That is because, as here, "the vast majority of class members have a *de minimis* interest in individually controlling the prosecution of their [overdraft fee] claims," "for most class members the only realistic alternative to a class action is no action at all," and "the difficulties that would be necessarily presented by thousands upon thousands of individual actions far outweigh any difficulties the Court may encounter in managing a class action." *In re TD Bank*, 325 F.R.D. at 162. These courts have concluded that "[a] class action is the only realistic way Plaintiffs' claims can be adjudicated." *Id.* (citation omitted).

The situation is the same here. Class members' individual claims are worth $36 per Retry Fee, giving them little incentive to litigate individually, especially against a massive bank like Simmons. Concentrating the litigation here is the best means of resolving this lawsuit, because the parties have already engaged in discovery and this Court is familiar with the legal and factual issues presented. Finally, addressing the claims collectively would be far more efficient than resolving them individually.

## 2.  Rule 23(b)(2) Certification is Also Warranted

Rule 23(b)(2) provides for class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The Eighth Circuit stated in *DeBoer v. Mellon Mortg. Co.* that "[i]f the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." 64 F.3d 1171, 1175 (8th Cir. 1995). Courts have previously certified a class action under Rule 23(b)(2) when plaintiffs sought a declaration under a uniform insurance policy that applied to numerous insureds. *Bond v. Liberty Ins. Corp.*, 2017 WL 1628956, at *11 (W.D. Mo. May 1, 2017). Certification of a declaratory and injunctive relief class is warranted here because Simmons is *still* assessing Retry Fees and indeed has not even changed its disclosures to inform it accountholders that it does so. Thus, the Class is entitled to a declaration of contract's meaning and, if Plaintiffs' construction prevails, prospective relief to remedy the breach.

## <u>CONCLUSION</u>

In cases challenging bank overdraft fees, courts overwhelmingly find class certification to be a straightforward exercise. This case is no different. The central issue is whether Simmons breached its standardized contract by assessing Retry Fees on items that had already been subjected to a fee. Whether the answer to that question is yes or no, it will apply equally Class-wide. Plaintiffs respectfully request that the Court certify the Class under Rule 23(b)(3) (as to damages) and (b)(2) (as to injunctive relief), and appoint Class Counsel under Rule 23(g).

Respectfully submitted this the 13th day of December, 2021.

E. Adam Webb
G. Franklin Lemond, Jr.
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com
Franklin@WebbLLC.com

William F. Burns, III (2008019)
WATSON BURNS, PLLC
253 Adams Avenue
Memphis, Tennessee 38103
(901) 529-7996
fwatson@watsonburns.com

Jeffrey Kaliel
KALIEL PLLC
1875 Connecticut Avenue NW
10th Floor
Washington, DC 20009
(202) 350-4783
jkaliel@kalielpllc.com

Tiffany M. Yiatras
Francis J. "Casey" Flynn, Jr.
CONSUMER PROTECTION LEGAL, LLC
308 Hutchinson Road
Ellisville, Missouri 63011
tiffany@consumerprotectionlegal.com
casey@consumerprotectionlegal.com

Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
(317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch , IV
BRANSTETTER, STRANCH & JENNINGS
PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37204
(615) 254-8801
gerards@bsjfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2021, I electronically filed the foregoing document with the clerk for the United States District Court for the Eastern District of Arkansas using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to attorneys of record, who have consented in writing to accept this Notice as service of this document by electronic means.

E. Adam Webb
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com