# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

SHUNDA WILKINS and DAVID WATSON,
on behalf of themselves and all others similarly
situated,

        Plaintiffs,

    vs.

SIMMONS BANK,

        Defendant.

Case No. 3:20-cv-00116-DPM

## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    In an attempt to rehabilitate an adhesion contract that this Court has already determined is

ambiguous, Simmons asks this Court to interpret excerpts of the 638-page NACHA Rules to

support its view of the adhesion contract.[1] The Court should decline to engage in this exercise,

---

[1] Simmons purported to attach a complete set of the NACHA Operating Rules (under seal) to its
Motion. Bogo-Ernst Decl., Ex. 29. That is false. Simmons merely attached a 106-page excerpt of
the 2015 version of the NACHA Rules. The 2015 version of the NACHA Rules are 638 pages,
and a true, complete and correct copy of those Rules are attached hereto as Exhibit 1. The 2015
Rules are not even the most recent version of the Rules, which are updated each year, and the
NACHA website currently offers for sale a 2022 version of the Rules for $99.
https://www.nacha.org/rulesyourway. Nor does Simmons attach the NACHA Rules for the years
in between. *E.g.*, Exhibit 2 (2019 NACHA Rules); and Exhibit 3 (2020 NACHA Rules). The
2016 version of the NACHA Operating Rules and Guidelines are available at:
http://ams.nacha.org/eweb/DynamicPageDrupal.aspx?Action=Add&ObjectKey
From=1A83491A-9853-4C87-86A4-F7D95601C2E2&WebCode=ProdDetailAdd&DoNotSave=
yes&ParentObject=CentralizedOrderEntry&ParentDataObject=Invoice%20Detail&ivd_formkey
=69202792-63d7-4ba2-bf4e-a0da41270555&ivd_cst_key=00000000-0000-0000-0000-
000000000000&ivd_prc_prd_key=d2bfd238-9e25-47a9-a9dd-ae411a7febdc   for   $97.00.   The
2017 NACHA Operating Rules and Guidelines are presently available as part of an app set at:
https://www.nacha.org/products/archive-nacha-operating-rules-2017-2019-app.   NACHA.   The
2021   version   of   the   NACHA   Operating   Rules   and   Guidelines   are   available   at:
https://www.nacha.org/products/2021-nacha-operating-rules-guidelines. Moreover, the NACHA

for five independent reasons: 1) the record shows the NACHA Rules never actually became part of the contract because they were never provided to accountholders, were never made available to accountholders, and were not even publicly available except for at a purchase price of approximately $99 from NACHA each year; 2) extrinsic evidence may not be considered to determine the meaning of an ambiguous adhesion contract; 3) even if such evidence could be considered, the NACHA Rules are silent on a bank's fee assessment practices, which are governed exclusively by individual bank contracts, not the NACHA Rules, *see Petrey v. Visions Credit Union*, 2021 WL 2364971, at *3 n.2 (N.D.N.Y. June 9, 2021) (declining to interpret NACHA Rules and noting "Defendant's argument would not vindicate it because . . . NACHA does not govern how Defendant may assess NSF fees."); 4) the NACHA Rules support Plaintiffs' view of the meaning of the term "item," not Simmons'; and 5) Simmons' argument in its Motion concerning the meaning of "item" conflicts with its own witness's testimony and its usage in contract documents..

The Court has already determined that Simmons' "per item" contract promise is ambiguous, having already reviewed largely the same arguments Simmons now makes again. *Wilkins v. Simmons Bank*, 2020 WL 7249030, at *1 (E.D. Ark. Dec. 9, 2020) (holding that "the customers allege a plausible breach. They say that Simmons's practice violates the fee schedule, which provides that overdraft fees are assessed on a per-item basis. They were charged multiple fees, they continue, on the same item when it was resubmitted. The Bank responds that the incorporated ACH rules contemplate reinitiation of what those rules call an entry, for a total of three tries, and that each is an item, which might generate a fee, for purposes of the parties' contract. The Court concludes that there is ambiguity in all this, and lurking in the Bank's 'per

Rules are frequently altered and interpreted by advisory letters, none of which Simmons provides.

item' fee in particular. Is each try an item? Or is the entire transaction one item even though multiple tries are involved?"). In light of this holding, the Court may not now turn to extrinsic evidence of any sort to determine the meaning of this ambiguous adhesion contract; the contract must be construed against the drafter, as discussed below.

Even if the Court were to consider the meager extrinsic evidence proffered by Simmons in its Motion (it should not), none of it should cause the Court to overrule its original ambiguity determination. First, whatever evidence Simmons proffers directly contradicts the testimony of its own corporate representative, who clearly and repeatedly testified that ACH payments and checks do not become new ones each time they are resubmitted. Second, the supposedly new "evidence" relied by Simmons is nothing more than quotations from the NACHA Rules that it already relied upon at the motion to dismiss stage, along with an expert opinion that impermissibly (and incorrectly) opines on the central legal issue in the case. Worse, Simmons never shows the NACHA Rules ever actually became part of the contract; the record shows the opposite, since the Bank admitted in discovery that it never provided a copy of the Rules to accountholders or *even made them available to accountholders* like Plaintiffs. For these reasons, the secret NACHA Rules document—so secret it has now been filed under seal by Simmons and cannot be accessed by the public except for a purchase price of approximately $99 each year— cannot be used to override the core ambiguity in Simmons' contract. Further, Simmons' expert declaration opining on the meaning of Simmons' contract is improper. Contracts are for courts and juries to interpret, not paid experts. Mr. Nesbitt himself admitted as much in deposition. *See* Deposition of Gary Nesbitt, pp. 24:25 – 25:4 ("Q: In your opinion do the Nacha rules supersede contracts between banks like Simmons and their customers? THE WITNESS: They do not") (Exhibit 4 hereto).

While Simmons provides virtually no record evidence to support its view of the meaning of the contract, it provides other evidence in an effort to denigrate Plaintiffs and to show that Plaintiffs incurred hundreds of dollars in OD and NSF Fees—fees assessed in large part due to the aggressive, exploitative fee-maximization practices of Simmons at issue in this litigation and in a different class action lawsuit against Simmons, in which the Bank has already agreed to a class wide settlement. *Walkingstick v. Simmons*, Case No. 6:19-cv-03184-RK (W.D. Mo.), ECF No. 121. That Simmons exploited and profited from struggling accountholders like Plaintiffs does not support summary judgment here. The simple question is whether the fees in this case were authorized by the contract. They were not. The Bank also argues that summary judgment is warranted because Wilkins has not yet paid back her challenged fees, and Watson has only paid some of them. This is irrelevant, since the law is well-established that a plaintiff has standing to eliminate outstanding debt in litigation, if that debt was wrongly charged to her.

The Motion should be denied, and the case should proceed to trial.

## I.      BACKGROUND

### A.      Simmons Documents Said "Per Item," Not "Each Presentation" of an Item.

Each and every iteration of the Fee Schedule in effect during the Class Period made the same promise:

14. Paid Item Fee (Overdraft Fee) (per item): $30.00
15. Return Item Fee (Insufficient Funds (NSF) Fee) (per item): $30.00

*E.g.,* Dec. 2017 Schedule of Fees (ECF No. 91-9). No version of the Fee Schedule ever disclosed that the same check or ACH could receive more than one OD or NSF Fee—or, in other words, that Simmons would assess a fee for each time or *occurrence* a check or ACH was presented, as opposed to a fee for each "item."

Crucially, Simmons corporate representative admitted that the Bank never once states in its contract documents that the same check or ACH can incur more than one NSF or OD Fee:

> Q. [W]ould you agree that Simmons doesn't expressly describe the circumstance in which a check or an ACH can get more than one fee in its account documents?
> THE WITNESS: Yes, I would agree. There is -- there are not scenarios in our documents.

*See* November 4, 2021 Corporate Representative Deposition of Lisa Hunter ("Hunter II*")* at 26:9-18 (ECF No. 91-11). While Simmons agrees that the Fee Schedule does not actually say that an item can cause more than one fee, it believes that accountholders should have *inferred* Simmons' preferred meaning, even though it is not stated expressly:

> Q. And do you think the [fee schedule means that] each -- a new fee will be assessed each time each item is presented?
> A. Yes.
> Q. Okay. You agree it does not say that, but you think that's what it means; right?
> […]
> THE WITNESS: Yes.

Hunter II at 51:15-22.

Crucially, in every Fee Schedule, Simmons <u>did</u> specify that certain <u>other</u> fee types were assessed on a "per occurrence," as opposed to a "per item" basis—the fee being assessed based on the number of times something occurs versus being assessed on the thing itself:

> 12. Miscellaneous Fees:
> Loan Coupon Book Replacement Fee (**per occurrence**) $3.00
> Levies/ Garnishments (**per occurrence**)

*See* Stipulation (ECF No. 78) (emphasis added). Simmons' corporate representative agrees that "per occurrence"—the term it never used with respect to NSF or OD Fee assessment—means "each time" something happens:

> Q. Well, would you agree "per occurrence" means each time something happens?
> […]
> THE WITNESS: I think -- I think yes, that would be the common understanding of it.

Hunter II at 57:2-6.

The key term in dispute, therefore, is "item." Simmons concedes that despite repeatedly using the term "item" in its account documents, it "*doesn't have 'item' defined in any of our documents* because, again, it is considered kind of an ordinarily generally understood word."  Hunter II at 12:18-20. Simmons believes there is no "special definition for 'item,'" *id*. at 12:23-24, and the term "is defined just in ordinary everyday use, it is something that is distinctive."  *Id*. at 12:13-15. In short, the Simmons corporate representative's own stated definition of the term "item" supports Plaintiffs' breach of contract claim here: an "item" is something that is ordinarily understood to be "distinct," just as each of Plaintiffs' instructions to make an ACH payment or write a check from their accounts were distinct. Further, Simmons' own contract documents use the key term "item" in just the same way. Simmons itself acknowledges in its Online Banking/Mobile Deposit Agreement/EULA that an "item" can be re-presented:

> "The manner in which the checks and **items** are cleared, presented (**or re-presented**) for payment, and collected shall be in Simmons Bank's sole discretion as set forth herein."

*See* Copy of User agreement, Available at: https://login.simmonsbank.com/eula.html (Last visited: 1/18/2022). As the court in *Hartnett, supra,* held:  "The term 're-presented' would lose meaning if an item became a new item each time it was presented," *id*., at 7.

Because Simmons' own witness and own documents agree with Plaintiff's view of the term "item," and because this Court has already determined that "item" doesn't have the generally understood meaning Simmons seems to believe it has, this alone necessitates a trial.

Contrary to its designated corporate representative's testimony that "item" has an "ordinary," generally understood meaning, Simmons' Motion now does a 180-degree pivot, arguing that the NACHA Rules (not ordinary, common sense meaning) actually support its understanding of the term "item." *See* ECF No. 80 at 4. The NACHA Rules don't actually support that view, as discussed below, but at this juncture Plaintiff merely points out that even

the Bank has conflicting positions on this issue. Because Simmons' own Corporate Representative agrees with Plaintiff's view of the term "item," and that view conflicts with Simmons' view of the NACHA Rules, this contested fact alone necessitates a trial.

**B.      NACHA Rules**

### 1.      Simmons Never Provided or Made Available the NACHA Rules to Its Customers

Simmons' summary judgment contract argument is premised entirely on the NACHA Rules, which it argues were "incorporated" into the account contract. *See* ECF No. 80 at 19. But it admits it never actually provided those rules to accountholders like Plaintiffs:

> Q. Does Simmons provide a copy of the NACHA rules at account opening to its customers?
> A. No.
> Q. And is there a link to the NACHA rules anywhere on the Simmons website currently?
> A. Not that I'm aware of[.]

*See* Hunter II at 36: 12-18.

Indeed, the Bank itself doesn't appear to even possess a complete copy of the NACHA Rules, since it failed to attach a complete and correct version of the Rules to its Motion. Simmons merely attached a 106-page excerpt of the 2015 version of the NACHA Rules. The 2015 version of the NACHA Rules are 638 pages. *See, e.g.*, Exh. 1. The 2015 Rules are not even the most recent version of the Rules, which are updated each year[2], and the NACHA website currently offers for sale a 2022 version of the Rules for $99. https://www.nacha.org/rulesyourway. Moreover, the NACHA Rules are frequently altered and interpreted by advisory letters, none of which Simmons provides.

---

[2] *See*, fn. 1, regarding the NACHA Operating Rules & Guidelines in effect from 2015-present.

### 2. NACHA Rules Are Silent on Fee Assessment by RDFI's Such as Simmons.

No provision of the NACHA Rules states when, how many, or at what amount a bank can assess its bank fees. The Rules are entirely silent on these topics, which are governed exclusively by contract between a bank and its accountholder. Simmons' expert agrees. *See* Nesbitt Depo. at 22:1 – 14 ("Mr. Nesbitt, do the Nacha rules require banks like Simmons to assess multiple NSF fees when a transaction is presented multiple times for payment? . . . THE WITNESS: The Nacha rules do not address bank pricing. **Q So they don't address whether or not the bank should assess a fee only once or whether a fee should be assessed multiple times? . . . THE WITNESS: They do not")** (emphasis added).

### 3. NACHA Rules Show Resubmissions are Not New Items.

Under NACHA's terminology, a request for payment by an accountholder via the ACH network is called an "*Entry.*" When an entry is returned for insufficient funds, NACHA's rules allow a merchant to make additional attempts to obtain payment by "re-presenting" (or "reinitiating") the returned entry. *See id.* § 2.12.4.2. When this occurs, subsequent submissions are called **"Reinitiated Entries."** *Id.*, § 8.89 of the Rules (defining "Reinitiated Entry" or "Reinitiation" or "Reinitiate" as "following the Return of an Entry, an Entry initiated to the same Receiver's account in the same amount in payment or fulfillment of <u>the same underlying obligation</u>"). (emphasis added). Plainly, an "item" or "entry" refers to the "underlying obligation" made by the accountholder, not reprocessing attempts. Indeed, to ensure that the receiving financial institution recognizes that the merchant's payment request is a reinitiated entry of the "same underlying obligation," rather than a new one, the request must "contain the identical data as the original" entry and include the label "RETRY PYMT." *See id.* The rules prohibit a merchant from altering a previously returned entry to look like a new entry. *Id.* Thus,

the rules thus make clear that a "re-presented" entry is just another request for payment of the original entry, not a separate entry (or "item").

Simmons argues contrarily that "*every* attempt by a merchant to collect payment from Simmons is a new and unique Automated Clearing House ("ACH") payment request 'Entry,' which the Rules specifically equate to an 'item'" as that term is used in the UCC. *See* ECF No. 80 at 1-2. But Simmons ignores the definition of an "Reinitiated Entry"—a district kind of entry that is not a "new" Entry. Further, while "entry" and the UCC's definition of "item" are equated under the NACHA Rules, the UCC uses the term to refer to an *accountholder* order or instruction for payment—to pay a certain underlying obligation—not to a merchant's order or resubmission.

Simmons makes another important misrepresentation about the NACHA Rules in its Motion. It argues that "the merchant (or the merchant's bank) decides to resubmit the transaction, it does so by creating a new ACH item—*with a new date* and a new, unique Trace Number—that is sent to Simmons to process anew, *just like any other ACH Entry*." ECF No. 80 at 17 (emphasis added). That is also false. When an entry is returned for insufficient funds, NACHA's rules allow a merchant to make additional attempts to obtain payment by "re-presenting" (or "reinitiating") the returned entry. *See id.* § 2.12.4.2. To ensure that the receiving financial institution recognizes that the merchant's payment request is a *reinitiated entry* of the "same underlying obligation," rather than a new one, NACHA Rules require the ODFI is required to include the description "RETRY PYMT" in the Company Entry Description field to identify entries that are permissible resubmissions of returned entries under the rules for reinitiation." *See*, OG 50, 2015 NACHA Operating Guidelines at 342 of pdf. OG 55, page 333 of 2018 PDF. See, also, § 2.12.3.2. (requiring that the contents of the Company Name, Company

Identification, and Amount fields of the Reinitiated Entry must be identical to the contents of the original Entry and that the contents of other fields should be modified only as necessary to correct an error or facilitate proper processing of the Reinitiated Entry.)  Clearly, a resubmission is not "just like any other ACH Entry."

Simmons makes yet another misrepresentation about the NACHA Rules. It argues that "the Nacha Rules expressly provide that 'each debit Entry shall be deemed an 'item' within the meaning of Revised Article 4 of the Uniform Commercial Code'" "and both terms refer to the 'order to pay money' that the bank receives and 'handle[s]'—not to the underlying transaction between a customer and a merchant."  ECF No. 80 at 18.  This sentence alone contains two inaccuracies. <u>First</u>, an "item," in its trade usage, is a "negotiable instrument or a promise or order to pay money handled by a bank for collection or payment."[3] The Arkansas UCC has the same definition: "an instrument or a promise or order to pay money handled by a bank for collection or payment."  Ark. Code Ann. § 4-4-104." In turn, the term "'Order' means a written instruction to pay money *signed by the person giving the instruction*. Ark. Code Ann. § 4-3-103(7) (emphasis added). The term "promise" means "a written undertaking to pay money *signed by the person undertaking to pay*." Ark. Code Ann. § 4-3-103(11). Again, as in the example above, there is a single "signed" check or ACH—a single order or promise to pay by the accountholder. The term "item" thus plainly means an order *by the accountholder* to pay—not a third party's resubmission of a previous payment order by that accountholder. Plaintiffs only made one instruction for payment and they only intended funds to leave their account one time. Under the NACHA Rules, then, entry and item both refer to an accountholder's order or instruction for payment. <u>Second</u>, Simmons entirely ignores the distinction drawn in the NACHA Rules between

---

[3] *Item*, Black's Law Dictionary; *Turner v. Comm'r of Internal Rev.*, 303 F.2d 94, 95 (4th Cir. 1962) (using "debit item" in that sense).

an "Entry" and a "Reinitiated Entry." The Rules say each "Entry" is an "item," they certainly do not state that "each debit Entry *and each Reinitiated debit Entry*" shall be deemed a new item— this is an invention of counsel. A "debit entry" is conclusively not the same thing as a "reinitiated debit entry," since again a "debit entry" is created by the authorization of an accountholder, not by a  reprocessing by a merchant. *See* OG 55, 2015 Operating Guidelines regarding "Reinitiation of Returned Entries," which makes clear only an accountholder authorization "creates a new entry":

> [A] debit entry will not be considered a "reinitiation" if the Originator obtains a new authorization for the debit entry under the receipt of the return. The existing reinitiation rule already makes a reference in this regard to entries that are returned due to stop payment orders, but the Rules will broaden the scope of the exception since a new authorization should always be considered to create a new entry.

Further context in the Rules make clear that Simmons is incorrect that each presentment of an ACH is a new "entry" or "item."  Indeed, in 638 pages, the NACHA Rules never once use the term "item" in the manner that Simmons urges here. In the rare circumstances where it uses the term "item," it does so in a way that exactly comports with Plaintiff's view of the term. For example, Rule provisions regarding so-called "RCK Entries"—ACHs that follow the return of an old-fashioned paper check for insufficient funds—make clear that all such entries are derivative of, and refer back to, the underlying "item" (the paper check):

> An Originator may satisfy the requirement for authorization of an RCK Entry by providing the Receiver a notice meeting the requirements of this subsection and obtaining the item to which the RCK Entry relates.

Exh. 1, OR 18

> Retention of Copy of Item. An Originator must retain a copy of the front and back of the item to which the RCK Entry relates for seven years from the Settlement Date of the RCK Entry.

*Id.*, OR 19. Crucially, RCK Entries themselves can also be reinitiated, and the Rules make clear that those too relate to the same underlying item:

> An Originator or ODFI may reinitiate any RCK Entry that was previously returned if: (a) the RCK Entry has been returned for insufficient or uncollected funds; and (b) the item to which the RCK Entry relates has been presented no more than one time through the check collection system (as a Check, substitute check, or image) and no more than one time as an RCK Entry.

Exh. 1, OR 20.

> Originators may transmit a re-presented check entry no more than twice after the first return of a paper item, and no more than once after the second return of a paper item.

OG 221. In sum, even in the rare cases where the NACHA Rules use the term "item," they use the term in precisely that way Plaintiffs understand: in reference to the underlying obligation or instruction for payment by the accountholder.

In a similar circumstance, a federal court recently made the same holding regarding paper checks – resubmissions of such underlying checks are still the same "item":

> [Defendant] argues that the Uniform Commercial Code's ("UCC") requirement that banks process re-presented checks the same way as initially presented checks means that "each check presentment [is] a new item." [Defendant's] own citations contradict their argument, however. UCC commentary states that "checks are checks, and the rules are the same whether an item is arriving for the first, second, or even third time." This commentary refers to a singular item, i.e., a check, that may arrive multiple times. This supports Plaintiffs' interpretation of the Agreement rather than [Defendant's]. The check is the item, and the Fee Schedule only allows one fee per item, regardless of how many times it is presented or re-presented. The term "re-presented" would lose meaning if an item became a new item each time it was presented.

> […]

> [Defendant] asserts that the merchant presented the "original check" on July 12, 2018, and presented a "substitute check" on July 17, 2018. Washington Federal contends that, because federal law and the Agreement define "original check" and "substitute check" differently, the merchant's "second payment request was a new 'item[.]'" Federal law provides that "[t]he term check includes an original check and a substitute check." 12 C.F.R. § 229.2(k)(7). "There is only one original

check for any particular payment transaction. However, multiple substitute checks could be created to represent that original check at various points in the check collection and return process." Id. at § 229, App. E § WW. In other words, the "substitute check" that the merchant submitted represented the original check. This does not support [Defendant's] argument that the substitute check was an entirely new item subject to a new NSF fee…In other words, the original check and the substitute check are both the same check, under [Defendant's] own Agreement. Neither federal law nor the Agreement indicates the original check and the substitute check were separate items for which separate NSF fees were permitted.

*Harnett v. Washington Federal Bank*, Case No. 2:21-cv-00888-RSM (W.D. Wash.) at 8-9

(Exhibit 5 hereto).

### C. Industry Custom Shows Resubmissions are Not New Items

Simmons repeatedly argues that because for each presentation of an item, "the ACH system assigns it a new, unique Trace Number," this somehow means that each presentation is a new item. But neither the Rules—much less Simmons' contract—in any way say that a Trace Number means a new "item" is created, or that fee assessment in any way relies upon a Trace Number. That is why Simmons never discloses trace numbers to its customers or prints them on its monthly statements. *See, e.g.,* WILKINS-0002363- WILKINS-0002365 (Exhibit 6 hereto). More to the point, Simmons' contract nowhere ties NSF Fee assessment to "trace numbers"— and indeed doesn't reference "trace numbers" at all.

In any event, trace numbers don't have the importance Simmons assigns to them under the NACHA Rules; they are merely a back-office processing tool assigned by an ODFI to identify ACHs within certain files: "A Trace Number, assigned by the ODFI in ascending sequence, is included in each Entry Detail Record, Corporate Entry Detail Record, and Addenda Record. *A Trace Number uniquely identifies each Entry Detail Record within a batch in an ACH input File.* In association with the Batch Number, Transmission (File Creation) Date, and File ID Modifier, *the Trace Number uniquely identifies an Entry within a specific File.*"  Exh. 1, at OR

133. Indeed, certain entries can share the same Trace Number, and Trace Numbers are far from unique and can be duplicated or shared by various entries: "For Addenda Records, the Trace Number is identical to the Trace Number in the associated Entry Detail Record…Since it is possible, although undesirable, for an ODFI to duplicate Trace Numbers on separate Files or within different batches submitted during the same processing date, the File ID Modifier contained in the ODFI's File Header Record should also be referenced when the ODFI is tracing returned Entries." *Id.* In sum, trace numbers are simply a tracking device for individual presentations. "Trace procedures must be available to ODFIs in the event that they need to determine an individual transaction's status in the ACH system." OG 125. "ACH Trace Number is not used to reassociate the EFT and ERA; it is used primarily for customer service and transaction research, and to aid in identifying returned transactions." OG 274.

That Simmons' reliance upon trace numbers is absurd is shown by this further fact: *in the ACH system, an entry and a return of that same entry for insufficient funds have different trace numbers*. Ex. 1, OG 320. Under Simmons' logic, that would mean a "return" of an ACH was a totally different item from the attempted debit of that ACH—a nonsensical position.

Not only does "industry custom" not support Simmons, but its own corporate representative repeatedly conceded the basic factual premise of Plaintiffs' claims: that a check or ACH can be presented more than one time, *without* morphing into a *new* check or ACH:

> Q. So let's talk about returned checks. Is it possible for a check to be presented more than one time after it has been returned for insufficient funds?
> A. Yes.

Hunter II at 15:8-14.

> Q. Okay. What about ACH payments, can those be presented a second or a third time after being returned for insufficient funds?
> A. Yes.

*Id*. at 18:10-13; 19:24-25 – 20:1-9.

> Q. [I]t is your testimony that they can incur fees specifically on the second or the
> third time an ACH or a check is presented?
> A. Yes. Yes.

*Id*. at 29:2-5. This testimony brings with it a logical necessity:  if a check or ACH can be

presented more than one time, as Simmons repeatedly testified, it is by necessity the <u>same</u> check

or ACH—the same item—being presented again. Indeed, the Bank's corporate representative

stated this premise—a check does not become a new check merely by dint of being

reprocessed—in even more plain terms:

> Q. [I]if someone at Simmons looked at check number 100 and returned it for
> insufficient funds and then saw check number 100 a few days later come in and
> returned for insufficient funds, if someone looked, **you would be able to
> determine it was the same check; right**?
> […]
> THE WITNESS: I think by visual review of the check you would see that -- you
> would see that yes, you would see that.

Hunter II at 83:12-21 (emphasis added).

It is crucial to point out how Simmons' witness testimony directly conflicts with what its

expert now says. Mr. Nesbitt attests that, in his supposed extensive "experience with the Nacha

Rules, … [*a] resubmitted ACH transaction is a new item.*" Bogo Ex. 1 ¶ 30 (Nesbitt Rep.)

(emphasis added). But as above, Simmons itself has already testified that is not true: "Q. What

about ACH payments, can those be presented a second or a third time after being returned for

insufficient funds? A. Yes." *Id*. at 18:10-13; 19:24-25 – 20:1-9. Mr. Nesbitt and Simmons'

corporate representative cannot both be right. If an ACH payment can be presented a second or

third time, as Ms. Hunter testified, it is the same ACH payment being submitted—not a "new

item" as Mr. Nesbitt now states in his report. At best, this discrepancy is for the trier of fact to

untangle.

Lastly, Simmons also argues that industry custom also shows each presentment of an item is a new item, since it does not believe Simmons has a "feasible, automated way for Simmons to accurately identify all of the 'retry' attempts to collect payment on previously returned transactions out of the millions of ACH payment Entries it receives daily." ECF No. 80 at 2. But its own corporate representative disagrees and stated that "by visual review," Simmons could very well determine which were items were being presented a second or third time:

> Q. With respect to -- to checks that have been re-presented, would you agree that if a check is re-presented with the same check number, Simmons is aware the check is being re-presented?
> […]
> THE WITNESS: Are you asking if we have some kind of -- do we track how many times it's been presented?
> BY MR. KALIEL: Q. I guess I'm just asking if -- if the same check number is presented twice, doesn't that mean you're aware the same check is being presented twice?
> THE WITNESS: I don't know the answer to that. I don't know if it's tracked in our system or not.
> BY MR. KALIEL: Q. Whether it's actually tracked in your system or not, if someone at Simmons looked at check number 100 and returned it for insufficient funds and then saw check number 100 a few days later come in and returned for insufficient funds, if someone looked, you would be able to determine it was the same check; right?
> […]
> THE WITNESS: I think by visual review of the check you would see that -- you would see that yes, you would see that.

Hunter II at 82-83. And regardless of whether Simmons' antiquated technology doesn't allow it to identify resubmissions or not, it should not have made contractual promises it could not keep.

This is precisely why many financial institutions of all sizes, all across the county, expressly disclose their "retry NSF Fee" practices—and do so in a way that further supports Plaintiffs' view of the common meaning of the term "item". Over and over across the industry, banks and credit unions describe "items" as being "resubmitted" or "represented." As examples,

First Hawaiian Bank engages in the same abusive practices as Simmons, but at least currently

discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT
> A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY
> BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND
> RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://bit.ly/2KWMvTg

(last accessed Jan. 28, 2021) (emphasis added).

Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment
> (electronic or check) is submitted to us for payment from your Bill Payment
> Account when, at the time of posting, your Bill Payment Account is overdrawn,
> would be overdrawn if we paid the item (whether or not we in fact pay it) or does
> not have sufficient available funds; or (2) we return, reverse, or decline to pay an
> item for any other reason authorized by the terms and conditions governing your
> Bill Payment Account. **We will charge an NSF/Overdraft Fee as provided in
> this section regardless of the number of times an item is submitted or
> resubmitted to us for payment, and regardless of whether we pay the item or
> return, reverse, or decline to pay the bill payment.**

*Consumer Account Terms and Conditions*, Klein Bank 4 (Jan. 2013), https://bit.ly/2KVCkhI

(emphasis added).

Central Pacific Bank, a leading bank in Hawai'i, states in its deposit account under the

"MULTIPLE NSF FEES" subsection:

> Items and transactions (such as, for example, checks and electronic
> transactions/payments) returned unpaid due to insufficient/non-sufficient funds
> ("NSF") in your account, may be resubmitted one or more times for payment, and
> a returned item/transaction fee will be imposed on you each time an item and
> transaction resubmitted for payment is returned due to insufficient/non-sufficient
> funds.

*Miscellaneous Fee Schedule*, Central Pacific Bank 1 (Jan. 4. 2021),

https://www.cpb.bank/media/2776/fee-001.pdf (last accessed June 4, 2021).

BP Credit Union likewise states: "We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item." *Membership and Account Agreement,* BP Federal Credit Union, ¶ 14(a), https://www.bpfcu.org/images/docs/membership-agreement.pdf (last accessed June 4, 2021).

Regions Bank likewise states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

*Deposit Agreement*, Regions Bank 18 (2018), https://bit.ly/2L0vx6A (last accessed June 4, 2021).

Andrews Federal Credit Union states:

You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

*Terms & Conditions*, Andrews Federal Credit Union 17 (Aug. 2020), ¶ 6, https://bit.ly/3iXEdHb (last accessed June 4, 2021).

Consumers Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or

resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Member Services Guide*, Consumers Credit Union 5 (Apr. 2020), ¶ 11a, https://bit.ly/3iVM1ta

(last accessed June 4, 2021).

Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information*, Wright Patt Credit Union 13 (July 2020), ¶ 6.1, (last accessed

June 4, 2021).

Railroad & Industrial Federal Credit Union states:

Consequently, because we may charge an NSF fee for an NSF item each time it is presented, we may charge you more than one NSF fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information for Our Members*, Railroad & Industrial Federal Credit Union, p.

2, (Aug. 1, 2019), https://bit.ly/3t5ehhF (last accessed June 4, 2021).

Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Consumer Membership & Account Agreement*, Partners 1st Federal Credit Union, p. 11 (Sept.

15, 2019), https://bit.ly/39pDZWb (last accessed March 2, 2021).

Members First Credit Union states:

> We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment[.]

*Membership and Account Agreement*, Members First Credit Union of Florida 3, https://bit.ly/39rRJ2Y (last accessed March 2, 2021).

> Community Bank, N.A. states:

> We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank 5 (Nov. 12, 2019), https://bit.ly/3iY9dH2 (last accessed June 4, 2021).

> RBC Bank states:

> We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

*Service Agreement for Personal Accounts*, RBC Bank 13 (Sept. 17, 2014), https://bit.ly/3otUtko (last accessed June 4, 2021).

> Diamond Lakes Credit Union states,

> Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

*Membership and Account Agreement*, Diamond Lakes Federal Credit Union, https://bit.ly/39o2P94 (last accessed June 4, 2021).

> Parkside Credit Union states,

20

> If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

*Membership and Account Agreement*, Parkside Credit Union 21 (Jan. 30, 2020), https://bit.ly/3aaXfpG (last accessed March 2, 2021).

Each of these industry usages of the term "item" comport exactly with Plaintiffs' view of the term here: *an item remains the same "item" even if it is processed*. The above usage across the industry shows it is Simmons Motion (including Mr. Nesbitt's opinion) here that urges an unusual, implausible definition of the key term.

### D.     Defendant's Ad Hominem Attacks on Plaintiffs are Unpersuasive.

In hopes of taking the Court's attention away from the fact that Simmons acted in a fashion that was not allowed by its form contract, Defendant resorts to ad hominem attacks on Ms. Wilkins and Mr. Watson – referring to them as "chronic overdrafters who owe Simmons hundreds of dollars."   *See* ECF No. 80 at 8. As Simmons's own expert admitted, however, whether Plaintiffs were or were not chronic overdrafters and whether Plaintiffs owed Simmons money has absolutely nothing to do with whether Simmons properly assessed NSF fees on their accounts. *See* Nesbitt Depo. at 45:9 – 14 ("Q: Whether or not the Watsons were chronical overdrafters, doesn't have anything to do with whether or not Simmons properly assessed NSF fees on their account? . . . THE WITNESS: It does not"); 45:16 – 22 ("Q: And similarly, whether the bank ultimately charged off their account or not has no impact on either of those two scenarios that we just discussed, does it? . . . THE WITNESS: It does not"). Given that the

Bank's own expert admitted these issues have no impact on questions raised by Plaintiffs in this class action, the Court should ignore Defendant's ad hominem attacks.

### 1.   Whether Plaintiffs Paid the Fees in Question is Irrelevant.

Simmons goes to great length in its motion to establish that Ms. Wilkins never paid the sole fee that she challenges and that Mr. Watson has only paid two of the five fees that he is challenging. *See* ECF No. 80 at 8 – 13. Whether or not Plaintiffs have paid these fees, however, is immaterial because courts have universally found that the liability to repay a defendant is sufficient to state a valid claim, even if the plaintiff never paid the fee or amount owed in question. *See, e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1119 (9th Cir. 2017); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 51 (2d Cir. 2016); *Hamilton v. SunTrust Mortg. Inc*., 6 F. Supp. 3d 1300, 1307 (S.D. Fla. 2014); *McCracken v. Verisma Sys.*, 131 F. Supp. 3d 38, 42 (W.D.N.Y. 2015). As Simmons contends throughout this litigation, Ms. Wilkins and Mr. Watson have "an obligation to repay" the amounts they have overdrawn their accounts. *See* ECF No. 23, pp. 3, 11. Further, Simmons has countersued Ms. Wilkins regarding her outstanding balance. *See* ECF No. 42. This obligation to pay, which the Bank has openly embraced, allows Ms. Wilkins and Mr. Watson to pursue their claims.

*McCracken v. Verisma Systems* is likewise instructive. There, the plaintiffs, all of whom were patients who received medical treatment at the healthcare facility, claimed that Defendants charged them excessively for copies of their medical records, in violation of the relevant New York statutes. 131 F. Supp. 3d at 41. Defendants challenged the plaintiffs' ability to bring the claim on the grounds that they never actually paid the copying expenses that they claimed were excessive. *Id.* The district court rejected this argument, finding that "Plaintiffs ha[d] pleaded facts, and attached documentary evidence indicating that, at the time the Firm incurred the

copying expenses, Plaintiffs were legally obligated to reimburse the Firm for expenses incurred in connection with representing them." *Id.* at 42. The court further held that the "liability to repay the Firm for the copying expenses has given Plaintiffs standing to challenge the copying charges as excessive" under the statutes in question. *Id. See also Carter*, 822 F.3d at 51 (holding that because plaintiffs bore the ultimate expense for paying for the records, they had standing to challenge amount of fee being charged).

*Hamilton* is also informative. There, the defendants claimed that Hamilton was not a proper plaintiff because she never paid for any of the force-placed insurance at issue in the case because "it was not placed until 2010 – two years after she stopped paying her mortgage." 6 F. Supp. 3d at 1307. In response, the plaintiffs argued they could pursue the claim because "under the terms of her mortgage contract, the force-placed insurance premiums are automatically added to her total debt." *Id.* In finding that Hamilton had standing, the district court concluded, "it is undisputed that Hamilton's account has already been charged for the force-placed insurance premiums. If Hamilton is successful in this action, her total debt may be reduced." *Id. See also Williams v. Wells Fargo Bank*, 280 F.R.D. 665, 673 (S.D. Fla. 2012) (certifying class of borrowers in force-placed insurance case to include those whom had been charged and either paid or still owed bank for premiums); *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.*, 274 F.R.D. 286, 292-93 (N.D. Cal. 2011) (rejecting argument that putative class representatives who owed money to bank were inadequate); *Lane v. Wells Fargo Bank, N.A.*, 2013 WL 3187410, at *11 (N.D. Cal. June 21, 2013) (finding borrowers had standing to bring force-placed insurance claims even though they had not yet paid any portion of premiums).

This Court's prior rulings in this case are in accord. *E.g.*, ECF Nos. 41, 62. It is undisputed that Ms. Wilkins and Mr. Watson have "an obligation to repay" the amounts they have overdrawn their accounts. Whether or not they owe Simmons money is irrelevant.

### 2.   Whether Plaintiffs Also Breached is Likewise Irrelevant.

Simmons's ad hominem attacks on Plaintiffs are also aimed at establishing that Plaintiffs breached the Customer Agreement. *See* ECF No. 80 at 8 – 13. As it did in its motion to dismiss, the Bank argues that Plaintiffs' breach excuses its own. *Id.* Unfortunately for the Bank, Arkansas law does not create such an exception as the Bank suggests. The three cases that Simmons cites for this theory – *Ramthun v. Bryan Career College, Inc.*, 93 F. Supp. 3d 1011, 1023 (W.D. Ark. 2015), *Commercial Credit Grp. Inc. v. Allianz Global Corp. & Specialty N. Am.*, 2018 WL 1575823, at *5 (E.D. Ark. Mar. 30, 2018), and *Moore v. Mack's Sport Shop, LLLP*, 2017 WL 4350980, at *11 (E.D. Ark. Sept. 29, 2017) – all cite the same Arkansas Supreme Court case, *Foreman School District No. 25 v. Steele*, 61 S.W.3d 801 (Ark. 2001), in support of this premise. *Foreman*, however, did not hold that a plaintiff must show that he or she "did what the contract required" in order to state a valid claim for breach of contract, but rather held "[a] person may be liable for breach of contract if the complaining party can prove ***the existence of an agreement, breach of the agreement, and resulting damages***." *Id.* at 807 (citing *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 33 S.W.3d 128, 133 (Ark. 2000) (same) (emphasis added). Defendant's attempt to create new criteria for a breach of contract claim beyond those stated by the Arkansas Supreme Court should be rejected.

Furthermore, Plaintiffs did not breach the contract first, as Simmons contends. The terms of the Overdraft Privilege Account Disclosure state:

SIMMONS BANK
OVERDRAFT PRIVILEGE ACCOUNT DISCLOSURE

As a benefit to our customers, we offer a useful feature on some of our checking account products - an Overdraft Privilege. **With this Overdraft Privilege, we will pay your non-sufficient funds (NSFs) checks and fees up to a pre-approved $500 negative available funds balance. This feature will save you time, embarrassment, and the additional fees charged by many other companies. You can access your Overdraft Privilege by writing checks to a third party, by withdrawing in person at a Teller window, at a point-of-sale (debit card transactions with merchants), at an ATM, or other electronic means.** [You are required to consent (opt-in) to receive the benefit of overdraft protection at a point-of-sale or at an ATM. Consent forms are available at any Simmons Bank location or at www.simmonsfirst.com/consent. You may also provide your consent by phoning 1-870-850-2550 or toll free at 1-866-246-2400.]

**The Overdraft Privilege will allow you to overdraw your account up to a negative available funds balance of $500.** You will be charged the normal Paid Item Fee (overdraft fee) of $30.00 per item as set forth in our Schedule of Fees and Charges. All bank fees and charges, including without limitation the Paid Item Fees, will be included in the negative available balance and will reduce your available overdraft limit.

CONDITIONS FOR THE PRIVILEGE: Naturally, it is always the policy of our bank to comply with all applicable laws and regulations and to conduct business in accordance with applicable safety and soundness standards. Accordingly, there are a few conditions that will apply to this Overdraft Privilege feature:

You **will** be eligible for the Overdraft Privilege ***unless***:

1. Your account has been open less than 30 days.
2. You are more than 30 days past due on any loan obligation to the Bank; or,
3. You are subject to any legal or administrative orders or levy; or,
4. You are currently a party in a bankruptcy proceeding; or,
5. You have a current outstanding balance in an Overdraft Repayment Plan; or,
6. Your account is currently overdrawn; or,
7. You did not deposit $300 or more into your account; or,
8. A hold is being placed on your account for any items and the bank is required by law to notify you. Your Overdraft Privilege will automatically be suspended, without prior notice, for as long as the hold is in effect; or,
9. It appears that improper activity is taking place in your account, in which case we may suspend your Overdraft Privilege without prior notice.

You must also bring your account to a positive balance at least once every thirty (30) days to maintain your Overdraft Privilege in good standing.

SUSPENSION OF PRIVILEGE: After your Overdraft Privilege has been activated, we may suspend your privilege without notice if we become aware of any of the above conditions.

*See* Overdraft Privilege Account Disclosure, WILKINS-0000562 (Exhibit 7 hereto).

First, three of the Challenged Fees Occurred on days in which Plaintiffs' Account Daily Balance was within the Negative $500.00 Threshold permitted by the Deposit Agreement as indicated by the Overdraft Privilege Account Disclosure. So Simmons cannot contend Plaintiff was even in breach at the time the following challenged fees were assessed:

- The $30 Paid Item Fee on 8/17/2015 was caused by the PayPal transaction in the amount of $6.17. This transaction was previously returned and assessed an NSF fee on 8/10/2015. Because the daily account balance on 8/17/2015 was negative $35.95 only (**WILKINS-0001788**) Plaintiff was using the benefit of the Overdraft Privilege and was not in breach of the contract as indicated by the Overdraft Privilege Account Disclosure. In fact, the statements reflect Plaintiff brought the account out of the negative within thirty days of the negative balance. *See* WILKINS-0001788 - first negative balance 8/17/2015; Account brought above zero on 8/24/2015 (WILKINS-0001784).
- The $30 Returned Item Fee on 2/1/2016 caused by the Progressive Direct Insurance transaction in the amount of $108.10. This transaction was previously returned and assessed an NSF fee on 1/26/2016. Because the daily account balance on 2/1/2016 was negative $60.00 only (**WILKINS-0001767**) Plaintiff was using the benefit of the Overdraft Privilege and was not in breach of the contract as indicated by the Overdraft Privilege Account Disclosure.
- The $30 Returned Item Fee on 2/9/2016 was caused by the Verizon Wireless transaction in the amount of $1,371.44. This transaction was previously returned and assessed an NSF fee on 2/2/2016. Because the daily account balance on 2/9/2016 was only negative 60.00 (WILKINS-0001767) Plaintiff was using the benefit of Overdraft Privilege and was not in breach of the contract as indicated by the Overdraft Privilege Account Disclosure.

Because the account balances were closer to a zero balance than the -$500 permitted by the Deposit Agreement as indicated by the Overdraft Protection Disclosure, Plaintiff Watson was using the account benefit (the "overdraft privilege, if you will) as Plaintiff was offered and accepted.

For these reasons, Simmons cannot in good faith advertise the benefit of paying NSF checks and fees up to a pre-approved $500 negative available funds balance (a "overdraft privilege" if you will – as the benefit, which requires an additional signature to obtain, is actually

26

named) and then claim the accountholder is in breach of contract or somehow has unclean hands when the stated benefit is used.

For those fees which were assessed while Plaintiff had an ODP Repayment Plan Loan was in effect, the analysis does not change because Plaintiff brought her account balance up within 30 days by entering into a loan that Simmons happened to offer him and for which there is no evidence that he was required to enter into. See, e.g., WILKINS-0001772 (Negative Daily Balance first shown on 12/22/2015; Daily Balance brought to Zero on 1/14/2016, which is less than 30 days) (ECF No. 88-13). And in those instances in which a fee was assessed at the time the account balance was further negative than the overdraft privilege limit, Defendant was entitled only to suspend the Overdraft Privilege per the terms of the Overdraft Privilege - not stop performing to the terms of its account as Simmons suggests.

For these reasons, Simmons cannot in good faith advertise the benefit of paying NSF checks and fees up to a pre-approved $500 negative available funds balance (a "overdraft privilege" if you will – as the benefit, which requires an additional signature to obtain, and is actually named Overdraft Privilege) and then claim the accountholder is in breach of contract or somehow has unclean hands when the stated benefit is used. Nor should Simmons be able to claim breach where Plaintiff entered into a Repayment Plan Loan to bring the account to a zero balance within 30 days. Simply put, there is no breach.

## II.   ARGUMENT

### A.  Summary Judgment is Not Warranted on Plaintiffs' Breach of Contract and Implied Covenant Claim

With respect to the Bank's contract argument, one striking reality about the Bank's Motion is the degree to which it makes the same arguments it made on in motion to dismiss, with virtually no new record "evidence" to support those repeat arguments. Indeed, other than legal

argument, Simmons offers no actual evidence that the term "item" does not mean what Plaintiffs argue. Rather, it merely offers copious quotes from the NACHA Rules, which it glosses with attorney argument and an expert report that offers an incongruous and improper opinion on the central legal issue in this case: the meaning of Simmons' contract. But courts and juries determine the meaning of contracts in our system, not paid experts, and Mr. Nesbitt (who is not a lawyer) may not properly opine on the meaning of the contract here. More, Simmons' ignores all the record evidence noted above—in the form of testimony from Simmons' own witness—that supports *Plaintiffs'* view of the contested term. This is not the type of evidence that can win a defendant summary judgment. The Bank's Motion is a house of cards, and should be denied.

### 1. The Court Has Already Determined the Contract to Be Ambiguous and It Must be Construed Against the Drafter Without the Aid of Extrinsic Evidence.

The key term in dispute is "item." Simmons concedes that despite repeatedly using the term "item" in its account documents, it "*doesn't have 'item' defined in any of our documents* because, again, it is considered kind of an ordinarily generally understood word." *See* Hunter II at 12:18-20. Simmons believes there is no "special definition for 'item,'" *id*. at 12:23-24, and the term "is defined just in ordinary everyday use, it is something that is distinctive." *Id*. at 12:13-15. Even Simmons' own stated definition of the term "item" supports Plaintiffs' breach of contract claim here:  an "item" is something that is ordinarily understood to be "distinct," just as each of Plaintiffs' instructions to make an ACH payment or write a check from their accounts were distinct.

The Court has already determined that Simmons' Fee Schedule is ambiguous:

The Court concludes that there is ambiguity in all this, and lurking in the Bank's "per item" fee in particular. Is each try an item? Or is the entire transaction one item even though multiple tries are involved?

(Order Denying Defendant's Motion to Dismiss, ECF No. 41, p. 3.) Determination of whether a contract is ambiguous is a question of law. *Stone v. Metro. Life Ins. Co.*, 184 F. App'x 584, 586 (8th Cir. 2006); *Roberts Contracting Co. v. Valentine-Wooten Rd. Pub. Facility Bd.*, 2009 Ark. App. 437, 10, 320 S.W.3d 1, 9 (2009). Contract language is ambiguous if reasonable people could come to different conclusions as to its meaning. *Blanchard as Tr. of Rick A. Blanchard Living Tr. Agreement Dated Aug. 18, 1989 v. City of Springdale by & Through Water & Sewer Comm'n*, 2019 Ark. App. 522, 18, 588 S.W.3d 807, 817 (2019) ("A provision in a contract is ambiguous when it is susceptible to two or more reasonable interpretations").

Simmons' Fee Schedule is a contract of adhesion. By definition, a contract of adhesion is a "form contract created and imposed by a stronger party upon a weaker party on a take this or nothing basis." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 513 (8th Cir. 2018). Standardized bank account agreements like Simmons' are considered contracts of adhesion because they are offered by a party with superior bargaining power on a take it or leave it basis.

In denying Simmons' Motion to Dismiss, this court concluded that the contract at issue is susceptible to two "equally reasonable interpretations." (ECF No. 41, p. 4.). Because the language supplied by Simmons in its Fee Schedule has been found to be reasonably susceptible to two interpretations, the Court must now construe the contract against its drafter, Simmons. *Clark v. Bank of Am., N.A.*, 2013 WL 12286057, at *3 (E.D. Ark. Sept. 10, 2013) (construing ambiguities in bank's deposit agreement and fee schedule "strictly against the drafter"); *Stone v. Metro. Life Ins. Co.*, 184 F. App'x 584, 586 (8th Cir. 2006) ("[i]n Arkansas, the law is clear: "When there is uncertainty or ambiguity in a contract or contracts and they are susceptible to more than one reasonable construction, then we must construe them most strongly against the

party who drafted them") (citations omitted); *see also Tri-State Fin., LLC v. First Dakota Nat'l Bank*, 538 F.3d 920 (8th Cir. 2008) (holding bank was not entitled to allowance of prepayment penalty as note contained conflicting provisions regarding prepayment penalties and was construed against bank as drafter); *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 146, 147 S.W.3d 681, 687 (2004) (concurrence); *Camden-Progressive Eldercare Servs., Inc. v. Cooper*, 2020 Ark. App. 187, 4, 597 S.W.3d 148, 150 (2020) (construing ambiguity in arbitration clause against drafter).

Indeed, Arkansas courts have in fact liberally applied this rule of construing ambiguities against the drafter without having to consider whether extrinsic evidence would clarify the parties' intent. "Where the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law."*Atl. Cas. Ins. Co. v. Paradise Club*, 219 F. Supp. 3d 938, 946 (W.D. Ark. 2016) (analyzing the meaning of the word "use" under the contract without looking to external evidence); *Fuller v. Fellows*, 30 Ark. 657 (1875) (patent ambiguity in real estate deed cannot be aided by parol evidence).

Further, because the Account Agreement is standardized, extrinsic evidence of the intent or understanding of a particular party is irrelevant to its interpretation. *See* 2 Restatement (Second), Contracts § 211 (2), pp. 119–20 (1981) (standardized agreements are interpreted "wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing"); 2 E. Farnsworth, Contracts (3d Ed. 2004) § 7.9, p. 285 ("Interpretation cannot turn on meanings that the parties attached if they attached none, but must turn on the meaning that reasonable persons in the positions of the parties would have attached if they had given the matter thought").

Courts across the country agree that extrinsic evidence is improper in analyzing standard form contracts, including those of banks, such as the agreements at issue here. *Kolbe v. BAC Home Loans Servicing*, *LP*, 738 F.3d 432, 436 (1st Cir. 2013) ("Because uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant"); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) (in analyzing a bank contract, determining "Boilerplate provisions are thus not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provisions is, therefore, a matter of law rather than fact"); *see also Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756 (3d Cir. 2017) ("In the context of standard form contracts . . . extrinsic evidence of individual understandings is especially irrelevant."); *Wold v. Zavanna, LLC*, 2013 WL 6858827, at *11 (D.N.D. Dec. 31, 2013) (declining to examine extrinsic evidence because "with standard lease forms being used, what may have been the individual beliefs of plaintiffs and Diamond Resources as to the meaning of the term is immaterial"). As the Court stated in *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*:

> If there is any type of standardized agreement that ought to be interpreted uniformly, without regard to the non-drafting party's idiosyncratic comprehension of its terms, it is a consumer checking account agreement . . . In this context, the focus is on the Bank's conduct in relation to the contractual language, and individual customers' "intent" and "course of performance" is largely irrelevant to resolving any ambiguity.

325 F.R.D. at 157.

Indeed, Arkansas courts have in fact liberally applied this rule of construing ambiguities against the drafter without having to consider whether extrinsic evidence would clarify the

parties' intent. "Where the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law." *Atl. Cas. Ins. Co. v. Paradise Club*, 219 F. Supp. 3d 938, 946 (W.D. Ark. 2016) (analyzing the meaning of the word "use" under the contract without looking to external evidence); *Fuller v. Fellows*, 30 Ark. 657 (1875) (patent ambiguity in real estate deed cannot be aided by parol evidence).

As a result, even if Simmons could advance a reasonable or even a more reasonable interpretation of the Account Agreement than Plaintiffs (it cannot), it would not help the Bank, since the adhesion contract must be construed strictly against the Bank. To prevail on summary judgment, Simmons must instead advance *the only* reasonable interpretation of the Account Agreement. Simmons cannot do so, as the Court has already held that the Account Agreement is ambiguous and that Plaintiffs' interpretation is at least reasonable.

Thus, this Court can, and should, readily construe the terms of the Fee Schedule against its drafter because the contract is ambiguous by its terms, and further, need not examine any extrinsic evidence in applying this rule of construction.

## 2. Simmons View of the Contract is Wrong, as Dozens of Courts Have Held

Since this Court ruled Defendant's Motion to Dismiss in December, 2020, dozens upon dozens of state and federal courts have agreed with this Court's holding that the same "per item" promise used by Simmons here is ambiguous. Indeed, some of those courts cited and relied upon this Court's reasoning in doing so. Overall, in the last two years over *twenty federal courts* alone have looked at similar "per item" promises and found them to be ambiguous, just as Simmons' is here:

> *Fludd v. South State Bank,* 2:20-cv-019959-BHH (D.S.C.) (Exhibit 8 hereto) ("The only thing that is abundantly clear about this dispute regarding whether the

re-presentment of a previously-returned transaction constitutes a new "item" is that the PDAA itself does not explicitly resolve it. This Court joints other courts that have found the definition of 'item' in a deposit agreement to be ambiguous[.]

*Abramson v. Affinity Federal Credit Union*, 2021 WL 3885325, at *5 (D.N.J. Aug. 31, 2021) ("the ... Agreement provides that Affinity may charge an NSF or OD Fee on any 'item,' when the account holder's available balance is not sufficient to cover the transaction. And that item may include "checks, orders and election transactions." The cited provisions, even when read in their entirety, simply do not expressly provide that the same transaction becomes a new item when reprocessed. Nor does Affinity cite any cases to support its interpretation of the Agreement. That is likely because, in similar cases, the overwhelming majority of courts have found that the term 'item' is ambiguous and have denied motions to dismiss on that basis").

*Gardner v. Flagstar Bank, FSB*, No. 2:20-cv-12061 (ECF No. 32) (E.D. Mich. Aug. 23, 2021) ("Plaintiff's construction of the Agreement is also reasonable, and 'the definition of "item" is ambiguous with regard to whether a resubmission of an ACH transaction is a separate item or is a part of the same initial ACH transaction, and that ambiguity must be read in favor of Plaintiff[] at this stage.'").

*McNeil v. Capital One Bank, N.A.*, 2020 WL 5802363, at *2 (E.D.N.Y. Sept. 29, 2020) (holding that the parties' respective interpretations of the term "item" were reasonable, "and a 'claim predicated on a materially ambiguous contract term is not dismissible on the pleadings.'").

*Roy v. ESL Fed. Credit Union*, 2020 WL 5849297, at *9 (W.D.N.Y. Sept. 30, 2020) (holding, regarding the term "item," that "that both parties' interpretations of this provision are reasonable and thus the provision is ambiguous. … Under Plaintiff's interpretation, 'item' could reasonably refer to an original, customer-authorized transaction, which, no matter how many times it is resubmitted, is still the same transaction. 'Each item' would therefore refer to a single transaction and could only incur one fee…. [T]he Account Agreement does not define 'item' and the parties dispute its meaning," therefore "the cases cited by Plaintiff [are] more persuasive, especially since ambiguities must be resolved in Plaintiff's favor").

*Perks v. TD Bank, N.A.,* 444 F. Supp. 3d 635, 640-641 (S.D.N.Y. 2020) ("[T]he definition of 'item' is ambiguous with regard to whether a resubmission of an ACH transaction is a separate item or is part of the same initial ACH transaction, and that ambiguity must be read in favor of Plaintiffs at this stage. Because Plaintiffs' proposed construction is a reasonable construction of the Agreement, Plaintiffs have sufficiently alleged a breach resulting from multiple overdraft charges imposed as a result of resubmissions of a single ACH transaction," and it is plausible to understand the term "ACH transaction" as "encompass[ing] all resubmissions associated with a single transaction").

33

*Chambers v. HSBC Bank USA, N.A.*, 2020 WL 7261155, at *5 (S.D.N.Y. Dec. 10, 2020) (holding that plaintiff's interpretation of the term "item" was reasonable because "it 'plausible that the phrase 'ACH transactions' merely refers to ACH transactions as a general category of 'item,' of which a single 'ACH transaction' is limited to the initial payment request authorized by the accountholder").

*Richard v. Glens Falls National Bank*, 2021 WL 810218 (N.D.N.Y March 3, 2021) (holding an account agreement "sufficiently ambiguous because: While the Fee Schedule provides for a $32 NSF Fee "per item," the Account Agreement does not define the term "item." There is no provision making clear that a separate NSF Fee may be charged for each presentment of the same transaction. The specific provisions Defendant relies on could reasonably be read as either authorizing Defendant to charge a single NSF Fee for each check, debit or other transaction that is presented for payment, regardless of how many times a merchant unsuccessfully attempts to present the transaction (as Plaintiff urges), or as authorizing Defendant to charge a NSF Fee each time a transaction is presented and returned for nonpayment (as Defendant urges)").

*Petrey v. Visions Federal Credit Union*, 2021 WL 2364971 (N.D.N.Y. June 9, 2021) (denying a motion to dismiss plaintiff's breach of contract claim in a case challenging the credit union's assessment of multiple NSF fees on the same item, holding that any ruling to the contrary "allows Defendant to benefit from ambiguity in its own contract, which is contrary to well-established contract law," and further concluding that "[m]uch like the courts in *Perks*, *Roy*, *McNeil*, *Chambers*, and *Coleman*, the Court here finds that the definition "item" and when items are "presented" is ambiguous. It is unclear whether resubmission of an ACH transaction is part of the same initial ACH transaction or a separate transaction altogether. Because Plaintiff's proposed interpretation of the Agreement is reasonable, her allegations as to her breach of contract claim are sufficient to withstand Defendant's motion to dismiss").

*Grice v. Independent Bank*, No. 7:20-cv-801948 (D.S.C.) (Mar. 26, 2021) (Exhibit 30 hereto) ("Given the record before the Court and the facts articulated herein, this Court does not agree that the Account Documents speak with the clarity Independent ascribes to them. Rather, they contain sufficient ambiguities which prevent dismissal at this stage. Grice offers a reasonable interpretation of the Account Documents, which plausibly supports her breach of contract claims. Moreover, she has plead sufficient facts to support a breach of good faith and fair dealing claim to survive a motion to dismiss").

*Varga v. American Airlines Credit Union*, 2020 WL 8881747, at *5 (C.D. Cal. Dec. 1, 2020) (holding that "the disclosure states '[w]e assess a fee for each item that we either pay, which results in an overdraft, or do not pay, which would have resulted in an overdraft had we paid it,' could lead a consumer to believe that only one fee (indicated by the singular 'a fee') would be levied for each item the consumer attempted to purchase, not for each attempt by the merchant to process

the transaction. Further, AAFCU's statement that the NSF fee is '$25/each' does not clarify anything, as there is no indication of what 'each' modifies. Construing the ambiguous language against the drafter, a consumer could believe that the 'each' refers to the specific item the consumer attempts to purchase, not the attempt to process the transaction").

*Coleman v. Alaska USA Fed. Credit Union*, 2020 WL 1866261, at *4 (D. Alas. Apr. 14, 2020) (holding that it "is plausible that a member could have expected to only be charged one NSF fee when she only gave one authorization for an ACH transaction, no matter how many times the merchant presented the transaction for payment").

*Noe v. City Nat'l Bank of W. Virginia*, 2020 WL 836871 (S.D. W.Va. Feb. 19, 2020), *vacated and remanded on other grounds,* 828 Fed. Appx. 163 (4th Cir. Sep. 30, 2020) ("it is unclear whether Defendant had the contractual right to assess more than one NSF fee for a single attempted purchase. As such, the Court cannot dismiss this case on these grounds").

*Morris v. Bank of Am., N.A.*, 2019 U.S. Dist. LEXIS 56652, at *5-6 (W.D.N.C. Jan. 7, 2019), *report and recommendation adopted in part*, 2019 WL 1421166 (W.D.N.C. Mar. 29, 2019) ("Plaintiffs base their breach of contract claim on both express breach and breach of the implied covenant of good faith and fair dealing. Plaintiffs have sufficiently alleged a breach of contract claim under both theories").

*Young v. The Wash. Trust Co.*, No. 1:10-cv-524 (D.R.I. June 2, 2020) (text order) (Exhibit 9 hereto) ("After reviewing the papers, the Court concludes that Plaintiff\s allegations plausibly give rise to an entitlement of relief, and thus survive a Rule 12(b)(6) challenge. Relatedly, Plaintiff's claim for breach of the covenant of good faith and fair dealing does not deserve to be stricken").[4]

---

[4] Additionally, dozens of state courts across the country also have rejected the identical arguments being attempted by Defendant here. *Tisdale v. Wilson Bank and Trust,* No. 19-400-BC (Tenn. Bus. Ct., Oct. 17, 2019) (Exhibit 10 hereto); *McMurrin v. America First Credit Union*, No. 190909065 CN (3d Dist. Salt Lake Cnty Utah May 5, 2020) (Exhibit 11 hereto); *Romohr v. The Tennessee Credit Union*, No. 19-1542-BC (Davidson Cnty. Tenn. Chancery Court May 19, 2020) (Exhibit 12 hereto); *Duncan v. BancFirst*, No. CJ-2020-348 (Okla. Cnty. Dist. Ct. June 3, 2020) (Exhibit 13 hereto); *Young v. The Washington Trust Co.*, No. 1:19-cv-00524-WES-PAS (D.R.I. June 2, 2020); *Vocaty v. Great Lakes Credit Union*, No. 19-L-727 (Lake Cnty. Cir., Ill. June 3, 2020) (Exhibit 14 hereto); *Garciga v. South Florida Educ. Fed. Credit Union*, No. 2020-000733-CA-01 (Miami-Dade Cnty., Fla. June 19, 2020); (Exhibit 15 hereto); *Darty v. Scott Credit Union*, No. 19L0793 (St. Clair Cnty. Cir. Ct., Ill. June 24, 2020) (ECF No. 91-1); *Brown  v. Educators Credit Union*, No. 2019CV1814 (Racine Cnty. Cir. Ct., Wis. July 1, 2020) (Exhibit 16 hereto); *Baptiste v. GTE Fed. Credit Union d/b/a GTE Financial*, No. 20-CA-002728 (Hillsborough Cnty. Cir. Ct., Fla. July 8, 2020) (Exhibit 17 hereto); *Almon v. Independence Bank*, No. 19-CI-000817 (McCracken Cir. Ct., Ky. Mar. 18, 2020) (Exhibit 18

*Grant v. Centerstate Bank*, No. 8:20-cv-1920-MSS-AAS, ECF No. 43 (M.D.FL. July 6, 2021), (Exhibit 31 hereto) (the term "item" is at least reasonably susceptible of the meaning to which Plaintiff ascribes it. Whether it is susceptible of the meaning Defendant suggests is debatable. Because Plaintiff has advanced a reasonable interpretation of the Account Documents that supports her claim, her breach of contract claim survives.

*Smith v. Jovia Fin. Credit Union,* 2021 WL 4173655, at *5 (E.D.N.Y. Aug. 24, 2021), *report and recommendation adopted*, 2021 WL 4173069 (E.D.N.Y. Sept. 14, 2021). [T]his Court finds the meaning of the term "item" to be ambiguous. The Account Documents do not clearly establish whether, for example, the ACH payment that Plaintiff attempted on May 29, 2019 and the re-processing of that payment on May 31, 2019 qualify as the same item or separate items.

*Hartnett v. Washington Federal Bank*, Case No. C21-888-RSM-MLP (W.D. Wash.), attached hereto as Exh. 6. (In a case similarly challenging a financial institution's assessment of multiple fees on the same "item," magistrate judge recommended that the Court deny the bank's motion to dismiss in its entirety, in part because "UCC commentary states that 'checks are checks, and the rules are the same whether an item is arriving for the first, second, or even third time.' 2 White, Summers, & Hillman, UCC § 20:30 (6th ed.). This commentary refers to a singular item, *i.e.*, a check, that may arrive multiple times. This supports Plaintiffs' interpretation of the Agreement rather than [defendant's]. The check is the item, and the Fee Schedule only allows one fee per item, regardless of how many times it is presented or re-presented.

---

hereto); *Jones v. Lake Michigan Credit Union*, No. 20-000240-CK (Washtenaw Cnty. Mich. Sept. 29, 2020) (Exhibit 19 hereto); *Teel v. HAPO Comm. Credit Union*, No. 19-2-03193-03 (Wash. Sup. Ct., Aug. 7, 2020) (Exhibit 20 hereto); *Rivera v. IH Mississippi Valley Credit Union*, No. 2019 CH 299 (Rock Island Cnty. Ill. Oct. 30, 2020) (Exhibit 21 hereto); *Garcia v. UMB Bank, NA*, No. 1916-CV01874 (Jackson Ctny. Cir. Ct., Mo. Oct. 18, 2019) (Exhibit 22 hereto); *Burgos v. Campus USA Credit Union*, No. 01-2020-CA-1175 (Alachua Cnty., Fla. Dec. 7, 2020) (Exhibit 23 hereto); *Silvey v. Numerica Credit Union*, No. 19-2-04344-30 (Spokane Cnty, Wash. Oct. 12, 2020) (Exhibit 24 hereto); *Hewitt v. UW Credit Union*, No. 20-cv-1295 (Dane Cnty., Wis. Cir. Ct. Nov. 5, 2020) (ECF No.47) (Exhibit 25 hereto); *Williams v. Travis Credit Union*, No. FCS054738 (Solano Cnty., Cal. Super. Ct. Oct. 8, 2020) (Exhibit 26 hereto); *Glass v. Delta Community Credit Union*, No. 2019CV318302 (Fulton Cnty., Ga. Dec. 8, 2020) (Exhibit 27 hereto); *Pierce v. Safe Credit Union*, No. 34-2020-00275892-CU-CO-GDS (Sacramento Cnty. Cal. Oct. 29, 2020) (Exhibit 28 hereto); *Adams v. MAX Credit Union*, No. 46-CV-2020-900119.00 (Ala. Cir. Ct. Feb. 26, 2021) (Exhibit 29 hereto); *Toth v. Scott Credit Union*, No. 20-CV-00306-SPM, 2021 WL 535549 (S.D. Ill. Feb. 12, 2021).

### 3.   Simmons's Interpretation of the Contract Is Wrong

The plain meaning of Simmons' "per item" promise is to assess one non-sufficient funds fee "per item," not *each time* the same "item" is returned for insufficient funds. The term refers to the accountholder's single order or instruction for payment from her account. Take the simplest example—an example expressly agreed with by Simmons' corporate representative. "Q. So let's talk about returned checks. Is it possible for a check to be presented more than one time after it has been returned for insufficient funds?  A. Yes." Hunter II at 15:8-14. An accountholder writes a single paper check, with a check number of 100. That check is returned for insufficient funds by Simmons. Without the accountholder taking any further action or even being aware of it, that same check—same amount, same check number—is reprocessed a second or third time. This back-office, behind-the-scenes reprocessing does not plausibly create a *new* "check" or "item."  The accountholder has not written a second or third check, has not ripped out a new check from his checkbook. She has written a single "check" or "item" that has been reprocessed repeatedly. Similarly, if an accountholder instructs her monthly Netflix bill to be paid via ACH, that payment does not reasonably become a *new* "ACH" or "item" if it is reprocessed a second or third time.

None of Simmons' disclosures ever say that once Simmons assesses an NSF Fee on check, ACH or item, it will or may assess *another* fee on that same check, ACH or item after it has been returned for insufficient funds. Crucially, in every Fee Schedule, Simmons <u>did</u> specify that certain <u>other</u> fee types were assessed on a "per occurrence," as opposed to a "per item" basis—the fee being assessed based on the number of times something occurs versus being assessed on the thing itself:

> 12. Miscellaneous Fees:
> Loan Coupon Book Replacement Fee (**per occurrence**) $3.00

Levies/ Garnishments (**per occurrence**) (Administrative Fees for garnishments are established by state statute, but will not exceed a maximum of $50.00.)

*See* Stipulation (emphasis added). Simmons' corporate representative agrees that "per occurrence"—the term it never used with respect to NSF or OD Fee assessment—means "each time" something happens:

Q. Well, would you agree "per occurrence" means each time something happens?
[…]
THE WITNESS: I think -- I think yes, that would be the common understanding of it.

Hunter II at 57:2-6.

Simply put, an "item" or "check" or "ACH" does not become a new "item" merely by dint of being reprocessed by the merchant and the bank. It remains the same item. Simmons' witness plainly agrees. *See supra*, "Q. [I]t is your testimony that they can incur fees specifically on the second or the third time an ACH or a check is presented? A. Yes. Yes." *Id*. at 29:2-5. Simmons' promise is for a fee "per item," not a fee *each time* an item is presented. Or as this Court succinctly summarized the problem its Order on the Motion to Dismiss, *supra*, "there is ambiguity in all this, and lurking in the Bank's 'per item' fee in particular. Is each try an item? Or is the entire transaction one item even though multiple tries are involved?"

Ignoring the dozens of other decisions that reach an opposite conclusion—many of which are discussed *supra*—Simmons relies heavily on *Lambert v. Navy Fed. Credit Union*, 2019 WL 3843064 (E.D. Va.). There, by relying on contract language Simmons does not use, the trial court determined each reprocessing attempt was worthy of a new fee. As the court in *Petrey v. Visions Credit Union, supra* held: "[I]n *Lambert*, the parties agreed that "'item' is a request or invitation for payment…The court found that the agreed-upon definition included the requests for payment made *by the merchants*. Here, there is no agreement or definition as to the term 'item.'" The same is true here. Moreover, *Lambert* is, to put it mildly, against the great weight

of authority. Accordingly, virtually every one of the cases cited by Plaintiff *supra* have already declined to follow *Lambert*. Indeed, Judge Holland in *Coleman* has already found that *Lambert* provides "little guidance." *Coleman* at *5. As another example, in *Perks*, at p. 6 (distinguishing *Lambert* because, *inter alia*, the contract at issue in *Perks v. TD Bank* "does [not] authorize fees on all ACH debits; but rather on "[an] ACH transaction," which could encompass all resubmissions associated with a single transaction").

Simmons' reliance on *Saunders v. Y-12 Fed. Credit Union*, 2020 WL 6499558, at *3-5 (Tenn. Ct. App. Nov. 5, 2020) is also misplaced. There, a Tennessee trial court dismissed a breach of contract claim where the key term contract defined an "overdraft" as *each time* an item was paid or returned and permitted the credit union to assess fees for each overdraft. The court thus reasoned that the "contract specifically provides that a fee may be charged for each overdraft, or **each time** a 'check, draft, transaction, or other item ... plus any applicable fee.'" *Id.* at *4 (emphasis added). Again, Simmons here expressly made the opposite promise—that it would assess a charge "per item."

### 4. The Limited Extrinsic Evidence Proffered by Simmons Does Not Show Simmons Complied with the Contract

Even if the Court were to consider extrinsic evidence (it should not, for the reasons discussed above), Simmons has provided no new evidence that should cause the Court to change its original determination that the contract is ambiguous.

#### a. The NACHA Rules Are Silent on Fee Assessment by RDFI

While NACHA Rules are important background as to how the ACH payments system operates, even if the Court were to consider them as part of the contract (its should not), they do not and cannot answer the central question in this case: what is the meaning of Simmons' "per item" contract promise. That is because – as set forth above in Part I(B)(2), *supra*, the NACHA

Rules are wholly *silent* regarding RDFI fee assessment on ACHs—that is a matter of contract between an accountholder and her bank.

### b.  The NACHA Rules Were Never Provided to Plaintiff and Not Validly Incorporated Into Contract

The NACHA Rules don't solve the contractual ambiguity identified by the Court, for the reasons above. More directly, though, they never even became part of the contract. Simmons' central argument can be summarized as follows: in order to decipher the "per item" promise in the contract, which this Court already concluded was ambiguous, accountholders must refer to the 638-page NACHA Rules. But as noted above, this is a document Simmons neither provides nor makes available to its customers. Indeed, the document is so restricted that Simmons has filed it under seal in this matter, and members of the public must pay to purchase it.

It is black letter law that "in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms...." Richard A. Lord, *Williston on Contracts,* § 30:25 (4th ed.1999). And, under Arkansas *law, **the reference must be clear and unequivocal, and the terms of the incorporated document must be known or easily available to the contracting parties.** Ingersoll-Rand Co. v. El Dorado Chem. Co.,* 373 Ark. 226, 233, 283 S.W.3d 191, 196 (2008); *AT & T Corp. v. Clark Cty. ex rel. Tucker*, 2018 Ark. App. 207, 16, 547 S.W.3d 697, 708 (2018) (documents were not clearly incorporated by reference resulting in ambiguous contract that must be construed against the drafter). At best for Simmons, whether Plaintiffs assented to the NACHA rules is a question of fact that precludes this Court from granting summary judgment. *See Delta Sprayers, Inc. v. Pratt & Whitney Canada*, 2018 WL 6252514, at *3 (E.D. Ark. Sept. 25, 2018) (summary judgment denied where question of whether a document was incorporated by reference was a question of fact).

Jurisdictions across the country are in accord. *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (recognizing that the common law requires the parties to have had knowledge of and assented to the incorporated terms, and requiring that the incorporated document be referred to and described sufficiently so that it may be identified beyond all reasonable doubt); *Hertz Corp. v. Zurich Am. Ins. Co.,* 496 F. Supp. 2d 668, 675 (E.D. Va. 2007) (recognizing that "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms"); *Servco Pac., Inc. v. SkyBridge Glob., Inc*., 2016 WL 6996987, at *5 (D. Haw. Nov. 29, 2016) (clear knowledge and assent  were required to validly incorporate by reference); *McMinimee v. Yakima Sch. Dist. No. 7*, 2021 WL 1559369, at *21 (E.D. Wash. Mar. 26, 2021), *reconsideration denied*, 2021 WL 6275065 (E.D. Wash. Apr. 7, 2021) ("There must be mutual assent to any terms that are incorporated by reference so that it is clear that the parties to the agreement had knowledge of and assented to the incorporated terms"); *Bacon v. Avis Budget Grp., Inc*., 357 F. Supp. 3d 401 (D.N.J. 2018), *aff'd*, 959 F.3d 590 (3d Cir. 2020) (rental car agreements signed by customers did not adequately incorporate "rental jackets" that contained agreement to arbitrate).

Simmons' contract does not properly incorporate the NACHA rules by reference when it does not provide those rules to Plaintiffs. Moreover, the rules are not reasonably accessible to Simmons' accountholders because they are not publicly available and instead cost $99 – each year – to obtain.[5]  For these reasons, Simmons' heavy reliance on, and reference to, the NACHA rules is therefore misplaced.

---

[5] *See* fn. 1, regarding the NACHA Operating Rules & Guidelines in effect from 2015-present.

### c.   Mr. Nesbitt is Wrong and Cannot Opine on Legal Issues

Much of what Mr. Nesbitt opines on is irrelevant. Indeed, for the bulk of his report, he simply opines that Simmons is required to process items and merchants are authorized to re-submit items—none of which is in dispute. To be very clear, there is nothing wrong with reprocessing a transaction—a merchant is entitled to do that under the NACHA rules, up to two times. Indeed, the NACHA Rules expressly contemplate merchants re-trying items and coding them as RETRY PYMTs. But the NACHA Rules also expressly bar the creation of new entries or items by anyone other than the accountholder. When a merchant reprocesses an item, it is still based on the *same instruction for payment by the accountholder*—it is still the same "item."  In short, while the NACHA Rules govern the ACH network through which Plaintiff's transactions were submitted, the Rules are entirely silent as to Simmons' ability to assess fees—that is a matter of contract between Simmons and its members. *See Petrey*, 2021 WL 2364971 at *3 n.2 (declining to interpret NACHA Rules and noting "Defendant's argument would not vindicate it because . . . NACHA does not govern how Defendant may assess NSF fees").

In addition to these irrelevant opinions regarding resubmission of items under the NACHA Rules, Mr. Nesbitt then goes too far, repeatedly attempting to opine on the central legal question in this case: whether a resubmission is a new "item" under Simmons' contract:

> From an industry perspective, each individual ACH transaction is a unique item, including resubmissions.

*See*, Nesbitt Report at 4 (ECF No. 88-1).

> [W]hen an ODFI (or Originator) resubmits a transaction through the ACH network, it creates a new item.

*Id.*, at 13.

It is entirely improper for Mr. Nesbit to opine on the legal questions in this case because expert "testimony cannot answer the legal question of ambiguity." *Ascente Bus. Consulting, LLC v. DR myCommerce*, 9 F.4th 839, 848 (8th Cir. 2021); *see also S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (experts may not offer legal conclusions in the guise of opinions); *Riverside Marine Remanufacturers, Inc. v. W. Diesel Servs., Inc.*, 2016 WL 9047112, at *1 (E.D. Ark. July 13, 2016) (prohibiting expert from drawing legal conclusions ); *Kemp v. Dupps Co.*, 2006 WL 2620323, at *2 (W.D. Ark. Aug. 25, 2006) (same).

This is especially true where Nesbitt purports to be an expert on the NACHA Rules, but those rules never once use the term "item" in the way Nesbitt opines it should. Further, Nesbitt's opinion as to the meaning of the contract term "item," derived from his view of the operation of the NACHA Rules, should be ignored and excluded because that opinion never discussed the numerous instances where the NACHA Rules use the term "item" in just the way Plaintiffs understand it (described above), and never discusses or grapples with the key definition of the term "Reinitiated Entry" (also discussed above). Nesbitt's report goes off the rails when it tries to answer the central legal question in this case: the meaning of Simmons' "per item" promise.

Mr. Nesbitt has testified as much. Indeed when asked whether the NACHA rules supersede the language found in a bank's contract, Mr. Nesbitt conceded they did not. *See* Deposition of Gary Nesbitt, pp. 24:25 – 25:4 ("Q: In your opinion do the Nacha rules supersede contracts between banks like Simmons and their customers? THE WITNESS: They do not"). And when asked if the NACHA rules dictate that banks like Simmons must assess multiple NSF fees when a transaction is presented multiple times, Mr. Nesbitt admitted they do not. *See* Nesbitt Depo. At 22:1 – 14 ("Mr. Nesbitt, do the Nacha rules require banks like Simmons to assess

multiple NSF fees when a transaction is presented multiple times for payment? . . . THE WITNESS: The Nacha rules do not address bank pricing. Q So they don't address whether or not the bank should assess a fee only once or whether a fee should be assessed multiple times? . . . THE WITNESS: They do not"). Clearly the NACHA rules don't resolve the central question before this Court. Mr. Nesbitt concedes as much. For those reasons, the Court should grant the partial Motion to Strike Mr. Nesbitt's opinion filed concurrently herewith.

### 5. Any Breach By Wilkins Does Not Empower Simmons to Charge Fees Not Allowed By the Customer Agreement.

Relying on *Mobil Expl. & Producing N. Am., Inc. v. Graham Royalty Ltd.*, 910 F.2d 504, 507 (8th Cir. 1990), Simmons contends it is entitled to summary judgment on Ms. Wilkins's breach of contract claims because "[w]here one party breaches a contract and defends that the other party did so first, defendant's obligation to perform may be discharged if plaintiff's breach is material and sufficiently serious." Defendant's argument in this regard is unpersuasive.

To be clear, Ms. Wilkins overdrew her account. But that is exactly what Simmons Bank wanted – for customers like Ms. Wilkins to overdraw their account, utilize the $500 overdraft protection line allowed under the agreement, and pay Simmons a $30 NSF fee for the privilege of accessing the $500 line. Overdrawing her account was not a breach. Nor did Ms. Wilkins breach her agreement with Simmons by not immediately repaying the Bank for the overdraft. This is because the Bank allowed customers 30 days to bring their account current. Make no mistake, this 30-day window was strategic, because it increased the likelihood that the Bank could seize automatic monthly deposits that often land in a customer's account within such a large window.

When Ms. Wilkins failed to bring her account current after the 30-day window, Simmons revoked her Overdraft Privilege. As a result, Simmons would no longer pay items presented to

her account, but would return the items because the account had insufficient funds and charge her a fee. If Ms. Wilkins's claim against Simmons had been that the Bank failed to pay an items that was presented to her account after her Overdraft Privilege had been revoked, then Ms. Wilkins's failure to abide by the terms of the program would certainly be material and sufficiently serious as to preclude her claim for breach of contract. But that is not what Ms. Wilkins is challenging. She is challenging the assessment of multiple NSF fees on the same item, when Simmons's contract says only one such fee will be assessed. Ms. Wilkins's breach of the Overdraft Privilege program has nothing to do with assessing multiple fees on the same item.

Under the Bank's logic, Simmons could have charged Ms. Wilkins a $1,000 NSF fee even though the contract said it would be $30 – "because Ms. Wilkins breached the contract first."  Ms. Wilkins's breach of the Overdraft Privilege program did not give the Bank carte blanche to breach its contractual obligations in whatever manner it saw fit. Under the facts before the Court, Ms. Wilkins has a valid breach of contract claim irrespective of whether she breached the contract first.

### B.  Summary Judgment is Not Warranted on Plaintiffs' Unjust Enrichment Claim

Defendant alleges that a claim for unjust enrichment cannot exist simultaneously with the existence of a valid written contract. ECF No. 80 at 28. In denying Simmons' Motion to Dismiss, this Court already rejected Simmons' argument. Nothing has changed from this Court's ruling of December 9, 2020. Because summary judgment in favor of Simmons on Plaintiffs' breach of contract claim is not appropriate, it will be up to a factfinder to determine whether Plaintiffs must select either of its breach of contract and unjust enrichment claims to proceed.[6]

---

[6] Simmons also argues that it is entitled to judgment because Plaintiffs cannot show that Simmons "received something of value to which [it] was not entitled and which [it] should

1.    **Plaintiffs' Unjust Enrichment Claims are Not Time Barred Because the Discovery Rule Applies.**

Arkansas generally applies the "discovery rule" to common law claims. *See Highland Indus. Park, Inc. v. BEI Def. Sys. Co.*, 357 F.3d 794, 796 (8th Cir.2004) (in environmental-contamination action based on diversity jurisdiction, applying law of forum state, Arkansas, to determine statute-of-limitations issue; concluding Arkansas three-year statute of limitations applied and Arkansas Supreme Court would use "discovery rule," i.e., statute does not begin to run until plaintiff knows, or reasonably should know, that its land has suffered remediable injury).

But to the extent that Arkansas law is silent about whether to apply the discovery rule, district courts have traditionally applied the discovery rule. *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) (federal courts "generally apply a discovery accrual rule when a statute is silent on the issue"); *see also In re Humes*, 468 B.R. 346, 356 (E.D. Ark. Bankr. 2011) ("Where a statute is silent on the issue of the discovery rule, the general rule is that the discovery rule applies").

In *Vogt v. State Farm Life Ins. Co.*, 2017 U.S. Dist. LEXIS 15100, at *7-8 (W.D. Mo. Feb. 3, 2017), the court held that even though the plaintiff had been charged a fee and had the underlying policies to charge the fee, the claim did not accrue until it was capable of ascertainment, and only an expert could have so ascertained that fact. The same holds true here: Plaintiffs needed the help of an experienced bank fee class action attorney and banking fee

---

restore." As discussed above, however, Simmons did not have the "right to assess (a) more than one NSF Fee on the same item; and (b) both NSF Fees and OD Fees on the same item."

expert to determine which fees breached the contract. That has been the subject of months of discovery and expert depositions.[7]

For the foregoing reasons, Defendants' motion for summary judgment as to unjust-enrichment should be denied.

### C. Plaintiffs Have Standing

#### 1. Plaintiff Watson Paid Each of the First Four Fees

First, there is no dispute that Plaintiff Watson has paid out of pocket at least some of the fees at issue in this matter. *See* ECF No. 80 at 10-14 (Simmons conceding same). There is no plausible argument that Watson does not have standing to recover those fees.

#### 2. Plaintiff Wilkins and Plaintiff Watson Have Been Injured by Wrongful Fees Whether They Were Paid or Not

Simmons argues, however, that Plaintiffs do not have standing because they have yet to pay some of the relevant fees they were assessed. But as Simmons has contended throughout this litigation, and as explained above in Part I(D)(1), *supra*, Ms. Wilkins and Mr. Watson have "an obligation to repay" the amounts they have overdrawn their accounts and therefore have standing

---

[7] Also, Defendant waived any statute of limitations defense by (a) failing to raise the statute of limitations defense in its motion to dismiss (ECF No.23, July 27, 2020); (b) waiting more than a year to try to dismiss the case on this ground after discovery had been completed; and (c) bringing an alternative counterclaim for unjust enrichment regarding the same exact fee (*see*, Defendant Simmons Bank's Answer to Plaintiffs' Amended Class Action Complaint, Affirmative Defenses, And Counterclaims, ECF No. 42 at 14-15) *Sierra Club v. Entergy Ark. Llc*, 503 F. Supp. 3d 821, 836 (E.D. Ark. 2020). Even if Defendant had not waived its statute of limitations defense, Defendant is estopped from asserting the defense because it is suing Plaintiffs in its counterclaims for unjust enrichment. *See Kitchens v. Evans*, 870 S.W.2d 767 (Ark. Ct. App. 1994). Finally, because of Defendant's fraudulent concealment of the challenged fees, the statute of limitations is as well tolled. *Bomar v. Moser*, 369 Ark. 123, 251 S.W.3d 234, 242 (Ark. 2007).

to bring their claims. Plaintiffs have been injured and, therefore, have standing to bring their claims – whether or not they have paid the assessed fee.

>    **3.**    **Simmons Has Not Set Forth Any Evidence that Credits Are Tied to A Particular Fee Assessment.**

In addition to having standing because the OD fees were charged off and they still owe that money, Watson was injured for the fee he was assessed and paid out of pocket on August 17, 2015. While Simmons argues that it provided a credit for that paid fee three days later, the bank statement issued by Simmons does show that the fee was removed from the Total Year-To-Date Overdraft Fees. The fee is still reflected on his account statements that the fee was assessed, making a negative mark on his ChexSystems report, which can affect the opening of future checking accounts. *See* Watson Statements, at WILKINS-0001785-WILKINS-0001788 at WILKINS-0001785 (Reflecting Total Year-To-Date Overdraft Fees at $450.00 as of Statement Ending Date 8/19/2015) (ECF No. 88-13); *See* Watson Statements, at WILKINS-0001782-WILKINS-0001784 at WILKINS-0001782 (still reflecting Total Year-To-Date Overdraft Fees at $450.00 as of Statement Ending Date 9/18/2015) (total overdraft fees assessed did not change after the credit was applied to the account) (*Id.*). This is clear evidence that—even though a credit may have been issued, the fee was not reversed— meaning, the "retry" NSF Fee that Watson paid on August 17, 2015 is still being accounted for in his Yearly Fee Totals and will impact his Chexsystems credit report. *See*, Impact of Mishandling a Checking Account, Available on the Chex Systems, Inc. website ("It is important to be responsible with your checking account in order to maintain a good debit history. Your debit history contains facts about you and your deposit or checking account history, similar to a credit report. It is made available, as permitted by law, to your current and prospective financial institutions to assess your likelihood of managing your debit accounts responsibly. Debit history may also be used by

companies assessing your credit worthiness") (Exhibit 32 hereto). *See also* WILKINS-0001304, regarding Simmons' practice of sending account information to credit bureaus and check verification services: "The next step is to send your account information to credit bureaus and check verification services. Once this is done, you may be unable to open a checking account at another bank") (ECF No. 88-11).

Finally, even though he was given that credit three days later, Watson lost the full use of his overdraft protection during that time period between the time the fee was assessed and the time it was credited back. *See,* daily balance on 8/19/2015 (-123.86) (WILKINS-0001788) v. daily balance after the account credit on 8/20/2015 ($93.86) (WILKINS-0001784). The Watson's lost the use of $30.00 of their Overdraft Privilege.

### 4.    Plaintiffs Have Established Redressability

Furthermore, regarding Simmon's redressability arguments, it cites cases where Plaintiff never suffered actual damages (*Brookewood, Ltd. P'ship v. DeQueen Physical Therapy & Occupational Therapy, Inc.*, 547 S.W.3d 461, 467 (Ark. App. 2018) and *Hobson v. Entergy Ark., Inc.*, 432 S.W.3d 117, 125 (Ark. App. 2014), where Plaintiff tried to sue for consequential damages when it never suffered actual damages. As described herein, the record shows that Plaintiff has suffered actual damages (or at a minimum it is a disputed fact), so their injuries-in-fact can be redressed with the remedy of compensatory damages.

Furthermore, Plaintiffs are entitled to injunctive or declaratory relief in the form of notification to Chex Systems that retry fees that were assessed were assessed wrongfully and notification to Chex Systems of the retry fees at issue assessed was done in error. See, section 3 above. Additionally, Plaintiffs are entitled to injunctive or declaratory relief in the form of reduction of the retry fee debt owed. *See*, Section 2 above.

49

## CONCLUSION

For the reasons set forth herein, Plaintiffs ask that this Court deny Simmons' Motion for

Summary Judgment in its entirety.

Respectfully submitted this the 24th day of January, 2022.

E. Adam Webb
G. Franklin Lemond, Jr.
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com
Franklin@WebbLLC.com

William F. Burns, III (2008019)
WATSON BURNS, PLLC
253 Adams Avenue
Memphis, Tennessee 38103
(901) 529-7996
fwatson@watsonburns.com

Jeffrey Kaliel
KALIEL PLLC
1875 Connecticut Avenue NW
10th Floor
Washington, DC 20009
(202) 350-4783
jkaliel@kalielpllc.com

Tiffany M. Yiatras
Francis J. "Casey" Flynn, Jr.
CONSUMER PROTECTION LEGAL, LLC
308 Hutchinson Road
Ellisville, Missouri 63011
tiffany@consumerprotectionlegal.com
casey@consumerprotectionlegal.com

Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
(317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch , IV
BRANSTETTER, STRANCH & JENNINGS
PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37204
(615) 254-8801
gerards@bsjfirm.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on this 24th day of January, 2024, I electronically filed the foregoing document with the clerk for the United States District Court for the Eastern District of Arkansas using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to attorneys of record, who have consented in writing to accept this Notice as service of this document by electronic means.

E. Adam Webb
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com
