# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

------------------------------------------------------------------

SHUNDA WILKINS; DIANN GRAHAM; and DAVID
WATSON, on behalf of themselves and all others
similarly situated,

                              Plaintiffs,

           vs.

SIMMONS BANK,

                              Defendant.

------------------------------------------------------------------

No. 3:20-cv-116-DPM (E.D. Ark.
Dec. 9, 2020)

 

**EXPERT REPORT OF GARY NESBITT**

October 4, 2021

**CONFIDENTIAL**

## Table of Contents

Page

I.     QUALIFICATIONS ............................................................................ 1

II.    ASSIGNMENT ................................................................................... 3

III.   SUMMARY OF OPINIONS ............................................................... 4

IV.    THE ACH PAYMENTS SYSTEM IN THE UNITED STATES IS GOVERNED
       BY VARIOUS RULES DEVELOPED AND ADMINISTERED BY NACHA
       AND BY INDUSTRY CUSTOM AND PRACTICE ........................................ 6

       A.    Overview Of ACH Participants ............................................... 7

       B.    Overview of ACH Payment Process......................................... 8

       C.    Nacha Operating Rules ........................................................... 9

       D.    Standard Entry Class Codes................................................... 10

       E.    ACH Economic Framework ................................................... 11

       F.    ACH Framework Has Not Changed For 50 Years ................ 12

V.     BASED ON MY EXPERIENCE AND FROM AN INDUSTRY PERSPECTIVE,
       EACH INDIVIDUAL ACH TRANSACTION IS A UNIQUE ITEM, INCLUDING
       RESUBMISSIONS ................................................................................. 12

VI.    UNDER THE NACHA RULES, SIMMONS CANNOT REJECT
       TRANSACTIONS ................................................................................. 13

VII.   SIMMONS, AS THE RECEIVING INSTITUTION OF THE TRANSACTION,
       CANNOT AND SHOULD NOT TRY TO DETERMINE THE INTENT OF THE
       MERCHANT OR CONSUMER. ............................................................. 15

       A.    Simmons Practices Are Typical of RDFIs.............................. 18

       B.    Attempting To Discern Intent Regarding  Specific Transactions Would Do
             More Harm Than Good............................................................ 19

VIII.  THE COMPANY ENTRY DESCRIPTION FIELD USED IN ACH
       TRANSACTIONS DOES NOT CREATE AN OBLIGATION FOR RDFIs TO
       ATTEMPT TO MATCH RESUBMITTED ITEMS ..................................... 20

IX.    SIMMONS'S HANDLING OF THE NAMED PLAINTIFFS' TRANSACTIONS
       IN THIS MATTER WAS CONSISTENT WITH THE NACHA RULES AND
       INDUSTRY CUSTOM AND PRACTICE.................................................. 22

       A.    Wilkins Chronically Overdrew Her Account & Simmons Ultimately
             Charged Off The Account........................................................ 24

       B.    Wilkins's Liberty National Transactions Caused The Fee At Issue ................ 27

       C.    David and Marilyn Watson Chronically Overdrew Their Account &
             Simmons Ultimately Charged Off The Account ................... 29

i

|       | D.    | Watson Account Transactions ............................................................ | 30 |
|       |       | 1.    | Watson PayPal Transactions ............................................... | 30 |
|       |       | 2.    | Watson Verizon Transactions ............................................. | 33 |
|       |       | 3.    | Watson Progressive Direct Transactions ............................. | 35 |
| X.    | CONCLUSION ......................................................................................... | 37 |

CONFIDENTIAL

## I.    QUALIFICATIONS

1.    I have spent over three decades in the banking and payments industry in a variety of roles. In 2013, I formed a consulting practice, GNesbitt Consulting, to advise financial institutions and companies with certain challenges with National Automated Clearing House Association ("Nacha") or automated clearing house ("ACH") payments rules and regulations.

2.    My entire career has been in electronic payments (wire transfer, ACH, and ATMs) as well as related regulatory issues.  Prior to starting GNesbitt Consulting, from 1970 to 1981, I worked for the Charlotte Branch of the Federal Reserve Bank where I managed reserve accounting and wire transfer. In 1981, I began working for First Union National Bank, where I stayed until 1994. While at First Union, I held a variety of operations management positions, including Electronic Banking Support Manager and Electronic Payments Manager, which included responsibility for ACH operations, wire transfers, ATM deposit accounting, and other cash management operations.

3.    Thereafter, I served as Senior Vice President, Member Services, Finance and Administration for EastPay, a regional ACH and payments association from 1994 to 2013.  I served as Executive Director of the North Carolina Automated Clearing House Association ("NorCACHA") from October 1994 until NorCACHA merged with the Virginia Automated Clearing House Association ("VACHA") in April 1996 to form EastPay. During my career with the ACH associations, I regularly conducted education events on the Operating Rules published by Nacha ("Nacha Rules") that govern the ACH network, as well as changes to the Nacha Rules over time.  I also provided assistance to member financial institutions to aid their understanding of the Nacha Rules and their impact as well as how to implement changes in the Nacha Rules.

4.    I have actively participated in and been recognized by various electronic payments industry groups over several decades. I was elected to the Bankwire Operations Committee in 1985 and

1

CONFIDENTIAL

VISA's ACH Advisory Committee in 1992. I also worked with the United States Treasury on a special task force dealing with ACH issues in 1994. From 1991 to 1995, I served two terms on the Nacha Rules and Operations Committee. I was elected in 1995 to the Nacha Marketing Committee on which I served until 1997. In 1996, I was named to Nacha's Arbitration Board. I chaired a Nacha task force on Electronic Child Support Payments from 1996 to 1998. In 2003, I was awarded the Commissioner's Partnership Award by the Federal Office of Child Support Enforcement for my work on the task force. From 2006 to 2007, I served on Nacha's Risk Management Advisory Group. In 2009, I worked on a task force with representatives from Nacha, American Payroll Association ("APA") and Association of Financial Professionals ("AFP") to identify ways to increase electronic payments of payroll. From 2010 to 2011, I served as co-leader of the Strategic Initiatives working group and also served on the Steering Committee of the Electronic Check Council ("ECC"). I was recognized by the APA in 2010 by being named to their Hall of Fame in recognition of my more than 10 years of service on their ACH and Electronic Payments Committee.

5.      My experience includes my industry training and accreditation in electronic payments as well as my academic training. For over 20 years, from 1998 to present, I have held the permanent Accredited ACH Professional ("AAP") certification from Nacha. I am active in the North Carolina Treasury Management Association ("NCTMA"), having served as Secretary and Treasurer. I am active at the national level of APA where I serve on the national APA ACH Committee. I hold BA and MBA degrees from UNC Charlotte. I am a graduate of the North Carolina Bankers Association School and the South Carolina Bankers Association School.

6.      Additionally, I conduct training and am frequently invited to speak on topics related to the electronic payments space. I have been a speaker at the Bank Administration Institute ("BAI") Money Transfer Conference, as well as the Nacha Annual Payments Conference on numerous

2

CONFIDENTIAL

occasions. I have also been an instructor at Nacha's Payment Institute on several occasions. I speak at local, regional, and national Treasury Management Association ("TMA") and APA chapter meetings and conferences, as well as for local bankers' associations and credit union groups. I conduct training for a number of the regional payments' associations around the country, as well as several companies that provide webinar training for banks and credit unions.

7.     During my time with the ACH associations and in consulting, I have conducted dozens of ACH audits and ACH risk assessments for a range of organizations.  Those organizations range from small credit unions to commercial banks with billions of dollars in deposits, as well as payment processors.  While conducting these audits, I regularly review compliance with the Nacha Rules as well as common industry practices.  I have also worked with card payment processors and technology developers to help them understand and implement the Nacha Rules, formats, and prevailing banking industry practices.  My curriculum vita is attached as Exhibit A.

## II.     ASSIGNMENT

8.     I have been retained by Mayer Brown LLP on behalf of Simmons Bank ("Simmons" or "Defendant") in connection with the above-referenced matter (the "Matter") to describe the United States Automated Clearing House ("ACH") payments system, including its governing Rules, supporting Guidelines, and industry custom and practice, in the context of certain allegations asserted in the complaint submitted on behalf of plaintiffs Shunda Wilkins and David Watson[1] ("Plaintiffs") and the proposed class in this Matter.

9.     Plaintiffs allege that Simmons breached certain provisions of its customer agreements by charging customers fees for insufficient funds ("NSF fees") and/or overdraft fees ("OD fees") when a merchant or service provider attempts to get paid multiple times for goods or services

---

[1] I understand that Ms. Graham has voluntarily dismissed her claims. Text Order Granting Dismissal of Plaintiff Diann Graham's Claims With Prejudice, dated October 4, 2021 (Dkt. 72).

CONFIDENTIAL

without success.  While Plaintiffs do not challenge the NSF fees associated with the first attempt to get paid (which is rejected due to insufficient funds), Plaintiffs do challenge the resulting NSF or OD fees associated with the merchant/service provider's second and/or third attempt to get paid. Plaintiffs challenge fees related to payment attempts made through the ACH network.

10.     The materials I have relied upon in conducting my assignment are listed in Exhibit B.  I have received assistance from Ankura Consulting Group, LLC ("Ankura")[2] in connection with preparing this report.  Ankura worked under my direction and supervision.  The opinions presented herein are mine and mine alone.  I reserve the right to modify, amend, or supplement my analysis as additional information becomes available.  I am being compensated in the Matter at a rate of $675 per hour.  My compensation is not contingent upon my opinions or the outcome of this litigation.

### III.     SUMMARY OF OPINIONS

11.     **The ACH payments system in the United States is governed by various Rules developed and administered by Nacha and industry custom and practice.** The ACH network is often referred to as a "lowest common denominator" network. For the network to function efficiently, the smallest and least technologically equipped financial institution must be able to successfully use it.

12.     **From an industry perspective, each individual ACH transaction is a unique item, including resubmissions.**  This is exemplified by the fact that each transaction, including retries initiated by a consumer's merchant or service provider, is assigned a new, unique trace number.

13.     **Under Nacha Rules, receiving institutions such as Simmons cannot reject transactions**. As such, Simmons was required to accept the merchant/service provider's payment

---

[2] Ankura is a professional services and consulting firm that provides dispute-related, investigative, financial and operational consulting services to various types of organizations.

CONFIDENTIAL

entries.

14.     **Simmons, as the receiving institution of the transaction, cannot and should not try to determine the intent of the requesting party.** The Nacha Rules do not require receiving institutions like Simmons to reach conclusions regarding intent related to the transactions.  By intent, I mean that Simmons cannot determine whether the merchant, service provider, and/or customer views the attempted transaction to be related to the same purchase or service as prior transactions.  With millions of transactions occurring on an annual basis, trying to match up transactions is simply not possible.  Indeed, even if this was possible, trying to determine intent would run counter to the fact that receiving institutions are required to accept all conforming ACH transactions.

15.     **Plaintiffs' reliance on the information in the Company Entry Description field used in ACH transactions to determine whether a transaction is a second or third attempt by a merchant to get payment is inappropriate.**  This field is not designed or intended to be used or interpreted by receiving institutions like Simmons.  Merchants and others using the ACH system (*e.g.*, cell phone carriers, life insurers, etc.) to obtain payments must enter some information into the Company Entry Description field, but it is a free-form field and there is no consistency or uniformity as to how the field is used.

16.     **Simmons's handling of the named Plaintiffs' transactions in this Matter was consistent with the Nacha Rules, industry practice, and the way in which electronic payment systems operate.**  Plaintiffs' transactions and circumstances demonstrate precisely why Plaintiffs' theory in this Matter does not make sense when considering the Nacha Rules, industry standards, and/or the mechanics of the electronic payment system.

CONFIDENTIAL

## IV. THE ACH PAYMENTS SYSTEM IN THE UNITED STATES IS GOVERNED BY VARIOUS RULES DEVELOPED AND ADMINISTERED BY NACHA AND BY INDUSTRY CUSTOM AND PRACTICE

17.     ACH is an acronym for "***automated*** clearing house." The ACH was conceived in the early 1970s as a means for banks to streamline the processing of recurring type payments (*e.g.,* payroll). While the original use of ACH was for direct deposit of payroll, it expanded to include other types of credit payments (*e.g.,* annuity payments, dividends, travel reimbursements, commissions, etc.). Within a few years, the ACH began to allow ACH debits, which has since become a ubiquitous means by which a wide range of companies collect payments from customers.[3]  Common usage for ACH debits include: collection of insurance premiums, health or fitness club dues, utility or phone bills, mortgage or loan payments, and credit card payments.  While ACH debits can be in the same amount each month (*i.e.*, recurring payments), usage varies and includes one-time payments authorized via an internet session (WEB ACH entries) or via a phone call (TEL ACH entries).

18.     In 1974, the regional ACH associations formed Nacha to coordinate the establishment of Rules to facilitate the nationwide clearing of ACH payments.[4,5]  As described below, Nacha does not process any transactions; its role is to develop the Rules and standards to allow for all financial institutions to be able to participate.

---

[3] Nacha Rules Section 8.37 "Entry" states (in part) "each debit Entry shall be deemed an 'item' within the meaning of Revised Article 4 of the Uniform Commercial Code…" Article 4-104 of the UCC defines "item" as "an instrument or a promise or order to pay money handled by a bank for collection or payment." Therefore, the terms item and ACH debit entry are used interchangeably in this report.

[4] Federal Reserve Bank of New York "Automated Clearing Houses (ACHs)", https://www.newyorkfed.org/aboutthefed/fedpoint/fed31.html (accessed October 4, 2021).

[5] The first regional ACH associations for the exchange of paperless entries were formed in the early 1970s, including the Calwestern Automated Clearing House Association ("CACHA"), the Georgia Automated Clearing House Association ("GACHA"), the Upper Midwest Automated Clearing House Association ("UMACHA"), and the New England Automated Clearing House Association ("NEACH"). In 1974, Nacha was formed to coordinate the ACH movement nationwide. Nacha Operating Rules Section VII "Appendices", Appendix A "History of the ACH Network".

CONFIDENTIAL

19. Usage of the ACH has increased over time and in 2020, nearly 27 billion ACH payments were made, valued at close to $62 trillion.[6]

### A. Overview Of ACH Participants

20. There are five distinct roles in an ACH transaction, each of which is described below. See **Figure 1** for a visual overview of the ACH participants and the role each plays in the process.

Figure 1



**Receiver** – A consumer, business, or government agency that has an account with the Receiving Depository Financial Institution and has authorized the Originator to originate ACH entries, either credits or debits, to their account. There exists an underlying business relationship, *e.g.*, customer-merchant, between the Originator and Receiver. The banks (here the Originating Depository Financial Institutions and Receiving Depository Financial Institutions) are simply the mechanism used to facilitate the payment between those parties. **In this Matter, the Receivers are Plaintiffs (*e.g.*, Wilkins and Watson).**

---

[6] Nacha "About Us", https://www.nacha.org/content/about-us (accessed October 4, 2021). This volume includes both ACH debit and credit entries, as well as payments initiated by the United States Department of Treasury and the United States Department of Defense for federal benefits, salaries, and retirement payments (*e.g.,* Social Security benefits, military pay and benefits, and retirement benefits).

CONFIDENTIAL

**Originator** – A merchant, servicer provider, company, government agency, entity or individual that has a business relationship with the Receiver to whom the Originator needs to make a payment to (*e.g.*, direct deposit of payroll collection of fees), or receive a payment from (*e.g.*, premiums, insurance premiums, goods, services, rent, or utility payments). **In this Matter, the Originators are the merchants and others attempting to obtain payment for goods and services provided to Plaintiffs by attempting to obtain funds through the ACH network for those goods and services (*e.g.*, Liberty National for plaintiff Wilkins).**

**Originating Depository Financial Institution ("ODFI")** - The ODFI's role is to provide a gateway into the ACH network for companies to originate ACH debits or credits. ODFIs are generally in the best position to determine that Originators are legitimate businesses and are following the appropriate Nacha Rules and other regulations. ODFIs assume a financial risk for all ACH entries if the Originator cannot settle (pay) for the ACH transactions. **In this Matter, the ODFIs are the financial institutions that the Originators, *e.g.*, the merchants, used to as a gateway to the ACH operators.**

**ACH Operator** - The two ACH operators are the Federal Reserve System and Electronic Payments Network, which is operated by The Clearing House. Both operators receive ACH files from ODFIs, validate and edit certain fields in the ACH record, and then sort and deliver them to the appropriate Receiving Depository Financial Institution.

**Receiving Depository Financial Institutions ("RDFI")** – The depository financial institution that receives ACH files from the ACH operators processes and attempts to post to the accounts for Receivers (like the Plaintiffs here) with whom they have a banking relationship. Under the Rules, RDFIs must receive and process all ACH entries delivered to them by the ACH Operator. However, RDFIs have rights outlined in the Rules for situations where they can return entries received. For example, RDFIs may return ACH entries due to insufficient funds in the account. **In this Matter, the RDFI is Simmons.**

## B. Overview of ACH Payment Process

21.     The ACH network electronically exchanges funds and related information among individuals, businesses, financial institutions, and government entities. By their nature, ACH entries are typically an ongoing stream of entries for a relationship between an Originator (*e.g.*, merchant) and Receiver (*e.g.*, consumer). The Originator directs a transfer of funds to or from a Receiver's account by providing the ODFI with payment instructions. The ODFI receives the payment instructions from the Originator and forwards those instructions to the ACH Operator that serves as a central processing facility. The ACH Operator receives the entry from the ODFI, validates its conformity to the Nacha Rules and may edit it, directs that entry to the appropriate

8

RDFI, and performs settlement functions. The RDFI receives the ACH entry from the ACH Operator and posts it to the account of its depositor (the Receiver or consumer).

22.    The ACH network is often referred to as a "lowest common denominator" network. For the network to function efficiently, the smallest and least technologically equipped financial institution must be able to successfully use it. The Rules are intentionally designed such that compliance is not prohibitively cumbersome or costly, particularly for smaller financial institutions.

### C.    Nacha Operating Rules

23.    All ACH transactions in the United States are governed by the Nacha Rules. The Nacha Rules direct how the ACH network is operated in order to keep it safe and efficient.[7] Parties using the ACH network, including consumers, businesses, financial institutions, and governments, have responsibilities under the Nacha Rules, which ensure that all ACH payments are handled on a level playing field and minimize the potential for abuse.

24.    The Nacha Rules were initially published in 1974 and were based on the technology available at that time. While the Nacha Rules are updated from time to time as technology evolves, they have never been re-drafted altogether.

25.    Since their inception, the Nacha Rules have been a living document in that Nacha regularly invites input from stakeholders and evaluates potential updates and improvements.[8] Nacha's rulemaking process is thorough and inclusive. Nacha's Rules and Operations Committee, a committee on which I sat for two terms, reviews ideas for updates to the Rules and includes diverse

---

[7] Nacha "What Are the Rules and Why Do They Matter?", https://www.nacha.org/content/rules-enforcement (accessed October 4, 2021).

[8] Nacha "What Are the Rules and Why Do They Matter?", https://www.nacha.org/content/rules-enforcement (accessed October 4, 2021).

CONFIDENTIAL

viewpoints to ensure all parties' needs are considered. These parties include, but are not limited to, Nacha Direct Members,[9] banks, credit unions, liaisons from the ACH Operators, U.S. Treasury, and the Federal Reserve Board of Governors as well as representatives from the end-user community such as companies and institutions that use the ACH network.[10] In the rule making process, the regional payments associations ("RPAs") represent the community banks and credit unions since the larger commercial banks tend to be direct members of Nacha. Most of the RPAs have committees made up of representatives from their membership that provide input and guidance on the proposed Nacha Rules. If the committee decides to pursue an idea, a proposal is developed, and input is sought from the technical community to ensure that the rule is viable. If so, Nacha issues a request for comment where any party can provide feedback on the proposed rule for the committee to consider. After the comment period closes, if the committee decides to move forward, it will make any updates to the rule based on the feedback received and issue a final proposal to Nacha's voting membership. If the measure passes, Nacha will begin the process of coordinating with stakeholders to provide resources, education, and tools to assist with implementing the rule.[11]

### D. Standard Entry Class Codes

26. Each ACH entry receives a three-character code called a Standard Entry Class Code ("SEC Code") that identifies the type of entry. The SEC Code provides information about the transaction, including type of sender and receiver accounts and whether the entry is for a monetary transaction

---

[9] Nacha Direct Members are comprised of financial institutions and payments association organizations that shape and influence the governance and direction of the ACH network and the Nacha Rules. https://www.nacha.org/content/nacha-direct-member-0 (accessed October 4, 2021).

[10] Nacha "What Are the Rules and Why Do They Matter?", https://www.nacha.org/content/rules-enforcement (accessed October 4, 2021).

[11] Nacha "What Are the Rules and Why Do They Matter?", https://www.nacha.org/content/rules-enforcement (accessed October 4, 2021).

CONFIDENTIAL

or whether the entry is non-monetary, such as an acknowledgement entry or a correction entry. The SEC Code also helps the RDFI (*e.g.*, Simmons) determine if an entry is intended for a consumer, and therefore covered by Regulation E or, instead, if the entry is for a corporate account. The SEC Code also conveys how the required authorization was obtained. For example, an entry representing an employee receiving a paycheck via direct deposit would be coded PPD, for Prearranged Payment and Deposit. A customer purchasing goods or services from an internet website would generate an entry with the SEC Code WEB, for Internet-Initiated/Mobile Entry. A required authorization obtained via telephone would generate an entry with the SEC code TEL.[12]

### E.    ACH Economic Framework

27.    Over the years, Nacha has used the ACH economic framework to determine how Nacha Rules changes might impact ACH participants. This concept was utilized to help determine where Nacha Rules changes should be made and to ensure that changes would not unfairly benefit or harm participants. The initial framework was for ACH credit for payroll disbursements. Originators benefited from using ACH credits instead of writing payroll checks by reducing costs for printing, distributing, and reconciling paper checks. These cost reductions were more than the fees paid to their ODFI resulting in a net benefit for Originators. ODFIs benefited by charging fees for providing ACH services and other related services. Receivers (*e.g.*, consumers) benefited by having their payroll deposited into their account at the opening of business on pay day without making a trip to the bank to deposit or cash their check.

28.    In contrast, RDFIs did not have any direct financial benefit from fees related to the ACH network as virtually no banks charge fees for incoming consumer ACH credits or debits.  Indeed, costs to RDFIs – such as Simmons – related to ACH entries include software operating costs and

---

[12] See Nacha Operating Guidelines Section VII Appendix B for a complete list of SEC Codes and descriptions.

CONFIDENTIAL

fees, handling customer inquiries and complaints, researching activity, and processing return entries. Ultimately, an RDFI may suffer financial loss for the amount of ACH debits in certain circumstances. These costs will vary by financial institution but generally speaking, the more human intervention required, the higher the cost. In addition, RDFIs like Simmons incur various external costs, including fees charged by the ACH Operators such as: per entry fees, account maintenance fees, and return entry fees. The RDFI bears these costs and receives no income to offset these expenses.

### F.    ACH Framework Has Not Changed For 50 Years

29.    ACH was developed with, and still uses, the framework established in the 1970s, including the formats and standards for payments. These formats and standards were developed well before the advent of the more sophisticated advances in technology that exist today. ACH was one of the first automated payment systems and has become ubiquitous in the United States. Moving ACH to new formats and standards that utilize today's more sophisticated technology would take years to fully implement and would require all ODFIs and RDFIs in the United States to make significant software changes to a number of systems within their organizations. For some financial institutions, the costs may outweigh any benefits.

### V.    BASED ON MY EXPERIENCE AND FROM AN INDUSTRY PERSPECTIVE, EACH INDIVIDUAL ACH TRANSACTION IS A UNIQUE ITEM, INCLUDING RESUBMISSIONS

30.    In this Matter, Plaintiffs assert that Simmons should not charge them for transactions that are resubmitted by merchants following a return of that transaction for insufficient funds. Contrary to Plaintiffs' assertions, after an RDFI like Simmons returns a transaction for insufficient funds using the insufficient funds Return Reason code (R01), and the ODFI (or Originator) decides to resubmit the transaction, an entirely new item is created with a new date and trace number. Furthermore, there is no discrete data field that allows a financial institution to easily associate one

12

CONFIDENTIAL

transaction with a resubmitted transaction. Based on my experience with the Nacha Rules, while the underlying debt and Receiver's legal obligation to pay that debt remain intact, the resubmitted ACH transaction is a new item. From a process standpoint, when an RDFI returns a transaction for insufficient funds, it does just that – returns the transaction. The RDFI (here, Simmons) does not hold the transaction and wait for further instructions from the Originator (merchant) or ODFI (merchant's bank). Therefore, when an ODFI (or Originator) resubmits a transaction through the ACH network, it creates a new item.

31.     This is demonstrated by the fact that each payment entry, including resubmissions, is assigned a new and unique trace number.[13]

32.     Based on my experience in the industry, third-party merchants or service providers likewise treat a resubmission of an ACH transaction as a unique item.  For example, third-party merchants and service providers commonly charge multiple fees for each attempt to collect payment for the same goods/services, as evidenced by the various types of agreements (such as auto-pay agreements) consumers sign authorizing these third parties to do so.

## VI.     UNDER THE NACHA RULES, SIMMONS CANNOT REJECT TRANSACTIONS

33.     Under the Nacha Rules, RDFIs like Simmons are required to accept valid ACH transactions.[14]  In fact, the very first statement under Article Three, Rights and Responsibilities of RDFIs and Their Receivers, is "[a]n RDFI must accept Entries that comply with these Nacha Rules and are received with respect to an account maintained with that RDFI, subject to its right to return

---

[13] Trace numbers are 15-digit strings in which the first eight digits represent the routing number of the ODFI and the remaining seven digits are a sequential number assigned by the ODFI to help it identify the transaction within its system by assigning a unique identification to the transaction. Nacha Operating Rules Appendix Three – "ACH Record Format Specifications."

[14] Nacha Operating Rules Article Three "Rights and Responsibilities of RDFIs and Their Receivers", Section 3.1 "General Rights and Responsibilities of RDFIs", Subsection 3.1.1 "RDFI Must Accept Entries".

CONFIDENTIAL

Entries under these Nacha Rules. An Entry is deemed to be received by an RDFI on the Banking Day on which the Entry is made available by the Receiving ACH Operator to the RDFI or to the RDFI's Receiving Point."[15]

34. Here, Plaintiffs assert that when Simmons (an RDFI) receives payment instructions from an ODFI (*e.g.*, a financial institution for the merchant or other party attempting payment) related to a transaction that was previously returned days prior for insufficient funds, Simmons is "process[ing] the same item yet again."[16] However, under the Nacha Rules, Simmons was required to accept those payment entries and could not simply ignore them because Plaintiffs did not have sufficient funds to make the payments on a prior date. RDFIs like Simmons rely on ODFIs and Originators (*e.g.*, merchants or other parties attempting payment) to follow the Nacha Rules just as ODFIs and Originators rely on RDFIs to follow the Nacha Rules.

35. Simmons was required to accept the transactions under the Nacha Rules. In contrast, Plaintiffs did have the ability to prevent the transactions from being processed. Had Plaintiffs made a stop payment request of Simmons with regard to the transactions that had previously been returned for insufficient funds, Simmons would have been obligated to honor such a request pursuant to the Nacha Rules.[17] Indeed, as discussed below in Section IX.C, David Watson's wife contacted Simmons to report an unauthorized PayPal transaction and asked that their account be credited for the transaction.[18] Simmons honored that request, as required by the Nacha Rules.[19]

---

[15] Nacha Operating Rules Article Three "Rights and Responsibilities of RDFIs and Their Receivers", Section 3.1 "General Rights and Responsibilities of RDFIs", Subsection 3.1.1 "RDFI Must Accept Entries".

[16] *See e.g.*, Amended Complaint at paragraphs 24, 38, and 42.

[17] Nacha Operating Rules Article Three "Rights and Responsibilities of RDFIs and Their Receivers", Section 3.7 "RDFI Obligation to Stop Payment", Subsection 3.7.1.1 "RDFI Obligation to Stop Payment of Recurring Entries" and Subsection 3.7.1.2 "RDFI Obligation to Stop Payment of Single Entries".

[18] Written Statement of Unauthorized Debit (ACH) dated August 19, 2015 (WILKINS_0001805).

[19] *Id.*; Watson Account transactions list (DWatson_0054).

CONFIDENTIAL

Other than a single instance involving Plaintiff David Watson, I am not aware that Plaintiffs otherwise ever made such a request related to the transactions at issue in this Matter.

## VII.   SIMMONS, AS THE RECEIVING INSTITUTION OF THE TRANSACTION, CANNOT AND SHOULD NOT TRY TO DETERMINE THE INTENT OF THE MERCHANT OR CONSUMER.

36.   By arguing that Simmons should be able to discern which transactions are "repeat" transactions for consumers, Plaintiffs are essentially arguing that RDFIs like Simmons should evaluate every transaction individually and attempt to infer the relationship between the originator and receiver and the underlying intent related to the transaction, including whether it might be related to any prior transaction. Plaintiffs' position is impractical and inconsistent with the design of the ACH network. To use an analogy, ACH participants together function like the United States Postal Service in that the participants in the ACH network simply deliver the mail (ACH payments); they do not interpret it.[20]

37.   Re-depositing or resubmitting of ACH debits returned for insufficient funds is a common practice. Occasionally, some ODFIs offer this service to the Originator (merchant/service provider), either immediately or within a certain time frame.  Payment processors for Originators of ACH debits also frequently offer resubmission services. Alternatively, the Originator may resubmit these returned entries. Based on my experience, there is no practical way for the RDFI like Simmons to readily identify when a recurring transaction is being resubmitted (or whether it is being resubmitted by an Originator or a payment processor), particularly because each such resubmission is assigned a unique trace number. More specifically, an RDFI like Simmons cannot

---

[20] The RDFI, here Simmons, is relying on the ODFI and its Originator to format the item correctly and not violate the Nacha Rules. Because the description of the item depends upon the Originator and is not edited by the ACH Operator, it may contain information that is not useful to RDFI. The ACH Operator's role is to sort, deliver, and settle these electronic instructions/payments. It has no role other than to support the business relationships between parties such as Receivers (consumers) and Originators (merchants and service providers) by facilitating the payments between these parties.

CONFIDENTIAL

readily differentiate between a resubmitted item and a subsequent recurring payment in an ongoing string of payments (*e.g.*, a March debit for March services looks essentially the same as the April debit for April services in a string of payments).[21]

38. Consistent with its name, the ACH is an *automated* system. Batches of entries, often numbering in the hundreds or thousands, are processed in an automated fashion with almost no human intervention or interpretive software. Human intervention occurs only when entries are rejected—typically for incorrect account numbers or non-post reasons (*e.g.*, insufficient funds, closed accounts, or stop payments). Some RDFIs have automated a feed from their deposit system into their ACH system to handle the more frequent types of rejected entries such as insufficient funds or invalid account numbers, further reducing human intervention.

39. The Nacha Rules do not require RDFIs like Simmons to reach conclusions regarding the intent of the transactions, nor could RDFIs. Indeed, attempting to do so would potentially run counter to the requirement that RDFIs are required to accept all valid ACH transactions. Further, it would be impractical and would impose an unreasonable burden to expect RDFIs to investigate each payment instruction received from a particular Originator to determine whether the Originator initiated prior transactions that may have been returned due to insufficient funds.

40. To further underscore this point, in the event an item is returned for insufficient funds, the Nacha Rules allow ODFIs (merchants' banks) or Originators (merchants) to resubmit the transaction that has been returned for insufficient funds up to an additional two times at any point

---

[21] Upon resubmission, a unique trace number is assigned to the new transaction while the other data elements of the ACH entry will be the same across a recurring transaction: Receiver name, Originator name, amount, and description of the payment (input by the Originator to help the Receiver identify what the payment is for). The rest of the ACH record contains data that is used by the RDFI to post the transaction: account number, routing number, type of account (checking or savings), and date of payment.

CONFIDENTIAL

within a 180-day period.[22] There is no requirement, and in my experience, no known pattern regarding when ODFIs or Originators might reinitiate items within the 180-day timeframe. Some Originators resubmitting items may do so on a schedule that benefits their interests. Others may choose a day or date in which they believe they will have a higher likelihood of success in recovering the payment (*e.g.,* potential pay days such as Fridays or the first or fifteenth of a month). Some Originators allow consumers to choose which day of the month they would like to make recurring monthly payments.[23] The RDFI (Simmons) does not choose the time of month that an ACH entry will be processed; it simply must process the entry upon presentment. To attempt to discern intent, as suggested by Plaintiffs, would essentially require the RDFI (Simmons) to interview the Originator (merchant) and the Receiver (consumer) on each transaction and might result in inconsistent understandings which would somehow have to be reconciled for millions of transactions. This does not make sense. Nor is it even possible to conduct such an interview as the RDFI likely has no relationship with the Originator and therefore has no way to facilitate an interview.

41.    On a related note, I understand that Plaintiffs contend that an RDFI (like Simmons) could identify resubmitted entries (which Plaintiffs characterize as the "same" item) by looking for patterns in the timing or scheduling of ACH payment entries sent by the same merchants for the same amounts. But, as discussed immediately above, the only relevant restriction on timing or scheduling of these payments imposed by the Nacha Rules is that items returned for insufficient funds may be resubmitted up to an additional two times *any* time within 180 days. Thus, the possible schedule variations for such payments and resubmissions are nearly endless, can change

---

[22] Nacha Operating Rules Article Two "Rights and Responsibilities of ODFIs, Their Originators, and Third-Party Senders", Section 2.12 "Return Entries", Subsection 2.12.4.1 "General Rule for Reinitiated Entries".

[23] *See*, *e.g.*, Primerica Life Insurance Company (WILKINS-PRIMERICA-0000035) and Liberty National Life Insurance Company (WILKINS-LIBERTY-0000009).

CONFIDENTIAL

at any time, and are not reasonably predictable, especially to an RDFI like Simmons, which is not

a party to the third-party agreements between merchants (Originators) and consumers (Receivers)

that typically contain terms addressing the timing of such payments. For example, some merchants

notify consumers that their schedule will automatically change if payments are missed, such as

changing from a monthly billing cycle to a quarterly billing cycle if a consumer is having trouble

making payments.[24] Certainly, an RDFI like Simmons, is not privy to the terms of these

agreements. Even if it was, managing that level of detail and data for every single merchant and

consumer with whom Simmons interacts is not practicable.

42.     Because the timing of resubmissions is neither predictable nor consistent, there would be

no way under Plaintiffs' proposed approach to accurately distinguish "resubmissions" from other

types of "new" charges by the same vendor for the same amount (*e.g.*, recurring charges, or

identical charges based on repeat consumer behavior, *e.g*., ordering the same coffee or lunch from

a vendor on a routine basis, or auto-ship subscriptions).

43.     Based on these considerations and my experience in the industry, I conclude that there is

no feasible way for an RDFI like Simmons to use merchant charge "patterns" to accurately identify

resubmissions in the manner suggested by Plaintiffs.

   **A.     Simmons Practices Are Typical of RDFIs**

44.     It is my understanding from discussions with Simmons[25] that it does not have a dedicated

department that handles ACH transactions.  Exceptions other than insufficient funds are handled

by Simmons's Exceptions Department, which reviews exceptions for the sole purpose of ensuring

that proper return reason codes are applied.  Simmons's Exceptions Department does not undertake

---

[24] *See, e.g.* WILKINS-PRIMERICA-0000015.

[25] Interviews with Amanda Horton (Senior Vice President, Director of Digital Banking Development at Simmons) and Lisa Hunter (Executive Vice President, Chief Data Officer of Simmons).

CONFIDENTIAL

any investigations, it merely facilitates returns.  Insufficient funds exceptions are automatically treated as returns with an NSF fee assessed unless a banker manually intervenes and decides Simmons will pay the item and instead charge the account with an OD fee. Simmons bankers do not (and cannot) investigate the insufficient funds exception items to attempt to discern the underlying intent, including whether the transaction is a resubmission of a previously returned item. Based on my experience, Simmons's practices are consistent with industry custom and practice.

### B. Attempting To Discern Intent Regarding Specific Transactions Would Do More Harm Than Good

45.     As noted above, Simmons (RDFI) cannot and should not attempt to determine the intent behind the underlying transaction including whether the consumer (Receiver) intended to make a particular purchase or payment. Setting aside the impracticality, if RDFIs did somehow attempt to determine intent, it would undoubtedly do more harm than good.

46.     As a hypothetical example, if Mr. Smith has been making his mortgage payment of $1,000 to his lender on the first of the month every month for the past ten years, and then he makes a second payment of $1,000 on the fifth of the month, an RDFI manually intervening might interpret this payment as unintended and reject it because it is outside of Mr. Smith's longstanding historical payment pattern. If Mr. Smith is actually attempting to pay down his mortgage by making additional payments, the RDFI could cause harm to Mr. Smith in this hypothetical example by rejecting the payment. In actuality, RDFIs like Simmons rely on ODFIs and Originators (merchants) to follow the Nacha Rules rather than attempting to interpret and subjectively police ACH transactions.

47.     There is no practical way to differentiate between the periodic payments between an Originator and Receiver. Plaintiffs' assertion that RDFIs like Simmons should infer the

CONFIDENTIAL

relationship between the Originator and Receiver and the underlying intent related to the transaction, including whether it might be related to any prior payment entry, is impractical and inconsistent with the design of the ACH network.

## VIII. THE COMPANY ENTRY DESCRIPTION FIELD USED IN ACH TRANSACTIONS DOES NOT CREATE AN OBLIGATION FOR RDFIs TO ATTEMPT TO MATCH RESUBMITTED ITEMS

48.     The Company Entry Description field is a ten-character field that is located in positions 54-63 in the data string of an ACH item. The purpose of the field is for Originators (merchants) to provide Receivers (consumers) with a description of the transaction (e.g., "gas bill" or "INS PREM"). The Company Entry Description field is a free-form field where Originators generally have discretion as to how they populate it. While the data input by an Originator into the Company Entry Description field may be helpful to the Receiver who authorized the transaction, only the human who inputs the data on behalf of the Originator can truly understand it. The Nacha Rules state that it is mandatory for Originators to populate the Company Entry Description Field.[26]

49.     Effective September 18, 2015, the Nacha Rules required ODFIs or Originators to add the description "RETRY PYMT" to the Company Entry Description field any time a transaction is resubmitted for payment after being returned previously for insufficient funds.[27]   The stated purpose of the change was to provide notice to the Receiver, here each Plaintiff, that the item is related to a previously returned item and to facilitate dispute resolution with Receivers.[28]

50.     Plaintiffs appear to allege that Simmons was obligated to use information contained in the Company Entry Description field of the ACH transaction data to identify resubmitted items and

---

[26] See Nacha Rules Appendix 3, Part 3.2 Glossary of ACH Record Format Data Elements, Subpart 3.2.1 Field Inclusion Requirements.

[27] See 2015 Revisions to the Nacha Operating Rules and Guidelines, Reinitiation of Entries at page ORxxvi.

[28] Nacha, ACH Network Risk and Enforcement Topics, Effective Date September 18, 2015, https://www.nacha.org/rules/ach-network-risk-and-enforcement-topics (accessed October 4, 2021).

CONFIDENTIAL

attempt to match those items to previously returned items.[29] However, Plaintiffs' allegations ignore that: (1) while an ACH payment entry may include some descriptive data in the Company Entry Description field, those data are input in a free-form manner (similar to a free-form memo entry on a check), and the meaning behind the data can only truly be understood by the human who input it; (2) in my experience, ODFIs and Originators often do not add the description "RETRY PYMT" to the resubmission of a previously returned item, regardless of whether the Nacha Rules require doing so. Notably, the Nacha Rules specifically state that a resubmitted debit that is part of a recurring string of payments (*e.g.*, monthly insurance premiums) is not required to have the phrase "RETRY PYMT" in the Company Entry Description field in place of the data normally in that field;[30] and (3) even when ODFIs and Originators do include the description "RETRY PYMT," RDFIs like Simmons have no obligation to review the contents of the Company Entry Description field at all and certainly are under no obligation under the Nacha Rules to attempt to perform any sort of matching exercise to identify the previously returned item.

51.     This issue is exemplified by the very transactions on which Plaintiffs have made allegations in this Matter. For each of the six fees challenged by Plaintiffs,[31] I reviewed data that included the Company Entry Description field; only one transaction (for Watson, as discussed below in paragraph 83) included the "RETRY PYMT" notation in the Company Entry Description field for alleged resubmitted entries. For the other five transactions, there was no indication in the Company Entry Description field related to any alleged resubmission.[32]

---

[29] Plaintiffs' First Set of Interrogatories Nos. 2 and 8 dated November 23, 2020; Plaintiffs' Requests for Production of Documents dated November 23, 2020.

[30] See Nacha Rules Subsection 2.12.4.1 General Rule for Reinitiated Entries.

[31] Plaintiffs Watson's and Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

[32] SB0054574_WILKINS_Plaintiffs_20160817_20181031_ACH.csv;
SB0054577_WILKINS_Plaintiffs_20181101_20210630_ACH_v2.csv;
SB0054569_WILKINS_Plaintiffs_20140501_20160816_ACH.csv.

CONFIDENTIAL

52.     The Nacha Rules do not impose any obligation on RDFIs to attempt to match the resubmitted item to a previously returned item. Indeed, given the large volumes of ACH transactions processed by RDFIs (reminder: the "A" stands for automated), such an undertaking would be impractical and prone to error.

## IX.     SIMMONS'S HANDLING OF THE NAMED PLAINTIFFS' TRANSACTIONS IN THIS MATTER WAS CONSISTENT WITH THE NACHA RULES AND INDUSTRY CUSTOM AND PRACTICE

53.     Prior to examining individual account histories, it is important to understand the customer account agreement that outlines the rights and responsibilities of both bank customers and Simmons.

54.     When opening an account, customers are presented with various disclosures including information about FDIC insurance coverage, account terms and conditions, the schedule of fees and charges, and information about overdraft protection, among other disclosures.[33] The customer acknowledges receipt of these disclosures by signing the Signature Card.[34] The Signature Card also provides information about the account such as the account type, account number, account ownership details, source and amount of initial deposit, as well as details about the account owner. The schedule of fees and charges details the fees the bank imposes for various services such as wire transfers, issuance of cashier's checks, ATM fees, stop payment fees, OD fees, and NSF fees.[35] With regard to NSF fees, at issue in this Matter, Simmons discloses that:

> A fee may be imposed if you overdraw your account. When you write a check, withdraw money in person or from an ATM, use your debit card to make a purchase, or make an automated bill payment or other electronic payment for more than the amount in your account; you overdraw your account. Simmons Bank has

---

[33] Understanding Your Simmons Bank Deposit Account (WILKINS-0000745).

[34] See *e.g.*, Wilkins Signature Card/Account Agreement (SWilkins_0001); Watson Signature Card (WILKINS-0001762).

[35] Simmons Bank Schedule of Fees and Charges (WILKINS-0000524).

CONFIDENTIAL

the choice to either pay the item or not. If we pay even though you do not have the money in your account; you may be charged a Paid Item Fee (Overdraft Fee). If we return your item without paying it, you may be charged a Return Item/Insufficient (NSF) Fee.[36]

55.     The Schedule of Fees and Charges further states that Paid Item/Overdraft Fee *per item* is $35 for customers. Similarly, the Return Item/Insufficient Funds Fee *per item* is $35 for customers (see Figure 2).[37]

Figure 2[38]



56.     As discussed in Section V, and based on my experience in the payments industry, when an ODFI (or Originator, like a merchant) resubmits a transaction that has previously been returned for insufficient funds, that resubmitted transaction is a new ACH debit entry, *i.e.*, a new item. Therefore, a resubmitted transaction is potentially subject to an additional NSF or Overdraft fee if sufficient funds are not available in the customer's account under the Schedule of Fees and Charges. Asserting otherwise fundamentally misconstrues how the ACH payment process actually functions, based on my experience in the industry.

---

[36] Simmons Bank Schedule of Fees and Charges (WILKINS-0000525).

[37] *Id.* The amount of the fees charged by Simmons has changed over time. For example, in 2015, Simmons disclosed overdraft and NSF fees of $30 per item. See Schedule of Fees and Charges dated 2015 (WILKINS-0000556).

[38] Simmons Bank Schedule of Fees & Charges (WILKINS-0000524) (emphasis added).

23

57. Additionally, under Regulation E, consumers have the right to contest transactions and financial institutions are required to investigate consumers' concerns. In fact, as discussed later in this section, Ms. Marilyn Watson did, in fact, contest a PayPal transaction that she believed was not authorized. Simmons responded by refunding the fee that the Watsons incurred as a part of the contested PayPal transaction. Notably, that is the only time that any plaintiff contested any of the transactions for which they allege Simmons charged a returned item or overdraft fee on a resubmitted item.

### A. Wilkins Chronically Overdrew Her Account & Simmons Ultimately Charged Off The Account

58. Ms. Wilkins challenges one fee in connection with this Matter – a $35 NSF fee incurred on December 19, 2017 (but never paid), when her account had been negative already for 30 consecutive days and was in the process of being charged off.[39]

59. By way of background, on December 2, 2016, Shunda M. Wilkins opened a new Simmons Simply Checking account (account number 131245378) (the "Wilkins Account").[40] Ms. Wilkins had overdraft protection at Simmons for her debit card and ATM transactions, and she qualified for a $500 overdraft privilege.[41] The Wilkins Account was overdrawn for the first time in February 2017 and was overdrawn six more times by June 6, 2017.[42] On June 6, 2017, Simmons notified Ms. Wilkins via letter that the Wilkins Account had been overdrawn for 15 days or more and that

---

[39] Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021; Account Statements (SWILKINS_0001–53); Letters from Simmons Bank to Ms. Wilkins dated June 6, 2017 to December 22, 2017 (WILKINS-0001297–1305).

[40] Account Agreement dated December 2, 2016 (SWilkins_0001).

[41] S. Wilkins Dep. Tr. 23:9-12 ("Q: Did you have overdraft protection on your account with Simmons – on your checking account with Simmons Bank? A: Yes.").

[42] Account Statements (SWilkins_0001-0053).

CONFIDENTIAL

the overdraft balance was ($231.60).[43] The letter also stated that "[o]ne of the requirements of your Overdraft Privilege is that you bring your checking account to a positive balance at least once every thirty days. If you don't meet this requirement, your Overdraft Privilege will be suspended."[44]

60.     The Wilkins Account incurred an eighth overdraft fee on June 22, 2017.[45] On July 5, 2017, Simmons notified Ms. Wilkins via a similar letter that the Wilkins Account had been overdrawn for 15 days or more and that the overdraft balance was ($337.90).[46] The letter also included the requirement to bring the Wilkins Account current at least once every 30 days. The Wilkins Account was charged with additional overdraft fees on July 6, 2017; July 24, 2017; and August 8, 2017.[47] On August 8, 2017, Simmons sent a third letter notifying Ms. Wilkins that the Wilkins Account had been overdrawn for 15 days or more and that the overdraft balance was ($324.20).[48]

61.     On August 22, 2017, Simmons returned an item due to insufficient funds in the Wilkins Account and charged a $35 Return Item Fee on August 23, 2017.[49] Also on August 23, 2017, Simmons notified Ms. Wilkins via letter that the Wilkins Account had been overdrawn for more than 30 days and that it was overdrawn by ($690.50) and that its Overdraft Privilege was being suspended.[50] Simmons notified Ms. Wilkins that as long as the Wilkins Account remained overdrawn, Simmons would return any items presented for payment and charge NSF fees for those

---

[43] Letter from Simmons to Shunda Maria Wilkins dated June 6, 2017 (WILKINS-0001297).

[44] *Id.*

[45] Account Statement dated June 20, 2017 through July 19, 2017 (SWilkins_0020).

[46] Letter from Simmons to Shunda Maria Wilkins dated July 5, 2017 (WILKINS-0001298).

[47] Account Statements (SWilkins_0001-0053).

[48] Letter from Simmons to Shunda Maria Wilkins dated August 8, 2017 (WILKINS-0001299).

[49] Account Statement dated August 21, 2017 through September 19, 2017 (SWilkins_0012).

[50] Letter from Simmons to Shunda Maria Wilkins dated August 23, 2017 (WILKINS-0001300).

CONFIDENTIAL

items.[51]

62.     After briefly bringing her account current, by October 6, 2017, the Wilkins Account incurred three additional overdraft fees.[52] On October 10, 2017, Simmons notified Ms. Wilkins via letter that the Wilkins Account had been overdrawn for 15 days or more and that the overdraft balance was ($225.10).[53] The Wilkins Account incurred additional overdraft fees on October 23, 2017 and November 7, 2017. On November 7, 2017, Simmons notified Ms. Wilkins via letter that the Wilkins Account had been overdrawn for 15 days or more and that the overdraft balance was ($327.06).[54] On November 22, 2017, Simmons notified Ms. Wilkins via letter that the Wilkins Account had been overdrawn for more than 30 days, was overdrawn by ($437.99), and that Overdraft Privilege was suspended.[55]

63.     On or about November 24, 2017, Simmons returned an item due to insufficient funds and charged a $35 NSF fee to the Wilkins Account.[56] On December 4, 2017, Simmons notified Ms. Wilkins via letter that the Wilkins Account remained overdrawn in the amount of ($472.21).[57] After Ms. Wilkins's account balance was already negative, Simmons returned two additional items on December 7, 2017, and December 19, 2017, and charged Ms. Wilkins one NSF fee for each item (one of which is the only fee that she challenges in this Matter).[58] Simmons then notified Ms.

---

[51] *Id.*

[52] Account Statements (SWilkins_0001-0053).

[53] Letter from Simmons to Shunda Maria Wilkins dated October 10, 2017 (WILKINS-0001301).

[54] Letter from Simmons to Shunda Maria Wilkins dated November 7, 2017 (WILKINS-0001302).

[55] Letter from Simmons to Shunda Maria Wilkins dated November 22, 2017 (WILKINS-0001303).

[56] Account Statement dated November 20, 2017 through December 19, 2017 (SWilkins_0002).

[57] Letter from Simmons to Shunda Maria Wilkins dated December 4, 2017 (WILKINS-0001304).

[58] Account Statement dated November 20, 2017 through December 19, 2017 (SWilkins_0002); Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

CONFIDENTIAL

Wilkins via letter that the Wilkins Account had been charged off due to Ms. Wilkins's failure to maintain the account according to the terms of the Overdraft Privilege Agreement.[59] Ms. Wilkins failed to pay either the December 7 or the December 19 NSF fees.[60]

### B. Wilkins's Liberty National Transactions Caused The Fee At Issue

64. On December 22, 2016, Shunda Wilkins entered into an agreement with Liberty National to be insured under a life insurance policy.[61] Lawanda Shepard was to be the payor on the policy. Ms. Wilkins and Ms. Shepard authorized Liberty National to initiate recurring monthly payments to be applied to policy premiums.[62]

65. The Liberty National entries returned in December 2017, during a period when Simmons had suspended the Wilkins Account Overdraft Privilege, are at issue in this Matter.[63] On December 6, 2017, Simmons received an item from Liberty National in the amount of $72.93.[64] Because the Wilkins Account had been long overdrawn and its Overdraft Privilege was suspended, Simmons returned the item and charged the Wilkins Account a $35 NSF fee the next day; based on my experience in the industry, that fee was entirely consistent with Simmons's Schedule of Fees and Charges and industry practice.[65] On December 18, 2017, Simmons received a second item from Liberty National for $72.93. The item Simmons received on December 18, 2017 had a different

---

[59] Letter from Simmons to Shunda Maria Wilkins dated December 22, 2017 (WILKINS-0001305).

[60] Account Statement dated December 2, 2017 through December 19, 2017 (SWilkins_0050-53); Order granting default judgment and attorney's fee, dated August 25, 2021 (Dkt. 62).

[61] Liberty National life insurance policy agreement dated December 22, 2016 (WILKINS-LIBERTY-0000001-016). In addition, sometime prior to December 2017, Wilkins authorized Liberty National to debit her Simmons Bank account for her sister's life insurance policy. S. Wilkins Dep. Tr. 133:18-21.

[62] S. Wilkins Dep. Tr. 133:18-21 ("Q: Did you authorize Liberty National to debit the Simmons Bank account for your sister's life insurance policy? A: Yes.").

[63] Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

[64] Account Statement dated November 20, 2017 through December 19, 2017 (SWilkins_0002).

[65] *Id.*

CONFIDENTIAL

trace number than the item received on December 6, 2017, again demonstrating that these were two distinct items.[66] Again, because the Wilkins Account was negative and the Overdraft Privilege suspended, Simmons returned the item and charged the Wilkins Account a $35 NSF fee the next day; based on my experience, that fee was consistent with the Schedule of Fees and Charges and industry practice.[67]

66. Even if Simmons were somehow required to review the Company Entry Description field discussed above in Section VIII to see if the Originator had included the language "RETRY PYMT" to signify a reinitiated transaction (which Simmons was not required to do, for the reasons set forth above), the item received on Ms. Wilkins's account on December 18, 2017 did not contain the description "RETRY PYMT."[68]

67. While Liberty National was not able to collect the $72.93 Wilkins's policy premium due to the items being returned for insufficient funds, Shunda Wilkins benefitted from a premium waiver that was offered by Liberty National.[69] On December 22, 2017, Liberty National acknowledged that the Shunda Wilkins's payment was not made due to insufficient funds and to help "maintain the valuable coverage that your Liberty National Life Insurance policy provides," Liberty National would waive the premium payment.[70] Notably, the waived premium payment of $72.93 exceeds the combined amount of the NSF fees that Shunda Wilkins incurred as a result of the returned items on December 6 and December 18.

---

[66] SB0054574_WILKINS_Plaintiffs_20160817_20181031_ACH.csv.

[67] *Id.*

[68] *Id.*

[69] Letter from Liberty National Customer Service dated December 22, 2017 (WILKINS-LIBERTY-0000001). While Shunda Wilkins was listed as the insured party on the Liberty National policy documents, the payor on the account was listed as Lawanda Shepard, Shunda Wilkins's sister. However, the premium payments were paid to Liberty National from Shunda Wilkins's Simmons account.

[70] *Id.*

CONFIDENTIAL

### C. David and Marilyn Watson Chronically Overdrew Their Account & Simmons Ultimately Charged Off The Account

68.     The Watsons challenge five $30 fees (which was the fee amount at the time) in connection with this Matter; those fees were incurred on June 11, 2015, August 17, 2015, January 11, 2016, February 1, 2016, and February 9, 2016.[71]

69.     By way of background, on April 21, 2015, David A. Watson and Marilyn Watson opened a new Simmons Checking account (account number 11863167) (the "Watson Account").[72] The Watsons had overdraft protection at Simmons for their debit card and ATM transactions, and they qualified for a $500 overdraft privilege.[73]   The Watson Account was overdrawn several times throughout 2015 and by the end of the year had incurred $600 in OD and NSF fees.[74] On June 22, 2015, the Watsons and Simmons entered into an overdraft repayment plan in which they agreed to repay $625.65 in overdrawn funds in monthly installments over the next eleven months interest free.[75] The same day, Simmons made a credit in the amount of $625.65 to the Watsons's account.[76] On January 14, 2016, the Watsons entered into another overdraft repayment plan with Simmons in which they agreed to repay $675.59 in overdrawn funds in monthly installments over the next eleven months interest free.[77]   The same day, Simmons made a credit in the amount of $675.59 to the Watsons's account.[78]

---

[71] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

[72] Account Opening Document (WILKINS-0001762).

[73] D. Watson Dep. Tr. 30:14-17 ("Q: Do you remember if you optioned into that overdraft protection, you said, yes, I want the overdraft protection? A: Yes, ma'am, we did.").

[74] Watson Account statement dated December 21, 2015 through January 19, 2016 (DWatson_0007).

[75] Overdraft Repayment Plan dated June 22, 2015 (WILKINS-0001760).

[76] Watson Account transaction history (DWATSON_0045).

[77] Overdraft Repayment Plan dated January 14, 2016 (WILKINS-0001761).

[78] Watson Account transaction history (DWATSON_0059).

CONFIDENTIAL

70.     On August 18, 2015, Simmons returned an item in the amount of $84.91 from PayPal due to insufficient funds in the Watson Account.[79] On August 19, 2015, Ms. Watson provided Simmons with a signed Written Statement of Unauthorized Debit (ACH) indicating that she had "revoked the authorization [she] had given to the party to debit [her] account before the debit was initiated."[80] As a result, per the Nacha Rules, Simmons agreed to re-credit the $84.91 to the checking account. Ms. Watson also provided Simmons with a second signed Written Statement of Unauthorized Debit (ACH) related to the same returned $84.91 PayPal transaction on August 19, 2015 that states she "did not authorize [PayPal] to debit [her] account."[81]

### D.     Watson Account Transactions

#### 1.     Watson PayPal Transactions

71.     Mr. and Ms. Watson used the Watson Account to make payments to PayPal.[82] Based on my experience, in order for these transactions to take place, an agreement would have been in place between the Watsons and PayPal authorizing the transactions that laid out the various terms and conditions of the electronic payments, such as when the payments would draft.

##### a.     Watson June 2015 PayPal Transactions ($3.25)

72.     On June 4, 2015, Mr. and Ms. Watson received a notice of non-sufficient funds informing them that Simmons had returned an item from PayPal in the amount of $3.25 and that the Watson Account had a negative balance of ($589.40).[83] As the Watson Account did not have sufficient

---

[79] Written Statement of Unauthorized Debit (ACH) dated August 19, 2015 (WILKINS-0001803).

[80] *Id.*

[81] Written Statement of Unauthorized Debit (ACH) dated August 19, 2015 (WILKINS-0001805).

[82] See *e.g.,* Watson Account Transactions List (DWatson_0040).

[83] Notice of Non-Sufficient Funds dated June 4, 2015 (WILKINS-0003834); Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, dated September 7, 2021; Watson Account transactions list (DWatson_0045).

CONFIDENTIAL

funds to pay the PayPal transaction, a $30 returned item fee was charged. On June 11, 2015, Mr. and Ms. Watson received another notice of non-sufficient funds informing them that Simmons had paid an item from PayPal in the amount of $3.25 creating an overdraft and that the Watson Account had a negative balance of ($622.65).[84] As the Watson Account did not have sufficient funds to fulfill the payment entry and Simmons paid the item on the Watsons's behalf, a $30 overdraft fee was charged, which was consistent with the Schedule of Fees and Charges and industry practice based on my experience in the industry. The Watsons challenge this $30 fee on June 11, 2015 in connection with this Matter.[85]

73.     The item Simmons received on June 10, 2015, leading to the June 11, 2015 notice of non-sufficient funds, had a different trace number than the item received on June 3, 2015, leading to the June 4, 2015 notice of non-sufficient funds.[86] Even if Simmons were somehow required to review the Company Entry Description field discussed above in Section VIII to see if the Originator had included the language "RETRY PYMT" to signify a resubmitted transaction (which Simmons was not required to do, for the reasons set forth above), the item received on the Watson Account on June 10, 2015 did not contain the description "RETRY PYMT."[87]

### b.      Watson August 2015 PayPal Transactions ($6.17)

74.     On August 10, 2015, Mr. and Ms. Watson received a notice of non-sufficient funds informing them that Simmons had returned an item from PayPal in the amount of $6.17 and that

---

[84] Notice of Non-Sufficient Funds dated June 4, 2015 (WILKINS-0003833); Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, dated September 7, 2021; Watson Account transactions list (DWatson_0045).

[85] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

[86] SB0054569_WILKINS_Plaintiffs_20140501_20160816_ACH.csv.

[87] Id.

CONFIDENTIAL

the Watson Account had a negative balance of ($29.78).[88]  As the Watson Account did not have sufficient funds to pay the PayPal transaction, a $30 returned item fee was charged. On August 17, 2015, Mr. and Ms. Watson received another notice of non-sufficient funds informing them that Simmons had paid an item from PayPal in the amount of $6.17 creating an overdraft and that the Watson Account had a negative balance of ($35.95).[89]  As the Watson Account did not have sufficient funds to pay the PayPal transaction and Simmons paid the item on the Watsons's behalf, a $30 overdraft fee was charged; based on my experience in the industry, that fee was consistent with the Schedule of Fees and Charges and industry practice. The Watsons challenge this $30 fee on August 17, 2015 in connection with this Matter.[90]

75.    The item Simmons received on August 7, 2015, which generated the August 10, 2015 notice of non-sufficient funds, had a different trace number than the item received on August 14, 2015, leading to the August 17, 2015 notice of non-sufficient funds.[91] Even if Simmons were somehow required to review the Company Entry Description field discussed above in Section VIII to see if the Originator had included the language "RETRY PYMT" to signify a resubmitted transaction (which Simmons was not required to do, for the reasons set forth above), the item received on the Watson Account on August 14, 2015 did not contain the description "RETRY PYMT."[92]

---

[88] Notice of Non-Sufficient Funds dated June 4, 2015 (WILKINS-0003831); Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, dated September 7, 2021; Watson Account transactions list (DWatson_0054).

[89] Notice of Non-Sufficient Funds dated June 4, 2015 (WILKINS-0003830); Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, dated September 7, 2021; Watson Account transactions list (DWatson_0054).

[90] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

[91] SB0054569_WILKINS_Plaintiffs_20140501_20160816_ACH.csv.

[92] Id.

CONFIDENTIAL

### 2. Watson Verizon Transactions

76. Mr. and Ms. Watson used the Watson Account to make payments to Verizon.[93] Based on my experience, in order for these transactions to take place, an agreement would have been in place between the Watsons and Verizon authorizing the transactions that laid out the various terms and conditions of the electronic payments, such as when the payments would draft.

### a. Watson January 2016 Verizon Transactions ($367.05)

77. On January 6, 2016, Mr. and Ms. Watson received a notice of non-sufficient funds informing them that Simmons had returned an item from Verizon in the amount of $367.05 and that the Watson Account had a negative balance of ($675.59).[94] On January 12, 2016, Mr. and Ms. Watson received another notice of non-sufficient funds informing them that Simmons had returned another item from Verizon in the amount of $367.05 and that the Watson Account had a negative balance of ($705.59).[95] The January 12, 2016, transaction presented Simmons with a new ACH debit item. Based on my experience in the industry, it was entirely appropriate and consistent with Simmons's Schedule of Fees and Charges and industry practice for Simmons to return the January 12, 2016 debit item and impose a $30 returned item fee, given that the Watson Account did not have sufficient funds to complete the payment. The Watsons challenge this $30 fee on January 12, 2016 in connection with this lawsuit.[96]

78. The item Simmons received on January 4, 2016, leading to the January 6, 2016 notice of

---

[93] See *e.g.,* Notice of Non-Sufficient Funds dated January 6, 2016 (DWatson_0005).

[94] Notice of Non-Sufficient Funds dated January 6, 2016 (DWatson_0005). The negative balance of ($675.59) appears to include the $30 NSF fee generated by the return of the $367.05 entry. Verizon cellular phone bill dated February 2, 2016 (WILKINS-VERIZON-0000027).

[95] Notice of Non-Sufficient Funds dated January 12, 2016 (DWatson_0006). The negative balance of ($705.59) appears to include the $30 NSF fee generated by the return of the $367.05 entry. Verizon cellular phone bill dated February 2, 2016 (WILKINS-VERIZON-0000027).

[96] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

CONFIDENTIAL

non-sufficient funds, had a different trace number than the item received on January 8, 2016, leading to the January 12, 2016 notice of non-sufficient funds.[97] Even if Simmons were somehow required to review the Company Entry Description field discussed above in Section VIII to see if the Originator had included the language "RETRY PYMT" to signify a resubmitted transaction (which Simmons was not required to do, for the reasons set forth above), the item received on the Watson Account on January 8, 2016 did not contain the description "RETRY PYMT."[98]

### b.     Watson February 2016 Verizon Transactions ($1,371.44)

79.     On February 2, 2016, Mr. and Ms. Watson received a notice of non-sufficient funds informing them that Simmons had returned an item from Verizon in the amount of $1,371.44 and that the Watson Account had a negative balance of ($90.00).[99] As the Watson Account did not have sufficient funds to pay the Verizon transaction, a $30 returned item fee was charged. On February 9, 2016, Mr. and Ms. Watson received another notice of non-sufficient funds informing them that Simmons had returned another item from Verizon in the amount of $1,371.44 and that the Watson Account had a negative balance of ($60.00).[100] As the Watson Account did not have sufficient funds to pay the Verizon transaction, a $30 returned item fee was charged; based on my experience in the industry, that charge was consistent with the Schedule of Fees and Charges and industry practice. The Watsons challenge this $30 fee on February 9, 2016 in connection with this Matter.[101]

---

[97] SB0054569_WILKINS_Plaintiffs_20140501_20160816_ACH.csv.

[98] *Id.*

[99] Notice of Non-Sufficient Funds dated February 2, 2016 (WILKINS-0003813); Verizon cellular phone bill dated March 2, 2016 (WILKINS-VERIZON-0000053).

[100] Notice of Non-Sufficient Funds dated February 2, 2016 (WILKINS-0003811); Verizon cellular phone bill dated March 2, 2016 (WILKINS-VERIZON-0000053).

[101] Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories dated September 7, 2021.

CONFIDENTIAL

80.    The item Simmons received on February 1, 2016, leading to the February 2, 2016 notice

of non-sufficient funds, had a different trace number than the item received on February 8, 2016,

leading to the February 9, 2016 notice of non-sufficient funds.[102] Even if Simmons were somehow

required to review the Company Entry Description field discussed above in Section VIII to see if

the Originator had included the language "RETRY PYMT" to signify a resubmitted transaction

(which Simmons was not required to do, for the reasons set forth above), the item received on the

Watson account on February 8, 2016 did not contain the description "RETRY PYMT."[103]

### 3.    Watson Progressive Direct Transactions

81.    On November 21, 2015, Ms. Watson entered into an agreement with Progressive Direct

Insurance for auto insurance.[104] Ms. Watson authorized Progressive Direct Insurance to initiate

electronic transfers of funds for payment of policy premiums from the Simmons checking account

that she shared with Mr. Watson.[105] In the "Payment of Premiums and Fees" section of Ms.

Watson's Progressive Direct Insurance policy, Progressive Direct Insurance disclosed that, in the

event an item is returned for insufficient funds or other reasons, Progressive Direct Insurance may

submit another payment entry.[106]

82.    On January 27, 2016, Mr. and Ms. Watson received a notice of non-sufficient funds

---

[102] SB0054569_WILKINS_Plaintiffs_20140501_20160816_ACH.csv.

[103] *Id.*

[104] Progressive Direct Insurance application for insurance dated November 21, 2015 (WILKINS-PROGRESSIVE-0000013-047).

[105] Progressive Direct Insurance Electronic Funds Transfer Authorization dated November 21, 2015 (WILKINS-PROGRESSIVE-0000042); D. Watson Dep. Tr. 149:1-15 ("Q: So going back to Exhibit 15, it looks like Ms. Watson set up automatic payments for this Progressive policy to be deducted from your checking account, is that right, at Simmons Bank? A: Yes, ma'am.").

[106] "If the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at our option, be deemed void from its inception…[a]ny action by us to present the remittance for payment more than once shall not affect our right to void this policy." (WILKINS-PROGRESSIVE-0000246-247).

CONFIDENTIAL

informing them that Simmons had returned an entry from Progressive Direct Insurance in the amount of $108.10 and that the Watson Account had a negative balance of ($60.00).[107] On February 2, 2016, Mr. and Ms. Watson received another notice of non-sufficient funds informing them that Simmons had returned another entry from Progressive Direct Insurance in the amount of $108.10 and that the Watson Account had a negative balance of ($90.00).[108]   The second payment entry presented Simmons with a new ACH debit item; based on my experience in the industry, it was entirely appropriate and consistent with Simmons's Schedule of Fees and Charges and industry practice for Simmons to return the entry and impose a $30 returned item fee, given that the Watson Account did not have sufficient funds to complete the payment.

83.     The item Simmons received on January 25, 2016, leading to the January 27, 2016 notice of non-sufficient funds, had a different trace number than the item received on January 29, 2016, leading to the February 2, 2016 notice of non-sufficient funds.[109] The item received on January 29, 2016 did contain the description "RETRY PYMT".[110] As discussed previously, however, the inclusion of "RETRY PYMT" in the Company Entry Description field does not create an obligation for Simmons to perform any sort of matching exercise to identify the previously returned item. Simmons, acting as a RDFI, fulfilled its obligations under the Nacha Rules by passing this information on to the Watsons through their monthly statement to help them identify the transaction.

---

[107] Notice of Non-Sufficient Funds dated January 27, 2016 (DWatson_0009). The negative balance of ($60.00) appears to include the $30 NSF fee generated by the return of the $108.10 entry. Progressive Direct Insurance Company payment reminders (WILKINS-PROGRESSIVE-0000103–04).

[108] Notice of Non-Sufficient Funds dated February 2, 2016 (DWatson_0010). The negative balance of ($90.00) appears to include the $30 NSF fee generated by the return of the $108.10 entry. Progressive Direct Insurance Company non-sufficient funds notice (WILKINS-PROGRESSIVE-0000107).

[109] SB0054569_WILKINS_Plaintiffs_20140501_20160816_ACH.csv.

[110] *Id.*

CONFIDENTIAL

84. The last activity on the Watson Account occurred on February 23, 2016. The Watson Account was charged off with a negative balance of $735.59, which is inclusive of the interest-free loan that Simmons provided to the Watsons as described in paragraph 69 above.[111]

## X.    CONCLUSION

85. Overall, based upon my review, I conclude that Simmons fulfilled its role as RDFI under the Nacha Rules in this matter. Simmons provided the required information about each ACH entry to the account holders as required by the Nacha Rules. I conclude that Simmons had no obligation to attempt to determine if incoming ACH debits are resubmitted items. Moreover, based upon my experience, it would not be practical or, on balance, in the customer's best interest, for Simmons to attempt to make such a determination. To attempt to do so could lead to errors that might harm the customer. Only the Originator (merchants or service providers) and the Receiver (Plaintiffs) are privy to the overall context and specific nuances of the underlying payment transaction.

The foregoing statements are made under penalty of perjury and are true and correct to the best of my knowledge and belief.

Gary B Nesbitt

Gary Nesbitt
October 4, 2021

---

[111] Deposit Inquiry dated February 27, 2018 (DWatson_0001); Watson Account statement dated March 18, 2016 (WILKINS-0001765).

CONFIDENTIAL

# Gary B. Nesbitt

**OVERVIEW**

Mr. Nesbitt has spent over three decades in the banking and payments industry in a variety of roles. His entire professional career has been in electronic payments (wire transfer, ACH, and ATMs) as well as related regulatory issues.

**PROFESSIONAL EXPERIENCE**

**GNesbitt Consulting**                                                                                   2013 - Present
*Principal* – Independent consulting firm whose focus is payments, banking, and risk management. Help organizations understand and mitigate the risks associated with participating in the various payment systems and help establish payment programs that are efficient, effective, and compliant with appropriate rules and regulations.

Additional responsibilities include:
- Payment Consultant for wide array of clients, including banks, credit unions, payment processors, card payment companies, and law firms.
- Performed dozens of ACH audits and ACH Risk Assessments for a wide array of financial institutions ranging from small credit unions, to multi-billion dollar banks, and payment processors.

**EastPay** (successor to NorCACHA)                                                               1994 - 2013
*Senior Vice President* – Responsible for finance and administration, which included accounting function as well as coordinating the investment portfolio for not-for-profit association. Responsible for handling accounts payable for Charlotte office and working with Accounting Manager to ensure that adequate controls were in place.

**North Carolina ACH Association** (NorCACHA)                                                1994 – 1996
*Executive Director* – Responsible for all functions including implementing new accounting software, working with external accounting firm to create annual financial reports and filings, as well as board reports. Provided a wide variety of services to members (financial intuitions) including delivering formal education, answering questions regarding payment rules and regulations, as well as technical and operational issues.

**First Union National Bank**                                                                         1981 - 1994
*Assistant President* - · Managed a number of operational functions, including Electronic Payments Department (ACH, wire transfer, data transmission to and from clients, ATM deposit reconcilement, as well as cash management services operations). Also managed staff area that supported these functions by providing policies and procedures, and operational support.

**Federal Reserve Bank**                                             1970 - 1981
*Assistant Accounting Manager, Charlotte Branch* - Managed reserve accounting and wire transfer.

**U.S. Army Reserve**                                                1975 - 2003
*SIDPERS Branch Chief CW4* - Managed various operational functions within the G-1 Section (personnel). Began as a Finance Clerk and was promoted several levels and transferred to Personnel section and was promoted to Warrant Officer.

**North Carolina National Guard**                                    1969 - 1975
*Armor Crewman*

**ACCREDIATIONS**

Accredited ACH Professional (AAP) certification from Nacha – Since 1993, achieved permanent certification in 1998

**EDUCATION**

MBA, University of North Carolina at Charlotte, May 1980
BBA, University of North Carolina at Charlotte, May 1976
North Carolina Bankers School of Banking, UNC Chapel Hill, 1977
South Carolina Bankers School of Banking, USC Columbia, 1978 to 1980

**PUBLICATIONS**

Authored the following articles for American Payroll Association's PayTech magazine:
- Regional ACH Associations and Payroll Professional, June 2002
- Direct Deposit Routing Numbers, February 2003
- Going Global: An Update on International ACH, February 2006
- To Prenote or Not: That Is The Question, July 2006
- Penny Prenotes Don't Always Make 'Cents', August 2010
- ACH Fraud: The New Identity Theft, February 2010
- FedWire Change to Affect Remittance Data for Wire Transfer, July 2011

Lexis/Nexis ACH Transactions Compliance and Training Guide, Editor since January 2020

**INSTRUCTOR ROLES / SPEAKING ENGAGEMENTS**

- Nacha Payment Institute, Instructor, 2001 and 2003
- Served as an Instructor in a wide variety of in-person workshops and teleseminars on ACH and payments and related topics, such as:  ACH Basics, Exception Processing, Rules and Regulations, Risk Management, New ACH Products and Applications, US Treasury Payments, AAP Prep Course, AAP Review Course; Wire Transfer Fundamentals, History

of Payments, ACH POS Entries, Corporate Account Take Over and Payments Fraud, UCC4A
- Nacha Payments Conferences, Speaker, numerous
- Bank Administrative Institute Money Transfer Conference, Speaker, 1983
- Carolinas Cash Adventure Conference, Myrtle Beach, SC, Speaker, numerous over 10+ years
- North Carolina Treasury Management Association chapter meetings and conferences, Speaker, numerous
- Local Bankers Association and Credit Union group meetings and conferences, Speaker, numerous

## HONORS / AWARDS

- Commissioner's Award – for chairing a NACHA & Office of Federal Child Support Enforcement Task Force that worked to make ACH and electronic payments more efficient and effective for employers and state agencies, 2003
- American Payroll Association Hall of Fame for serving on ACH/Electronic Payments Committee for over 10 years, 2010
- American Payroll Association Meritorious Service Award for service on ACH/Electronic Payments Committee, 2013, 2015, 2016-2021

## MEMBERSHIPS / AFFILIATIONS

Bankwire Operations Committee, 1985
VISA ACH Advisory Committee, 1992
U.S. Treasury Task Force specific to ACH issues, 1994
American Payroll Association, 1994 to Present
American Payroll Association ACH National Committee, 1996 to Present
North Carolina Treasury Management Association, 1995 to Present
North Carolina Treasury Management Association, Secretary, Treasurer, 1995-1997
Nacha Rules and Operations Committee, 1991-1995
Nacha Marketing Committee 1995-1997
Nacha Task Force on Electronic Child Support Payments, Chair, 1996-1998
Nacha Arbitration Board, 1996-2013
Nacha Risk Management Advisory Group, 2006-2007
Electronic Check Council Strategic Initiatives working group, Co-Leader, 2010-2011
Electronic Check Council Steering Committee, 2010-2011

Exhibit B

**Materials Relied Upon**

**Case Filings**
- Amended Class Action Complaint, dated June 29, 2020 (Dkt. 15)
- Order granting default judgment and attorney's fee, dated August 25, 2021 (Dkt. 62)
- Text Order Granting Dismissal of Claims of Plaintiff Diann Graham with Prejudice, dated October 4, 2021 (Dkt. 72)

**Interrogatories and Requests for Production**
- Plaintiffs' First Set of Interrogatories, dated November 23, 2020
- Plaintiffs' Requests for Production of Documents, dated November 23, 2020
- Plaintiff Shunda Wilkins's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, dated September 7, 2021
- Plaintiff David A. Watson's Second Supplemental Responses to Defendant Simmons Bank's First Set of Interrogatories, dated September 7, 2021

**Depositions**
- Deposition of Shunda Wilkins, dated September 14, 2021
- Deposition of David Watson, dated September 15, 2021

**Interviews**
- Amanda Horton
- Lisa Hunter

**Plaintiff-Produced Documents**
- SWilkins_0001 – 0058
- DWatson_0001 – 0265

**Account Agreements, Disclosures, and Schedules**
- WILKINS-0000001 – 1231

**Shunda Wilkins Account-Related Documents**
- WILKINS-0001232 – 1330
- WILKINS-0002354 – 2394
- WILKINS-0002402 – 2408

**David and Marilyn Watson Account-Related Documents**
- WILKINS-0001760 – 1805
- WILKINS-0002332 – 2344
- WILKINS-0002395 – 2401
- WILKINS-0002409 – 2409
- WILKINS-0003808 – 3841

**Named Plaintiff Electronic Data**
- WILKINS-0002645 – 2653

**Third-Party Productions**
- WILKINS-PROGRESSIVE-0000001 – 0425
- WILKINS-ALDER-0000001 – 0105
- WILKINS-21MORT-0000001 – 0025
- WILKINS-LIBERTY-0000001 – 0016
- WILKINS-PRIMERICA-0000001 – 0070
- WILKINS-METLIFE-0000001 – 0223
- WILKINS-VERIZON-0000001 – 0124

**Materials Relied Upon**

**Research Materials**

- Federal Reserve Bank of New York "Automated Clearing Houses (ACHs)", https://www.newyorkfed.org/aboutthefed/fedpoint/fed31.html (accessed October 1, 2021).
- Nacha "About Nacha Direct Members", https://www.nacha.org/content/nacha-direct-member-0 (accessed October 1, 2021).
- Nacha "About Us", https://www.nacha.org/content/about-us (accessed October 1, 2021).
- Nacha "ACH Network Risk and Enforcement Topics", https://www.nacha.org/rules/ach-network-risk-and-enforcement-topics (accessed October 1, 2021).
- Nacha "What Are the Rules and Why Do They Matter?", https://www.nacha.org/content/rules-enforcement (accessed October 1, 2021).
- Nacha Operating Rules & Guidelines (2013-2019)