**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

| | |
|---|---|
| **SHUNDA WILKINS and DAVID WATSON, on behalf of themselves and all others similarly situated,** | **Case No. 3:20-cv-00116-DPM** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **vs.** | |
| **SIMMONS BANK,** | |
| **Defendant.** | |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

## I.       INTRODUCTION

Simmons Bank's 57-page, everything-but-the-kitchen-sink opposition to Plaintiffs'
Motion for Class Certification is a grab-bag of a) implausible arguments, contrary to Eighth
Circuit controlling law, that run-of-the-mill breach of contract claims cannot be certified for class
treatment; and b) *ad hominem*, irrelevant attacks on the named Plaintiffs.. None of Simmons'
arguments should defeat certification here.

Simmons' core argument is that because the Court concluded Simmons' uniform,
standardized contract is ambiguous at the motion to dismiss stage, the Court must look to
extrinsic evidence regarding the individual intent of tens of thousands of class members at trial.
That is not the law in Arkansas or elsewhere—which is why class certification repeatedly been
granted in breach of contract cases and specifically in bank fee class actions. Simmons'
argument is additionally wrong for these reasons:

1) Neither party actually alleges the contract is ambiguous; both parties argue the contract is
   unambiguously in their favor. Indeed, when provided an opportunity after a class is
   certified, Plaintiffs will prove to the Court or to the jury that the contract is *unambiguous*
   in barring the assessment of more than one fee on the same "item." Defendant, on the
   other hand, has just argued strenuously in its Motion for Summary Judgment that the
   contract *unambiguously* authorized its practice. ECF No. 80. Either way, the contract will
   be answered for all class members in one fell swoop.

2) Even if the Court or the jury ultimately determined that Simmons' contract was
   ambiguous, Arkansas law requires ambiguities to be construed strictly against the drafter,
   Simmons. The contract's meaning therefore does not depend on any extrinsic evidence,
   much less individualized evidence of intent for each class member.

3) Even if extrinsic evidence regarding intent or understanding of tens of thousands of class
   members could be considered (it cannot), Simmons has offered none. There is zero
   evidence in the record that class members were exposed to different promises or
   contracts, or that they understood the Bank's uniform contracts in varying ways. The
   Bank merely speculates what it *might* introduce at trial. ECF No. 90, p. 34. But self-
   serving speculation cannot substitute for record evidence, and such speculation cannot
   defeat class certification here.

4) Extrinsic evidence (if there is any) does not require individualized determinations. but will be evaluated by the Court or the jury on a classwide basis to determine a single, objective meaning for the form contract issued by Simmons.

The facts here are simple: Simmons promulgated uniform account contracts in exactly the same manner. Simmons, using bank-wide, automated practices, breached those contracts. Whether or not a contract—especially a form contract—has been breached is an objective determination. Class certification under these circumstances is routine. Indeed, Simmons' class certification opposition completely ignores the wave of recent similar cases in which state and federal courts across the country have certified classes challenging financial institutions' fee practices. This includes cases like *Darty v. Scott Credit Union*, *Gunter v. United Credit Union*, *Smith v. Bank of Hawaii*, *In re TD Bank*, *Hernandez v. Point Loma Credit Union*, and *Faris v. Flagstar Bank*, where each court certified breach of contract classes involving bank fee assessment.[1] It also includes numerous federal and state court decisions certifying classes concerning other standardized overdraft fee practices, including eight certification rulings in a federal multi-district litigation proceeding concerning some of the country's largest financial institutions,[2] as well as other federal and state certification decisions as to similar types of

---

[1] *Gunter v. United Fed. Cred. Un.*, 2017 WL 4274196, at *9 (D. Nev. Sept. 25, 2017); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, [*In re TD Bank*], 325 F.R.D. 136, 174–75 (D.S.C. 2018); *Smith v. Bank of Haw.*, 2019 WL 3297301, at *8 (D. Haw. Jan. 30, 2019), *report & recommendation adopted in part, rejected in part*, 2019 WL 2712262 (D. Haw. June 28, 2019); *see also Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 528 S.W.3d 524, 529-34; 543 (Tenn. Ct. App. 2017).

[2] *In re Checking Account Overdraft Litig. (Overdraft MDL)* [*Union Bank*], 275 F.R.D. 666, 680 (S.D. Fla. 2011); *Overdraft MDL* [*Comerica*], 286 F.R.D. 645, 661 (S.D. Fla. 2012); *Overdraft MDL* [*Capital One*], 2012 WL 12877717, at *19 (S.D. Fla. July 19, 2012); *Overdraft MDL* [*PNC Bank*], 2012 WL 12877718, at *11-12 (S.D. Fla. May 16, 2012); *Overdraft MDL* [*TD Bank (Overdraft MDL)*], 281 F.R.D. 667, 682 (S.D. Fla. 2012); *Overdraft MDL* [*BancorpSouth*], No. 1:09-md-02036 (ECF 2673) at p. 22-23 (S.D. Fla. May, 4, 2012); *Overdraft MDL* [*Wachovia*], 307 F.R.D. 656, 683-84 (S.D. Fla. 2015); *Overdraft MDL* [*Wells Fargo*], 307 F.R.D. 630, 655-56 (S.D. Fla. 2015).

overdraft fee practices.[3]  That is because those cases – just like this one – involved standard form contracts and uniform fee assessment practices that create a "classic case for treatment as a class action."[4] Standardized contracts call for a standardized meaning.

Likely cognizant of the above reality, Simmons then focuses its fire on the two class representatives, Ms. Wilkins and Mr. Watson, personally. With respect to Wilkins, Simmons' attorneys unilaterally diagnose her with a "mental health condition" that no doctor has ever diagnosed, simply because Wilkins testified that she sometimes has trouble remembering. That is absurd and offensive. With respect to Watson, Simmons dredges up old criminal incidents and a mental illness diagnosis, but totally fails to explain why either prevent him from being an adequate class representative in this class action, where a single contract with a single objective meaning has allegedly been breached. There is no rule that a past criminal history or a mental illness preclude acting as a class representative, and Simmons provides none. Such a rule would exclude millions of Americans—in 2019, 19.2% of U.S. adults received mental health treatment in the past 12 months, including 15.8% who had taken prescription medication for their mental health. *See* https://www.cdc.gov/nchs/products/databriefs/db380.htm. A "mental health condition" does not disqualify Watson or tens of millions of Americans from acting as class representatives, in the absence of a showing that they cannot meet those responsibilities. Simmons has made no such showing. To the contrary, both Plaintiffs sat for grueling, seven-hour depositions, gathered documents, responded to discovery, and have otherwise been engaged in the litigation from the start.

---

[3] *Gutierrez v. Wells Fargo Bk.*, 2008 WL 4279550, at *17 (N.D. Cal. Sept. 11, 2008) *aff'd*, 704 F.3d 712, 728–29 (9th Cir. 2012) (certifying class asserting claims for improperly assessed overdraft fees); *Jacobs v. FirstMerit*, 2013 WL 5445302 (Ohio Ct. App. Sept. 30, 2013) (same).
[4] *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998).

## II.        Background

Given the extensive background and procedural history regarding this matter that are found in Plaintiffs' request for class certification and opposition to Defendant's request for summary judgment – *see* Motion for Class Certification, pp. 2-8 (ECF No. 91); Opposition to Defendant's Motion for Summary Judgment, pp. 4-27 (ECF No. 94) – Plaintiffs will refrain from reiterating those sentiments again herein.

## III.       Argument

At the outset, it should be noted that Defendant does not contest Plaintiffs proof that Simmons used standardized, adhesion contracts and systematically and uniformly assessed Retry Fees on the same item, for both personal accounts and business accounts. Further, Simmons does not challenge Plaintiffs showings under Rule 23(a)(i) as to numerosity, and 23(a)(ii) as to commonality. *See generally* ECF No. 93. Thus, Simmons' challenge to class certification is limited to unpersuasive arguments contesting typicality, adequacy, ascertainability, and predominance. *Id.*

Moreover, in opposing class certification, Defendant spends an extensive amount of briefing arguing the merits of Plaintiffs' claims. *E.g.*, ECF No. 93, pp. 17-23 (arguing Plaintiffs are not adequate due to the merits of the Bank's defenses). This Court has made it clear, however, that in determining whether to certify a class action, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or ***will prevail on the merits***, but rather whether the requirements of Rule 23 are met." *Nelson v. Wal-Mart Stores, Inc.*, 245 F.R.D. 358, 365 (E.D. Ark. 2007). "Accordingly, while the Court must conduct a 'rigorous analysis,' class certification is a procedural determination and should ***not*** include an inquiry into the merits." *Id. See also Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 620 (8th Cir. 2021) ("We do not

address the merits at this stage, but we do consider the nature of the underlying claim to determine its suitability for class certification"). Defendant's attempt to defeat certification by arguing the merits should be rejected by the Court.

**A. Plaintiffs are Typical and Adequate.**

As the Eighth Circuit held recently in *Custom Hair Designs by Sandy v. Central Payment Co., LLC*, 984 F.3d 595, 604 (8th Cir. 2020), "[t]ypicality is fairly easily met so long as other class members have claims similar to the named plaintiff." Futhermore, "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Id.* Even though the claims of Ms. Wilkins and Mr. Watson arise from the same course of conduct as the class claims and give rise to the same legal theory, Defendant contends that Plaintiffs are atypical for various reasons, none of which are persuasive.

**1. The Bank's "Unique Defenses" Arguments Fail.**

In arguing that Ms. Wilkins and Mr. Watson are atypical, Simmons contends that it has unique defenses such as the Plaintiffs owe Simmons more money than they seek to recover and Ms. Wilkins never paid the fee in question. *See* ECF No. 93, pp. 17-21. These arguments fail for several reasons. First, as noted above, these merits-based arguments are inappropriate on class certification. *Nelson*, 245 F.R.D. at 365. Second, each of these arguments are immaterial because courts have universally found that the liability to repay a defendant is sufficient to state a valid claim in the class action context, even if the plaintiff never paid the fee or amount owed in question. *See* ECF No. 94, pp. 22-24. Third, arguments relating to a named plaintiff having their account "charged off" or owing the defendant bank money are not unique to Ms. Wilkins and Mr. Watson, but rather commonplace in overdraft fee litigation. *See, e.g.*, *In re Checking Acct.*

*Overdraft Litig.*, 307 F.R.D. 656, 671 (S.D. Fla. 2015) (rejecting argument that charged off account made named plaintiff atypical); *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 643 (S.D. Fla. 2015) (same).

In rejecting an identical argument, the district court in *In re Checking Acct. Overdraft Litigation*, held,

> The fact that [named plaintiff] had her account closed with a negative balance does not make her atypical of the Class. Many other Class members also had their accounts closed—in part because of the Bank's scheme that triggered a slew of fees. Moreover, to the extent it may be appropriate to offset damages based on such "charged off" amounts, **those amounts can readily be applied as an offset or to reduce the amount the account holder may owe**.

307 F.R.D. at 671 (emphasis added); *see also In re Checking Acct. Overdraft Litig.*, 307 F.R.D. at 643 ("The fact that [named plaintiff] had her account closed with a negative balance does not make her atypical of the Class"). Similar findings are warranted here. Defendant's "unique defenses" are simply not unique and do not preclude a finding that Ms. Wilkins and Mr. Watson are typical plaintiffs.

### 2.   The "Wilkins Breached First" Argument has already been debunked.

In arguing that Ms. Wilkins is atypical, Simmons also regurgitates its contention that Ms. Wilkins cannot represent that class because she breached the parties' contract first. *See* ECF No. 93, pp. 22-23. This argument is also unpersuasive for several reasons. First, this merits-based argument is inappropriate on class certification. *Nelson*, 245 F.R.D. at 365. Second, the logic of this argument has already been disproven by Ms. Wilkins in her opposition to summary judgment. *See* ECF No. 94, pp. 44-45. Finally, in the same fashion that having an account charged off is not unique to Ms. Wilkins or Mr. Watson – it happens to countless other Simmons customers – the same is true of the Bank's argument that certain of its customers may too have breached their contract. However, such a breach does not empower Simmons to assess multiple

NSF fees on the same item, when Simmons's contract says only one such fee will be assessed. The "Wilkins Breached First" argument does not preclude a finding that Ms. Wilkins is a typical and adequate class representative.

### 3. The Bank's Statute of Limitation Argument Fails.

Defendant's next attack on the typicality and adequacy of Mr. Watson is that his unjust enrichment claim is untimely. *See* ECF No. 93, pp. 23-24. Setting aside the inappropriate merits-based nature of this argument, this argument is unpersuasive for the same reasons set forth in Plaintiffs' opposition to the Bank's request for summary judgment. *See* ECF No. 94, pp. 46-47 (arguing discovery rule precludes summary judgment as to Mr. Watson's unjust enrichment claim). Moreover, Arkansas district courts have found that questions regarding statute of limitations as to some class members' claims do not preclude class certification. *See, e.g.*, *Barker v. FSC Sec. Corp.*, 133 F.R.D. 548, 553 (W.D. Ark. 1989). Similar findings are warranted here.

### 4. The Bank's Attempt to Parse Words to Limit Liability Fails.

In this case, Plaintiffs are seeking to certify the following class:

> All persons who, within the applicable statute of limitations period, were charged Retry Fees – NSF Fees or Overdraft Fees – on an item that had already been subject to an NSF Fee in a Simmons checking account.

*See* ECF No. 91, p. 1. In seeking to certify such a class, Plaintiffs utilize the exact terminology – "item" – relied upon by Simmons throughout its Customer Agreement and Fee Schedule. It is irrelevant whether the underlying payment is a check or an ACH. While the term "item" is not explicitly defined by Simmons, the Bank makes it clear that the term item includes a check, a withdrawal of money in person or from an ATM, or the use of a debit card to make a purchase, automatic bill payment or other electronic payment. *See* Fee Schedule, p. 5 (ECF No. 15-1). ("If

any of these items are for more than the amount in your account, you overdraw your account, and Simmons has the choice to either pay the **item** or not"). *Id.*

Even though Simmons does not differentiate between the aforementioned items when assessing NSF Fees or Overdraft Fees, the Bank now wants to eschew use of the word "item" and focus on whether the underlying item was a check, debit card transaction, or automated ACH payment, in order to reduce its potential exposure. *See* ECF No. 93, pp. 24-25. Respectfully, the Court should see right through this ruse as checks and automated ACH payments (the two payment types at issue in this litigation)  are both subject to the same uniform practices and procedures—and they are both referred to by Simmons in the contract as "items."  Simmons' attempt to distinguish between the types of items in hopes of creating division within the proposed class should be rejected.

## 5.    Personal Circumstances Do Not Make Plaintiffs Inadequate.

Next, Simmons argues that certain "personal circumstances" make Mr. Watson and Ms. Wilkins inadequate class representatives. *See* ECF No. 93, pp. 26-28. Not so. First, Simmons tries to paint Mr. Watson as a mentally disabled, criminal, drug user. *Id.* at 27-28. But Defendant fails to explain why any of this – if accurate – would prevent Mr. Watson from being an adequate class representative in this class action. Mr. Watson's purported drug use over fifteen years ago has nothing to do with whether he is an adequate class representative for this class action regarding Simmons' overdraft fee practices.[5]

Contrary to what Defendant would have this Court believe, numerous courts have recognized that persons with mental disabilities can serve as representative plaintiffs in class actions. *See, e.g., Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) (stating that prisoners and

---

[5] The admissibility of evidence regarding Mr. Watson's purported drug use is certainly unlikely given that it was over 15 years ago. *See, e.g.*, Fed. R. Evid. 609(b).

parolees suffering from, among other things, learning disabilities and mental retardation were adequate representatives); *Jenkins v. Hyundai Motor Fin. Co.*, 2008 WL 781862, at \*6 (S.D. Ohio Mar. 24, 2008) (noting that plaintiff's suffering from mental health issues such as depression and anxiety did not make her unfit and inadequate to represent the class); *Daniels v. City of New York*, 198 F.R.D. 409 (S.D.N.Y. 2001) (stating that mental retardation of a class representative is not an automatic disqualifier, even where the class does not consist of mentally retarded persons). Moreover, in *McGinnis v. Advance America*, 300 S.W.3d 487 (Ark. 2009), the Arkansas Supreme Court found that the named plaintiff was an adequate class representative despite the defendant's contention that the class representative did not have the mental capacity to make sound decisions on behalf of the class or otherwise carry out the duties of a class representatives because the class representative had admitted schizophrenia, anxiety, and depression. *Id.* at 492-93. Recognizing that courts have held that persons with limited intellect or mental handicaps can serve as representative plaintiffs in class actions, the Supreme Court of Arkansas held that "[the class representative's] mental illness does not automatically disqualify her from representing the class." *Id.*

Simmons' attorneys, who went to law school and not to medical school, also attempt to diagnose Ms. Wilkins with a "mental health condition" that no doctor has ever diagnosed, simply because Wilkins testified that she sometimes has trouble remembering is absurd and offensive. Defendant is simply grasping at straws to avoid class certification. Mr. Watson and Ms. Wilkins are adequate class representatives.

### 6.    Plaintiffs Know the Case and Their Claims.

The Bank's final attack on the adequacy and typicality of Mr. Watson and Ms. Wilkins is that neither have a meaningful understanding of the case. *See* ECF No. 93, pp. 28-29. This last

criticism is also false. As Plaintiffs set forth in their class certification brief, it is undisputed that both incurred Retry Fees – NSF Fees or Overdraft Fees – on an item that had already been subject to an NSF Fee. Their challenge to such fees stems from the same practices and same form contracts as the putative class. Both have actively participated in the case including responding to discovery. *See* ECF No. 91-12; ECF No. 91-13. Both sat for deposition. *See generally* ECF No. 91-14; ECF No. 91-15. Ms. Wilkins and Mr. Watson understand the general nature of the case (Wilkins Dep. at 63:3-8 ("Being charged for the same item, being charged -- recharged a fee when it went through and it was sent back and they charge it again when it came back"); 87:7-10; Watson Dep. at 83:4-7 ("It's about them charging me twice for the same transaction. It might have been a different day they run it through, charge me for it, and run it through again and charge me a second time"); 85:18-22; 88:21 – 89:1) and understand their duty to prosecute the case in the best interest of the Class. *See* Wilkins Dep. at 76:21 – 77:7; Watson Dep. at 98:2-22. By any measure, Shunda Wilkins and David Watson are adequate class representatives.

Defendant would require Ms. Wilkins and Mr. Watson be seasoned legal scholars in order to serve as class representatives, but courts have made it clear that "[m]erely because Plaintiff cannot articulate precise legal terms regarding the basis and theory of the claims, or hypothesize regarding the contours of class-action practice does not mean that she has ceded all control of her case to overreaching class counsel." *Jenkins*, 2008 WL 781862, at *6. Ms. Wilkins and Mr. Watson are adequate and typical plaintiffs. Defendant's attacks should be rejected.

B.      **There are No Individual Questions Under Rule 23(b)(3)**

1.   **Breach of Contract Classes Are Routinely Certified Precisely Because They Do Not Turn on Individualized Understanding or Intent**

Contrary to Simmons' argument, breach of contract cases are routinely certified in this Circuit and elsewhere. *See e.g., Custom Hair Designs by Sandy v. Central Payment Co., LLC,* 984 F.3d 595, 601 (8th Cir. 2020) (affirming certification of breach of contract class where common questions and answers predominated because "all plaintiffs allege failure to get bank preauthorization" for defendant's credit card processing services, and "[t]he relevant contract term was uniform."); *Stuart v. State Farm Fire and Casualty Company,* 910 F.3d 371 (8th Cir. 2018) (affirming certification of breach of contract class under Arkansas law regarding how State Farm calculated "actual cash value" payments for its homeowners pursuant to its form insurance policies); *McKeage v. TMBC, LLC,* 847 F.3D 992, 999 (8th Cir. 2017) (affirming certification of breach of contract class where breach arose from a form contract); *Bartle v. T.D. Ameritrade Holdings Corp.*, 2021 WL 5106459, at *10-12, fn.10 (W.D. Mo. Sept. 15, 2021) (certifying breach of contract class and concluding that predominance was met where each putative class member is exposed to the same language in the same form contract and thus, there is "no reason to depart from the rule that a contract of adhesion means the same thing to each signatory"); *H & T Fair Hills, Ltd. v. Alliance Pipeline L.P.*, 2021 WL 2526737, at *12 (D. Minn. June 21, 2021) (certifying breach of contract class, stating "[c]ases involving form contracts are generally well-suited to class action treatment" and rejecting argument that differences between contracts defeat predominance where those purported differences "are not material to the questions in this case"); *Vogt v. State Farm Life Ins.,* 2018 WL 1955425, *6 (W.D. Mo. 2018) (certifying breach of contract class and finding predominance met in case alleging that State Farm used unauthorized factors in calculating cost of insurance ("COI") rates"); *Haile v. Debt Shield, Inc.*, 2011 WL

11

13290211, *7 (W.D. Mo. Aug. 29, 2011) (rejecting argument that court must make an individualized inquiry as to class members' varying states of mind where the plaintiff's "claims are based on the same standardized agreements [and] [s]uch uniform duties or promises are not based on individual expectations, but on evidence common to the class"). In each of these cases involving claims for breach of contract, the courts refused to engage in the examination of individualized issues of understanding or intent that might vary amongst class members because such analysis is ultimately irrelevant in the context of claims for breach of **uniform** contract terms that were presented to each putative class member under identical circumstances.[6] This Court should similarly refuse to create individualized issues where none exist.

The *Bartle* decision is illustrative. There, the court certified the plaintiff's breach of contract claim arising from allegations that the defendant brokerage firm, Scottrade, "improperly issued 'substitute payments' rather than qualified dividends to certain customers, depriving them of the more favorable taxation afforded to qualified dividends." *Bartle,* 2021 WL 5106459 at *1. In holding that the issues were common to the class and predominated over any purported individual issues, the Court explained:

> At the heart of the case lies this question: when Scottrade issued substitute payments in lieu of qualified dividends, did it breach the provision in the Agreement . . .? The answer to [that question] depends on interpreting the Agreement, which was a standard-form contract issued to all Scottrade users. Because a large number of consumers 'entered into a contract identical or substantially similar to the one entered into by the class representative, this is a class case for treatment as a class action,' in that all of the putative class members' claims depend on the interpretation of the same contractual language.

---

[6] Notably, each of these cases came out *after* the Eighth Circuit's decision in *Avritt v. Realiastar Life Ins. Co.,* 615 F.3d 1023 (8th Cir. 2010), a case that Defendant heavily relies on to argue that individual issues defeat predominance where, like here, a uniform contract is at issue. Thus, aside from being radically different from the facts of this case as addressed below, *Avritt* shouldn't be given much weight in light of the subsequent overwhelming body of case law in the Eight Circuit certifying breach of contract classes.

*Id.* at *10 (quoting *McKeage,* 847 F.3d at 999.) Importantly, the *Bartle* court expressly discounted *Avritt*'s application and rejected the defendant's argument that the agreement may have different meanings to different class members and therefore, the individualized inquiries would defeat predominance. The Court stated, "[b]ecause the Agreement is a standard-form contract, the Court must interpret it the same way with respect to all Scottrade customers who signed it[.]." *Id.* at *11. Like the agreement at issue in *Bartle,* the Agreement here with Simmons Bank is a standard-form contract and the challenged misconduct that Plaintiff complains of involves the *same exact language* for each putative class member, "meaning that no individualized inquiry into the knowledge and experience of those customers is necessary." *Id.*

The same is true in bank fee class actions across the nation.

In *TD Bank*, *Gunter*, *Smith*, *Darty*, and other cases, each court found predominance satisfied because the central issue was whether, through a standard fee assessment practice, the bank breached its standard form contracts with all customers. For example, in *Gunter*, the court found predominance because "class members were subject to the same contractual language regarding overdraft fees in their account agreements . . . ." *Gunter*, 2017 WL 4274196, at *7. Thus, in *Gunter*, "[t]he legal question presented by the proposed Positive Balance Class – whether [defendant] breached its contractual agreements – predominates over any individual characteristics of the proposed class members." *Id.*

In *In re TD Bank*, the court found that "the focus is on the Bank's conduct in relation to the contractual language, and individual customers' 'intent' and 'course of performance' is largely irrelevant to resolving any ambiguity." *In re TD Bank*, 325 F.R.D. at 157. And in *Darty v. Scott*, a case concerning the exact same "retry" fee practice as at issue here, the court certified the same class as at issue here.

13

Simmons relies heavily on *Avritt*, but that case is not to the contrary. There, the panel held that where a form contract is ambiguous <u>and</u> the record indicates that the meaning of the contract varied across class members, individual questions will likely predominate. But as an initial matter, *Avritt* was decided on the basis of <u>Washington</u> law—not the Arkansas law relevant here (or the law of any other state in this Circuit). 615 F.3d at 1030. For that reason alone, it is irrelevant—especially where Arkansas law strongly implements *contra proferentem*.

Further, the record was far different from the record here. In *Avritt*, the court held that liability could not be established with common evidence because extrinsic evidence would be admissible to resolve ambiguity in the contract, including individualized evidence regarding "how the contract was explained in various sales discussions and whether each purchaser's understanding of the contract was consistent with the theory the [plaintiffs] now advance." *Id.* at 1029–31. As the court in *In re TD Bank* held in distinguishing *Avritt*, in terms that are directly applicable here:

> The context of the parties' bargain in *Avritt* was a host of individualized sales pitches, in which the purchasers of fixed deferred retirement annuities alleged that insurance salesmen unfairly obscured, misrepresented, or failed to disclose the true nature of the way interest rates on deposits would be set. In other words, the ambiguity at issue in *Avritt* was the *extrinsic evidence itself*—i.e., the content of the individualized sales pitches. Thus, the setting in *Avritt* bears no relation to the contractual context at issue here—customers subject to uniform disclosures when opening new checking accounts or when being notified of changes to accounting practices for existing accounts—where the breach of contract claim is grounded in the actual words of the contract[.]

> If the Court were to find that *this* case could not be certified as a class action based on breach of contract and implied covenant theories due to Defendant's assertions regarding the predominance of individual issues, the logical consequence would be that *no* contract-based claims could be certifiable, because any prospective defendant could defeat certification simply by raising the specter of putative class members' idiosyncratic understanding of the term(s) at issue, irrespective of the form nature of the contract and the absence of negotiation regarding terms. Such a result would be an entirely nonsensical interpretation of class actions as a vehicle for the resolution of mass disputes, particularly disputes

14

> where the harm suffered by any one class member may be too small to incentivize a lawsuit for vindication of that class member's rights. Given the Bank's repeated affirmation that uniform disclosures were provided to its entire customer base, individualized proof is peripheral, if necessary at all, and the predominance requirement of Rule 23(b)(3) is satisfied with respect to the breach of contract and implied covenant claims.

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.,* 325 F.R.D. 136, 158–59 (D.S.C. 2018). In

yet another bank fee class action, another court distinguished *Avritt* in similar terms:

> *Avritt* bears no relation to the contractual context at issue here—customers subject to uniform disclosures when opening new checking accounts or when being notified of changes to accounting practices for existing accounts (citation omitted).

> This conclusion is in keeping with other federal courts which have concluded that extrinsic evidence is not fatal to the predominance requirement where ambiguity can be resolved through common proof or the contract itself. *Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019) ("In fact, with a form contract such as this one, uniform application and interpretation of the clauses would be expected absent evidence that the form contracts in fact had a meaning that varied from one signatory to another.");

*Klopfenstein v. Fifth Third Bank,* 2021 WL 1439659, at *5–6 (S.D. Ohio Mar. 26, 2021).

Here, common issues predominate for the same reasons as in *In re TD Bank*,

*Klopfenstein*, *Gunter, Smith*, and the *Overdraft MDL* matters.[7] During the Class Period and for all

Class Members, Simmons (1) used common, standardized form adhesion contracts with identical

---

[7] Simmons identifies four bank fee class actions where classes were not certified, including *Shelley v. AmSouth Bank*, 2000 WL 1121778 at *11 (S.D. Ala. July 24, 2000), and *Compass Bank v. Snow*, 823 So. 2d 667, 677 (Ala. 2001), to argue that to determine liability would require individualized assessments of what each accountholder understood. But while the practices at issue in *Shelley* dealt with insufficient funds charges for paper checks, the challenged practices were not alleged to be uniform. 2000 WL 1121778 at *1-2. Likewise, *Snow*, 823 So.2d at 667, differs in the same way as *Shelley* –no uniform policy. The Alabama Supreme Court held that the trial court would have to look at individualized proof of whether the class members were provided the appropriate disclosures. *Id*. at 677. Given Simmons' steadfast assertion that Plaintiffs and the Class were provided uniform disclosures, such individualized proof is not necessary here.

terms; and (2) breached those terms in a uniform way. Also, per the choice of law provision in Simmons's contracts with each Class Member[8], Arkansas law applies no matter the

### 2. Plaintiffs Will Prove the Contract Is Unambiguous

For the reasons explained in Plaintiffs' opposition to the Bank's motion for summary judgment, after a class is certified here, Plaintiffs will prove the contract *unambiguously* bars the assessment of more than one NSF or OD Fee on the same "item." In short, Plaintiffs (and the Court) have no need of the extrinsic evidence Simmons threatens to introduce because the contracts are not ambiguous. Defendant agrees; it has not alleged that its contract is ambiguous, but rather it argues the contract unambiguously supports its view.

"When contracting parties express their intention in a written instrument in clear and unambiguous language, it is [the Court's] duty to construe the written agreement according to the plain meaning of the language employed." *C. & A. Const. Co. v. Benning Const. Co*., 509 S.W.2d 302, 303 (Ark. 1974); *also Stone v. Metropolitan Life Ins. Co.*, 184 F. App'x 584, 585 (8th Cir. 2006); *Bielema v. Razorback Found., Inc*., 2020 WL 4906054, at *3 (W.D. Ark. Aug. 20, 2020) ("The best evidence of the parties' intent is their written agreement").

Because there is no need for extrinsic evidence, the Court should reject Simmons' argument that extrinsic evidence could create individualized issues.

### 3. Even Ambiguous Form Contracts Are Suitable for Class Certification Because Ambiguities Must Be Construed Against the Drafter

"A contract is ambiguous if reasonably susceptible of more than one construction, and the question of whether an ambiguity exists is a matter of law for the court". *Sun Oil Co. v. Vickers Refining Co*., 414 F.2d 383, 386 (8th Cir. 1969); *Medtronic, Inc. v. Catalyst Research Corp*., 664

---

[8] Simmons Terms and Conditions expressly provide that "This agreement is subject to […] the laws of the state of Arkansas […]." Bogo-Ernst Decl. Exhibit 5 at WILKINS-0000551; *see also*, Exhibit 6 at WILKINS-0001096 (same).

F.2d 660, 664 (8th Cir. 1981). Even if the Court determines the contract actually *is* ambiguous, ambiguities must be construed against the drafter, without regard to extrinsic evidence. *Clark v. Bank of Am., N.A.*, 2013 WL 12286057, at *3 (E.D. Ark. Sept. 10, 2013) (construing ambiguities in bank's deposit agreement and fee schedule "strictly against the drafter"); *see also Tri-State Fin., LLC v. First Dakota Nat'l Bank*, 538 F.3d 920 (8th Cir. 2008) (holding bank was not entitled to allowance of prepayment penalty as note contained conflicting provisions regarding prepayment penalties and was construed against bank as drafter)

Simmons' Terms and Conditions of its Deposit Agreement, the Overdraft Privilege Account Disclosure, the Schedule of Fees and Charges ("Fee Schedule"), the Truth in Savings Disclosures, Important Information Regarding Your FDIC Coverage, and other documents that are contained in Bogo Exs. 5 and 6, and, *inter alia*, the Online Banking Agreement (collectively, the "Account Agreement") is a contract of adhesion. By definition, a contract of adhesion is a "form contract created and imposed by a stronger party upon a weaker party on a take this or nothing basis." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 513 (8th Cir. 2018). Standardized bank account agreements like Simmons' are considered contracts of adhesion because they are offered by a party with superior bargaining power on a take it or leave it basis, and the Court's application of *contra proferentem* is particularly appropriate where the parties have unequal bargaining power. *See Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 632 (N.D. Iowa 2019).

Simmons contends at trial it intends to offer communications with individual class members, class member fee histories, and customer experiences at other banks. Simmons may not offer this evidence because as explained in greater detail above, Simmons' Account Agreement is standardized, and thus, extrinsic evidence of the intent or understanding of a

particular party is irrelevant to its interpretation. *See* 2 Restatement (Second), Contracts § 211 (2), pp. 119–20 (1981) (standardized agreements are interpreted "wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing"); 2 E. Farnsworth, Contracts (3d Ed. 2004) § 7.9, p. 285 ("Interpretation cannot turn on meanings that the parties attached if they attached none, but must turn on the meaning that reasonable persons in the positions of the parties would have attached if they had given the matter thought").

Again, this maxim applies without respect to extrinsic evidence or varying subjective intent of individual class members—as other courts in the Eighth Circuit routinely hold. *See e.g.*, *Atl. Cas. Ins. Co. v. Paradise Club*, 219 F. Supp. 3d 938, 946 (W.D. Ark. 2016) (analyzing the meaning of the word "use" under the contract without looking to external evidence); *Fuller v. Fellows*, 30 Ark. 657 (1875) (patent ambiguity in real estate deed cannot be aided by parol evidence).

Federal courts routinely hold that extrinsic evidence is improper in analyzing standard form contracts, including those of banks, such as the agreements at issue here. *Bradley v. Washington, A. & G. Steam-Packet Co.*, 38 U.S. 89, 94 (1839) ("Extrinsic evidence is not admissible to explain a patent ambiguity, that is, one apparent on the face of the instrument"); *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 436 (1st Cir. 2013) ("Because uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant."); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) (in analyzing a bank contract, determining "[b]oilerplate provisions are thus not the consequence of the relationship of particular borrowers and lenders and do not depend upon

particularized intentions of the parties to an indenture."); *see also Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756 (3d Cir. 2017) ("In the context of standard form contracts . . . extrinsic evidence of individual understandings is especially irrelevant."); *Wold v. Zavanna, LLC*, 2013 WL 6858827, at *11 (D.N.D. Dec. 31, 2013) (declining to examine extrinsic evidence because "with standard lease forms being used, what may have been the individual beliefs of plaintiffs and Diamond Resources as to the meaning of the term is immaterial"). And, as Simmons recognizes, the Court in *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.* declined to consider extrinsic evidence in another bank fee class action, noting:

> If there is any type of standardized agreement that ought to be interpreted uniformly, without regard to the non-drafting party's idiosyncratic comprehension of its terms, it is a consumer checking account agreement . . . In this context, the focus is on the Bank's conduct in relation to the contractual language, and individual customers' "intent" and "course of performance" is largely irrelevant to resolving any ambiguity.

325 F.R.D. at 157.

As discussed above in greater detail, Simmons reliance on *Avritt v. Reliastar* is misplaced. As another court in the Eighth Circuit held recently:

> There, the process of contract formation was dramatically different; there, class members entered contracts with the defendant only after conversations with sales agents who 'were not required to follow any particular sales script' when discussing the contracts…Here, as Plaintiff points out, there is no evidence that particularized 'sales discussions' would have affected the meaning of the Agreement, and thus, ***no reason to depart from the rule that a contract of adhesion means the same thing to each signatory***.

*Bartle*, 2021 WL 5106459, at *11 (emphasis added). Similarly, here, there is no reason to consider the extrinsic evidence Simmons purports it would offer at trial to interpret Simmons' adhesion contract.

### 4.   Individualized Extrinsic Evidence Has No Role Here

Even putting aside the fact that neither party believes the contract is ambiguous, and even if were not true that *contra proferentem* would apply to construe that ambiguity against Defendant, accountholders' subjective understandings or expectations would *still* not be relevant to interpreting the form contracts at issue here—for the simple reason that standard contracts have a standard meaning. *See, e.g.*, *Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019) ("In fact, with a form contract such as this one, uniform application and interpretation of the clauses would be expected absent evidence that the form contracts in fact had a meaning that varied from one signatory to another."); *see also* Restatement (Second) of Contracts § 211 (1981) ("Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing"). Because standardized contracts address the mass of users, the test for "reasonable expectations" is objective, addressed to the average member of the public who accepts such a contract, not the subjective expectations of an individual adherent. *Estrin Constr. Co. v. Aetna Cas. & Sur. Co*., 612 S.W.2d 413, 419-420 (Mo. Ct. App. 1981); *See also, Haines v. St. Charles Speedway, Inc.*, 874 F.2d 572, 575 (8th Cir. 1989) (citing *Estrin*).

### 5.   There is no Extrinsic Evidence of Varying Intent or Understanding

As above, ambiguity does not automatically render a breach of contract claim ill-suited for class treatment. That is especially true here, where there is no evidence of individualized understandings in the record. Here, Simmons has not brought to the Court's attention evidence demonstrating that these form contract could be, should be, or were interpreted differently by different accountholders depending upon diverse locations at which these policies were purchased or individual circumstances of individual accountholders. Plaintiffs do not rely on

extrinsic evidence at all, but rather on the contract itself and on *contra proferentem*. Even Simmons' own witness agrees with Plaintiffs' view of the contract, as explained in the opposition to the motion for summary judgment. ECF No. 94, p. 6.

In *In re U.S. Foodservice, Inc. Pricing Litigation*, *supra*, the court held that "argument[s] as to the importance of individualized extrinsic evidence as to the contract claims" failed because there—like here—the record lacked evidence that the class members' "contract negotiations or individualized conduct in performing pursuant to the contract tend[ed] to show either that the customer understood his contract to authorize the [practice] or that he otherwise acquiesced in them." *Id.* (citing *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 125 (2d Cir. 2013)).

In the instant case too, evidence in the record does not indicate that the meaning of "per item" varied from customer to customer, much less *undisputed evidence* that a *significant number* of class members were notified of Defendant's view of the meaning of its "per item" promise. Indeed, the record proves the Bank imposed identical contract on all customers, without variation. The record demonstrates, unsurprisingly, that Plaintiff and Defendants have divergent interpretations of the contract. That breach is properly characterized as a common issue is most clearly demonstrated by the fact that both sides advocate for an interpretation of the contract that would apply to all class members—Defendant asserts that "per item" means each submission of an ACH or check and Plaintiffs assert that the phrase means per order for payment by the accountholder.

### 6.   Any Extrinsic Evidence Offered Would Be Considered on a Class-Wide Basis

Here, and unlike in *Avritt*, neither party has introduced any potential evidence not common to the putative class. Even Simmons, has, after all, cited its own class-common evidence that NACHA

Rules support its version of the meaning of "item." Both parties' sources of proof are common to the putative class.

Indeed, Simmons' sole extrinsic evidence is that of the NACHA Rules and expert testimony of Mr. Nesbitt – evidence it argues uniformly supports the contract is *unambiguous* in its favor. Simmons' own witness agrees with Plaintiffs' view of the contract, as explained in the opposition to the motion for summary judgment. *See* ECF No. 94, p. 6. S*ee In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*, 270 F.R.D. 521, 530 (N.D. Cal. 2010) ("[A]s long as plaintiffs are willing to attempt to prove their claims based solely on the policy documents, and not on any oral representations ... the [c]ourt does not believe that a significant amount of individualized proof will be required."); *Claridge v. N. Am. Power & Gas, LLC*, 2016 WL 7009062, at *6 (S.D.N.Y. Nov. 30, 2016) ("In large measure, plaintiffs' claims will succeed or fail based on a determination of whether the Sales Agreement was deceptive in its description of the 'variable market based rate'—an issue that can be adjudicated through the use of common proof, and not individualized proof").

### 7. Class Members by Definition Did What the Contract Required With Respect to OD/NSF Fees

Simmons also argues that individual questions predominate because if an accountholder breaches a contract, that excuses any breach by the bank, and to determine whether the accountholder breached would be an individualized inquiry. Opp. 35. This argument is also wrong.

First, and as explained in Plaintiffs' Opposition to the Motion for Summary Judgment, Arkansas law does not create such a rule. The sole case that Simmons cites for this theory – *Ramthun v. Bryan Career College, Inc.*, 93 F. Supp. 3d 1011, 1023 (W.D. Ark. 2015), cites the Arkansas Supreme Court case, *Foreman School District No. 25 v. Steele*, 61 S.W.3d 801 (Ark.

2001), in support of this premise. *Foreman*, however, did not hold that a plaintiff must show that he or she "did what the contract required" in order to state a valid claim for breach of contract, but rather held "[a] person may be liable for breach of contract if the complaining party can prove ***the existence of an agreement, breach of the agreement, and resulting damages***." *Id.* at 807 (citing *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 33 S.W.3d 128, 133 (Ark. 2000) (same) (emphasis added).

Second, in the sole case relied upon by Simmons, the court in *Ramthun* stood ready to certify a breach of contract class—and only refrained from doing so for reasons not applicable to this case:

> Regarding the cause of action for breach of contract, common evidence might resolve whether a contract existed and whether putative class members performed or stood ready to perform. [But] there appears to be some dispute over the terms of the contract, and Plaintiffs have not demonstrated that this issue can be resolved primarily on the basis of common evidence.

*Ramthun v. Bryan Career Coll.-Inc.,* 93 F. Supp. 3d 1011, 1028 (W.D. Ark. 2015). That infirmity does not plague Plaintiffs' motion, here.

Here, the class challenges the assessment of certain OD and NSF Fees. It is difficult to conceive how a failure to perform by an accountholder could even exist, since the assessment of OD and NSF Fees are expressly contemplated by the contract. It is not a breach to overdraft – it is expressly called for in the contract, with corresponding penalties (off of which Simmons makes tens of millions of dollars a year).

### 8.  Ratification and Waiver Defense

Simmons' affirmative defenses stem from Simmons's allegation that Plaintiffs continued to pay fees after gaining some knowledge about how the Bank's fee schemes work. ECF No. 93, pp. 43-44. Whether this is even the type of conduct that could, as a matter of law, support such

defenses is a question this Court can answer on a class-wide basis. *See Miller v. Optimum Choice, Inc.*, 2006 WL 2130640, *7 (D. Md. July 28, 2006) (common affirmative defenses "do not operate to destroy the predominance of common questions across the class, but [] instead provide an additional link of commonality between the class members").

Furthermore, these defenses all require a party to have had ***full knowledge*** of the circumstances for the defense to prevail. *E.g.*, *Comerica*, 286 F.R.D. at 660; *TD Bank*, 281 F.R.D. at 678-79. Plaintiffs and the Class members, however, did not have full knowledge of Simmons' practice. Simmons did not disclose the practice of assessing multiple fees on the same "item" in the uniform disclosures provided to class members. Because Plaintiffs will use common evidence to show that they were precluded from obtaining complete knowledge of the circumstances, affirmative defenses which require full knowledge do not defeat predominance.[9] *Union Bank*, 275 F.R.D. at 678 (lack of knowledge presents common issue which "will undercut [Bank's] defenses by common evidence").

### 9.   Good Faith and Fair Dealing

Simmons argues that a separate analysis is required as to whether certification of a class is appropriate with respect to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. Opp., 36-37. But the implied covenant claim is simply part of Plaintiffs' breach of contract claim. Under Arkansas law, "every contract imposes upon each party a duty of good

---

[9] As found in *Union Bank*, "[t]o the extent [the bank] could prove that some customers learned of their secret line of credit [], yet continued to incur and pay overdraft fees, the presence of individualized defenses as to a small number of class members would not destroy the predominance of common liability questions." 275 F.R.D. at 678 n.9. Rule 23(b)(3) "tolerates some individualized issues, so long as 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members.'" *Gutierrez v. Wells Fargo*, 2010 WL 1233810, *13 (N.D. Cal. Mar. 26, 2010).

faith and fair dealing in its performance and enforcement."[10] "As is the case with the contract's express terms, the implied covenant is part of the contract and creates contractual obligations that are actionable."[11] Accordingly, violation of the implied covenant may give rise to a breach of contract claim.[12] Contrary to Simmons's assertion, Plaintiffs do not assert a standalone claim for breach of the implied covenant of good faith and fair dealing. Rather, Plaintiffs claim that Simmons breached its duty of good faith—which is a recognized part of the parties' contract under Arkansas law—when enforcing its fee policies.[13]

### 10. Olsen Can Determine Damages and Ascertain Class Members

Next, as further explained in Plaintiffs' Opposition to Defendant's Motion to Exclude (ECF No. 97), Simmons' criticisms of Plaintiffs' damages methodology are unfounded. As Olsen explained both in his declaration and at his deposition, Olsen can develop an algorithm to ascertain class members and calculate damages using standard data routinely saved by Simmons and all banks in the course of its daily operation, just as Olsen has done in dozens of similar cases in the past. Under the law of this Circuit and every Circuit, Olsen was not required to perform a full analysis at this stage. *Barfield v. Sho-Me Power Elec. Coop.*, 2013 WL 12145824, at *3 (W.D. Mo. July 8, 2013) ("the focus must be solely on principles and methodology, not on the conclusions that [the experts] generate" at the class certification stage); *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013) (Experts "need only propose a valid method for calculating classwide damages, not perform an actual calculation").

---

[10] *Aon Risk Servs., Inc. v. Meadors*, 267 S.W.3d 603, 613 (Ark. Ct. App. 2007); *In re Checking Account Overdraft Litig.*, 2013 WL 5774287, at *7 (S.D. Fla. Oct. 24, 2013) (Arkansas law).

[11] *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 732 (8th Cir. 2003) (Arkansas law).

[12] *See Affiliated Foods Sw., Inc. v. Moran*, 322 Ark. 808, 812, 912 S.W.2d 8, 10 (1995) (noting that "failure to exercise good faith raises the issue of breach of contract").

[13] SAC ¶¶ 46-51.

Olsen has provided sufficient details as to his proposed algorithm. Specifically, Olsen proposes using a lookback method which will determine whether customers were charged two or more fees on a transaction of the same amount, submitted by the same merchant, within ten business days. *See* Deposition of Arthur Olsen at 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104: 4-15 (ECF No. 88-26). Olsen can employ a similar methodology for check transactions, for which he will use check numbers to identify the same check being presented a second or third time. *Id.* at 49:20 – 50:2; 53:16 – 54:5; 79:14 – 80:14; 104:4-15. This is the same methodology that has been endorsed by other courts (*see, e.g., Darty*) and the same methodology Defendant's own expert uses when developing class lists and distributing damages in the settlement context. Kwon. Dep. at 66:15-21 ("Q: "…you would agree with me that you've used look-back periods to develop a class list and determine distribution of damages, right? A: "Yes, we have").

And even if the trier of fact were to disagree with Plaintiffs' lookback approach, Olsen could also identify "retry" transactions by relying on the "retry" label used by merchants on ACH transactions. *See* Olsen Report ¶ 25(e). While Plaintiffs contend the lookback approach is the superior method, the decision of which damages model to use is ultimately a merits issue for the trier of fact. *See, e.g., Union Bank* at 672-73 (Certifying class in reliance on declaration from Olsen and noting "[w]hile the finder of fact will ultimately have to decide which of these [damages] scenarios is most consistent with [defendant's] duty of good faith and fair dealing, Mr. Olsen will be able, at the outset, to identify all of [defendant's] customers who were harmed as compared to each of these alternative scenarios . . . The exact damages due each member of the class will then be calculated by Mr. Olsen once the fact finder has chosen the appropriate [damages] methodology").

In arguing Plaintiffs have failed to meet their burden at class certification, Simmons attempts to mischaracterize the burden at class certification as far higher than it is. Indeed, the common method for ascertaining individual damages need not be exact at the class certification stage. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (noting that though "[c]alculations need not be exact" at the class certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case") (internal quotes omitted). Rather, models that "reasonably" account for the defendant's liability are acceptable. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 348, 351 (E.D. Mich. 2001) (holding that because plaintiffs "proffered reasonable damage methodologies for measuring class-wide damages on an aggregate basis and for calculating damages for individual class members" they satisfied predominance). Courts have adopted this approach to ensure that a wrongdoer will not be able to escape liability due solely to the imprecision of damage calculations. *See* Newberg on Class Actions § 20:62 (5th ed.). While Plaintiffs must proffer a damages theory consistent with their theory of liability, at this stage, the Court must not determine whether Plaintiffs' damages theory is correct. *See DeLoach*, 206 F.R.D. at 564 ("The certification stage is not the proper forum for resolving the battle of the experts").

Through this lens, Simmons arguments crumble. <u>First</u>, Simmons complains Mr. Olsen's lookback approach is flawed. But as explained in the Opposition to the Motion to Exclude, Simmons' hypothetical criticisms are unfounded in the data. Tellingly, Simmons' own expert from frequently utilizes the exact same lookback method Plaintiffs propose here.

<u>Second</u>, the data is sufficient to conduct an analysis. Their expert admits the requisite data readily exists after November 2018, and can be recreated for prior to November 2018. See Kwon Dep. at 80:16-19; Kwon 79:2-80:7. Moreover, to the extent any data is missing, this is the

27

fault of Simmons and cannot now work to the Bank's benefit. *Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 553 (W.D. Mo. 2017) (Holding the court "will not deny relief based on the absence or inadequacy of records of the extent/amount of each class member's damages"). Also, refunds and charge-offs should not affect certification. Indeed, Ms. Kwon has trotted out the same argument in opposing class certification in 12 other cases; her record of success is 0-12. Kwon Dep. at 93:11-22. Moreover, the Eighth Circuit has already rejected the idea that the existence of credits or refunds might defeat certification in *Vogt v. State Farm Life Insurance Co.*, 963 F.3d 753 (8th Cir. 2020).

Next, all class members have standing. Unlike most of the cases cited by Simmons, this is not a case in which an expert is required to prove *if* class members were harmed by the defendant's conduct, as is often the case in securities and antitrust cases. *Cf Blades v. Monsanto Co.,* 400 F.3d 562, 575 (8th Cir. 2005); *Ford v. TD Ameritrade Holding Corp.,* 995 F.3d 616, 621 (8th Cir. 2021); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,* 247 F.R.D. 156, 176-77 (C.D. Cal. 2007); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187-88, 191 (3d Cir. 2001). Here, all class members were assessed a retry fee and, therefore, were damaged. That means all class members necessarily have been injured and necessarily have standing. *Stuart v. State Farm Fire and Casualty Co., 910 F.3d 371* (8th Cir. 2018) (Rejecting State Farm's argument to decertify class for lack of standing of certain class members because "[A] party to a breached contract has a judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged."); *see also Vogt v. State Farm Life Insurance Co.*, 963 F.3d 753 (8th Cir. 2020) (same).

Finally, Simmons is wrong to suggest the calculation of damages will be individualized here. Simmons all but ignores that these same calculations have been done by Olsen in cases that

proceeded through trial, utilizing common assumptions Olsen can use here too, as directed by the Court. *See, e.g., Gutierrez v. Wells Fargo & Co.,* 2009 WL 1247040 (May 5, 2009). Simmons also ignores that Kwon herself testified she could ascertain the class and calculate damages if a class was certified here. Kwon Dep. at 104:14-21.

Furthermore, Defendant in no way addresses Plaintiffs' argument that the requirements of ascertainability are relaxed at the class certification stage. ECF No. 91, p. 18.

For the foregoing reasons, it has been clearly established that Plaintiffs' expert can programmatically calculate damages and ascertain class membership. However, even if the Court concluded differently, Plaintiffs are still entitled to certification to determine liability.

### C. Plaintiffs can easily demonstrate "predominance" as to their unjust enrichment claims.

Defendant is under the misapprehension that "predominance" is not usually found in unjust enrichment cases. *See* ECF No. 93, pp. 44-48.

First, there is a choice of law provision that applies Arkansas law to all class members.[14] Despite Defendant's contention to the contrary, courts have found that unjust enrichment claims are ideally suited for class treatment, even with multistate classes. Indeed, the basic principle underlying a claim of unjust enrichment is that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement (First) of Restitution § 1 (1937). "Although there are numerous permutations of the elements of the cause of action in the various states, there are few real differences." *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007), vacated on other grounds, 328 Fed. Appx. 121 (3d Cir. 2009). The basic elements of the claim are that "the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff." *Id.*

---

[14] See, e.g., May 2013 Terms & Conditions; August 2017 Terms & Conditions; October 2019 Terms & Conditions.

District courts in Arkansas have certified multi-state unjust enrichment classes. See, e.g., *Mojica v. Securus Techs., Inc.*, 2017 WL 470910 (E.D. Ark. Feb. 3, 2017).

Indeed, as courts have observed, claims of unjust enrichment are often especially well-suited for class treatment because they are established largely based on the conduct of the defendant. See, e.g., *Martinez v. Wells Fargo Bank*, N.A. (In re Checking Account Overdraft Litig.), 307 F.R.D. 630, 647 (S.D. Fla. 2015) ("the claim is well-suited for multi-state class treatment by virtue of its uniform availability and focus on the defendant's ill-gotten gain."); *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 613 (D.S.D. 2004) ("In looking at claims for unjust enrichment, we must keep in mind that the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs. That is a universal thread throughout all common law causes of action for unjust enrichment").

Despite Defendant's claim to the contrary, Simmons affirmative defenses (notably voluntary payment doctrine and unclean hands) do not create individualized issues. ECF No. 93, p. 47. First, courts rarely refuse class certification on the basis of affirmative defenses. See, e.g., *Newberg on Class Actions* § 4:57 (5th ed.) ("affirmative defenses ... rarely defeat class certification."); In re *Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) ("where common issues otherwise predominate[], courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses."); *Bridging Cmties. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016) (noting that "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones").

Next, individual questions "are permissible [in a certified class] if they do not 'overwhelm questions common to the class.'" *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 798 (8th Cir. 2014), aff'd, 136 S. Ct. 1036 (2016) (quoting Comcast, 133 S. Ct. at 1433). Indeed, unjust enrichment classes may be certified despite the existence of individual issues. In *Mojica*, 2017 U.S. Dist. LEXIS 15096 at *26, the court held that certifying two unjust enrichment sub-classes based on differing statute of limitations, stating: "because the critical issue here for purposes of predominance is not whether the elements vary, but rather **whether common evidence can be used to satisfy them in a prima facie case**." *Id.* (emphasis added.)

Here, as explained more fully herein, the common evidence regarding whether Defendant was allowed to charge the "retry fee" will resolve **or not** Plaintiffs' unjust enrichment claims against Defendant.

Furthermore, there is no evidence that Plaintiff made a "voluntary" payment, and in fact even knew about the assessment of the "retry fee." Defendant's algorithmic program assesses the fee and takes the money out of Plaintiff's account. Courts, including the Arkansas Supreme Court, have recognized that the existence of circumstances that renders a payment involuntary for purposes of a voluntary payment defense. See, e.g., *Ark. Nat. Gas Co. v. Norton Co.*, 263 S.W. 775, 778-79 (Ark. 1924) (holding that a gas utility charging excessive rates and a "consumer were in no sense on equal terms, and the money thus paid to obtain the necessary service was not voluntarily paid as the law interprets that phrase"). Defendant's unilateral assessment and charging of the 'retry fee' that is challenged in this class action are those circumstances that make Plaintiff and class members payment involuntary.

Finally, there are exceptions under Arkansas law because the voluntary payment doctrine generally does not apply to payments made under a mistake of fact. "The voluntary payment

doctrine holds that 'payments which are voluntarily made cannot be recovered except for payments made as a result of duress, fraud, mistake or failure of consideration." *Gautrau v. Long*, 271 Ark. 394, 396 (Ark. Ct. App. 1980). As explained more fully herein, Plaintiff never contractually agreed to pay to "retry fee" so to the extent that it was paid, it is a mistake of fact. In any case, the determination of whether it was a mistake of fact or not as defendant's uniform conduct will also be a common question that predominates.

For the foregoing reasons, Plaintiff has easily established "predominance" as to their unjust enrichment claims.

### D.    A Class Action is the Superior Method to Resolve this Dispute.

Defendant claims Plaintiffs cannot show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because "individual issues predominate in the way they do here—including in the identification of class members—courts find that the proposed class does not satisfy Rule 23's superiority requirement."  (Memo. at  50). Simmons argues that the availability of arbitration "is another factor weighing against a finding that the class action is 'superior'" to individual actions, citing *Baum v. Great W. Cities, Inc. of N.M.*, 703 F.2d 1197, 1210 (10th Cir. 1983); *Drake v. Morgan Stanley & Co., Inc.*, 2010 WL 2175819, at *9 (C.D. Cal. Apr. 30, 2010); (finding arbitration superior to class action); *Cardiovascular Care of Sarasota, P.A. v. Cardinal Health, Inc.*, 2009 WL 928321, at *7 (M.D. Fla. Apr. 3, 2009) (same); *Telco Grp., Inc. v. Ameritrade, Inc.*, 2007 WL 203949, at *11 (D. Neb. Jan. 23, 2007) (same). *Id.*

"The superiority requirement involves showing 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Perras v. H & R Block*, 789 F.3d 914, 916 (8th Cir. 2015), quoting Fed. Civ. P. 23(b)(3). Class actions are

superior when "the class members' claims are generally small and unlikely to be pursued individually." *Custom Hair Designs by Sandy*, 984 F.3d at 605 (citing *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018); *see also,* In re *Engineering Animation Securities Litigation*, 203 F.R.D. at 422 (S.D. Iowa 2001) (emphasis added) ("superiority is met in this case as the class action **is the most realistic alternative for class members**.")  For example, in the case of *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 605 (8th Cir. 2020), the class, over 160,000 small retailers using CPAY for credit card processing, brought a class action against CPAY, challenging certain of their fees, not unlike Plaintiffs in this *instant* litigation. The Eighth Circuit held in CPAY that:  "A class action is the superior mechanism to try this case. Plaintiffs' individual claims are for tens or hundreds of dollars. Absent a class action, no plaintiff is likely to pursue their claim individually." *Id.*

Here, and first, Defendant never challenges the most basic principle that the superiority requirement is met based on this question:  are class members' claims generally small and unlikely to be pursued individually?  The answer to both of these questions is yes. Also class members do not know about Simmons challenge practice of charging "retry fees" because Defendant conceals it from the class.

Next, as indicated in the predominance section, individual issues do not predominate, and, therefore, like with predominance, Plaintiff can demonstrate superiority. Also, the *CPAY* case as well disposes of this argument. CPAY argued that certain contracts authorized the challenge fees, while other ones did not, and also that the fee price varied per customer, which would require an individual inquiry; therefore, the requirements of 23(b)(3) were not met. To this argument, the Court held that Plaintiffs' expert, in calculating damages, need identify only whether a contract authorized the challenged fees, and because this inquiry is not highly

individualized, it does not defeat predominance or superiority. CPAY, 984 F.3d at 605. Accordingly that plaintiff had to look at 160,000 files (presumably with many pages in each) to identify class membership in that they were subject to the challenge fees did not defeat the requirements of 23(b)(3) for predominance or superiority.

Here, Simmons argues (as did CPAY) that individual issues predominate, notably the identification of class members that were subject to the "retry fee" will necessitate an individual inquiry, but consistent with the C ourt's holding in CPAY, this does not defeat a finding of predominance or superiority.

Furthermore, as to Defendant's argument as to a finding of superiority that the availability of arbitration and that "no rational person would elect to have their claims brought by the uniquely unsuitable representatives proffered here (see supra Part I) over no-cost arbitration," Defendant once again fails to challenge the most basic principle that the superiority requirement is met when class members' claims are generally small and are unlikely to be pursued individually, **and this includes in arbitration**. The notion that a class member would on their own file an arbitration, contact Defendant Simmons to cover the filing fee, when the alleged "retry" charge was fraudulently kept from them is a delusional one. Notably, Simmons has put forth no evidence that any customer class member has ever initiated an arbitration against Defendant over the challenged retry fee. That Defendant pays for the arbitration is an immaterial point because class action attorneys and the class action treatment also bear the expense of litigation for Plaintiff and class members.

To Defendant's 'no rational person' argument, the holding of *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) provides the necessary rebuttal: "The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a

lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative--no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied--to no litigation at all."  Likewise, only a lunatic or a fanatic would initiate an arbitration over a $36.00 retry fee.

For the foregoing reasons, Plaintiff has established that a class action is the superior way to resolve this litigation.

### E.     Rule 23(b)(2) Certification is Also Warranted

Defendant claims that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages" (*Wal-Mart*, 564 U.S. at 360–61) and on this basis opposes Plaintiff's certification of a 23(b)(2) class. *See* ECF No. 93, pp. 52-55

Nevertheless, post Wal-Mart decision, district courts have certified Rule 23(b)(2) as to the declaratory and injunctive relief claim. With respect to Plaintiff's claim for declaratory judgment and injunctive relief, the proposed Class satisfies Rule 23(b)(2) because Simmons "has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). See *Vogt*, 2018 WL 1955425, at *7 (certifying the plaintiff's declaratory judgment claim under 23(b)(2) for purposes of interpreting the Policy because "the terms of the Policy are the same for all potential class members, [and therefore] the interpretation will result in one declaratory judgment applicable to all class members"); *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 395 (N.D. Cal. 2020)  (same, stating: "The terms of Form 94030 are the same for all prospective Class members, so an injunction or declaration relating to the contract terms will be uniform.");   *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 558-559 (W.D. Tex. 2020)

(approving of "'divided certification,' certifying the damages claims under Rule 23(b)(3) while certifying the injunctive relief under 23(b)(2)").

As such, the Court is able to craft equitable relief related to Simmons' practices of charging "retry fees" that will equally benefit all of Simmons dusters, including all members of the Injunctive Class. Accordingly, should the Court grant injunctive relief that requires Simmons to change its practice of charging retry fees, all members of the class would equally benefit. See *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."

Furthermore, despite Defendant's contentions to the contrary, Defendant's only challenge to the cohesiveness of Plaintiffs' claims is to reassert the same discredited here arguments raised in opposition to Plaintiff's motion for certification pursuant to Rule 23(b)(3). Plaintiff is challenging Defendants' uniform policies and practices of assessing retry fees as to the entire class, Rule 23(b)(2) is clearly satisfied. *H & T Fair Hills, Ltd. v. All. Pipeline L.P.*, 2021 WL 2526737, at *12 (D. Minn. June 21, 2021).

For example, in *H & T Fair Hills, Ltd. v. All. Pipeline L.P.*, Defendant argues that the proposed class here is not cohesive because of issues related to identifying class members, proving causation related to crop loss, and calculating damages (individualized issues predominate), to which Plaintiffs responded that a declaratory judgment is essential to confirm Defendant's obligations under the contracts at issue. 2021 WL 2526737, at *12-13. The court found that Plaintiffs have satisfied Rule 23(b)(2) because a declaratory judgment would clarify defendant's obligations under the contract. *Id.*

Here, Plaintiffs have satisfied Rule 23(b)(2) because a declaratory judgment would clarify Defendant's obligations under the terms and conditions whether it has the right or not to assess the retry fee.

Finally, as to Defendant's standing arguments regarding former customers, here there is no dispute that all class members were overcharged fees. That means all class members necessarily have been injured and necessarily have standing. *Supra, Vogt v. State Farm Life Insurance Co.*, 963 F.3d 753 (8th Cir. 2020) (same). Accordingly, as Plaintiffs have standing for damages, the case law holds that Plaintiffs also have standing for other forms of relief, such as injunctive and declaratory. See *Smith v. City of Fontana,* 818 F.2d 1411, 1423 (9th Cir. 1987) (holding that standing for a damages claim satisfies Article III standing with respect to other forms of relief "involv[ing] the same operative facts and legal theory"); *Giles v. Ackerman*, 746 F.2d 614, 619 (9th Cir. 1984) (treating the presence of a related damages claim as satisfying Article III standing, thereby allowing the court to consider "whether relief in addition to damages is appropriate"); *Gonzales v. City of Peoria*, 722 F.2d 468, 481 (9th Cir. 1983) (concluding that the presence of a damages claim "present[ed ] a case in controversy as to injunctive relief").

## CONCLUSION

For the reasons set forth herein, Plaintiffs ask that this Court GRANT their Motion for Class Certification.

Respectfully submitted this the 14th day of February, 2022.

E. Adam Webb
G. Franklin Lemond, Jr.
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com
Franklin@WebbLLC.com

William F. Burns, III (2008019)
WATSON BURNS, PLLC
253 Adams Avenue
Memphis, Tennessee 38103
(901) 529-7996
fwatson@watsonburns.com

Jeffrey Kaliel
KALIEL PLLC
1875 Connecticut Avenue NW
10th Floor
Washington, DC 20009
(202) 350-4783
jkaliel@kalielpllc.com

Tiffany M. Yiatras
Francis J. "Casey" Flynn, Jr.
CONSUMER PROTECTION LEGAL, LLC
308 Hutchinson Road
Ellisville, Missouri 63011
tiffany@consumerprotectionlegal.com
casey@consumerprotectionlegal.com

Lynn A. Toops
COHEN & MALAD, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
(317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch , IV
BRANSTETTER, STRANCH & JENNINGS
PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37204
(615) 254-8801
gerards@bsjfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of February, 2022, I electronically filed the foregoing document with the clerk for the United States District Court for the Eastern District of Arkansas using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to attorneys of record, who have consented in writing to accept this Notice as service of this document by electronic means.

> E. Adam Webb
> WEBB, KLASE & LEMOND, LLC
> 1900 The Exchange, S.E.
> Suite 480
> Atlanta, Georgia 30339
> (770) 444-0773
> Adam@WebbLLC.com