IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

SHUNDA WILKINS and
DAVID WATSON, on
behalf of themselves and
all others similarly situated                                            PLAINTIFFS

v.                          No. 3:20-cv-116-DPM

SIMMONS BANK                                                              DEFENDANT

## ORDER

The typical consumer doesn't spend much time thinking about what happens when he or she pays a bill online. The immediate concern is whether the transaction goes through. Behind the scenes, though, much happens. The funds are processed through a complex computer network known as an automated clearing house—the ACH. As the name indicates, the system is largely automatic, but participating banks, such as Simmons, must ensure that they comply with an elaborate set of operating rules and guidelines. Wilkins and Watson are former customers of Simmons. This case is about the fees Simmons charged them and other customers on what the parties aptly call "retry" transactions processed through the ACH system when an account was overdrawn. The customer agreements Wilkins and Watson signed allowed Simmons to charge them one fee "per item"

returned for insufficient funds. Whether a retry counts as an "item" is the core of this dispute.

Wilkins's and Watson's checking accounts came with a $500 overdraft protection feature. If their accounts lacked sufficient funds to cover an order or request for payment, Simmons could choose to either pay it and assess the accountholders a paid-item fee, or return it to the originating bank and assess a return-item fee. Either way, Wilkins and Watson agreed in their account documents to be on the hook for the $30–$35 fee "per item." Eventually, both their accounts ended up in the red. When payment requests came through, Simmons returned them and assessed return-item fees. Days later, the payees—Liberty National Life Insurance (Wilkins), and Verizon Wireless and Progressive Insurance (Watson)—re-submitted their requests for payment. Simmons again returned them and again assessed fees. Wilkins and Watson contend that this second fee assessment was a breach of the "per item" provision in their contracts because Simmons had already charged a fee on the underlying transaction, or "item." Simmons responds that "item" refers to each payment request it receives and processes, not to the underlying transaction.

To support its interpretation of the contract's term, Simmons points to the rules governing the ACH network. These are known to the banking industry as the "NACHA rules," a reference to the non-profit organization that writes, maintains, and enforces them.

Under those rules, every order or request for withdrawal is a "debit Entry." In turn, every debit Entry is deemed an "item" as the term is used in the Uniform Commercial Code. *E.g.*, ARK. CODE ANN. § 4-4-104. After Simmons returns an Entry unpaid, the rules provide that the payment request may be "Reinitiated" two more times within 180 days. Each of these attempts is a debit Entry—and, as Simmons sees it, a new "item." But, as Wilkins and Watson point out, the NACHA rules don't govern how Simmons will assess fees. That's what the parties' contract is for. They argue that "per item" is ambiguous and should therefore be construed against Simmons because it drafted all the account-related documents.

The parties have completed discovery. Wilkins and Watson ask the Court to certify a class and proceed to trial. Simmons argues that's unnecessary because, it says, the contract should be interpreted in the Bank's favor. Simmons seeks summary judgment on the former customers' claims for unjust enrichment and breach of contract. The parties have also filed dueling motions asking to exclude key experts. The Court regrets its delay in addressing the well-briefed issues.

*Unjust Enrichment*

For various reasons, Simmons is entitled to judgment as a matter of law on the unjust enrichment claims.

Watson's claim is untimely. He paid the last fee in February 2016, but the original complaint in this case was filed in April 2020, more than three years later. His claim is barred by ARK. CODE ANN. § 16-56-105. *Graham v. Catamaran Health Solutions LLC*, 940 F.3d 401, 408 (8th Cir. 2017). Arkansas follows the occurrence rule. *Ibid.* And the challenged fees were obvious on Watson's bank statements. No fraudulent concealment occurred.

The defects in Wilkins's unjust enrichment claim are matters of substance rather than timing. Tennessee law controls because she's a Tennessean. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 221 (1971). The claim was pleaded, explored in discovery, and briefed based on the undisputed fact that Wilkins never paid the one $35 fee that she contests—the bank closed her account with a negative balance of approximately $545. The Court granted Simmons summary judgment on its counterclaim for this debt, less the challenged fee. *Doc. 62.* Wilkins recently tried to fill this hole by repaying the bank. *Doc. 106.* But the record was fixed long ago. No reasonable fact finder could conclude, taking that record in the light most favorable to Wilkins, that the Bank was unjustly enriched by doing business with her. *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005). Simmons lost money. In the old phrase, there is no equity in Wilkins's favor.

The unjust enrichment claims therefore pass out of the case.

*Contract Claim—Wilkins*

There is another threshold issue of law. Wilkins committed the first material breach. It is undisputed that she failed to bring her overdrawn account current for more than thirty days before the Bank assessed the only fee she challenges—a fee for retrying a recurring monthly charge for a life insurance premium through Liberty National. The Bank's "overdraft privilege disclosure" required Wilkins to bring her account current within a month after becoming overdrawn. *Doc. 88–5 at 6.* This document was one part of the parties' multi-part contract. *Doc. 95 at 1–2.* Wilkins's inaction was a material breach—balance requirements are at the core of the relationship between any bank and its customers. *Taylor v. George*, 92 Ark. App. 264, 272–73, 212 S.W.3d 17, 23–24 (2005). Wilkins may not recover on a contract she broke first in a material way. Wilkins acknowledges that her good faith and fair dealing claim is merely an aspect of her breach claim. *Doc. 15 at 19–20.* This is settled law. *Arkansas Research Medical Testing, LLC v. Osborne*, 2011 Ark. 158, at 4, 2011 WL 1423993, at *2. Wilkins has no solid pleaded claim. She will remain in the case only as to Simmons's counterclaim.

*Experts*

Before the Court can address Watson's breach claim, it must resolve the expert issues. Watson's motion to exclude the Bank's expert, Gary Nesbitt, is denied as untimely. The motion came

approximately six weeks after the deadline in the Court's Third Amended Final Scheduling Order; no request to file out of time was made; and no good reason for the delay has been offered. *Doc. 66 at 2*; *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715–17 (8th Cir. 2008). But, it would be plain error for the Court to receive testimony from Simmons's expert on what the parties' contract means. *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). Nesbitt has provided testimony about how the ACH system operates and how the term "item" is treated in the NACHA rules and in the banking industry in general. To the extent Nesbitt's testimony drifts into a legal opinion regarding what the parties' contract means, the Court will disregard it. Otherwise, though, this testimony is relevant and admissible.

Simmons's motion to exclude Watson's expert, Arthur Olsen, presents vexed issues. The parties agree on the governing law: Federal Rule of Evidence 702, as construed in *Daubert* and its progeny. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The first consideration under Rule 702 is Olsen's qualifications. FED. R. EVID. 702(a). They're stellar. And Simmons does not challenge them. He is a data expert. For many years he has been involved in much bank-fee litigation, including an overdraft fee MDL. *In re Checking Account Overdraft Litigation*, 275 F.R.D. 666, 672–73 (S.D. Fla. 2011).

Olsen proposes to mine Simmons's data to identify individuals who paid retry fees, calculate their damages, and make adjustments to account for fee refunds and account charge offs. He says he could do so. Olsen's expertise in doing these kinds of calculations (through algorithms and other math) would help the Court on certification issues and the jury on the merits. Rule 702(a) is satisfied in a general sense, though the unfinished and limited nature of Olsen's work so far creates shadows.

Olsen insists that sufficient facts and data exist for him to do his work. He was unequivocal about this on deposition. He recently worked on another Simmons case and is familiar with the Bank's data sets. *See Walkingstick v. Simmons Bank,* No. 6:19-cv-3184 (W.D. Mo.). Simmons makes several responding points that could be seen as challenges to the sufficiency of the available data. For example, the Bank criticizes the proposed ten-day lookback approach for identifying class members, and it questions how Olsen could account for refunded fees and charge offs. The Court concludes, however, that these criticisms are better analyzed as matters of reliability. Rule 702(b) is satisfied.

Next, methodology. Is Olsen's testimony "the product of reliable principles and methods[?]" FED. R. EVID. 702(c). Yes, but. Simmons has no quarrel with the mathematical principles involved. Olsen has

used them in many cases. But Simmons criticizes some of Olsen's methods for this case.

The ten-day lookback period is imperfect. It is underinclusive—because the NACHA rules allow two retries within one hundred eighty days. And it is overinclusive—because it would capture recurring but separate charges in the same amount, such as a weekly parking fee or favorite meal. Olsen's explanation for why he chose to use the ten-day period raises a flag. He says that Plaintiff's counsel suggested it, and he acknowledges not knowing why or how Plaintiff's counsel selected that timeframe. *Doc. 88–26 at 38*. As to refunds and charge offs, Olsen testified that he could account for these, as he's done in other cases, but did not specify exactly how he would do so. Nor has he provided the Court with any specific cases where he has actually done so.

Simmons's critique of Olsen's methodology is strong but not necessarily dispositive. Olsen testified that he will be able to identify resubmitted transactions using the data stored in Simmons's core processor because "banks that don't assess multiple fees on the same item use the same data points and the same methodology to identify the retries." *Doc. 88–26 at 36*. This is a solid indicator of a reliable method. Olsen's assurances, however, are undermined by the failure to test these methods against any of the data Simmons provided. The Court is less skeptical about the proposed look-back period. A ten-day or seven-day period has been used in other retry cases. *Doc. 88–26 at 38*.

And Simmons's expert confirmed the use and usefulness of a lookback period. *Doc. 91–26 at 17–18.* The Court agrees with Watson that charge offs are a matter of damages and do not undermine the methodology. Refunds present a closer issue. If customer X got a refund for a retry-related fee, then she has no claim. Olsen believes that he can address the charge off and refund issues, but does not describe his plan for doing so.

On the whole, Olsen's experience-based methodology seems sufficiently reliable to support admissibility. FED. R. EVID. 702(c). Reliability does not require perfection. The assumptions and imperfections of Olsen's methodology could be tested after he does the work and in the clash of expert opinions, and in cross-examination at trial. The core of Simmons's critique here concerns matters of weight, not admissibility. *In re Bair Hugger Forced Air Warming Devices Products Liability Litigation,* 9 F.4th 768, 778 (8th Cir. 2021).

The Rule's last requirement is application. Olsen must have "reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702(d). Olsen did not do so. He hasn't created the computer code or algorithm that he proposes to run on the Bank's data. *Doc. 88–26 at 27.* Details about the proposed algorithm's capabilities and limitations are scarce. And it remains untested on Simmons's data. While Olsen did not have access to a complete production of customer data, the Bank produced 17 million rows of data related to more than

82,000 customer accounts. *Doc. 103 at 10.* This was more than enough data to develop and test the algorithm. The parties agreed to this sample production because of the costs associated with a full production covering the class period. This work-around was reasonable. The parties' agreement has an unspoken consequence: If a class is certified, there would be a full production, and then a full calculation/opinion by Olsen. Those needed steps would supply good cause for amending the deadlines in the Third Amended Final Scheduling Order, which did not contemplate supplemental expert opinions. *Doc. 66.* So, the Court does not fault Olsen's work for not analyzing data which the parties agreed to hold back.

But Olsen did not apply his algorithm to the sample data or apply it to determine the named plaintiffs' membership in the proposed class. Instead, he consulted various bank statements and notices of insufficient funds for each of them individually. *Doc. 88–26 at 19.* This omission makes it difficult, if not impossible, for the Court to decide whether he has "reasonably applied" his algorithm to this record. He doesn't contend that there was insufficient data to conduct these test runs. Olsen was candid: he has not tested his algorithm on the data produced in this case; he was not asked to do so; he has tested algorithms using the same data points in other cases; and there would be no material difference here. *Doc. 88–26 at 34.*

–10–

Here, then, is the situation with Olsen. The Court confronts a well-qualified expert with loads of experience. His methodology seems sound. But he has not yet applied that methodology "to the facts of the case." FED. R. EVID. 702(d). The law requires reliable application of a reliable methodology. Can Olsen's experience, and use of a similar algorithm in other cases, fill the application gap? Perhaps—except that most of those other cases (including the MDL) involved resequencing, rather than retries. *E.g., In re Checking Account Overdraft Litigation*, 307 F.R.D. 656, 665–66 (S.D. Fla. 2015). In at least one retry case, Olsen has been accepted as an expert and a class was certified. *Doc. 91-1* (citing *Darty v. Scott Credit Union*, No. 19L0793 (Cir. Ct. St. Clair County, Illinois, 19 July 2021)). It's not clear what the state of the record was there when Olsen was accepted; a relaxed *Daubert* standard applies early in the case before discovery on the merits is complete and the sole issue is certification. *In re Zurn Pex Plumbing Products Liability Litigation*, 644 F.3d 604, 613–14 (8th Cir. 2011). An analogy to peer review helps here. This record does not contain sufficient information showing that Olsen has successfully developed and applied his algorithm in a sufficient number of retry situations for the Court to hold that it can necessarily be reliably applied to the facts of this case. Olsen could have refined his algorithm and applied it to Simmons's sample data. That test would have shown clearly, one way or the other, whether application of his methodology in this case was sufficiently reliable.

He did not do so. Too much uncertainty remains. The Court therefore excludes Olsen's opinions.

*Contract Claim – Watson*

Now, to the contract between Watson and Simmons. It includes several documents, including the deposit agreement, the overdraft privilege account disclosure, and the schedule of fees and charges. *Doc. 41 at 3*. The disputed issue is ambiguity. Whether language in a written contract is ambiguous is a question of law. *Smith v. Prudential Property and Casualty Insurance Co.*, 340 Ark. 335, 340–41, 10 S.W.3d 846, 850 (2000). This Court's preliminary conclusion, early in the case, was that the term "per item" was ambiguous because the parties' interpretations were equally reasonable. *Doc. 41 at 3–4*.

On the basis of our full record, Simmons disagrees. It contends that the NACHA rules are incorporated into the parties' agreement. Drawing on those rules and referring to the term "item" as it is defined in the UCC, Simmons argues that the contract's use of the term is unambiguous. In its Order on the motion to dismiss, the Court found that the NACHA rules were incorporated into the parties' contract. *Doc. 41 at 3*. But the Court spoke too quickly on this issue. Although the contract's reference to the NACHA rules is clear and unequivocal, there is no indication in the record that the Bank's customers "had knowledge of and assented to the incorporated terms."

*Ingersoll-Rand Co. v. El Dorado Chemical Co.*, 373 Ark. 226, 233, 283 S.W.3d 191, 196 (2008).

Of course Simmons is well familiar with the NACHA rules and legal creatures such as "debit Entry" and "item." Customers such as Watson are not. The NACHA rules are hundreds of pages long. Access to them is not free; a copy of the full set of rules costs approximately $100. Simmons explains that "any member of the public can obtain a free, basic set of NACHA Rules from the website for the Rules." *Doc. 100 at 35–36.* Yet the bank acknowledges that "[t]o do so, one must create [a website account], then click on a link to claim a subscription, then redeem the subscription after checking a box indicating no subscription code, then click to access the basic set of Rules." *Doc. 100 at 36 n.10.* It's unreasonable to expect customers to perform that many steps just to get access to a modified version of "incorporated" contract documents. It is also unclear whether the basic set of rules contains the necessary information regarding retries. Although Simmons argues that it would provide the full set of rules to any customer who asked, the Bank provides no testimony that this offer is in fact the standard drill. And there is no record evidence that customers are informed about or assented to even a summary of key NACHA rules impacting their agreement with Simmons. The Court therefore concludes that the rules were not incorporated into the

-13-

parties' contract. The ambiguity of the term "item" persists beyond the contract's four corners.

The Court may still consider the NACHA rules as extrinsic evidence in interpreting the meaning of this ambiguous term. *JMD Construction Services, LLC v. General Construction Solutions, Inc.*, 2019 Ark. App. 268, at 5–6, 577 S.W.3d 50, 53–54. Simmons argues that the rules establish the meaning of "item" as a settled term of art in the banking industry—it means a request or demand for payment. The rules allow for repeated requests, the argument goes, and so the Bank can charge a fee for each try. But Simmons has not offered any evidence to establish that Watson (or any of the Bank's customers) actually knew about this usage of the term in the NACHA rules, or that the usage was applied so universally by the banking industry that Watson (or any average depositor) must be presumed to have known of its existence. *See* RESTATEMENT (SECOND) OF CONTRACTS § 220 (1981); 12 SAMUEL WILLISTON & RICHARD LORD, WILLISTON ON CONTRACTS § 34:15 (4th ed. 1993).

To the contrary, Watson responds with several examples where other banks treat each underlying transaction as the item. *Doc. 94 at 17–21.* Those banks' customer agreements specifically allow them to charge multiple fees on a particular "item" based on the number of times the item is submitted, or resubmitted, for payment. For instance:

- "YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION." *Doc. 94 at 17* (quoting *Terms and Conditions of FHB Online Services*, First Hawaiian Bank (2021)).

- "If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment . . . ." *Doc. 94 at 18* (quoting *Deposit Agreement*, Regions Bank (2018)).

- "You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. . . . Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment . . ." *Doc. 94 at 18* (quoting *Terms & Conditions*, Andrews Federal Credit Union (2020)).

- "We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned." *Doc. 94 at 20* (quoting *Overdraft and Unavailable Funds Practices Disclosure*, Community Bank, N.A. (2019)).

Watson's evidence demonstrates that banks don't universally apply a strict NACHA usage where the term "item" appears in their customer agreements.

–15–

Is a trial necessary to determine what the parties' contract means? The need for extrinsic evidence to liquidate the contract's meaning is not determinative. To create a jury question, the extrinsic evidence must be disputed. *Smith*, 340 Ark. at 341, 10 S.W.3d at 850. Here the parties disagree over the NACHA rules' legal effect, but those rules are what they are; there is no dispute that they exist. Likewise, the practices of other banks are what they are. They're also undisputed. After considering the parties' evidence, no reasonable factfinder could conclude that the hypothetical reasonable depositor knew (or should have known) the definition of "Entry" on page OR63 of the NACHA rules, and then, in turn, understood and assented to multiple overdraft charges for retries. Because the meaning of "item" doesn't depend on *disputed* extrinsic evidence, the contract's construction remains a question of law. *Ibid.* Under settled Arkansas law, it must be construed against the drafter, Simmons, because the Bank prepared all the forms that make up the parties' contract. *Stacy v. Williams*, 38 Ark. App. 192, 198, 834 S.W.2d 156, 159 (1992); *Price v. Willbanks*, 2009 Ark. App. 849, at 6, 374 S.W.3d 28, 32.

The latent ambiguity in the "per item" term resolves in Watson's favor. That seems to be the only fighting issue of liability on his contract claim. Watson, though, has not sought summary judgment. The Court therefore looks forward to briefing from the parties in due course about whether trial is needed on any remaining liability issue.

*Class Certification*

Does this case proceed for Watson alone or for similarly situated customers? Watson seeks to certify the following class under Rule 23(b)(2) and (b)(3):

> All persons who, within the applicable statute of limitations period, were charged Retry Fees—NSF Fees or Overdraft Fees—on an item that had already been subject to an NSF Fee in a Simmons checking account.

Rule 23(a) requires that the Court satisfy itself, "after a rigorous analysis," that four threshold prerequisites are met. *Ebert v. General Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016). The first two are easily met here. First, a bank of Simmons's size no doubt has checking accounts with thousands of customers, which makes joinder impossible and satisfies numerosity. FED. R. CIV. P. 23(a)(1). Second, whether Simmons's assessment of a retry fee is a breach of contract is a common question capable of classwide resolution. The class members' contracts contained materially identical provisions on the subject. Rule 23(a)(2) is satisfied.

Watson's suitability as class representative falters, though, when the Court considers the typicality of his claim and whether he can adequately represent the class. Watson is the only proposed class representative, so he "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). The putative class seeks a full spectrum of legal and

equitable remedies, including declaratory and injunctive relief. *Doc. 15 at 21–22.* But Watson is not a current Simmons customer, so he does not have standing to seek injunctive relief. *Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1161–62 (8th Cir. 2019). Watson therefore cannot be a member of a (b)(2) class, and he cannot, on behalf of a (b)(3) class, stop Simmons from making future fee assessments. Whether Simmons can charge retry fees in the future is of significant interest to current checking account holders. Even if he did have standing, Watson has no incentive to pursue these interests. In his deposition, he has explicitly disavowed any interest in the Bank's current practices or in protecting current checking account holders from future retry fees. *Doc. 88–4 at 31.* The Court is far from assured that Watson could adequately represent the interests of all proposed class members in these proceedings.

Without expert testimony of the sort Olsen proposed to offer, Watson cannot demonstrate that Simmons's liability to all class members can be established with common evidence, which is essential to meet the predominance requirement of Fed. R. Civ. P. 23(b)(3). *Avritt v. Reliastar Life Insurance Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010). And, without Olsen's testimony, Watson has not established that class members can be clearly identified by reference to any available "objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998–99 (8th Cir. 2017) (*per curiam*). Therefore, his case may only proceed on an individual basis.

To sum up: Simmons is entitled to summary judgment on Wilkins's claims. Nesbitt's expert testimony is admissible as trimmed. Olsen's testimony is excluded. Without it, no damages class can be certified. Simmons is entitled to summary judgment on Watson's unjust enrichment claim, but his individual breach of contract claim survives. On 9 March 2023, the parties may submit simultaneous supplemental briefs about whether any liability issues remain in light of this Order. Please strive for brevity.

\* \* \*

Motion for summary judgment, *Doc. 79*, partly granted and partly denied. Wilkins's claims are dismissed. Motion to exclude testimony, *Doc. 85*, granted. Motion to exclude testimony, *Doc. 96*, denied with a caveat. Motion for class certification, *Doc. 90*, denied.

So Ordered.

*DPMarshall Jr.*

D.P. Marshall Jr.
United States District Judge

9 February 2023